| | |
|---|---|
| XAVIER BECERRA<br>Attorney General of California<br>SARAH E. MORRISON<br>ERIC KATZ<br>Supervising Deputy Attorneys General<br>CATHERINE M. WIEMAN, SBN 222384<br>TATIANA K. GAUR, SBN 246227<br>ROXANNE J. CARTER, SBN 259441<br>JESSICA BARCLAY-STROBEL, SBN 280361<br>Deputy Attorneys General<br>　300 South Spring Street, Suite 1702<br>　Los Angeles, CA 90013<br>　Telephone: (213) 269-6329<br>　Fax: (916) 731-2128<br>　E-mail: Tatiana.Gaur@doj.ca.gov<br>*Attorneys for Plaintiff State of California, by and through Attorney General Xavier Becerra and California State Water Resources Control Board*<br>*[Additional Parties and Counsel Listed on Signature Page]* | LETITIA JAMES<br>Attorney General of the State of New York<br>PHILIP BEIN<br>Senior Counsel<br>TIMOTHY HOFFMAN*<br>Senior Counsel<br>　Office of the Attorney General<br>　Environmental Protection Bureau<br>　28 Liberty Street<br>　New York, NY 10005<br>　Telephone: (716) 853-8465<br>　Fax: (716) 853-8579<br>　Email: Timothy.Hoffman@ag.ny.gov<br>*Attorneys for Plaintiff State of New York* |

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA BY AND THROUGH ATTORNEY GENERAL XAVIER BECERRA AND CALIFORNIA STATE WATER RESOURCES CONTROL BOARD, STATE OF NEW YORK, STATE OF CONNECTICUT, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA ex re. ATTORNEY GENERAL JOSHUA H. STEIN, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, STATE OF WISCONSIN, COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA, THE NORTH CAROLINA DEPARTMENT OF ENVIRONMENTAL QUALITY, THE DISTRICT OF COLUMBIA, AND THE CITY OF NEW YORK,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　v. | **DECLARATION OF KATHLEEN M. BASKIN** |

Declaration of Kathleen M. Baskin

|   |   |
|---|---|
| 1 | **ANDREW R. WHEELER**, AS ADMINISTRATOR |
| 2 | OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; UNITED STATES |
| 3 | ENVIRONMENTAL PROTECTION AGENCY; R. D. JAMES, AS ASSISTANT SECRETARY OF THE |
| 4 | ARMY FOR CIVIL WORKS; AND UNITED STATES ARMY CORPS OF ENGINEERS, |
| 5 |   |
| 6 | Defendants. |

### DECLARATION OF KATHLEEN M. BASKIN

**I, Kathleen M. Baskin, declare and state as follows:**

1. I am the Assistant Commissioner for the Bureau of Water Resources at the Massachusetts Department of Environmental Protection, a position I have held since July 2019. I have over 35 years of experience studying and implementing improvements to wastewater discharges; stormwater management; wetlands protection; drinking water protection; and water quality of natural systems, including approximately 15 years dedicated to the cleanup of both Boston Harbor and the Charles River. I have worked in the private, not-for-profit, and public sectors, and was the Director of Water Policy for the Commonwealth of Massachusetts for 11 years. I submit this declaration in further support of the Commonwealth of Massachusetts' ("Commonwealth" or "Massachusetts") challenge to the U.S. Environmental Protection Agency (EPA) and U.S. Army Corps of Engineers (jointly, "Agencies") final rule ("New Rule") promulgating a new definition of the Waters of the United States covered by the Clean Water Act (33 U.S.C. §§ 1251-1387).

2. I oversee and am responsible for the statewide implementation of the agency's water-related programs, all housed in the Bureau of Water Resources, including the Massachusetts Wetlands Protection Act; Section 401 of the Federal Clean Waters Act; the Wetlands Conservancy Mapping Program; MassDEP's Wastewater Programs, including Title 5 (septic systems), National Pollution Discharge Elimination System (NPDES) regulating surface water discharges, and the Groundwater Discharge Program. I am responsible for implementation of the Safe Drinking Water Act, Water Management Act, and the Drinking Water and Clean Water

1. State Revolving Funds. I also manage the Bureau's personnel and finances. I earned Bachelor of Science degrees in Civil Engineering and Biology, and a Master of Science in Environmental Engineering at Tufts University. I also hold a Master in Public Administration from the Harvard Kennedy School of Government.

