XAVIER BECERRA
Attorney General of California
SARAH E. MORRISON
ERIC KATZ
Supervising Deputy Attorneys General
CATHERINE M. WIEMAN, SBN 222384
TATIANA K. GAUR, SBN 246227
ROXANNE J. CARTER, SBN 259441
JESSICA BARCLAY-STROBEL, SBN 280361
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013
 Telephone:  (213) 269-6329
 Fax:  (916) 731-2128
 E-mail:  Tatiana.Gaur@doj.ca.gov
*Attorneys for Plaintiff State of California, by and through Attorney General Xavier Becerra and California State Water Resources Control Board*

LETITIA JAMES
Attorney General of the State of New York
PHILIP BEIN
Senior Counsel
TIMOTHY HOFFMAN*
Senior Counsel
   Office of the Attorney General
   Environmental Protection Bureau
   28 Liberty Street
   New York, NY 10005
   Telephone: (716) 853-8465
   Fax: (716) 853-8579
   Email: Timothy.Hoffman@ag.ny.gov
*Attorneys for Plaintiff State of New York*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA BY AND THROUGH ATTORNEY GENERAL XAVIER BECERRA AND CALIFORNIA STATE WATER RESOURCES CONTROL BOARD, STATE OF NEW YORK, STATE OF CONNECTICUT, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA ex re. ATTORNEY GENERAL JOSHUA H. STEIN, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, STATE OF WISCONSIN, COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA, THE NORTH CAROLINA DEPARTMENT OF ENVIRONMENTAL QUALITY, THE DISTRICT OF COLUMBIA, AND THE CITY OF NEW YORK, <br><br> Plaintiffs, <br><br> v. <br><br> ANDREW R. WHEELER, AS ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; R. D. JAMES, AS ASSISTANT SECRETARY OF THE ARMY FOR CIVIL WORKS; AND UNITED STATES ARMY CORPS OF ENGINEERS, <br><br> Defendants. | Case No. 3:20-cv-03005-DMR <br><br> **DECLARATION OF REBECCA ROOSE** <br><br><br> Date: <br> Time: <br> Courtroom: <br> Judge: <br> Trial Date: <br> Action Filed: |

## DECLARATION OF REBECCA ROOSE

**I, Rebecca Roose, state and declare as follows:**

1. My name is Rebecca Roose. I am over 21 years of age and am fully competent and duly authorized to make this Declaration. The facts contained in this Declaration are based on my personal knowledge and are true and correct.

2. I submit this declaration in support of the motion by the States and Cities for a preliminary injunction. As discussed below, the WOTUS Rule will have a devastating impact on New Mexico's waters and the State is in no position to fill the regulatory vacuum left by EPA and the Army Corps as a result of that rule.

## BACKGROUND

3. I am employed as the Director of the Water Protection Division of the New Mexico Environment Department (Department). In my role, I oversee the Department's Ground Water Quality, Surface Water Quality, Drinking Water, and Construction Programs Bureaus. I have been employed by the Department for approximately one year. Prior to joining the Department, I worked for the U.S. Environmental Protection Agency (EPA). At EPA Headquarters, I devoted 13 years to supporting EPA, states, and tribes with implementation of Clean Water Act (CWA) programs. Specifically, I drafted and defended National Pollutant Discharge Elimination System (NPDES) program regulations and effluent limitations guidelines promulgated pursuant to CWA Section 402, provided oversight of states' implementation of NPDES, pretreatment and CWA Section 319 nonpoint source control programs, and developed policy and training for compliance inspections of NPDES permittees and CWA Section 311 spill prevention, control and countermeasures facilities. During my tenure at EPA, I served as a national expert on NPDES requirements for Concentrated Animal Feeding Operations, NPDES program requirements for authorized states and tribes, and NPDES compliance monitoring policy. I earned my law degree and natural resources law certificate from the University of New Mexico in 2004.

4. The purpose of the Department is "to ensure an environment that in the greatest possible measure will confer optimum health, safety, comfort and economic and social well-being on its inhabitants; will protect this generation as well as those yet unborn from health threats posed by

the environment; and will maximize the economic and cultural benefits of a healthy people."
N.M. STAT. ANN. § 74-1-2 (1997).