3. As explained below, the New Rule will irreparably harm Massachusetts and its residents and those harms would be remedied by enjoining, and ultimately invalidating, the New Rule. The New Rule will likely impair water quality in the Commonwealth; increase the likelihood of flood damage; disrupt the Commonwealth's existing efforts to ensure clean water; impose new regulatory costs and burdens; increase costs to downstream municipalities and facilities that may become subject to more stringent discharge limitations; and create confusion for regulatory bodies, project proponents, and the public.

**HARM DUE TO REDUCED WATER QUALITY AND INCREASED FLOOD RISKS**

4. The health and quality of Massachusetts' many navigable rivers, streams, lakes and coastal waters is inextricably intertwined with the health and quality of upland and upstream wetlands and waterways. The many waters that have a nexus with navigable waters—including wetlands; standing water bodies like lakes and ponds; and flowing streams of all types, including perennial, intermittent, and ephemeral streams—perform numerous critical functions. For example, they maintain the quality of water for human consumption by filtering and trapping contaminants and toxic substances; they protect fisheries habitats by moderating stream flow temperatures; and they store and confine floodwaters that protect structures and people from the harmful impacts of hurricanes and other major storm events, which, due to climate change, are becoming more frequent and more severe.

5. By decreasing the scope of wetlands and waterways that are subject to the protections of the federal Clean Water Act, the New Rule is likely to result in additional water pollution, reduced water quality in both upstream waters and downstream navigable waters, degraded habitat for fisheries, and increased flood risks within Massachusetts.

## HARMS DUE TO OUT-OF-STATE ACTIVITY

6. A clear and strong federal baseline is critical to the protection of waters in Massachusetts because the Commonwealth cannot directly regulate or control out-of-state activities that affect waters flowing into Massachusetts. The Connecticut and Merrimack Rivers, for example, are interstate waters that flow through Vermont and New Hampshire, respectively, before entering Massachusetts. Numerous other waterways also enter Massachusetts after flowing through upstream States. *See* 314 C.M.R. § 4.06 (identifying the rivers basins in Massachusetts and mapping waterways, including the many waterways originating upstream, within each basin). The water quality of the navigable rivers within Massachusetts therefore depends on sufficient safeguards in upstream States.

7. The New Rule eliminates from the scope of federal protections certain critical waters in the States upstream of Massachusetts—including ephemeral headwater streams (which EPA estimates comprise 53%-59% of total stream miles in the country) and certain wetlands—that impact the health and integrity of Massachusetts' water resources. The reduction in the Clean Water Act's coverage is thus likely to result in increased upstream development activities, destruction of wetland resources that filter pollutants, and pollutant discharges that will have adverse impacts on waters within Massachusetts.

8. Reduced protections in upstream States, such as New Hampshire, also pose dangerous flood risks to Massachusetts. Headwater streams and non-floodplain wetlands are highly effective in storing stormwater. By eliminating some of those water bodies in upstream States from federal protection, more of these important areas will likely be destroyed or filled, thus increasing flood-associated risks to public and private property and to water quality within the Commonwealth.

9. The New Rule also newly eliminates from federal protections many ponds that cross state lines. For example, MassDEP has identified a pond that straddles Egremont, Massachusetts and Copake, New York near Catamount Ski Area, and a water body that straddles Webster, Massachusetts and East Thompson, Connecticut just Northeast of Long Pond (in Connecticut) as interstate bodies of water that had previously been covered by the Act, but may not be covered by

the New Rule. These are thus examples of waters whose health is both directly affected by activity in other jurisdictions, and likely to be undermined by the New Rule.

HARMS DUE TO IN-STATE ACTIVITY

10. Diminishing the scope of waters subject to the federal Clean Water Act will also undermine water quality and integrity because it will affect certain in-state filling and discharge activities. Although Massachusetts' jurisdiction over wetlands and waterways in the Commonwealth is broad, and although Massachusetts' state laws are broadly protective of those waters, Massachusetts laws and regulations are not coextensive with federal protections and regulatory tools. The loss of protections under the Clean Water Act will thus create regulatory gaps in Massachusetts to the detriment of the integrity and quality of its waters.