5. The Department serves as agent of the State in matters of environmental management and consumer protection. N.M. STAT. ANN. § 74-1-6(E) (2009). The Department has primary responsibility for implementing the activities of the New Mexico Water Quality Control Commission, the state water pollution control agency for purposes of the federal CWA.

## THE WOTUS RULE'S HARM TO NEW MEXICO WATERS

6. New Mexico has seven traditionally navigable waters (TNWs): the Rio Grande, the Canadian River, the San Juan River, the Cimarron River, the Rio Chama, the Pecos River, and Navajo Lake. The U.S. Army Corps of Engineers (USACE) has attempted to designate the entire stretch of the Gila River that flows through New Mexico as a TNW, but this designation has been challenged and to date remains unresolved. In its review of the National Hydrology Dataset, the Department has determined that approximately 89% of the State's rivers and streams are ephemeral, 7% are perennial, and 4% are intermittent. Under the WOTUS Rule, none of the ephemeral streams will be protected by the CWA.

7. The WOTUS Rule will also result in the loss of many wetlands in New Mexico. Saint Mary's University of Minnesota's Geospatial Services, with input from the Department, created a model to evaluate the extent of federally protected wetlands and other surface waters in the Cimarron River Watershed.[1] The results of this case study show that by narrowing the scope of federal jurisdiction, the number of wetlands protected by the CWA is substantially decreased, leading to a likely loss of benefits provided by wetlands such as flood control and attenuation, pollution control, wildlife habitat, and recreation. Depending on how the new WOTUS rule is applied, 20-70% of the wetlands in the Cimarron River Watershed would lose CWA protections.

8. To represent benefit-cost analyses of the WOTUS Rule, EPA and USACE (collectively the "Agencies") relied on three case studies in the supporting Economic Analysis, "to explore

---

[1] For details of the Saint Mary's University of Minnesota model, visit
https://www.arcgis.com/apps/Cascade/index.html?appid=f3de6b30c0454c15ac9d3d881f18ae33.

(continued…)

potential changes and resulting forgone benefits and avoided costs." [2] The case studies focused on three geographical regions – the Ohio River Basin, the Lower Missouri River Basin, and the Rio Grande River Basin – that intersect 10 states. The Rio Grande River Basin was divided into two major watersheds, the Upper Pecos (HUC 1306) and Lower Pecos (HUC 1307) River Basins, which contain a combined 44,300 square miles in New Mexico and Texas from east of Santa Fe, New Mexico to the confluence of the Pecos River and Rio Grande at the Texas-Mexico border. This case study found 85% of stream miles within the Upper Pecos River Basin in New Mexico are ephemeral, and 34% of all wetland acres to be "non-abutting" wetlands. These ephemeral waters and non-abutting wetlands in the Upper Pecos River Basin will no longer be protected under the WOTUS Rule. Further, the cost analysis for the Pecos River case study shows benefits of the WOTUS Rule to be minimal or negligible; however, the Agencies did not quantify or monetize the environmental effects and forgone benefits of the WOTUS Rule for the Rio Grande River Basin case study, blaming this deficiency on limitations in the data. The *Economic Analysis of the EPA-Army Clean Water Rule*[3] monetized the ecosystem services and benefits from wetlands, so it is possible to evaluate this important component of any new rule. In fact, the estimation of nonmarket environmental values is not new – one notable example is compensation for the 1989 Exxon Valdez oil spill in the Gulf of Alaska. It is well known that wetlands provide many ecological and economic benefits to watersheds such as filtering and improving water quality, flood attenuation, erosion control, carbon sequestration, aquifer recharge, and providing fish and wildlife habitat and nurseries.[4] It is also known that ephemeral waters are ecologically and hydrologically significant in arid and semi-arid watersheds of the southwestern United States.[5] Loss of environmental protections for ephemeral streams and wetlands, reductions in