11. Control of stormwater discharges presents such a regulatory gap that will result from the New Rule. Massachusetts law does not require stormwater controls in upland areas for existing projects, absent a showing that the construction will alter a defined resource area. The federal Clean Water Act, by contrast, does impose stormwater controls in upland areas wherever construction activity will disturb more than 1 acre and stormwater will discharge to a water of the United States. *See* 40 C.F.R. 122.26(b)(14)(x), (b)(15). By reducing the scope of waters that would otherwise require federal stormwater controls, certain activities affecting water quality in Massachusetts that had been regulated under federal law will no longer be regulated. This is a critical gap because stormwater is the leading cause of water quality impairment in Massachusetts. Sediments such as sands, clays, and silts are the most common pollutants in stormwater runoff by volume and weight, and construction site erosion due to stormwater discharges is among the most significant sources of sediments in Massachusetts waterways and wetlands. Moreover, stormwater discharges also transport significant amounts of other damaging pollutants into waterways and wetlands in Massachusetts, such as pathogens and nutrients, which adversely affect water quality and ecosystem and public health.

12. The New Rule also will affect protections for vernal pools in Massachusetts—pools that typically fill with water in autumn or winter and remain ponded into the summer. Such pools provide essential habitat, including for critical breeding functions, for a variety of amphibians and

other wildlife species, including species protected under federal and state rare and endangered species laws. There are 7,615 vernal pools in Massachusetts that have been certified as "Outstanding Resource Waters" because they contain certain ecologically important animal species, and there are likely many other such pools that have not been certified but that may potentially meet the same qualifying criteria.[1]

13. Under state law, the Massachusetts Wetlands Protection Act applies only to those vernal pools that are located within a state defined wetland resource area. Nonetheless, the Commonwealth's Section 401 Water Quality Certification regulations have historically afforded protections to many other vernal pools because they have fallen within the jurisdiction of the federal Clean Water Act (as determined by the Army Corps of Engineers pursuant to the Section 404 permitting program). Because of the New Rule's narrower definition of waters covered by the Act, many vernal pools that are not located in defined wetland resource areas will lose such protections. In other words, even though these pools have a significant nexus with the health of downstream waters and serve critical ecological functions, MassDEP's Section 401 Water Quality Certification authority will no longer allow the agency to protect this important water resource from harmful dredging and filling activities due to the narrower scope of jurisdiction under the New Rule.

14. Certain other activities that are covered by federal permits are not covered by state permits. For example, under the Massachusetts Wetlands Protection Act, filling or dredging activities undertaken for the purpose of replacing a public utility structure do not require a permit. Where that type of activity is conducted in wetlands that had been deemed jurisdictional under federal law, but are no longer within federal jurisdiction under the New Rule—a class that will include many critical wetlands that do not directly abut jurisdictional tributaries—such activity will lie outside of any permitting requirement. Similarly, state bridge projects are exempt from the Massachusetts Wetlands Protection Act. When such projects are undertaken in areas no longer subject to federal jurisdiction under the New Rule, protections previously afforded to waters and

---

[1] *See* MassGIS Data: NHESP Potential Vernal Pools (Dec. 2000), https://docs.digital.mass.gov/dataset/massgis-data-nhesp-potential-vernal-pools.

wetlands within Massachusetts under Sections 401 and 404 will no longer attach, thus resulting in degradation of wildlife habitat, increased flood risks to people and property, and decreases in downstream water quality caused by the destruction of upstream wetlands that would otherwise have stored floodwaters and filtered out the pollutants.

**HARMS TO REGULATORS AND THE REGULATED COMMUNITY**

15. Along with reductions in water quality, the New Rule will impair the Commonwealth's efforts to improve and protect in-state waters; impose costs and new regulatory burdens on the Commonwealth; further burden those in-state entities that are already subject to stringent regulatory limitations; and result in widespread confusion about the scope of waters subject to federal protections.

INTERFERENCE WITH EFFORTS TO ENHANCE WATER QUALITY

16. The Commonwealth engages in various activities to continuously assess and improve water quality within Massachusetts, many of which are mandated by the Clean Water Act. For example, under Section 305(b) of the Act, the Commonwealth evaluates waters to determine their capacity to support "designated uses," such as aquatic life support, fish and shellfish consumption, drinking water supply, and recreation. And under Section 303(d) of the Clean Water Act, the Commonwealth identifies waters that are not expected to meet state water quality standards and will require additional regulation, such as the development of total maximum daily loads (TMDLs) to control pollution or the imposition of new limitations on effluent discharges. The impacts of the New Rule will disrupt the Commonwealth's progress under these frameworks in protecting and enhancing water quality in Massachusetts. Rather than focus on obtaining further progress, the Commonwealth may be forced to divert its resources to address water bodies that have become newly impaired due to increased pollution levels from the loss of federal protections, including due to pollution from out-of-state waterways that flow into Massachusetts. For example, the Commonwealth may have to revise existing TMDLs or prepare new TMDLs in areas where water quality has deteriorated as a result of the New Rule. And this will be a costly

task: in a draft report issued by EPA in 2001, the agency estimated the average cost of developing TMDLs to be about $52,000, with a range of costs between $26,000 to over $500,000.[2]