---

[2] Economic Analysis for the Navigable Waters Protection Rule: Definition of ''Waters of the United States.'' U.S. Environmental Protection Agency and U.S. Department of the Army. January 22, 2020.
[3] Economic Analysis of the EPA-Army Clean Water Rule. U.S. Environmental Protection Agency and U.S. Department of the Army. May 20, 2015. Available at: https://www.epa.gov/sites/production/files/2015-06/documents/508-final_clean_water_rule_economic_analysis_5-20-15.pdf
[4] https://www.epa.gov/sites/production/files/2016-02/documents/wetlandfunctionsvalues.pdf
[5] Levick, L., et al. 2008. The Ecological and Hydrological Significance of Ephemeral and Intermittent Streams in the Arid and Semi-arid American Southwest. U.S. Environmental Protection Agency and USDA/ARS Southwest Watershed Research Center, EPA/600/R-08/134, ARS/233046, 116 pp.

water quality, and cumulative impacts will be devastating to wildlife and humans who are dependent on these waters, especially at the local scale, and should have been quantified.

9. Because of the ephemeral exemption and new definition of "adjacent wetland," the WOTUS Rule will create a significant gap in regulation under CWA Section 402 general permits (i.e., construction and industrial stormwater discharges) and CWA Section 404 dredge and fill permits in ephemeral streams and non-abutting wetlands. The Agencies considered the potential effect of the WOTUS Rule on issuance of CWA Section 402 permits for stormwater from construction activities. Overall, the Agencies concluded that the ephemeral exemption would likely change circumstances in arid and semi-arid states where many streams are ephemeral, and CWA protections would be removed from the vast majority of waters in these states.[6] As a result, many construction sites in arid states will not be required to obtain NPDES permit coverage for stormwater discharges. Dredge and fill and industrial activities in ephemeral streams will not need a CWA Section 404 permit. Besides excess sediment, which can smother bottom-dwelling organisms, fill deep pools that are critical refugia during summer and drought, and clog or injure gills of fish, stormwater carries other harmful pollutants. Construction, industrial, and urban sites generate pollutants such as phosphorus and nitrogen from the application of fertilizer, various metals (arsenic, cadmium, chromium, copper, zinc), acidic wastewaters, pesticides, phenols, paints, solvents, phthalates, petroleum products, and solid wastes that attach to sediment and/or get washed into streams and wetlands during overland stormflows. Sediment loading rates from constructions sites are typically 10 to 20 times that of agricultural lands and 1000 to 2000 times that of forest lands. Even a small amount of construction or industrial activity may have a significant negative impact on water quality in localized areas if permits are not required and proper management practices are not implemented to reduce or eliminate pollutants in stormwater. New Mexico has over a thousand facilities covered by stormwater general permits and approximately 25-45% of these will no longer be subject to those stormwater management requirements as a result of the WOTUS Rule.

---

[6] Economic Analysis for the Navigable Waters Protection Rule: Definition of ''Waters of the United States.'' U.S. Environmental Protection Agency and Department of the Army. January 22, 2020.

10. The WOTUS Rule will also create a significant gap in regulation of individual permits issued by EPA under CWA Section 402 in New Mexico. The Agencies did not effectively consider the potential effect of the WOTUS Rule on issuance of CWA Section 402 individual permits for discharges to ephemeral or other non-jurisdictional waters under the WOTUS Rule. New Mexico currently has 115 individual, EPA-issued NPDES permits in the State, including permits issued in Indian Country. Under the 2020 Rule, approximately 50% of these current permittees will no longer be required to obtain an NPDES permit because they discharge to receiving streams that lose CWA protections. Examples of facilities in New Mexico that would no longer discharge pursuant to NPDES individual permit requirements include: municipal and private domestic wastewater treatment plants; tribal and Bureau of Indian Affairs wastewater treatment plants; multiple types of mines, both active and in reclamation (coal, uranium, cement, rock, minerals and metals); national laboratories; federal facilities; fish hatcheries; and oilfield sanitary waste treatment plants. Eliminating CWA protections will degrade ephemeral water quality and the downstream TNWs and other jurisdictional waters that they feed.

11. The Department has relied upon the Agencies' broad interpretation of WOTUS under the 1980s regulations and the *Rapanos* Guidance in order to ensure protection of New Mexico's waters.