17. Imposing new or revised TMDLs would, in turn, adversely impact many entities in Massachusetts, such as municipal sewage treatment plants and industrial facilities that have permits to discharge directly into navigable-in-fact waters. Those entities may be forced to further limit their own discharges, facing additional costly effluent limitations. To the extent such entities are commercial actors, the costs of such measures would place them at a competitive disadvantage, as they would have to compete with out-of-state entities that do not have to bear such costs and that may, because of the effect of the New Rule, actually face reduced compliance costs.

## NEW COSTS AND BURDENS TO COMMONWEALTH AS REGULATOR

18. In its capacity as regulator, the Commonwealth will face unique costs and burdens. First, Massachusetts is one of three States (along with New Hampshire and New Mexico) that does not have authorization from EPA to administer the National Pollution Discharge Elimination System (NPDES) permitting program. In other words, the federal government, as a general matter, remains responsible for permit issuance, compliance, and enforcement for the nearly 3,000 NPDES permit holders in Massachusetts.

19. The New Rule threatens to disrupt a number of MassDEP's staffing and resource decisions, which have been made in reliance on both the federal government's administration of the NPDES program in Massachusetts and the scope of activities that have been covered by federal law. Under the New Rule, in circumstances involving discharges into a waterbody that is covered by state law protections but that has newly lost federal Clean Water Act coverage, MassDEP would have to work on its own to issue permits for any surface water discharges. While MassDEP has such authority, exercising that authority would impose new costs and burdens on an agency that has been staffed more leanly as a non-delegated program. MassDEP would face particular difficulties regulating discharges (into waters newly deemed to be outside of the federal

---

[2] *See* EPA, The National Costs of the Total Maximum Daily Load Program 18 (Aug. 2001), https://nepis.epa.gov/Exe/ZyPDF.cgi/901K0800.PDF?Dockey=901K0800.PDF. When adjusted for inflation, these costs range from $38,000 to more than $730,000 per TMDL.

Act) that are covered under general permits, as MassDEP would either have to develop an entirely new, separate general permit, or issue numerous individual permits to facilities that normally would be covered under a general permit.

20. In addition to disrupting the NPDES permit process under Section 402 of the Act, the New Rule will also disrupt the administration of Section 404 permits for dredge and fill activities. The Commonwealth has undertaken significant work over the years to streamline the processes for projects triggering multiple federal and state permits, and to eliminate duplicative Massachusetts requirements for projects that require Section 404 permits, as well as the Section 401 Water Quality Certifications that apply to areas covered by such Section 404 permits. Reducing the scope of jurisdiction for Section 404 permits is a direct by-product of the New Rule since the definition of regulated "water of the United States" under the Clean Water Act applies to all of the federal Act's permitting programs. This will eliminate the alignment between state and federal requirements in these areas and would likely impose further regulatory costs and burdens on the Commonwealth to fill the gaps created by the New Rule.

21. The New Rule will also disrupt MassDEP's administration of the state Wetlands Protection Act. In particular, MassDEP will have to grapple with significant uncertainties about the jurisdictional status of different wetlands and will have to identify, and adequately respond to, activities and projects that may no longer be subject to federal permitting requirements.

22. Taken together, these various disruptions would result in considerable new costs and burdens across multiple programs at MassDEP. For example, assessing the impacts of the New Rule for implementing the TMDL, NPDES, Section 401 Water Quality Certification, and wetlands programs would require extensive technical analyses—including hydraulic, hydrologic, and water quality analyses, GIS interpretation and analyses, and field verification work—as well as regulatory research and development, including additional coordination with EPA since Massachusetts is one of the states that does not have authorization to administer the NPDES Program. The costs of the associated workload are difficult to estimate but would, at a minimum, entail additional staffing needs in the form of multiple Full Time Equivalents (FTEs), as well as expenses for contracted services to develop a data management system—which would be

necessary to manage data associated with issuing state permits to waters no longer subject to federal protections. The Department estimates that hiring outside consultants to build such a data management system would require a considerable amount of funds.