12. The WOTUS Rule's ephemeral exemption will have a disproportionate effect on water quality in the arid Southwest (e.g., Arizona, Nevada, and New Mexico) because many stormwater discharges from sites into ephemeral streams will no longer be subject to CWA permits. New Mexico is one of the driest states, averaging less than twenty inches of annual precipitation. Ephemeral streams provide the same ecological and hydrological benefits as perennial streams by moving water, sediment and nutrients through the system to be utilized downstream. Ephemeral flows are in need of CWA protection because when they are functioning properly they provide important hydrologic connections across the landscape and across geopolitical boundaries; they dissipate stream energy during high flow events to reduce erosion, thus improving water quality; they recharge aquifers where water can be stored for current and future drinking water supplies; they transport, store and deposit sediment to help maintain floodplains; they transport, store and

cycle nutrients for vegetation, wildlife and aquatic life; and they support and provide migration corridors. Given the distribution of ephemeral streams in New Mexico (89% of streams) and their important hydrological and ecological functions, cumulative impacts of ephemeral streams throughout a watershed must be considered in order to protect and maintain water quality and watershed health. Removing protections from ephemeral streams will degrade water quality in the jurisdictional waters that they feed.

13. Science has clearly demonstrated that ephemeral waters are ecologically and hydrologically significant in the arid southwestern United States. In New Mexico, ephemeral tributaries contribute up to 76% of the stormflow in the Rio Grande after a storm event. Where pollutants can be mobilized, ephemeral stormflows will deliver the pollutants to downstream waters, such as the Rio Grande – a TNW. The cumulative impacts of these non-jurisdictional ephemeral stormflows are detrimental to downstream water quality and threaten human health and the environment.

14. More frequent droughts and shifting precipitation patterns due to climate change result in lower water levels in rivers, lakes, and streams, leaving less water to dilute pollutants. In addition, more frequent and more powerful storms increase polluted runoff from urban and agricultural areas, which transports pollutants from the landscape to nearby waterways. These changes will stress aquatic ecosystems and dramatically impact communities throughout the United States, especially in the Southwest. Community impacts include threats to public health, economic strain, and decreased quality of life. The effects of climate change in New Mexico amplify the complexities of western water management. A lack of connectivity or perenniality today or in a "typical year" is not a suitable feature that EPA, USACE and New Mexico can rely upon to define a jurisdictional water.

15. Tijeras Arroyo presents an example of the anticipated devastating effects of the WOTUS Rule on water quality. This waterway winds for 26 miles from its headwaters in the Sandia and Manzano Mountains east of Albuquerque, New Mexico through developed and undeveloped areas of Albuquerque in the foothills, including Kirtland Air Force Base, before entering the Rio Grande. The waterway is perennial in the headwaters but is ephemeral for 11 miles as it flows out

of the mountains and into the Rio Grande. Tijeras Arroyo is a major tributary of the Rio Grande in the Albuquerque area and carries stormwater, and any pollutants mobilized by stormwater, to the Rio Grande during significant rain events. It is the subject of (1) a Watershed Restoration Action Strategy to address excess *E. coli* bacteria and sedimentation through stormwater management and erosion controls; (2) a Total Maximum Daily Load (TMDL) to reduce watershed nutrient loading during both low-flow and high-flow events; and (3) federal permits including several CWA Section 404 permits, an individual NPDES permit for Kirtland Air Force Base, and the Municipal Separate Storm Sewer System (MS4) permit for the Albuquerque-Bernalillo County area under CWA Section 402. These various permits and requirements limit and/or monitor the discharge of the following pollutants into Tijeras Arroyo: nitrate-nitrogen, ammonia-nitrogen, total nitrogen, total phosphorus, ethylene dibromide (EDB), heptachlor, per- and polyfluoroalkyl substances (PFAS), total residual chlorine, total suspended solids, biological oxygen demand, and oil and grease. In addition, the Rio Grande downstream of Tijeras Arroyo is impaired for *E. coli* bacteria, polychlorinated biphenyls (PCBs) in fish tissue, and dissolved oxygen. Tijeras Arroyo was jurisdictional under the 1980s regulations, the 2008 Rapanos Guidance, and the 2019 Rule but is not jurisdictional under the 2020 WOTUS Rule. Surface water quality is also a major concern for the two acequia associations in the Tijeras watershed and the Pueblo of Isleta, which is downstream of Tijeras Arroyo and the City of Albuquerque. Under the WOTUS Rule, these CWA protections (e.g., *E. coli* strategy, TMDL, NPDES permits) will not be enforceable as is. They will either be modified to move the point of discharge to a jurisdictional water and consequently dilute the limitations and requirements, or they will be terminated.