## LIKELIHOOD OF CONFUSION AND UNCERTAINTY

23. The Commonwealth's efforts to take the necessary steps to protect water quality and to maintain adequate protections due to reduced federal jurisdiction will be especially difficult in light of the New Rule's vague and ambiguous definitions, which will cause widespread confusion—to regulators, the public, and regulated entities—about the scope of waters covered by the federal Act. For example, confusion will arise under the New Rule's requirement that a river or stream be "naturally occurring" to qualify as a "tributary" covered by the Clean Water Act. Although the New Rule states that a covered "tributary" does not lose its status through "alteration or relocation," in practice it may be extremely difficult to determine whether certain streams that currently flow in artificial channels were once "naturally occurring" (and thus subject to federal jurisdiction) or whether they had only ever been artificial (and thus outside of federal jurisdiction). Evidence of changes occurring decades or centuries ago may be difficult to locate (if such evidence exists at all today), yet a great many bodies of water in Massachusetts were altered or relocated centuries ago. For example, in the 18th and 19th centuries, manufacturing facilities associated with Massachusetts' historic textile industry and gristmills often altered the flow of streams and rivers to provide power to their facilities and create impoundments for fire protection. *E.g.* 1875 Mass. Laws ch. 74.

24. Another avenue of confusion will be distinguishing between intermittent streams that flow continuously during certain times of the year (which—along with perennially flowing streams that flow continuously year-round—are covered by the New Rule) and ephemeral streams that flow only in response to precipitation (which are not covered). Data from the federal National Hydrography Dataset indicates that approximately 31,188 stream segments— approximately 14% of all mapped stream segments—are not perennial (and are thus either

intermittent or ephemeral) in Massachusetts.[3] But that federal dataset identifies very few ephemeral streams and so it is likely that the distinction between intermittent and ephemeral streams will turn in part on field delineations, and the burden of that task will fall on MassDEP as well as federal officials. Accordingly, by excluding ephemeral streams from federal jurisdiction, the New Rule will spur confusion for regulatory bodies, project proponents, and the public about, for example, which projects require a MassDEP issued Water Quality Certification pursuant to Section 401 of the federal Clean Water Act. And clearing up that confusion will require expending resources on field delineations that MassDEP would not otherwise have to incur.

25. The New Rule also uses vague terminology in excluding from federal Clean Water Act jurisdiction any river or stream that is not perennial or intermittent in a "typical year," as well as any river, stream, pond, lake, or impoundment that does not contribute surface flow to jurisdictional waters in a "typical year." Requiring assessment of precipitation and flow in a "typical year" is inconsistent with the tools the Commonwealth relies on to assess water bodies. Rather than rely on precipitation averages over long periods of time, as the New Rule requires—and despite the fact that doing so will obscure the impact that higher precipitation associated with climate change has, and will continue to have, on these waterbodies—the Commonwealth has long depended on data from USGS stream gauge network to determine actual stream flow, estimate flow parameters at streams that are not gauged, and account for streams' geomorphological characteristics. Indeed, the USGS StreamStats is the best tool available, barring a detailed hydrologic/hydraulic analysis, to assess whether a stream is perennial or intermittent (rather than ephemeral) and flows into other jurisdictional waters. Mandating a different framework to ascertain whether certain waters are subject to federal law will result in added costs and increased confusion.

\* \* \*

26. In sum, based on MassDEP's analysis of the New Rule, its likely adverse impacts on waters in the Commonwealth, and the challenges that the agency will likely face in terms of

---

[3] According to EPA, "[a]lmost 60% of all stream miles in the continental U.S. only flow seasonally or after storms." EPA, Web Archive: Streams, https://archive.epa.gov/water/archive/web/html/streams.html.

additional burdens and disruptions to our regulatory framework, the New Rule will cause substantial and irreparable harm to the Commonwealth.

\* \* \*

27. I have read the above statement consisting of 12 pages, and I certify under the penalty of perjury that the foregoing is true and correct.

Executed on the 15th day of May in Boston, Massachusetts.

*Kathleen M. Baskin*
Kathleen M. Baskin