16. Another example of the WOTUS Rule's harm is the Gila River, which originates in the Nation's first designated wilderness area (the Gila National Wilderness) and is the last major wild and free-flowing river in New Mexico. The Gila River supports a remarkable abundance of aquatic life and wildlife, provides significant economic value to the region through abundant outdoor recreation opportunities, and is culturally important to indigenous peoples who have lived in southwestern New Mexico for thousands of years. The Gila River flows from New Mexico into

Arizona and typically goes dry before it reaches the Colorado River due to large irrigation diversions, groundwater mining, and sustained drought. Some segments of the Gila River in Arizona have been designated as TNWs, but the Gila River is not a designated TNW in New Mexico. New Mexico's Gila River was named by American Rivers as the country's most endangered river in 2019 because of threats from water diversions and climate change.[7] If the new WOTUS Rule is implemented, the Gila River in New Mexico would not be protected by the CWA, further endangering this precious resource.

17. The Rio Hondo Watershed in south-central New Mexico is yet another example of the irreparable harm the WOTUS Rule will have on New Mexico. As the perennial headwaters of the Rio Ruidoso and Rio Bonito flow downstream, they become interrupted and eventually go underground along several ephemeral segments. Because the ephemeral segments are substantially long (over 50 miles), it is highly unlikely that the Rio Ruidoso, Rio Bonito or upstream portions of the Rio Hondo have a surface connection to the Pecos River (a TNW) in a "typical year." Therefore, everything upstream of these ephemeral breaks/segments would be considered non-jurisdictional under the WOTUS Rule. In this watershed there are several facilities that would no longer be required to obtain a NPDES permit to discharge to the river, including the Ruidoso Downs Wastewater Treatment Plant and the Ruidoso Racetrack. The Rio Ruidoso already exceeds water quality standards for total nitrogen and total phosphorus, two pollutants that are controlled by the aforementioned NPDES permits. Historically, excess nitrogen and phosphorus have negatively impacted downstream irrigation uses. Further, construction and industrial sites would not be required to obtain NPDES permit coverage for their stormwater discharges. This means industrial facilities and construction sites could discharge pollutants into the river without consequence under federal law. Loss of federal pollution control for the Rio Ruidoso could result in polluted water conveyed to local farms via the 82 acequias, or community ditches, in this area. Acequias have important historical and cultural value in New Mexico, with many dating to the 17th and 18th Centuries, and provide essential water for agriculture. Public

---

[7] https://www.americanrivers.org/2019/04/americas-most-endangered-rivers-of-2019-spotlights-climate-change-threats/

9

health and the environment will be directly impacted by the federal rollback and unregulated pollutant discharges in the Rio Hondo Watershed.

18.  Because the vast majority of New Mexico's waters are ephemeral and large numbers of wetlands will lose protections, the WOTUS Rule will have a profound adverse effect on water quality in the state. In much of the country, ephemerality of rivers is typically seen in the upper watershed where impacts of the proposed rule may be minimal. That is not the case in the arid West. By removing protections for ephemeral waters, waters like the Santa Fe River, Rio Ruidoso, Jemez River, Rio Puerco, Tijeras Arroyo, and Rio Grande tributaries on the Pajarito Plateau (which contain legacy contamination from the Manhattan Project) will have severed and interrupted jurisdiction in the middle and lower reaches. This will create a patchwork of jurisdictional and non-jurisdictional segments along the path of a river that will make it nearly impossible to implement an effective water quality protection program. A patchwork of unregulated contamination will have serious public health and economic consequences related to drinking water supplies, cultural and agricultural uses, recreational uses, and aquatic species and wildlife.

**DIFFICULTIES OF FILLING THE FEDERAL REGULATORY GAP WITH STATE PROGRAMS**

19.  New Mexico cannot, as a practical matter, fill the regulatory gap created by the WOTUS Rule. The WOTUS Rule disproportionately impacts states that do not have authority to operate the NPDES permitting program under CWA Section 402. This program is the primary mechanism under the Act for regulating and limiting discharges of pollutants into the "waters of the United States." Further, the WOTUS Rule disproportionately impacts arid states that have many ephemeral waters. The State of New Mexico fits both these characterizations and is therefore particularly adversely impacted by the WOTUS Rule.

20.  The Agencies state, "[a]bsent CWA jurisdiction, states and tribes can still choose to regulate waters irrespective of federal mandates." While in theory this may be true, in practice this is impossible for states without NPDES authority or an established state permitting program. New Mexico is one of only three states without NPDES authority, and the only such state in the

west. While the Department is interested in having EPA authorize New Mexico to implement the NPDES program, adopting and implementing such a program requires significant time, funding, and staff. Unlike most states with established NPDES programs, New Mexico does not have the legal and procedural program infrastructure to issue NPDES-like permits to regulate discharges of pollutants to surface waters of the state that are not WOTUS under the new definition. As laid out above, the Department estimates that 50% of NPDES individual permits and 25-45% of stormwater general permits will not be required under the 2020 Rule amounting to hundreds of unregulated discharges in New Mexico as a result of the federal rollback, creating a burdensome federal regulatory gap that the state is expected to fill to protect its surface waters and its citizens.

21. The WOTUS Rule imposes significant resource burdens on the Department while putting the health of New Mexico waters at great risk. The premise that all states are capable of addressing water quality issues in their state is false. Not all states can implement a robust and successful water quality program without significant federal assistance. Recurring federal and state funds need to be identified to support a New Mexico surface water discharge permitting program because reasonable permit fees would not cover the costs of the program in New Mexico. Federal financial support for pollution control programs has been steadily declining over the past decade to the detriment of New Mexico's precious surface waters.

22. To prevent water quality degradation in State surface waters from the rollback of CWA protections, the Department will be required to expand the Surface Water Quality Bureau and develop a State surface water permitting program. The Department lacks sufficient funding to expand the Bureau and implement a permitting program as the WOTUS Rule goes into effect. In addition, expansion and funding requests are dependent on approval from the State legislature. With no new funding associated with this substantial shift in CWA jurisdiction, oversight of WOTUS Rule implementation will force the Department to pull resources from current Surface Water Quality Bureau priorities, such as ambient water quality monitoring, assessment and reporting on the status of the state's surface waters, water quality standards revisions, water quality management and watershed-based planning, watershed and wetland restoration, and program and project effectiveness monitoring. In fulfilling its mission to preserve, protect and

improve surface water quality across our state, the Department will be harmed by the WOTUS Rule due to the need to redirect already strained resources, inadequate resources to implement an effective permitting program, and uncertain legislative and federal support.

23. The WOTUS Rule introduces great uncertainty into the Department's regulatory efforts and burdens the Department with the onerous task of interpreting and applying the Rule. If the WOTUS Rule becomes effective, previous guidance documents, memoranda, and materials will be rendered inoperative. In addition, the Department is unaware of a firm commitment by the Agencies to provide guidance and training to assist with early implementation of the WOTUS Rule. This would hamper and delay the Department's ability to administer Surface Water Quality Bureau programs affected by the new WOTUS definition when questions arise. For example, on-the-ground investigations will be needed to delineate which waters are truly intermittent and which are ephemeral for compliance and enforcement purposes. Considering New Mexico has over 88,000 miles of non-perennial streams, and the vast majority of streams in the State do not have active gages to measure stream flows, these stream-specific investigations will be extremely resource-intensive. The Department already has received inquiries from various stakeholders about scope and implementation of the WOTUS Rule that cannot be answered due to uncertainties related to jurisdictional interpretation and enforcement. These are not insignificant burdens and may lead to additional costly litigation stemming from the Department's future interpretation the new WOTUS definition

**THE WOTUS RULE WILL ADVERSELY AFFECT THE NEW MEXICO ECONOMY**

24. The value of healthy surface waters in New Mexico is both cultural and economic. New Mexico's diverse waters recharge aquifers, provide important ecological and hydrological connections, support an amazing variety of wildlife and aquatic life, maintain drinking water resources, and sustain critical economic activity. The State's lakes, reservoirs, rivers, streams, and wetlands are essential to the future vitality of the agricultural, outdoor recreation and tourism industries.

25. The WOTUS Rule does not take into account the recreational economy impacts associated with poorer water quality influencing lake and river recreation as well as the many

rafting companies in New Mexico that depend on clean water for their business. Sixty-five percent of New Mexicans participate in outdoor recreation activities each year. The New Mexico Tourism Department reports that the State also has a high percentage of visitors who choose outdoor recreation activities, such as river rafting, fly fishing, camping, boating and wildlife viewing along the state's scenic waters. Visitors spent $846 million on recreation in the state in 2017 and spending supports 13,000 direct jobs. In addition, the New Mexico Department of Game and Fish reports there are 160,000 anglers who fish in New Mexico, spending $268 million on their activities annually. In recognition of the state's iconic natural landscapes and treasured waters, desire to protect and conserve New Mexico's lands and waters, and potential for developing a more robust outdoor recreation-based economy, the New Mexico Outdoor Recreation Division was created by legislation during the 2019 legislative session. This Division is tasked with increasing outdoor recreation-based economic development, tourism and ecotourism, recruiting new outdoor recreation business to New Mexico, and promoting education about outdoor recreation's benefits to enhance public health. Investing in outdoor recreation helps promote healthy lifestyles and a high quality of life and attracts and sustains employers and families. People do not want to recreate on polluted waters that cannot sustain healthy fish, bird and wildlife populations. The outdoor recreation industry in New Mexico will be adversely impacted by the gap in coverage when the WOTUS Rule goes into effect, to the detriment of jobs and revenue in New Mexico.

26. The WOTUS Rule will also create economic burdens associated with new regulatory gaps. Approximately 40% of New Mexicans rely on surface water as a drinking water source. The regulatory gaps created by the ephemeral waters exemption and loss of wetlands protections resulting from the WOTUS Rule will result in decreased water quality, as explained above. As a result, the cost to treat drinking water and maintain drinking water infrastructure will increase. The cost to treat surface water to drinking water standards depends on the quality of water coming into the treatment plant, the technologies used, the size of the system, and the energy source. Municipalities will likely need to invest in water treatment infrastructure and other costly technologies, such as desalination and ultrafiltration, to provide clean, safe water for drinking.

Degraded water quality coming into the treatment plant, the need for improved and more costly treatment technologies and the less populated, rural nature of New Mexico as a whole will cause water treatment costs to increase substantially for many in the state and may force municipalities to choose lower water quality over necessary investments for clean and safe drinking water. In addition, enhanced treatment to remove pollutants causes increased water loss during treatment, which translates to less potable water in an increasingly arid State.

27.  The Agencies failed to address cross-media implications of the WOTUS Rule. The federal Resource Conservation and Recovery Act (RCRA) exempts wastewater treatment units from regulation under RCRA if, in addition to a number of other conditions, those units discharge effluent pursuant to a NPDES permit. 42 U.S.C. § 6903(27). Under the WOTUS Rule, many facilities currently discharging pursuant to a NPDES permit would no longer be required to have such a permit due to the jurisdictional change in the waters to which they discharge. As a result, these facilities may be subject to regulation under RCRA for the first time, are likely to not have performed an analysis of whether they are subject to RCRA, and would likely not be in compliance with RCRA as a result. Given that a number of these facilities are industrial or municipal facilities that have not contemplated regulation as a RCRA treatment, storage or disposal facility (TSDF), this will present an additional economic hardship on these facilities in New Mexico. If the industrial or municipal facilities are discharging into an ephemeral stream in New Mexico and that ephemeral stream is no longer a WOTUS, these newly regulated TSDFs may also be deemed as land disposing of waste – or hazardous waste – pursuant to the implications of WOTUS.

**CONCLUSION**

28.  The Department respectfully requests that the Court enjoin implementation of the WOTUS Rule. If the rule takes effect, it will have a devastating impact on New Mexico's waters and harm the New Mexico economy. The rule creates a regulatory vacuum that the State will be incapable of filling to mitigate its harm.

29.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 11th day of May 2020 in Santa Fe, New Mexico.

_____

Rebecca Roose

15

Declaration of Rebecca Roose