XAVIER BECERRA
Attorney General of California
SARAH E. MORRISON
ERIC KATZ
Supervising Deputy Attorneys General
CATHERINE M. WIEMAN, SBN 222384
TATIANA K. GAUR, SBN 246227
ROXANNE J. CARTER, SBN 259441
JESSICA BARCLAY-STROBEL, SBN 280361
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013
  Telephone:  (213) 269-6329
  Fax:  (916) 731-2128
  E-mail:  Tatiana.Gaur@doj.ca.gov
*Attorneys for Plaintiff State of California, by and
through Attorney General Xavier Becerra and
California State Water Resources Control Board*

LETITIA JAMES
Attorney General of the State of New
York
PHILIP BEIN
Senior Counsel
TIMOTHY HOFFMAN*
Senior Counsel
  Office of the Attorney General
  Environmental Protection Bureau
  28 Liberty Street
  New York, NY 10005
  Telephone: (716) 853-8465
  Fax: (716) 853-8579
  Email: Timothy.Hoffman@ag.ny.gov
*Attorneys for Plaintiff State of New
  York*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA BY AND THROUGH ATTORNEY GENERAL XAVIER BECERRA AND CALIFORNIA STATE WATER RESOURCES CONTROL BOARD, STATE OF NEW YORK, STATE OF CONNECTICUT, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA EX REL. ATTORNEY GENERAL JOSHUA H. STEIN, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, STATE OF WISCONSIN, COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA, THE NORTH CAROLINA DEPARTMENT OF ENVIRONMENTAL QUALITY, THE DISTRICT OF COLUMBIA, AND THE CITY OF NEW YORK,**<br><br>Plaintiffs,<br><br>v.<br><br>**ANDREW R. WHEELER, AS ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; R. D. JAMES, AS ASSISTANT SECRETARY OF THE ARMY FOR CIVIL WORKS; AND UNITED STATES ARMY CORPS OF ENGINEERS,**<br><br>Defendants. | Case No. 3:20-cv-03005-DMR<br><br>**DECLARATION OF DR. S. MAŽEIKA PATRICIO SULLIVÁN**<br><br>Date:<br>Time:<br>Courtroom:<br>Judge:<br>Trial Date:<br>Action Filed: |

**Dr. S. MAŽEIKA PATRICIO SULLIVÁN, under penalty of perjury, declares as follows:**

1.     I am an Associate Professor in the School of Environment and Natural Resources at The Ohio State University and am an expert in the fields of aquatic and riparian ecology, water resources, and environmental science. I submit this declaration in support of the motion by the plaintiff States and Cities for a preliminary injunction to prevent implementation of the Navigable Waters Protection Rule (hereafter "the Rule"),[1] and in support of plaintiffs' action to vacate the Rule. If the Rule becomes effective, it will cause substantial and widespread harm to the Nation's waters. The Rule substantially undermines water quality, lacks factual support, and is contrary to the best available and current science.

I.     SUMMARY

2.     The objective of the Federal Water Pollution Control Act, more commonly known as the Clean Water Act (CWA), is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[2] The CWA protects rivers, lakes, and territorial seas (i.e., traditional navigable waters), and other waters, including stream tributaries and wetlands, which established science finds are connected to and contribute to the integrity of downstream and downslope traditional navigable waters.

3.     The Rule, if it becomes effective, is highly probable to cause substantial and widespread harm to the Nation's waters. The Rule removes or decreases protections for millions of miles of headwater streams and millions of acres of wetlands, which are vital for sustaining water quality across the country. While western states will experience a disproportionately greater loss in federal protection, all states will be significantly impacted. Of the 9.2 million miles of

---

[1] U.S. Environmental Protection Agency and Department of Defense, Department of the Army, Corps of Engineers, "The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22250 (April 21, 2020).
[2] Federal Water Pollution Control Act, 33 U.S.C. 1251(a).

streams protected under the 2015 Clean Water Rule (CWR),[3] 4.8 million miles will not be protected under the Rule.[4] With ephemeral and intermittent streams making up over 81% of streams in the Southwest[5], loss of protections in these arid and semi-arid regions will be extreme: recent modeling estimates indicate that greater than 85% of stream length in some New Mexico watersheds will lose protection under the Rule.[6] Further, 16.3 million acres of wetlands nationwide will lose federal protection.[7] In many states, loss of protections for wetlands could be staggering: e.g., 61% of wetlands in Montana[8] had no apparent surface water connection to any other waterbody and could lose protection;[9] in North Carolina, wetlands that would lose protection include the majority of  basin, bog, bottomland hardwood forest, headwater forest, Carolina bay, floodplain pool, hardwood flat, non-riverine swamp forest, pine savanna, pocosin, and seep wetland types found in the state;[10] and more than 50% of Tennessee wetlands are potentially excluded from protection under the Rule.[11] New modeling estimates indicate that more than 40% of wetland acres in some New Mexico watersheds will lose protection under the Rule.[12] **The harms wrought by the Rule will be extensive, cumulative, and lasting, and will damage aquatic ecosystems and entire watersheds by leaving upstream and upslope waters subject to pollution and dredging and filling.**[13] This, in turn, will severely impair downstream

---

[3] U.S. Environmental Protection Agency and Department of Defense, Department of the Army, Corps of Engineers, "Clean Water Rule: definition of 'Waters of the United States'," 80 Fed. Reg. 37054, (2015).

[4] K. Fesenmyer et al. *Majority of streams are unprotected in new interpretation of Clean Water Act*. Nature Geoscience (In review).

[5] L.R. Levick et al., *The ecological and hydrological significance of ephemeral and intermittent streams in the arid and semi-arid American Southwest*, U.S. Environmental Protection Agency and USDA/ARS Southwest Watershed Research Center, EPA/600/R-08/134, ARS/233046. Washington, D.C. (2008).

[6] R. Meyer and A. Robertson. *Navigable Waters Protection Rule spatial analysis: A GIS-based scenario model for comparative analysis of the potential spatial extent of jurisdictional and non-jurisdictional waters and wetlands*. Saint Mary's University of Minnesota, Winona, MN, (2020).

[7] C.R. Lane and E. D'Amico, *Identification of putative geographically isolated wetlands of the conterminous United States,* 52 J Am Water Resour  Associ 705 (2016).

[8] Mapped in the National Wetland Inventory (NWI),  Found at: https://www.fws.gov/wetlands/.

[9] L.K. Vance, *Geographically isolated wetlands and intermittent/ ephemeral streams in Montana: extent, distribution, and function*. Montana Natural Heritage Program, Prepared for Montana Department of Environmental Quality and U.S. Environmental Protection Agency (2009).

[10] Moffat and Nichol, *Proposed changes to the Waters of the United States (WOTUS) definition–summary of M&N conclusions* (2019). Found at: https://www.southernenvironment.org/uploads/words_docs/Exhibit_B.pdf.

[11] G. Siedschlag et al, *Five case studies on the effects of the SWANCC and Rapanos Supreme Court rulings on Tennessee waterways*. Report prepared for the National Wildlife Federation, Trout Unlimited, and Ducks Unlimited. (2010).

[12] Supra note 6.

[13] S. Colvin et al., *Headwater streams and wetlands are critical for sustaining fish, fisheries, and ecosystem services* 44 Fisheries

Declaration of Dr. S. Mažeika Patricio Sulliván

waters, whose water quality depends on the functions performed by streams and wetlands throughout the watershed.[14]

4.      By removing CWA protections for all ephemeral streams, the Rule subjects a significant amount of the Nation's stream miles to destruction and unchecked pollution. Ephemeral streams (i.e., those that flow periodically following precipitation events) are critical to the health of river systems and comprise the vast majority of stream length in many parts of the country, especially in the western United States. In addition, climate-change is causing reduced overall stream flow, effectively converting once protected perennial and intermittent streams into unprotected ephemeral streams, further magnifying the harm to the Nation's waters. These harms include increased downstream pollution and sedimentation, and loss of habitat for myriad fish and other animals, many of whom are already threatened and endangered.[15]

5.      By removing CWA protections for all non-floodplain wetlands (referred to "isolated" or "physically isolated" in the Rule), the Rule subjects millions of acres of wetlands across the Nation, an area approaching the size of West Virginia, to destruction and pollution. These wetlands provide essential functions, including the trapping of pollutants that improves downstream water quality, flood control, and habitat for multiple species. The Rule's elimination of protection for non-floodplain wetlands will reduce water storage in times of drought while increasing downstream nutrient pollution as well as other pollution impacts.

6.      The Rule will cause these and other harms because it ignores widely accepted scientific knowledge. In 2015, the United States Environmental Protection Agency (EPA) and Army Corps of Engineers (hereafter, "the Agencies") promulgated the CWR[16]. The CWR was based on the best available science, and was supported by an extensive report based on over 1,200 peer-reviewed scientific publications by 17 federal agency authors, known as the "Connectivity Report."[17] The Connectivity Report and the CWR were then publicly reviewed by 49 technical

Magazine 73 (2019).

[14] I.F. Creed et al., *Enhancing protection for vulnerable waters*, 10 Nat Geosci 809 (2017).

[15] Supra note 13.

[16] Supra note 3.

[17] U.S. EPA, *Connectivity of streams and wetlands to downstream waters: a review and synthesis of the scientific evidence.* Technical Report, EPA/600/R-14/475f. US Environmental Protection Agency, Washington, D.C., (2015).

experts, including a 25-member Science Advisory Board (SAB) Panel of which I was a member.[18] Since that time, substantial additional literature and supporting statements from highly credible experts have emerged that reaffirm the scientific conclusions and recommendations of that 2013-2014 SAB Panel, which broadly supported the Connectivity Report.[19]

7.      The Rule adopts a limited, scientifically unsupported implementation of waters' connectivity. Connectivity of waters has emerged as a cornerstone scientific principle. Connectivity of waters is the notion that waters are linked to various degrees via physical, chemical, and biological mechanisms; even small and geographically distant waters can have significant impacts on larger downstream waters. In the Rule[20], the Agencies have largely abandoned factual or science-based protection of waters under the CWA. The Agencies' justification for the Rule ignores or misrepresents much of the Connectivity Report and subsequent SAB review and draws incomplete or incorrect conclusions. The Rule is inconsistent with the best available and most current science, and lacks grounding in the scientific understanding of waterbody connectivity. For example, the agencies "improperly used [a straightforward figure developed by the 2013-2014 SAB Panel depicting the consequences of gradients of waterbody connectivity] … to support removing federal protection for ephemeral streams and non-floodplain wetlands."[21] In this and other ways, the Rule ignores the complexity of drainage network and watershed processes and disregards many key functions that streams and wetlands provide, from local to watershed scales, that significantly affect the integrity of downstream waters.

---

[18] "Letter to Gina McCarthy. October 17, 2014. SAB review of the draft EPA report Connectivity of streams and wetlands to downstream waters: a review and synthesis of the scientific evidence. U.S. Environmental Protection Agency", (2014).

[19] E.g., M. Cohen et al., *Do geographically isolated wetlands influence landscape functions?*, 113 Proceedings of the National Academy of Sciences of the United States of America 1978 (2016); Supra note 50; K. Fritz et al., *Physical and chemical connectivity of streams and riparian wetlands to downstream waters: a synthesis*, 54 J Am Water Resour Assoc 323 (2018); S. Leibowitz et al., *Connectivity of streams and wetlands to downstream waters: an integrated systems framework*, 54 J Am Water Resour Assoc 298 (2016); K. A. Schofield et al., *Biota connect aquatic habitats throughout freshwater ecosystem mosaics*, 54 J Am Water Resour Assoc 372 (2018); Supra note 13; J. Harvey et al., *How hydrologic connectivity regulates water quality in river corridors,* 55 J Am Water Resour Assoc 369 (2018).

[20] U.S. EPA and U.S. DOA,  *Economic analysis for the Navigable Waters Protection Rule: definition of  "Waters of the United States",* (2020).

[21] S.M.P. Sullivan et al., *The proposed change to the definition of "Waters of the United States" flouts sound science*, 116 Proceedings of the National Academy of Sciences of the United States of America 11558 (2019).

8.     Many states rely on federal water pollution controls to ensure water quality. Absent effective federal protections, many waterbodies within states will be left unprotected. The Agencies recognize dozens of U.S. states have laws that could prohibit or limit the authority of state agencies or localities to regulate waters unprotected by the CWA.[22] The Rule will result in harms that states cannot take action to prevent, including pollution of waters in upstream states that will flow into downstream states' waters.

## II.   PERSONAL BACKGROUND AND EXPERIENCE

9.     I am an Associate Professor in the School of Environment and Natural Resources at The Ohio State University (OSU) and the Director of the Ramsar-designated Shiermeier Olentangy River Wetland Research Park. I received a B.A. in Anthropology from Dartmouth College, and earned an M.S. in Biology and Ph.D. in Natural Resources from the University of Vermont. Subsequently, I was a Postdoctoral Research Fellow at the University of Idaho before joining the OSU faculty in 2008. My research focuses on watershed and coastal science and management. I have published 60 journal articles and book chapters, have reviewed submitted manuscripts for over 30 ecological and environmental journals, and am an active member of the Society for Freshwater Science, American Fisheries Society, American Society of Limnology and Oceanography, and Ecological Society of America.

10.    I have been actively engaged in the science underpinning the CWA, including serving as a member of the EPA Science Advisory Board "*Connectivity of Streams and Wetlands to Downstream Waters*" Panel (2013-2014), briefing Congress on the proposed changes to the Clean Water Rule (2019), and offering two national webinars on the topic (2019). I have also been recognized as a Distinguished University Teacher (2014), served as a Fulbright Distinguished Chair of Biodiversity and Sustainable Development (Colombia, 2015-2016), and was recently

---

[22] U.S. EPA and U.S. DOA, *Economic analysis for the Navigable Waters Protection Rule: definition of "Waters of the United States"*, (2020); Environmental Law Institute. *State constraints: state-imposed limitations on the authority of agencies to regulate waters beyond the scope of the federal Clean Water Act*. Environmental Law Institute, Washington, D.C., (2013).

selected as the 2020 recipient of OSU's College of Food, Agricultural, and Environmental

Sciences' Distinguished Junior Faculty Research Award.

### III.   THE RULE IS INCONSISTENT WITH ACCEPTED SCIENCE

11.   **The Rule disregards an extensive, established and growing body of scientific literature on waterbody connectivity and the processes that underpin water quality and watershed functions.** In 2015, the Agencies promulgated the CWR, which was supported by the Connectivity Report[23] that synthesized over 1,200 peer-reviewed scientific publications and input from 49 technical experts. After a public review process, a 25-member EPA SAB Panel confirmed the scientific bases of both the Connectivity Report and the CWR. Moreover, since the development of the Connectivity Report and the CWR, that body of supporting evidence has only grown.[24] What has emerged is a scientific understanding of how biological, chemical, and hydrologic connectivity among waterbodies throughout a watershed, including wetlands and ephemeral streams, contributes to freshwater ecosystem integrity. This scientific understanding includes recognition that gradients of waterbody connectivity (rather than an overly simplistic, "connected or not connected" approach) operate as a function of frequency, magnitude, timing, duration, and predictability, and are critical to services derived from freshwater ecosystems.[25]

12.   **The Rule is not based on a comparable body of evidence: by disregarding or misinterpreting clear scientific understanding of waterbody connectivity, the Rule draws arbitrary boundaries to distinguish between protected and unprotected waters.** The Rule is highly inconsistent with current scientific understanding and is therefore contrary to effective water-quality protection.

---

[23] Supra note 17.

[24] E.g., M.J. Cohen et al., *Do geographically isolated wetlands influence landscape functions?,* 113 Proceedings of the National Academy of Sciences of the United States of America 1978 (2016); S.G. Leibowitz et al., *Connectivity of streams and wetlands to downstream waters: an integrated systems framework*, 54 J Am Water Resour Assoc 298 (2016); K.A. Schofield et al., *Biota connect aquatic habitats throughout freshwater ecosystem mosaics*, 54 J Am Water Resour Assoc 372 (2018); Supra note 13.

[25] Supra note 18.

13.     Although the Agencies state that they "*looked to science to inform other aspects of the final rule …*"[26], the end result is a rule that largely opposes or misinterprets previous science-based recommendations. For instance, the Agencies briefly acknowledge that both EPA's 2013-2014 SAB Panel[27] and the Connectivity Report[28] stressed gradients of waterbody connectivity and the consequences of variability in that connectivity for downstream or downslope waters. But they proceed to set this information aside and draw hard jurisdictional lines that remove federal protections for a significant subset of floodplain wetlands, and all ephemeral streams and non-floodplain wetlands. In doing so, the Agencies arrive at erroneous conclusions that are not supported by established science and are the opposite of the SAB's intent[29]. **The 2013-2014 SAB emphasized that even low levels of connectivity can be important relative to impacts on the chemical, physical, and biological integrity of downstream waters**. In fact, the lack of connectivity between some wetlands and downstream waters is a key reason they contribute to improved water quality.[30] For instance, non-floodplain wetlands trap stormwater and agricultural runoff, store water and capture materials and nutrients, thereby preventing or reducing pollution to downstream and downslope waters.

14.     The 2013-2014 SAB Review also highlighted the importance of the cumulative, aggregate effects of streams and wetlands on downstream waters, which has not been adequately recognized in the Rule. For example, even though non-floodplain wetlands are typically located more distant from traditional navigable waters, and ephemeral streams flow less frequently than intermittent or perennial ones, these wetlands and streams are often extremely abundant and widespread. As a result, just as ignoring the critical role played by tiny capillaries in our vascular systems can spell disaster for a human body, destroying or impairing non-floodplain wetlands and ephemeral streams negatively impacts watersheds, water quality, water supply, and organisms

---

[26] 85 Fed. Reg. at 22271.
[27] Supra note 18.
[28] Supra note 17.
[29] Supra note 21.
[30] J.M. Marton et al., *Geographically isolated wetlands are important biogeochemical reactors on the landscape*, 65 Bioscience 408 (2015).

like fish.[31] And like small capillaries in the human body, small tributaries comprise 60-80% of the total length of streams in watersheds, varying by geographic region.[32] Yet, in the final rule the Agencies summarily eliminate protections for all ephemeral streams and non-floodplain wetlands, individually and in the aggregate. For instance, in a significant departure from the CWR, similarly situated waters such as California vernal pool and prairie pothole complexes will no longer be afforded protection, despite evidence that their hydrology and ecology are strongly linked with the processes that formed them.[33]

## IV.   THE RULE LACKS FACTUAL AND SCIENTIFIC SUPPORT

15.   **The Rule rests on a limited conception of physical hydrologic connectivity, and ignores the chemical and biological connectivity of waters, which is in direct contrast with the CWA's objective to protect the chemical, physical, and biological integrity of the Nation's waters**. The Agencies use direct hydrologic surface connectivity as the sole factor determining whether wetlands are subject to CWA jurisdiction. Consequently, wetlands that do not abut or lack a direct surface water connection with a traditional navigable water or other jurisdictional water "in a typical year" will generally not be protected.[34] All non-floodplain wetlands, as well as many floodplain wetlands, will lose protection despite multiple lines of evidence demonstrating important chemical and biological connectivity between these wetlands and downstream waters. Wetlands can be critical sources of chemicals and matter (e.g., nutrients, dissolved organic compounds, salts) to downstream waters, which can be detrimental or beneficial depending upon the specific circumstances. Wetlands (including non-floodplain wetlands) can act as chemical sinks, protecting downstream waters by retaining compounds

---

[31] C.R. Lane et al., *Hydrological, physical, and chemical functions and connectivity of non-floodplain wetlands to downstream waters: a review*, 54 J Am Water Resour Assoc 346 (2018); G.R. Evenson et al., *Geographically isolated wetlands and watershed hydrology: a modified model analysis*, 529 Journal of Hydrology 240 (2015).

[32] T. Nadeau and M.C. Rains, *Hydrological connectivity between headwater streams and downstream waters: how science can inform policy*, 43 J Am Water Resour Assoc 118 (2007); Supra note 5.

[33] Supra note 3.

[34] An exception to this is a wetland separated from a jurisdictional water only by a natural feature, such as a berm. 33 C.F.R §§ 328.3(a)(4), (c)(1). For such wetlands, the hydrologic surface connection is, in effect, presumed.

through a suite of physico-chemical processes including denitrification, sedimentation, long-term storage in plant detritus, and ammonia volatilization, among others.[35]

16.   **The Rule disregards the importance of both floodplain and non-floodplain wetlands to biodiversity.** These wetlands provide habitat and food resources for myriad organisms across their life cycles.[36] The high variability in habitat of non-floodplain wetlands, for instance, typically supports habitat specialists (i.e., species requiring specific, unique resources) leading to high species richness within and among wetlands.[37] In New York, the 2015 State Wildlife Action Plan identified 166 "High Priority Species of Greatest Conservation Concern" that have experienced population declines and require urgent conservation measures; 37% of these species rely on good water quality and aquatic habitat, including wetlands.[38] Migratory animals, including migratory birds, transport nutrients, energy, and other organisms between disparate locations, at both local and landscape scales and thus provide functional connectivity among often widely spaced wetlands and other waterbodies.[39] Through these movements, biota also prevent inbreeding, escape stressors, locate mates, find food resources, and recolonize habitats. In these ways, a multitude of organisms contribute to biodiversity and the exchange of materials among waterbodies, and serve as critical agents of connectivity and resiliency among streams, wetlands, and downstream waters.[40]

---

[35] C.R. Lane et al., *Hydrological, physical, and chemical functions and connectivity of non-floodplain wetlands to downstream waters: a review*, 54 J Am Water Resour Assoc 346 (2018); M.J. Cohen et al., *Do geographically isolated wetlands influence landscape functions?*, 113 Proceedings of the National Academy of Sciences of the United States of America 1978 (2016); C.L. Atkinson et al, *Water quality and planktonic microbial assemblages of isolated wetlands in an agricultural landscape*, 31 Wetlands 885 (2011); T.M. Anderson et al., *Landscape-scale analyses suggest both nutrient and antipredator advantages to Serengeti herbivore hotspots*, 91 Ecology 1519 (2010); C.B. Craft and W.P. Casey, *Sediment and nutrient accumulation in floodplain and depressional freshwater wetlands of Georgia, USA*, 20 Wetlands 323 (2000).

[36] M.A. Fortuna et al, *Spatial network structure and amphibian persistence in stochastic environments*, 273 Proceedings of the Royal Society B-Biological Sciences 1429 (2006); D. Dudgeon et al., *Freshwater biodiversity: importance, threats, status and conservation challenges*, 81 Biological Reviews 163 (2006).

[37] S.G. Leibowitz, *Isolated wetlands and their functions: an ecological perspective*, 23 Wetlands 517 (2003).

[38] NY DEC. New York State Wildlife Action Plan, 2015, Department of Environmental Conservation, Albany, New York, (2015). Found at: https://www.dec.ny.gov/docs/wildlife_pdf/swapfinaldraft2015.pdf.

[39] A.L. Subalusky et al, *Ontogenetic niche shifts in the American alligator establish functional connectivity between aquatic systems*, 142 Biological Conservation 1507 (2009); S. Bauer and B.J. Hoye, *Migratory animals couple biodiversity and ecosystem functioning worldwide*, 344 Science 1242552 (2014).

[40] K.A. Schofield et al., *Biota connect aquatic habitats throughout freshwater ecosystem mosaics*, 54 J Am Water Resour Assoc 372 (2018).

17.  **The Rule ignores fundamental facts about the connectivity of waters.**
Connectivity is dictated by structural aspects (e.g., the spatial configuration and contiguity of habitat or other physical units) as well as functional aspects (e.g., the functional interactions between units, which might be species or landscape elements). In addition to surface water connections, there are multiple other elements of structural connectivity. For instance, streams are connected to downstream waters through networks of continuous beds and banks; yet the Agencies have eliminated the use of bed, banks, and an ordinary high-water mark to define a tributary, instead employing a much narrower definition. Functional connectivity, such as the movement of sediment from upstream to downstream in river networks[41], is critically important to waterbody connectivity, as recognized both by the 2013-2014 SAB Panel and more recent literature.[42] The functional connectivity framework outlines five functions – source, sink, refuge, lag, and transformation – that describe the mechanisms by which streams and wetlands influence material fluxes to downstream waters.[43] Thus, both structural and functional aspects mediate the export or import of mass, energy, and biota from one waterbody to another. In the Rule, the Agencies' consideration of only one element of structural connectivity (i.e., surface hydrology), at the expense of functional and other physical aspects, is insufficient.[44]

18.  **The Rule ignores the importance of subsurface connections between waters.**
Scientists have long known that surface water and groundwater are a single resource.[45] Over large scales of space and time, wetlands can have large effects on groundwater recharge,[46] which in

---

[41] G.E. Petts and C. Amoros (eds.), Fluvial hydrosystems, Chapman and Hall, London and New York, (1996).

[42] E.g., Matthew J. Cohen et al., *Do geographically isolated wetlands influence landscape functions?,* 113 Proceedings of the National Academy of Sciences of the United States of America 1978 (2016); .M. Fritz et al., *Physical and chemical connectivity of streams and riparian wetlands to downstream waters: a synthesis*, 54 J Am Water Resour Assoc 323 (2018).

[43] S.G. Leibowitz et al., *Connectivity of streams and wetlands to downstream waters: an integrated systems framework,* 54 J Am Water Resour Assoc 298 (2016); S.G. Leibowitz et al., *Non-navigable streams and adjacent wetlands: addressing science needs following the Supreme Court's Rapanos Decision*, 6 Frontiers in Ecology and the Environment 364 (2008).

[44] M. Rinderer et al, *Assessing structural, functional and effective hydrologic connectivity with brain neuroscience methods: state-of-the-art and research directions,* 178 Earth-Science Reviews 29 (2018); G. Ali et al., *The T-Tel Method for assessing water, sediment, and chemical connectivity*, 54 Water Resources Research 634 (2018).

[45] T.C. Winter et al., *Ground water and surface water: a single resource*. U.S. Geological Survey Circular 1139, (1998).

[46] M.C. Rains, *Water sources and hydrodynamics of closed-basin depressions, Cook Inlet Region, Alaska,* 31 Wetlands 377 (2011); W.C. Sinclair, *Experimental study of artificial recharge possibilities in Northwest Hillsborough County, Florida,* US Geological Survey Water-Resources Investigations 77-13, (1977); W.W. Wood and W.E. Sanford, *Chemical and isotopic methods for quantifying groundwater recharge in a regional, semiarid environment*, 33 Ground Water 458 (1995).

Declaration of Dr. S. Mažeika Patricio Sullivan

1   turn can drive flow in streams throughout the region.[47] Wetlands and streams are linked by

2   integrated surface-water and groundwater flow systems,[48] modulating both the local storage of

3   water[49] and the rate at which water flows to downstream waters.[50] Given the close connection

4   between surface and groundwater, the term hyporheic zone was created to refer to the boundary

5   where river water and groundwater mix in the gravel under and around the river channel.[51] In the

6   Rule, the Agencies disregard groundwater connectivity and thereby disregard the reality of how

7   the Nation's natural waters function. The fact that the Rule includes the language – "*Like diffuse*

8   *overland flow, the agencies also conclude that relatively permanent bodies of water that are*

9   *connected to downstream jurisdictional waters only via groundwater are not jurisdictional ...*"[52]

10   – shows a significant lack of appreciation for the consequences of waterbody connectivity for

11   water quality, as well as a lack of understanding of where and how natural waters accumulate on

12   a landscape. Virtually every "water" is fundamentally dependent on variable rates of

13   precipitation, accumulation on the surface, and infiltration into the ground.

14       19.   **The Rule ignores basic scientific realities about waterbody connectivity,**

15   **watershed function, and the maintenance of water quality.** Restoring and maintaining the

16   chemical, physical, and biological integrity of the Nation's waters presents inherently complex

17   issues due to the myriad interactions among climate, geology, topography, land use and land

18   cover, and the many contributing chemical, physical, and biological processes that are all

19   influenced by human actions (e.g., water withdrawal, development, climate change).[53] Thus, a

20   ─────────────────────

[47] Supra note 45; G.R. Kish et al., *A geochemical mass-balance method for base-flow separation, Upper Hillsborough River
21   Watershed, West-Central Florida, 2003-2005 and 2009*. U.S. Geological Survey Scientific Investigations Report 2010–5092
(2010).

22   [48] M.C. Rains et al., *The role of perched aquifers in hydrological connectivity and biogeochemical processes in vernal pool
landscapes, Central Valley, California*, 20 Hydrological Processes 1157 (2006).

23   [49] J. Min et al, *Wetland-groundwater interactions in subtropical depressional wetlands*, 30 Wetlands 997 (2010); D.L.
McLaughlin et al, *A significant nexus: geographically isolated wetlands influence landscape hydrology*, 50 Water Resources
24   Research 7153 (2014); G. Ali et al., *Groundwater-driven wetland-stream connectivity in the Prairie Pothole Region: inferences
based on electrical conductivity data*, 37 Wetlands 773 (2017).

25   [50] M.C. Rains et al. *Geographically isolated wetlands are part of the hydrological landscape*. 30 Hydrological Processes 153
(2016).

26   [51] J.A. Stanford  and J.V. Ward, *The hyporheic habitat of river ecosystems*, 335 Nature 64 (1988).

[52] 85 Fed. Reg. at 22278.

27   [53] C. Amoros and G. Bornette, *Connectivity and biocomplexity in waterbodies of riverine floodplains,* 47 Freshwater Biology 761
(2002); S.G. Leibowitz et al., *Connectivity of streams and wetlands to downstream waters: an integrated systems framework,* 54 J
28   Am Water Resour Assoc 298 (2016).

Declaration of Dr. S. Mažeika Patricio Sullivan

key recommendation of the 2013-2014 SAB Panel was to view waterbodies at functional spatial scales and as part of interconnected river-riparian landscapes[54] and groundwater basins,[55] thus highlighting the critical nature of these connections that are essential to understand the impacts of altered connectivity to downstream waters. For example, ephemeral and intermittent streams make up 59% of all streams in the conterminous United States,[56] and in the arid and semi-arid Southwest they comprise more than 81% of all streams.[57] As such, they are critically important in maintaining water quality, biodiversity, and overall watershed function.[58]

20.     **The Rule forces hard jurisdictional lines on watershed and landscape boundaries, contrary to established and growing scientific evidence of the need to recognize waterbody connectivity across landscape boundaries to achieve CWA goals.** The Agencies state that "*[t]his final rule is intended to establish categorical bright lines that provide clarity and predictability for regulators and the regulated community. Consistent with that goal, the final rule eliminates the case-specific application of Justice Kennedy's significant nexus test, and instead establishes clear categories of jurisdictional waters and non-jurisdictional waters and features ...*"[59] But the establishment of hard jurisdictional lines opposes scientific evidence that waterbody connectivity and other landscape boundaries occur along a gradient. For instance, the Rule draws artificial distinctions between upland and bottomland, with direct implications for determining CWA jurisdiction over some waters (e.g., artificially irrigated areas, artificial lakes and ponds). Determination of upland boundaries is challenging, and many landscapes exhibit gradual shifts from bottomland to upland (i.e., ecotones);[60] this complexity should be

---

[54] J.A. Wiens, *Riverine landscapes: taking landscape ecology into the water*, 47 Freshwater Biology 501 (2002); P. Tagwireyi et al., *Associations between riverine landscape patches and internal and external environmental determinants are scale dependent: evidence from the Scioto River, USA*, 190 Fundamental and Applied Limnology 235 (2017); K. D. Fausch et al., *Landscapes to riverscapes: bridging the gap between research and conservation of stream fishes*, 52 Bioscience 483 (2002); J. Harvey et al., *How hydrologic connectivity regulates water quality in river corridors*, 55 J Am Water Resour Assoc 369 (2019).

[55] S.M. Gorelick and C. Zheng, *Global change and the groundwater management challenge*, 51 Water Resources Research 3031 (2015).

[56] Supra note 5; T.L. Nadeau and M.C. Rains, *Hydrological connectivity between headwater streams and downstream waters: how science can inform policy*, 43 J Am Water Resour Assoc 118 (2007).

[57] Supra note 5.

[58] Ibid.; Supra note 18; Supra note 13.

[59] 85 Fed. Reg. at 22325.

[60] H. Décamps and R.J. Naiman. *Towards an ecotone perspective*. 4 Ecology and management of aquatic-terrestrial ecotones 1 (1990).

13

acknowledged, not oversimplified. Moreover, although the Agencies assert that the Rule establishes jurisdiction under the CWA in a clearer and more understandable way, it does not effectively accomplish this. For instance, the Agencies have removed case-specific evaluations for non-floodplain wetlands (i.e., none is protected) citing clarity, yet propose case-by-case judgments or their equivalent in multiple other instances: e.g., estimating snowpack-streamflow relationships, determining tributary flow classification (i.e., to distinguish ephemeral from intermittent and perennial streams), determining if inundation by flooding or a direct hydrological surface connection exists in a "typical year" for wetlands, and evaluating ditches potentially constructed in a tributary. To make these and other determinations, the Agencies have indicated that a suite of tools and methods will be used, including (but not limited to) maps, flow records, gage data, flood predictions, elevation data, statistical evidence, and field work and direct observations. Thus, while the Agencies recognize that case-specific evaluations are necessary to adequately address the complexity of waters and watersheds in some cases, they disregard this complexity in other situations (e.g., ephemeral streams and non-floodplain wetlands), putting millions of miles of streams and acres of wetlands at risk for the sake of ease of implementation.

## V.   BY IGNORING SCIENCE THE RULE THREATENS IRREPARABLE HARM TO THE NATION'S WATERS

21.   **The Rule will remove protections for millions of miles of streams and millions of acres of wetlands,[61] leaving them vulnerable to dredge and fill, draining, development, and pollution.** While waters in certain regions of the country will be disproportionately impacted given the distribution of vulnerable waters (e.g., high proportion of ephemeral streams in arid regions such as the Southwest),[62] the harms threatened by the Rule will be extensive, long-lasting,

---

[61] See U.S. EPA, Comments from Center for Biological Diversity (2019) Doc No. EPA-HQ-OW-2018-0149-5076); U.S. Environmental Protection Agency, Comments from Waterkeeper Alliance et al.  (May 14, 2019) Doc No.EPA-HQ-OW-2018-0149-11318 and EPA-HQ-OW-2018-0149-11319.

[62] Center for Biological Diversity, Center for Food Safety, Turtle Island Restoration Network, Waterkeeper Alliance, Humboldt Baykeeper, Lake Worth Waterkeeper, Missouri Confluence Waterkeeper, Russian Riverkeeper, Monterey Coastkeeper, Rio Grande Waterkeeper, Snake River Waterkeeper, Sound Rivers, Upper Missouri Waterkeeper. 60-day Notice of Intent to Sue Regarding the 2020 Revised Definition of "Waters of the United States", February 13, 2020; Supra note 5.

Declaration of Dr. S. Mažeika Patricio Sulliván

and nationwide. Damage to the Nation's waters is particularly likely given the current

compromised state of many waters across the country. Wetland loss in the continental U.S. is

staggering, with states including Iowa, Missouri, Illinois, Kentucky, Indiana, Ohio, and California

having lost more than 80% of wetland area from the 1780s to the 1980s.[63] Of remaining wetlands,

32% were identified as being in poor condition as of 2011.[64] As of 2008-2009, 46% of U.S.

streams and rivers were categorized by the EPA as being in poor condition. Over 40% of streams

and rivers suffer from excessive nutrients, 22% exceed indicators of bacterial concentrations that

can affect human health (e.g., gastrointestinal illness), and more than 13,000 miles have been

found to have fish exhibiting unsafe levels of mercury.[65]

22. A suite of recent studies illustrates how human activities on the ground can impact

headwater ecosystems, including ephemeral streams and non-floodplain wetlands.[66] For instance,

human alterations to headwaters streams in the northeastern U.S. lead to reduced capacity of

headwaters to remove nitrogen and to excess nutrient export to downstream waters such as

coastal ecosystems.[67] The list of stressors to freshwater ecosystems includes overexploitation;

water pollution; flow modification; destruction or impairment of habitat; invasion by exotic

species; and climate and land-use change.[68] Urban and agricultural development has been

implicated in massive wetland losses (*see* below), leading to wetland dredging and draining for

economic expansion with quantitative environmental consequences.[69] For instance, agricultural

development led to the loss of 95% of non-floodplain wetlands in the U.S. Prairie Pothole Region

[63] T.E. Dahl, *Wetland losses in the United States 1780's to 1980's,* U.S. Department of the Interior, Fish and Wildlife Service, Washington, D.C. (1990).

[64] U.S. EPA, Office of Wetlands, Oceans and Watersheds. Office of Research and Development. Washington, DC, *National wetland condition assessment 2011: a collaborative survey of the Nation's wetlands* (2016) Doc No. EPA-843-R-15-005. Found at: https://www.epa.gov/sites/production/files/2016-05/documents/nwca_2011_public_report_20160510.pdf.

[65] U.S. Environmental Protection Agency, Office of Water and Office of Research and Development. Washington, DC. *National rivers and streams assessment 2008-2009: a collaborative survey* (2016) Doc No. EPA/841/R-16/007. Found at: http://www.epa.gov/national-aquatic-resource-surveys/nrsa

[66] Supra note 13.

[67] N.M. Schmadel. et al. *Low threshold for nitrogen concentration saturation in headwaters increases regional and coastal delivery*, 15 Environmental Research Letters 044018 (2020).

[68] D. Dudgeon et al., *Freshwater biodiversity: importance, threats, status and conservation challenges*, 81 Biological Reviews 163 (2006); M.M. Brinson and A.I. Málvarez, *Temperate freshwater wetlands: types, status, and threats*, 29 Environmental Conservation 115 (2002); V. Acuña et al., *Why should we care about temporary waterways?,* 343 Science 1080 (2014).

[69] N.C. Davidson, *How much wetland has the world lost? Long-term and recent trends in global wetland area*, 65 Marine and Freshwater Research 936 (2014).

Declaration of Dr. S. Mažeika Patricio Sulliván

between 1997-2009.[70] Non-floodplain wetlands and ephemeral streams are considered among the most vulnerable waters and have been disproportionately impaired or destroyed by a suite of human activities when compared to other waterbodies. Thus, **the collective evidence of these studies underscores the importance of conservation safeguards for restoring and maintaining waters' integrity, and demonstrates the significant harm to U.S. waters that will result from the narrower scope of protected waters in the Rule.**

23.   **Many states rely on federal regulation for water protection, and absent comprehensive federal protection, many of their waterbodies will be left unprotected.** The Agencies have identified thirteen states that have laws requiring state regulations to parallel federal regulations, and twenty-four states with laws requiring proof of benefit before state regulations can be extended beyond federal requirements.[71] Additional research suggests restrictions on the state level to be more extensive, with as many as 36 states with laws that could restrict the authority of state agencies or localities to regulate waters unprotected by the CWA, and 28 states with laws that could prohibit or limit the authority of the states to regulate waters more stringently than the CWA.[72]

a.   **Harm to Ephemeral Streams**

24.   **The Rule removes protections for all ephemeral streams, despite their importance and the risks associated with their impairment that have been widely recognized,**[73] **including by EPA:** "*Despite their seasonal or temporary appearance on the landscape, seasonal and rain-dependent streams are critical to the health of river systems, are hydrologically and biologically connected to the downstream waters, and provide many of the same functions and values as rivers and larger streams.*"[74] Fesenmyer et al.[75] estimate that

---

[70] T.E. Dahl, *Status and trends of prairie wetlands of the United States 1997 to 2009*. U.S. Department of the Interior, Fish and Wildlife Service, Ecological Services: Washington D.C. (2014).
[71] Supra note 20.
[72] Environmental Law Institute. *State constraints: state-imposed limitations on the authority of agencies to regulate waters beyond the scope of the federal Clean Water Act*. Environmental Law Institute, Washington, D.C. (2013).
[73] Supra note 5; Supra note 13.
[74] U.S. EPA and DOD. Section 404 of the Clean Water Act, Streams under CWA Section 404. Found at: https://www.epa.gov/cwa-404/streams-under-cwa-section-404
[75] Supra note 4.

Declaration of Dr. S. Mažeika Patricio Sulliván

**nationwide 7.7 million km (4.8 million miles), or 52% of stream channels by length, will not be protected under the Rule.**[76] This is in contrast to 9.3 million miles protected under the CWR.[77] Meyer and Robertson[78] estimate that under the CWR, 96.7% of stream length in the Río Salado watershed of New Mexico is protected but only 5.2% will be protected under the Rule. In the South Platte watershed of Colorado, protection drops from 96.5 to 55.2%. For the Río Peñasco watershed (New Mexico), the CWR protects 96% of total stream length but the new Rule will only protect 8.7%. Losses in protections are not limited to the Southwest: the percentage of stream length protected in the Roanwood Creek watershed of Montana drops from 95.9 under the CWR to 26.2 under the Rule. For the Nanticoke watershed of Delaware-Maryland, jurisdictional stream length drops from 99.2% under the CWR to 79.7% under the Rule.[79]

25.    Historic permitting data can also be used to approximate the scope of lost stream protections under the Rule.[80] Based on permit data in the record, an initial analysis conducted by the Southeast Environmental Law Center identified up to 10,027,475 linear feet (total) and 2,005,495 linear feet (annually) of stream impacts no longer requiring a permit under the proposed Rule. Similarly, data from the National Pollution Discharge Elimination System (NPDES) program[81] – previously assessed by EPA in connection with the *Rapanos* decision[82] – suggest that 14,751, or **40%** of permits that had location data, were on headwaters (intermittent and ephemeral streams grouped together).

26.    **Under the Rule, elimination of ephemeral stream protections will lead to deterioration of physical, chemical, and biological water quality both locally and in**

[76] The authors used a geographic information systems (GIS) version of the high-resolution National Hydrography Dataset (NHD), complemented with national flow accumulation and slope datasets (U.S. Geological Survey, 2005, Elevation derivatives for national applications: U.S. Geological Survey Fact Sheet 2005–3049, 2 p., Found at: https://doi.org/10.3133/fs20053049), to address NHD undermapping of ephemeral streams. Note this estimate excludes NHD canals, ditches, and features that overlap with pasture/hay or cultivated crops.
[77] Supra note 4.
[78] Supra note 6.
[79] Ibid. Meyer and Robertson's analysis also indicates that the CWR estimates on stream protections are comparable to the 1986 Rule, showing that the CWR was much more consistent with past regulations than the Rule.
[80] U.S. EPA. Clean Water Act Section 404 Data used in proposed rule economic analysis and resource and programmatic assessment. (2019). Doc No. EPA-HQ-OW-2018-0149-0052.
[81] U.S. EPA Clean Water Act Section 402 Data used in proposed rule economic analysis and resource and programmatic assessment. (F2019) Doc No. EPA-HQ-OW-2018-0149-0058.
[82] Rapanos v. United States, 547 U.S. 715 (2006).

Declaration of Dr. S. Mažeika Patricio Sull ván

**downstream waters.** Ephemeral streams – often unmapped, small in size, and poorly protected – are highly vulnerable systems, yet are critical to watershed functioning, and ecological and human well-being.[83] Ephemeral streams are also widespread in other states and in wetter climates. In central and eastern Montana, for example, more than 60% of streams are ephemeral, and in wetter, mountainous regions of the state, more than 30% of stream miles are ephemeral.[84]

27.   **The Rule will harm many native populations of fish and other aquatic biota.** These organisms currently persist in ephemeral streams in regional metapopulations, where frequently isolated refuge pools and dispersal among local populations mediate species survival.[85] Ephemeral streams often support levels of aquatic invertebrate diversity and abundance that are equal or greater to that found in perennial streams. Additionally, ephemeral streams can support taxa not found elsewhere in the watershed.[86] For instance, in Tennessee approximately 50% of more than 500 aquatic invertebrate species sampled by the Tennessee Wildlife Resource Agency were found in non-navigable waters; of 230 fish species sampled at sites across the state, 74 fish species were found only in non-navigable waters.[87] Ephemeral streams also support habitat for imperiled species inhabiting downstream waters. For example, ephemeral and intermittent streams support aquatic habitats of the federally listed Ozark Cavefish in Arkansas[88] and the Alabama Cavefish in Alabama.[89] Thus, alterations to ephemeral streams have harmful effects that extend throughout watersheds.

[83] Supra note 14.
[84] Supra note 9.
[85] J.T. Puckridge et al, *Hydrological persistence and the ecology of dryland rivers*, 16 Regulated Rivers-Research and Management 385 (2000); G.L.W. Perry and N.R. Bond, *Spatially explicit modeling of habitat dynamics and fish population persistence in an intermittent lowland stream*, 19 Ecological Applications 731 (2009).
[86] K. Price et al., *Communities of aquatic insects of old-growth and clearcut coastal headwater streams of varying flow persistence,* 33 Canadian Journal of Forest Research-Revue Canadienne De Recherche Forestiere 1416 (2003); R.A. Progar and A.R. Moldenke, *Insect production from temporary and perennially flowing headwater streams in western Oregon*, 17 Journal of Freshwater Ecology 391 (2002).
[87] G.T. Myers, on behalf of the Tennessee Wildlife Resources Agency. *Letter re: Advanced notice of proposed rulemaking* (2003); Doc No. OW-2002-0050, p. 126.
[88] G.O. Graening et al., *The 30-year recovery effort for the Ozark Cavefish (Amblyopsis rosae): analysis of current distribution, population trends, and conservation status of this threatened species*, 87 Environmental Biology of Fishes 55 (2010).
[89] U.S. Fish and Wildlife Service. *Alabama Cavefish Speoplatyrhinus poulsoni 5-year review: summary and evaluation.* Mississippi Ecological Services Field Office, Jackson, MS, (2017).

28.    **Because ephemeral streams will not be protected under the Rule, they will be more susceptible to sedimentation that harms downstream waters.** Land disturbances can have strong effects on the hydrology and geomorphology of ephemeral streams, and ephemeral streams may be more sensitive to human perturbation than perennial streams.[90] This is particularly important for sediment transport because ephemeral streams can be more effective as bulk sediment transporters than their perennial counterparts in humid zones.[91] Siekert et al.[92] observed that summer and fall cattle grazing led to increased channel cross sections (i.e., width) on ephemeral streams in Wyoming, with implications for increased stream-bank instability, erosion, sedimentation, and flood risk, and decreases in water quality and ground-water recharge. Thus, human activities that alter the hydrology of ephemeral stream systems including urbanization and agriculture can increase peak flows with serious consequences including entrenchment of stream channels and the transport of eroded sediment downstream, leading to a substantial increase in sediment load in downstream waters.[93] Excess sedimentation is the most common form of pollution in streams and rivers, and has been estimated to cause $16 billion in environmental damage annually.[94] Even in Appalachian headwater streams not impacted by mining, excess sedimentation is the leading cause of environmental impairment.[95] Sediment pollution can also exert negative effects on aquatic biota, such as aquatic invertebrates.[96] Further, as streams become increasingly entrenched, lateral hydrologic connectivity with floodplains (including floodplain wetlands) is lost with negative implications for biodiversity and ecosystem function.[97]

---

[90] W.B. Bull, *Discontinuous ephemeral streams*, 19 Geomorphology 227 (1997).

[91] J.B. Laronne and I. Reid, *Very high-rates of bedload sediment transport by ephemeral desert rivers*, 366 Nature 148 (1993).

[92] R.E. Siekert et al, *Channel response of an ephemeral stream in Wyoming to selected grazing treatments.* Riparian ecosystems and their management: reconciling conflicting uses. First North American Riparian Conference, April 16-18, 1985. U.S.D.A. Forest Service General Technical Report RM-120, p. 276-278.

[93] Supra note 5.

[94] Mid-America Regional Council, Kansas City, MO, *What is a watershed? What is sediment pollution?* Found at: https://cfpub.epa.gov/npstbx/files/ksmo_sediment.pdf

[95] T.F. Waters, *Sediment in streams: sources, biological effects, and control,* 7 American Fisheries Society Monograph, Bethesda, Maryland 7 (1995).

[96] T.R. Angradi, *Fine sediment and macroinvertebrate assemblages in Appalachian streams: a field experiment with biomonitoring applications,* 18 Journal of the North American Benthological Society 49 (1999).

[97] S.M.P. Sullivan and M.C. Watzin, *Stream-floodplain connectivity and fish assemblage diversity in the Champlain Valley, Vermont, U.S.A.,* 74 JFish Bio 1394 (2009).

29.     Left unprotected by the Rule, ephemeral streams will be particularly susceptible to both regulated and unregulated wastewater effluent discharges, representing yet another stressor to already vulnerable and critical ecosystems. Municipal and industrial wastewater effluents contribute artificial flow to streams in many arid areas of the U.S. For instance, 285 of 582 effluent discharges in Texas, Oklahoma, New Mexico, Arkansas, and Louisiana enter streams where more than 90% of instream flow is derived from effluent discharges.[98] Effluent discharges dramatically alter instream habitat, temperature, dissolved oxygen, instream toxicity, and chemical loading, as well as alter water quantity, thereby changing riparian habitat and channel form.[99] Limited variability of dissolved organic carbon (DOC) in urban ephemeral streams (e.g., with reservoirs or waste-water treatment plants) can limit the diversity of organisms that otherwise would experience higher variability in environmental conditions (e.g., cycles of drying and wetting, temperature, etc.) in more natural streams.[100]

30.     Because of the lack of protection of ephemeral streams under the Rule, biota will be increasingly jeopardized by water scarcity and extraction, especially for irrigation.[101] Modeled increases in water extraction have shown increased risk of population declines of local fish populations.[102] In Great Plains streams – where flow alterations from reservoir storage, water diversions, groundwater pumping, and drought are widespread – Falke et al.[103] found that habitat drying negatively influenced Brassy Minnow spawning and recruitment: both growth and survival rates were significantly lower under warm, dry conditions than in wetter years. In southern California, ephemeral stream reaches have been shown to be critical to preservation of genetic diversity of the endangered Threespine Stickleback.[104]

[98] B.W. Brooks et al., *Water quality of effluent-dominated ecosystems: ecotoxicological, hydrological, and management considerations,* 556 Hydrobiologia 365 (2006).

[99] Ibid.

[100] P. Westerhoff and D. Anning, *Concentrations and characteristics of organic carbon in surface water in Arizona: influence of urbanization,* 236 Journal of Hydrology 202 (2000).

[101] J.A. Falke et al., *The role of groundwater pumping and drought in shaping ecological futures for stream fishes in a dryland river basin of the western Great Plains, USA,* 4 Ecohydrology 682 (2011).

[102] N.R. Bond et al., *Fish population persistence in hydrologically variable landscapes,* 25 Ecological Applications 901 (2015).

[103] J.A. Falke et al, *Streamflow reductions and habitat drying affect growth, survival, and recruitment of Brassy Minnow across a Great Plains riverscape,* 139 Transactions of the American Fisheries Society 1566 (2010).

[104] J. Richmond et al., *Ephemeral stream reaches preserve the evolutionary and distributional history of Threespine Stickleback in the Santa Clara and Ventura River watersheds of southern California*, 16 Conservation Genetics 85 (2015).

Declaration of Dr. S. Mažeika Patricio Sullivan

31.     Harm to downstream waters from mining pollution illustrates how important water protections are for small headwater stream systems, including intermittent and ephemeral streams. Mining has been shown to exert strong negative effects on streams. Coal, for example, has been mined in the Appalachian region for over 250 years. Acid-mine drainage produces elevated concentrations of insoluble precipitate ferric hydroxide [$Fe(OH)_3$], dissolved sulfate ($SO_4^{2-}$), and acid ($H^+$) and can lead to elevated concentrations of aluminum, manganese, zinc, among other constituents in waters. Extensively mined sub-basins in the Monongahela River and Allegheny River basins of Pennsylvania were the primary contributors of 2.55 million tons of sulfate loads to the Ohio River at Pittsburgh in 1980.[105]

32.     **By eliminating protections for ephemeral streams, the Rule will only exacerbate the harmful effects on biodiversity from mining.** Current mining methods, including mountaintop mines and valley fills (MTM-VF) have also been shown to have strong negative effects on streams. For example, Giam et al.[106] show that streams impacted by coal mining under current regulation exhibited 32% lower taxonomic richness, and 53% lower total abundance of invertebrates, fish, and salamanders than unmined streams. Ephemeral (and intermittent) streams were disproportionately impacted by coal mining in southern Appalachia. Moreover, mitigation projects (i.e., restoration or preservation of aquatic resources) have largely failed to meet the objectives of the CWA in the region, with 97% of the projects reporting suboptimal or marginal habitat after 5 years, and levels of chemical pollution sufficiently high to impair aquatic life at most project locations.[107] Thus, even under current regulations, stream biodiversity is not protected sufficiently. In particular, many federally and endangered species of conservation concern in the region have been identified to be at risk, including the Diamond Darter, the

[105] J.I. Sams and K.M. Beer, *Effects of coal-mine drainage on stream water quality in the Allegheny and Monongahela River basins – sulfate transport and trends:* U.S. Geological Survey Water-Resources Investigations Report 1999-4208, 17  (2000) Found at: https://pubs.er.usgs.gov/publication/wri994208.

[106] X. Giam et al., *Impact of coal mining on stream biodiversity in the US and its regulatory implications,* 1 Nature Sustainability 176 (2018).

[107] M.A. Palmer and K.L. Hondula, *Restoration as mitigation: analysis of stream mitigation for coal mining impacts in southern Appalachia*, 48 Environmental Science and Technology 10552 (2014).

Tuxedo Darter, the Kentucky Arrow Darter, and the Blackside Dace.[108] The situation will be more dire under the Rule.

33.    Coal mining and other perturbations also are expected to have strong downstream and cumulative effects.[109] For example, downstream declines in chemical water quality (as measured by in increases in conductivity, $SO_4^{2-}$, and selenium) were documented along mainstem stream sites as inflows compounded from eight tributaries affected by MTM-VF.[110] Other studies have found increased fine sediment – which is widely known to be detrimental to aquatic life – in streams downstream from valley fills.[111]

### b.  Harm to Non-floodplain Wetlands

34.    **The Rule removes protections for all non-floodplain wetlands, which comprise 6.59 million hectares (16.3 million acres) in the coterminous United States**.[112] Although these wetlands have sometimes been referred to as "isolated," they are frequently connected to other waters ecologically, hydrologically, and physico-chemically. Terminology such as "upland embedded wetlands" has been proposed to alleviate confusion and improve scientific and conservation efforts hampered by these misnomers.[113] These ecosystem are already at risk; temporary wetlands (i.e., intermittently inundated wetlands) such as vernal pools and prairie potholes, for instance, have been identified as "disappearing ecosystems".[114] Non-floodplain wetlands and their critical functions and ecosystem services (e.g., water-quality improvement,

---

[108] Supra note 106.

[109] M.B. Griffith et al., *The effects of mountaintop mines and valley fills on the physicochemical quality of stream ecosystems in the central Appalachians: a review*, 417 Science of the Total Environment 1 (2012).

[110] T.T. Lindberg et al., *Cumulative impacts of mountaintop mining on an Appalachian watershed*, 108 Proceedings of the National Academy of Sciences of the United States of America 20929 (2011).

[111] J. Green et al., *A survey of the conditions of stream in the primary region of mountaintop mining/valley fill coal mining. Mountaintop mining/valley fills in Appalachia*. Final programmatic environmental impact statement. Philadelphia, PA: U.S. Environmental Protection Agency, Region 3. Appendix D. (2000).
Found at: http://www.epa.gov/Region3/mtntop/pdf/appendices/d/streamsinvertebrate-study/FINAL.pdf.
J.B. Wiley et al, *Reconnaissance of stream geomorphology, low streamflow, and stream temperature in the mountaintop coal-mining region, southern West Virginia, 1999–2000*. Charleston, WV: U.S. Geological Survey. Water Resour Invest Rep 01-4092, (2001).

[112] Supra note 7.

[113] D.M. Mushet et al., *Geographically isolated wetlands: rethinking a misnomer*, 35 Wetlands 423 (2015).

[114] A.J. K. Calhoun et al., *Temporary wetlands: challenges and solutions to conserving a 'disappearing' ecosystem,* 211 Biological Conservation 3 (2017).

22

1    flood control, wildlife habitat, source-sink functions, etc.) will be among the most affected by the

2    Rule.[115]

3        35.    **In the West, the Rule will result in lost protections for a disproportionately high**

4    **percentage of wetlands overall.** Eighty-three percent of jurisdictional determinations received in

5    EPA Region 8 (Rocky Mountains, Great Plains, parts of Colorado Plateau) from June 2007-2008

6    were for wetlands,[116] implying that the majority of proposed dredge and fill and other

7    development activities would impact wetlands.

8        36.    Experts[117] estimate that 61% of wetlands mapped in Montana in the National Wetland

9    Inventory (NWI)[118] had no apparent surface water connection to any other waterbody. Under the

10   Rule, these wetlands – many in the prairie pothole region – will not be protected. For example,

11   McGregor Meadows is an isolated wetland in Flathead County, Montana. It is a small,

12   depressional pothole with no surface water connection to other waterbodies. However, the

13   wetland is an important source of drinking water for wildlife and a breeding site for amphibians,

14   situated away from heavily trafficked roads and recreation areas.[119] Many terrestrial animals (e.g.,

15   reptiles, birds, non-breeding amphibians) rely on these and other non-floodplain wetlands not

16   only for drinking water, but also for critical carbon and food resources including egg masses,

17   amphibian larvae and adults, algae and plants, and invertebrates.[120] Note that more than 50% of

18   prairie potholes have been destroyed since the 1800s.[121] Warner and Asada[122] estimate that up to

19   70% of prairie potholes near the U.S.-Canada border have already been lost or impaired.

20

21

22   [115] Supra note 21.

23   [116] B.S. Caruso and J. Haynes, *Connectivity and jurisdictional issues for Rocky Mountains and Great Plains aquatic resources*, 30 Wetlands 865 (2010).

24   [117] Supra note 9.
     [118] National Wetland Inventory (NWI). Found at: https://www.fws.gov/wetlands/.

25   [119] L. Vance, *Post-SWANCC and Rapanos jurisdictional determinations in Montana: four case studies of waters at risk.* Report prepared for National Wildlife Federation, Ducks Unlimited, and Trout Unlimited. (2010).

26   [120] P.W.C. Paton, *A review of vertebrate community composition in seasonal forest pools of the northeastern United States,* 13 Wetland Ecology and Management 235 (2005).
     [121] Supra note 63.

27   [122] B.G. Warner and T. Asada, *Knowledge gaps and challenges in wetlands under climate change in Canada*, in Climate change and managed ecosystems, eds. R. Lal, et al. (2006).

28

37.     **The dramatic overall loss of wetlands under the Rule is not limited to the western U.S.** According to Siedschlag et al.,[123] Tennessee has already lost 60% of its historic wetlands. Of the remaining wetlands in Tennessee, more than 50% are potentially "geographically isolated". Vernal pools – small, ephemeral, geographically isolated wetlands that provide important habitat for amphibians, invertebrates, plants, mammals, and birds – have been impaired across the Southeast. For example, Evans et al.[124] report that 93% of the 2,399 vernal pools mapped in Tennessee, Alabama, and Georgia were located on unprotected lands, and only 37% of these had at least 75% adjacent native forest buffer, making them highly vulnerable to human activities. Moffat and Nichol[125] suggest that the majority of many wetland types in North Carolina would lose protection under a narrower definition of CWA-protected waters.

38.     **Modeling results indicate potentially significant impacts from lost protections for non-floodplain wetlands under the Rule.** In assessing the proposed rule, Meyer and Robertson[126] looked at three watersheds as case-studies to model three levels of regulatory scenarios: most restrictive scenario (limits protection of wetlands to those directly adjacent to perennial streams and rivers only), very restrictive scenario (limits protection of wetlands to those adjacent to perennial and intermittent streams and rivers), and less restrictive scenario (limits protection of wetlands to those adjacent to protected perennial, intermittent, and ephemeral streams and ditched or channelized streams). Modeling was based on total acreage of wetlands and wetland function impacts (flood protection, wildlife habitat, fish habitat, and water quality assessed as provisioning moderate to high value) under the three scenarios. Presented below are results from the second, very restrictive scenario, which most closely aligns with the Rule.

    **a.  Cottonwood River Watershed, Minnesota: 12,567 of 57,371 acres (22%) would not be protected.** Losses include 25% of wetland acreage for flood

---

[123] G. Siedschlag et al., *Five case studies on the effects of the SWANCC and Rapanos Supreme Court rulings on Tennessee waterways*. Report prepared for the National Wildlife Federation, Trout Unlimited, and Ducks Unlimited, (2010).

[124] J.P. Evans et al., *Widespread degradation of a vernal pool network in the southeastern United States: challenges to current and future management*, 37 Wetlands 1093 (2017).

[125] Supra note 10.

[126] R. Meyer and A. Robertson, *Clean Water Rule spatial analysis: a GIS-based scenario model for comparative analysis of the potential spatial extent of jurisdictional and non-jurisdictional wetlands*. Saint Mary's University of MN, Winona, Minnesota, (2020). Found at: http://smumn.maps.arcgis.com/apps/Cascade/index.html?appid=f3de6b30c0454c15ac9d3d881f18ae332019).

Declaration of Dr. S. Mažeika Patricio Sullivan

protection, 10% of wetland acreage for wildlife habitat, 3% of wetland acreage for fish habitat, and 34% of wetland acreage for water quality; overall, 10% of moderate to high value functions (by acreage) would not be protected. This is in contrast to 16% not protected by overall acreage and 7% not protected by function under the least restrictive scenario.

b. **South Platte Headwaters Watershed, Colorado: 10,344 of 67,597 acres (15%) would not be protected.** Losses include 10% of wetland acreage for flood protection, 11% of wetland acreage for wildlife habitat, 8% of wetland acreage for fish habitat, and 13% of wetland acreage for water quality; overall, 11% of moderate to high value functions (by acreage) would not be protected. This is in contrast to 3% not protected by overall acreage and 2% not protected by function under the least restrictive scenario.

c. **Cimarron River Watershed, New Mexico: 3,626 of 20,445 acres (18%) would not be protected.** Losses include 26% of wetland acreage for flood protection, 18% of wetland acreage for wildlife habitat, 9% of wetland acreage for fish habitat, and 21% of wetland acreage for water quality; overall, 18% of moderate to high value functions (by acreage) would not be protected. This is in contrast to 11% not protected by overall acreage and 11% not protected by function under the least restrictive scenario.

39.     More recently, Meyer and Robertson[127] made direct comparisons of wetland acres protected under the CWR and the Rule, showing **there will be drastic losses of wetland acres protected under the Rule**.[128] Under the CWR, 13,000 wetland acres (97.3%) of the Río Salado watershed of New Mexico are protected but only 7,000 acres (50.7%) will be protected under the Rule. In the South Platte watershed of Colorado, 66,000 wetland acres (97.1%) are protected under the CWR while 59,000 acres (87.7%) will be protected under the Rule. For the Río Peñasco watershed (New Mexico), the CWR protects 690 wetland acres (71.5%) while the Rule will only protect 271 acres (28%). Losses in protections are not limited to the Southwest: the number of wetland acres protected in the Roanwood Creek of Montana watershed drops from 3,000 (85.7%) under the CWR to 1,000 (46.6%) under the Rule.

40.     Losses of non-floodplain, so-called "isolated" wetlands can lead to increasing isolation of remaining wetlands.[129] In the absence of protection, these wetlands will become

---

[127] Supra note 6. Meyer and Robertson's analysis also indicates that the CWR estimates on wetland protections are comparable to the 1986 Rule, showing that the CWR was much more consistent with past regulations than the Rule.

[128] The 2020 analysis is based on the best available NWI data, mostly updated as recently as 2016 or later depending on the project area.

[129] R.D. Semlitsch and J.R. Bodie, *Are small, isolated wetlands expendable?*, 12 Conservation Biology 1129 (1998).

increasingly more disconnected.  These wetlands contribute disproportionately to the biodiversity

of aquatic and semi-aquatic plants and animals, and thus loss of protections for these systems puts

many species in jeopardy. For example, the Northern Leopard Frog and Bullfrog depend on

small, temporary wetlands for reproduction or feeding, and then return to deeper-water habitats to

overwinter.[130] Species supported by non-floodplain wetlands also can significantly contribute to

the biodiversity of the greater region.[131] Non-floodplain wetlands provide critical habitat for

hundreds of federally-listed threatened and endangered species.

41.    **Evidence for potential damage to non-floodplain wetlands under the Rule is
alarming**. Small wetlands, many of which are non-floodplain wetlands, provide

disproportionately large landscape-scale nutrient processing functions (e.g., for phosphorus and

nitrogen), with 50% of nitrogen removal occurring in wetlands smaller than $10^{2.5}$ m$^2$ in a global

study of 600 freshwater systems (i.e., wetland, ponds, lakes, and reservoirs).[132] Wetland draining

has been shown to significantly affect non-point pollution. Prairie potholes, for example, can play

an important role as nutrient sinks, and thus their draining presents a high risk for phosphorus

export into the watershed.[133] This function is particularly important in watersheds with elevated

nutrient contributions from agriculture or urban sources,[134] which paradoxically, represent land

uses that pose the greatest threats to prairie potholes and other non-floodplain wetlands.

Conversions of pocosins - inland acidic wetlands primarily fed by groundwater - to agricultural

fields is accomplished by filling and draining the pocosins. This process decreases salinity in

adjacent estuaries and elevates peak-flow rates, turbidity, and concentrations of ammonium,

nitrate, and phosphate in both streams and estuaries downstream.[135] Playa lakes and prairie

---

[130] D.M. Mushet et al., *Complex spatial dynamics maintain Northern Leopard Frog (Lithobates pipiens) genetic diversity in a temporally varying landscape,* 8 Herpetological Conservation and Biology 163 (2013).

[131] K.L. Altman-Goff, *An examination of plant community composition in six Carolina bays on the coastal plain of South Carolina*. (2016) (Master's thesis, Coastal Carolina University, Conway, SC.)

[132] F.Y. Cheng and N.B. Basu, *Biogeochemical hotspots: role of small water bodies in landscape nutrient processing*, 53 Water Resources Research 5038 (2017).

[133] P. Badiou et al., *Phosphorus retention in intact and drained prairie wetland basins: implications for nutrient export*, 47 J Environ Qual 902 (2018).

[134] K.R. Reddy et al., *Biogeochemistry of phosphorus in wetlands,* 46 Phosphorus: Agriculture and the Environment. 263 (2005).

[135] R. R. Sharitz and C.A. Gresham, *Pocosins and Carolina bays.* p. 343–377. Southern forested wetlands. Ecology and management. Lewis Publishers, Boca Raton, Florida. (1998).

potholes store water during periods of droughts and recharge aquifers (e.g., Ogallala Aquifer), contributing to the baseflow of many interstate streams and rivers. The conversion of Carolina bays, Delmarva potholes, and vernal pools to logging, agriculture, and urban development eliminates refuge and breeding habitat for vertebrate and invertebrate species, including many rare, threatened, and endangered species (*see* below).[136]

42.     Successful restoration activities offer an additional line of evidence concerning the damage resulting from lost protections for wetlands under the Rule. For instance, Bruland et al.[137] reported that a restoration consisting of filling agricultural drainage ditches and planting native seedlings effectively restored the hydrology of a Carolina bay wetland complex in North Carolina that had been cleared and ditched in the 1960s. The restoration led to restored flood-control and improvements in downstream chemical water quality (reduced phosphorus and nitrogen concentrations).[138] Restoration of 20,000 acres of restored pocosins, also in North Carolina, is estimated to sequester over 21 million tons of $CO_2$ over a 100-year period.[139]

43.     As for streams, historic permitting data can also be used as an approximation of the scope of loss of wetland protection under the Rule.[140] Based on permit data in the record, an initial analysis conducted by the Southern Environmental Law Center identified up to 17,632 acres (total) and 3,526 acres (annually) of wetlands that would no longer require a permit under the proposed rule.[141]

[136] Supra note 17.

[137] G.L. Bruland et al., *Effects of agriculture and wetland restoration on hydrology, soils, and water quality of a Carolina bay complex,* 11 Wetlands Ecology and Management 141 (2003).

[138] N.E. Flanagan and C.J. Richardson, *A multi-scale approach to prioritize wetland restoration for watershed-level water quality improvement,* 18 Wetlands Ecology and Management 695 (2010).

[139] U.S. Fish and Wildlife Service, *Benefits of wetland hydrology restoration in historically ditched and drained peatlands: carbon sequestration implications of the pocosin lakes.* Technical report, U.S. Department of Interior, U.S. Fish and Wildlife Service, Washington, DC. (2010); S. Ward, & S. Settelmeyer, *Special focus: coastal blue carbon,* 36 Coastal Blue Carbon (2014).

[140] Supra note 80.

[141] Southern Environmental Law Center. *Letter to Administrator Wheeler and Assistant Secretary James re: Revised definition of Waters of the United States* (2019) Doc No. EPA-HQ-OW-2018-0149.

Declaration of Dr. S. Mažeika Patricio Sullivan

**c. The Agencies Have Ignored and Underestimated the Rule's Harms to the Nation's Waters**

44.     The Agencies indicate that to identify a jurisdictional stream they will combine the use of streams on USGS topographic or National Hydrology Dataset (NHD) maps with other measures (i.e., stream order, field work, professional judgement) to avoid overestimating flow and erroneously concluding that a jurisdictional tributary is present. **However, the opposite problem is most likely – that drainage networks have not been mapped at sufficient resolution and thus could grossly underestimate streams on the landscape.[142]** The NHD has been widely used to describe the location of streams and stream types, yet NHD data are limited as they underestimate intermittent and ephemeral stream length.[143] For example, Lang et al.[144], found that the NHD maps capture only 66% of stream length compared to maps based on higher resolution LiDAR (Light Detection and Ranging) data. Brooks and Coburn[145] found that unmapped stream segments occurred on more than 80% of mapped stream terminuses in the Quabbin Reservoir watershed of Massachusetts. NHD mapping only captured approximately 35% of the stream network – including intermittent and ephemeral streams – in Duke Forest drainages of North Carolina.[146] Thus, the Agencies underrepresent the number and extent of ephemeral streams that will be left unprotected by the Rule.

45.     There are options available to but not used by the Agencies that would improve their estimates of ephemeral stream coverage under the Rule. Coarse national estimates of ephemeral stream coverage (e.g., Fesenmyer et al.[147]) could be updated to incorporate advances in GIS-

---

[142] J.L. Meyer and J.B. Wallace, in *Ecology: achievement and challenge*, eds. M. C. Press, N. Huntly, and S. Levin (2001); C.R. Lane et al*., Hydrological, physical, and chemical functions and connectivity of non-floodplain wetlands to downstream waters: a review*, 54 J Am Water Resour Assoc 346 (2018).

[143] L.B. Leopold, *A view of the river,* Cambridge, MA: Harvard University Press, (1994); J.L. Meyer et al,. *The contribution of headwater streams to biodiversity in river networks*, 43 J. Am. Water Resour. Assoc. 86 (2007); T.L. Nadeau and M.C. Rains, *Hydrological connectivity between headwater streams and downstream waters: how science can inform policy*, 43 J Am Water Resour Assoc 118 (2007).

[144] M. Lang et al., *Enhanced detection of wetland-stream connectivity using LiDAR*, 32 Wetlands 461 (2012).

[145] R.T. Brooks and E.A. Colburn, *Extent and channel morphology of unmapped headwater stream segments of the Quabbin watershed, Massachusetts*, 47 *J Am Water Resour Assoc* 158 (2011).

[146] J.P. Miller, *Identifying temporary headwater streams and channel heads in the North Carolina Piedmont*, (2015) (Master's Thesis, Nicholas School of the Environment, Duke University, NC.)

[147] Supra note 4.

based channel mapping, including addition of other advanced tools such as additional remote sensing products[148] and new software tools,[149] as well as models like the model developed by the U.S. Geological Survey of streamflow permanence for the Pacific Northwest at a 30-meter resolution. The PRObability of Streamflow PERmanence (PROSPER) model could be a substantial improvement over current NHD-derived maps, including predicting intermittent and ephemeral streams (note that the Agencies have acknowledged this tool for potential use in determining stream flow classification).[150] Monitoring approaches developing or modifying low-cost sensors present additional approaches to address the challenges and limitations of traditional mapping.[151]

46.    The U.S. Fish and Wildlife Service's National Wetlands Inventory (NWI) describes the location and types of wetlands. However, wetlands have been undermapped in the NWI,[152] and damage from loss of protections under the Rule will likely be more extensive than current estimates derived from the NWI. In general, current wetland mapping inventories tend to be incomplete and out of date.[153] The size of the minimum mapping unit for NWI inventories is too course to capture small wetlands (e.g., many prairie potholes).[154] For arctic wetlands, the presence of permafrost and lower plant-species diversity (i.e., neighboring plant species can have similar reflectance values) in general poses challenges for accurate mapping. Northern peat-dominated wetlands are often undermapped because the focus of many maps is on surface inundation. Timing of imagery can also lead to undermapping: it is critical to capture wetlands

[148] Y. Hamada et al., *Mapping ephemeral stream networks in desert environments using very-high-spatial-resolution multispectral remote sensing,* 130 Journal of Arid Environments 40 (2016).

[149] L.V. Stanislawski et al., *An open source high-performance solution to extract surface water drainage networks from diverse terrain conditions*, 45 Cartography and Geographic Information Science 319 (2018).

[150] K.L. Jaeger et al., *Probability of streamflow permanence model (Prosper): A spatially continuous model of annual streamflow permanence throughout the Pacific Northwest* 2 Journal of Hydrology 100005 (2019).

[151] R.S. Assendelft and H.J.I. van Meerveld, *A low-cost, multi-sensor system to monitor temporary stream dynamics in mountainous headwater catchments*, 19 Sensors 4645 (2019); D.P. Lettenmaier, *Observational breakthroughs lead the way to improved hydrological predictions*, 53 Water Resources Research 2591 (2017).

[152] E.g., Supra note 130.

[153] C. Baker et al., *Mapping wetlands and riparian areas using Landsat ETM+ imagery and decision-tree based models*, 26 Wetlands 465 (2006).

[154] J.N. Serran and I.F. Creed, *New mapping techniques to estimate the preferential loss of small wetlands on prairie landscapes*, 30 Hydrological Processes 396 (2016); C.M. Finlayson et al., *Global wetland inventory - current status and future priorities*" 50 Marine and Freshwater Research 717 (1999).

under varying water conditions and time-series images are often limited due to budget-constraints.[155] Furthermore, existing NWI data for many areas are not complete (e.g., only about 30% of Alaska was mapped by the NWI as of 2009[156]) and are based on data from decades ago; thus, they often do not accurately represent the changes to wetlands that have occurred over the last 20-30 years. In Minnesota, for instance, limitations in the source data, technology, and methods resulted in the underrepresentation of various wetland types, including emergent and forested wetlands.[157] That said, the NWI is the most comprehensive hydrogeographic dataset for mapping wetlands in the United States and is of significant value with updated and more complete inventories and when combined with other tools. For example, remotely-sensed data using airborne sensors such as LiDAR can improve mapping by producing high-resolution geospatial data that bridges the gap between large-scale aerial photography and satellite imagery.[158] LiDAR has also been used to improve detection of stream-wetland connectivity.[159] Because of these and other shortcomings, the agencies abandoned using the NWI to quantify potential changes in the CWA jurisdiction as a result of the Rule, opting for a descriptive evaluation instead of the quantitative evaluation that is needed. The Rule further indicates that the agencies will continue to work to enhance the NHD, NWI, and other products to better map aquatic resources such as wetlands. **Improved methodologies should be developed and used to accurately quantify the magnitude of the loss of wetland protections** *before* **finalizing a potentially damaging rule.**

47.    **The Rule's "typical year" criterion will endanger many floodplain wetlands**. Many floodplain wetlands situated more distant from rivers, yet still within floodplains, will not be protected owing to the fact that they do not abut or have a direct surface water connection with a territorial sea, a tributary, or a lake, pond, or impoundment of a jurisdictional water "in a typical

[155] R.W. Tiner et al. (eds.), *Remote sensing of wetlands: applications and advances*. Ed 1, CRC Press, Boca Raton, FL, (2015).
[156] R.W. Tiner (ed.), 2009. *Status report for the National Wetlands Inventory Program: 2009*. U.S. Fish and Wildlife Service, Division of Habitat and Resource Conservation, Branch of Resource and Mapping Support, Arlington, VA. 48 pp.
[157] Ibid.
[158] M.W. Lang and G.W. McCarty, *LiDAR intensity for improved detection of inundation below the forest canopy,* 29 Wetlands 1166 (2009); V. Klemas, *Remote sensing of wetlands: case studies comparing practical techniques*, 27 Journal of Coastal Research 418 (2011).
[159] Supra note 144.

year". This requirement assesses the jurisdictional status of wetlands based on conditions that are 'not too wet, not too dry,' using a range of precipitation for a waterbody's geographic area based on a rolling 30-yr period. The proximity of two waterbodies is a key factor affecting connectivity; in general, the closer a stream tributary or wetland is a to a downstream water, the stronger and more frequent the connections to the downstream water will be (but note that even low levels or frequency of connectivity can be critical to aquatic ecosystem integrity). Negrel et al.[160] observed that a more recently formed oxbow lake that was closer to the river channel exhibited more frequent surface-flow connectivity with the river than the more distant, older, oxbow lake. Similarly, Hudson et al.[161] observed a non-linear, complex relationship between river discharge and lake level of an older oxbow lake vs. a strong linear and nearly synchronous relationship between river discharge and lake level of a recently formed oxbow lake in the Lower Guadalupe River, Texas. In contrast to floodplain wetlands closer to rivers, those located at greater distances often rely on subsurface (i.e., groundwater) flow, which will not be captured by the "typical year" protected under the Rule.

48.     **The Rule will cause increased flooding risks.** In the U.S., flooding caused 4,586 fatalities from 1959-2005;[162] from 1996-2015, flooding resulted in 1,563 deaths.[163] Floods during the 20-yr period from 1996-2015 led to more than $167 billion in damages in the U.S.,[164] with projections pointing to increasing frequency and magnitude of extreme weather events such as severe flooding.[165] In a divergence from FEMA's more conservative estimates, which do not account for smaller streams, Wing et al.[166] estimated that approximately 41 million people (more than 13% of the U.S. population) reside in 100-year floodplains, and that number could increase

[160] P. Negrel et al., *Surface water-groundwater interactions in an alluvial plain: chemical and isotopic systematics,* 277 Journal of Hydrology 248 (2003).

[161] P.F. Hudson et al., *Hydrologic connectivity of oxbow lakes Along the lower Guadalupe River, Texas: the influence of geomorphic and climatic controls on the "flood pulse concept",* 414-415 Journal of Hydrology 174 (2012).

[162] S.T. Ashley and S. Ashley, *Flood fatalities in the United States,* 47 Journal of Applied Meteorology and Climatology 805 (2008).

[163] J. Lim and M. Skidmore, *Flood fatalities in the United States: the roles of socioeconomic factors and the National Flood Insurance Program,* 85 Southern Economic Journal 1032 (2019).

[164] Ibid.

[165] P.C.D. Milly et al., *Increasing risk of great floods in a changing climate,* 415 Nature 514 (2002).

[166] O.E. J. Wing et al., *Estimates of present and future flood risk in the conterminous United States,* 13 Environmental Research Letters 034023 (2018).

to 15.8% by 2050 and 16.8% by 2100. Communities in Nebraska, New Mexico, and South Dakota could experience a five-fold increase in flood exposure by 2100; Florida and Texas's flood risk might be expected to triple or quadruple in that timeframe. In New York state alone, at least 733,000 residents live in mapped FEMA 100-year floodplains; excluding New York City, private property in 100-year floodplains has been valued at more than $46 billion.[167] Although a "typical year" does not include periods of extreme flooding (or drought), it is precisely during these periods that many floodplain waterbodies can be most critical in providing critical services such as flood control. Wetlands, including those situated further into a floodplain (that do not abut or have a direct surface water connection with a traditional navigable water or other jurisdictional water "in a typical year") are key players in reducing the number and severity of floods, as well as in storing storm-water runoff and minimizing non-point source pollution.[168] Many of these wetlands will fall within the 100-yr base flood zone (i.e., 1% chance of occurring in any given year) – classified as high-risk areas by FEMA[169] – yet will lose protection under the Rule, putting people and property at risk across the Nation.

49. **The Rule will jeopardize imperiled species across the United States, undermining biodiversity and the biological integrity of the Nation's waters.** Consistent with the CWA's objective to restore and maintain the biological integrity of the Nation's waters, the Endangered Species Act's purpose is "*to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved* [.]"[170] A coalition of conservation groups have estimated that the Rule will negatively impact, at a minimum, the following listed species:

Alameda Whipsnake, Arroyo Toad, Ash Meadows Amargosa Pupfish, Beautiful Shiner, Big Spring Spinedace, Bonytail Chub, Borax Lake Chub, Bull Trout, California Red-legged Frog, California Tiger Salamander (Central California DPS), California Tiger Salamander (Santa

[167] W. Nechamen. *Declaration of William Nechamen,* Albany, New York, (2019).

[168] M.C. Acreman and A.J. D. Ferguson, *Environmental flows and the European Water Framework Directive,* 55 Freshwater Biology 32 (2010); M. Acreman and J. Holden, *How wetlands affect floods,* 33 Wetlands 773 (2013); *Wetlands: protecting life and property from flooding*, (2016). Found at: https://www.epa.gov/sites/production/files/2016-02/documents/flooding.pdf

[169] *Definitions of FEMA flood zone designations*. Found at: https://efotg.sc.egov.usda.gov/references/public/NM/FEMA_FLD_HAZ_guide.pdf

[170] 16 U.S.C. § 1531(b).

Barbara County DPS), Casey's June Beetle, Chiricahua Leopard Frog, Coachella Valley Fringe-toed Lizard, Colorado Pikeminnow, Conservancy Fairy Shrimp, Dakota Skipper, Desert Dace, Diminutive Amphipod, Gila Chub, Hiko White River Springfish, Huachuca Water-Umbel, Humpback Chub, Least Bell's Vireo, Little Colorado Spinedace, Little Kern Golden Trout, Loach Minnow, Longhorn Fairy Shrimp, Lost River Sucker, Modoc Sucker, Mountain Yellow-Legged Frog (Northern DPS), Mountain Yellow-legged Frog (Southern California DPS), New Mexican Ridge-nosed Rattlesnake, New Mexico Meadow Jumping Mouse, Oregon Spotted Frog, Owens Tui Chub, Phantom Springsnail, Poweshiek Skipperling, Quino Checkerspot Butterfly, Railroad Valley Springfish, Razorback Sucker, Riverside Fairy Shrimp, San Bernardino Springsnail, San Diego Fairy Shrimp, Santa Ana Sucker, Sharpnose Shiner, Shortnose Sucker, Sierra Nevada Yellow-Legged Frog, Smalleye Shiner, Southwestern Willow Flycatcher, Yellow-billed Cuckoo, Desert Pupfish, Huachuca Water Umbel, Northern Mexican Garter Snake, Spikedace, Three Forks Springsnail, Vernal Pool Fairy Shrimp, Vernal Pool Tadpole Shrimp, Virgin River Chub, Warner Sucker, White River Spinedace, White River Springfish, Woundfin, Yaqui Catfish, Yaqui Chub, Yosemite Toad, Zuni Bluehead Sucker, River Winter-run Chinook Salmon, Snake River Fall-Run Chinook Salmon, Snake River Spring/Summer Run Chinook Salmon, Upper Columbia River Spring-Run Chinook Salmon, Upper Willamette River Chinook Salmon, Central California Coast Coho Salmon, Lower Columbia River Coho Salmon, Oregon Coast Coho Salmon, South Oregon And North Califiornia Coasts Coho Salmon, Ozette Lake Sockeye Salmon, Snake River Sockeye Salmon, California Central Valley Steelhead, Central California Coast Steelhead, Lower Columbia Steelhead, Middle Columbia Steelhead, Northern California Steelhead, Puget Sound Steelhead, Snake River Basin Steelhead, South-central California Coast Steelhead, Southern California Steelhead, Hood Canal Summer-run Chum Salmon, Southern Resident DPS of Orca, Upper Columbia River Steelhead, Upper Willamette River Steelhead, West Indian Manatee, Rio Grande Chub, Rio Grande Cutthroat Trout, Rio Grande Sucker, Rio Grande Silvery Minnow, Pecos Sunflower, Jemez Mountains Salamander, Ozark Hellbender, Eastern Hellbender DPS, Sea Otter, Tidewater Goby, Eulachon, Longfin Smelt, Southern DPS Of Pacific Smelt, Southern DPS Of Green Sturgeon, Shortnose Sturgeon, Carolina DPS Of Atlantic Sturgeon, Chesapeake Bay

1  DPS Of Atlantic Sturgeon, Gulf Of Maine DPS Of Atlantic Sturgeon, New York Bight DPS Of

2  Atlantic Sturgeon, and South Atlantic DPS Of Atlantic Sturgeon.[171]

3       **50.** **Experts broadly agree that the Rule jeopardizes waters across the United States,**

4  **lacks scientific foundation, and is contrary to the CWA's objective:**

5      a. Society of Wetland Scientists (representing more than 3,000 wetland and aquatic-
science professionals): "*The proposed Rule poses a significant threat to the*
6       *integrity and security of our drinking water (quality and quantity), public health,*
*and to fisheries, shellfish habitat and wildlife habitat. It increases the threat of*
7       *damage to communities and infrastructure from flooding, severe storm events, and*
8       *sea level rise, all of which have negative economic impacts on citizens,*
*communities and businesses. For these and the following reasons, SWS strongly*
9       *supports the 2015 CWR and opposes the proposed Rule*."[172]

10      b. American Fisheries Society and The Wildlife Society (representing more than
20,000 members of fishery and aquatic scientists and managers and wildlife
11       biologists, managers, and educators): "*In conclusion, AFS and TWS strongly*
*oppose the proposed Rule, strongly support the 2015 CWR, and reject any re-*
12       *definition of WOTUS that is not based in sound, peer-reviewed science. The*
*proposed redefinition of WOTUS will make it impossible to achieve the objectives*
13       *of the Clean Water Act because it excludes numerous waters and wetlands that*
14       *directly affect the chemical, physical, and biological integrity of primary waters.*
*The loss of protections for our nation's waters called for in the proposed Rule*
15       *would have grave consequences for fish and fisheries and would have far-reaching*
*implications for fish, wildlife, and their habitats, as well as the thousands of*
16       *economies dependent on those systems.*"[173]

17      c. Society for Freshwater Science (representing  more than 1,000 aquatic scientists
and practitioners): "*As a result of both the extensive record of well-established and*
18       *recent science, the SFS continues to affirm, as we did in our April comment letter,*
19       *that the proposed Rule remains 'scientifically indefensible' and 'as a result…will*
*directly lead to the degradation of the physical, chemical, and biological integrity*
20       *of water quality, in direct conflict with the goals of the Clean Water Act.*'"[174]

21

22  [171] Center for Biological Diversity, Center for Food Safety, Turtle Island Restoration Network, Waterkeeper Alliance, Humboldt
Baykeeper, Lake Worth Waterkeeper, Missouri Confluence Waterkeeper, Russian Riverkeeper, Monterey Coastkeeper, Rio
23  Grande Waterkeeper, Snake River Waterkeeper, Sound Rivers, Upper Missouri Waterkeeper. 60-day Notice of Intent to Sue
Regarding the 2020 Revised Definition of "Waters of the United States", February 13, 2020.

24  [172] M. Finlayson, President-elect of the Society of Wetland Scientists. *Letter to Administrator Wheeler and Assistant Secretary
James re: scientific societies comments on proposed rule – revised definition of "Waters of the United States*" (2019) 84FR 4154;
Doc No. EPA-HQ-OW-2018-0149, p. 2.

25  [173] A.J. Austen and G.C. White, on behalf of the American Fisheries Society and The Wildlife Society. *Letter to Administrator
Wheeler and Assistant Secretary James re: revised definition of "Waters of the United States"* (2019) 84 FR 4154; Doc No. EPA-
26  HQ-OW-2018-0149, p. 4.

[174] A.D. Rosemond, President of the Society for Freshwater Science. Letter to Thomas Armitage re: Society for Freshwater
27  Science public input on Science Advisory Board Commentary on the proposed rule Defining the scope of waters federally
regulated under the Clean Water Act (10/16/19) *Commentary on revised definition of "Waters of the United States*" (84 FR 4154),
28  p. 2. (2020).

Declaration of Dr. S. Mažeika Patricio Sullivan

d. Consortium of Aquatic Sciences (representing  more than 200,000 individuals from a suite of scientific societies – American Fisheries Society, American Institute of Biological Sciences, Association for the Sciences of Limnology and Oceanography, Coastal and Estuarine Research Federation, Ecological Society of America, Freshwater Mollusk Conservation Society, International Association for Great Lakes Research, North American Lake Management Society, Phycological Society of America, Society for Ecological Restoration. Society for Freshwater Science, Society of Wetland Scientists – with expertise in aquatic, ecological, hydrologic, biogeochemical, biological, and ecological sciences): "*In conclusion, the undersigned scientific societies strongly oppose the proposed Rule, strongly support the 2015 CWR, and reject any definition of WOTUS that is not based in sound, peer-reviewed science. The proposed Rule does not meet this standard. Effective implementation of the CWA requires science as its foundation. There have been significant advances and discoveries in aquatic science since the CWA was passed 50 years ago. These advances, meticulously documented and vetted in the Connectivity Report, conclusively demonstrate the need for the proposed rule to protect the chemical, physical, and biological integrity of our nation's waters. Through an evaluation of the best available science (including the Connectivity Report), we conclude that the proposed Rule poses a significant threat to the integrity and security of our drinking water (quality and quantity), public health, and to fisheries, shellfish habitat and wildlife habitat. It increases the threat of damage to communities and infrastructure from flooding, severe storm events, and sea-level rise, all of which have negative economic impacts on citizens, communities and businesses*."[175]

51.     Further, the current Science Advisory Board (SAB), reconfigured in its staffing under the present EPA Administration, issued a letter to the EPA Administrator indicating its disapproval of the proposed rule leading to the Rule: *"… thus the SAB finds that the proposed Rule lacks a scientific justification, while potentially introducing new risks to human and environmental health"*.[176]

---

[175] Consortium of Aquatic Sciences. *Letter Administrator Wheeler and Assistant Secretary James re: scientific societies' comments on proposed rule – revised definition of "Waters of the United States"* (2019) 84 FR 4154; Docket ID No. EPA-HQ-OW-2018-0149, p. 6.

[176] U.S. EPA, Letter to Andrew Wheeler. February 27, 2020. "SAB Commentary on the proposed rule defining the scope of waters federally regulated under the Clean Water Act", EPA-SAB-20-002. Environmental Protection Agency. Washington, D.C., (2020).

## VI.   CONCLUSIONS

52.   **The Rule is not only inconsistent with the best available science, but it also will jeopardize and harm critical aquatic ecosystems across the United States.**[177] Multiple lines of scientific evidence – some, but not all of which are presented in this declaration – clearly establish that waters that will be excluded from federal protection under the Rule (such as ephemeral streams, non-floodplain wetlands, and some floodplain wetlands) have important and consequential effects on downstream and downslope waters. Further, these ecosystems support multiple other important functions (e.g., provisioning biodiversity, water purification, flood protection). Yet, the Rule runs counter to responsible plans and strategies for effective conservation of U.S. waters. For instance, non-floodplain wetlands function as integral landscape components rather an isolated, individual units, and thus their cumulative loss is highly detrimental. Damage to critical functions (e.g., regulating flows to downgradient waters[178]) provided by the cumulative effect of non-floodplain wetlands in regions such as the upper coastal plain of South Carolina (i.e., that are dominated by non-floodplain wetlands) are expected to be particularly severe. Yet, in spite of clear calls for management and conservation approaches that recognize the need for aggregate stewardship,[179] the Rule has removed all protections for non-floodplain wetlands, individually or in the aggregate.

53.   **The Rule exacerbates ongoing loss of water quantity that combined with climate change will lead to further harmful consequences across the country.** For instance, Perkin et al. calculated that 21% of stream length in the Upper Kansas River basin was lost from 1950-1980, and projected a 32% cumulative loss of stream length by 2060, implicating ground-water pumping and climate change in shifting perennial to intermittent and ephemeral streams.[180] Decreased runoff and stream flows in late summer and autumn – when water consumption is

---

[177] Supra note 21; J.R. Mihelcic and M.C. Rains, *Where's the science? Recent changes to Clean Water Act threaten wetlands and thousands of miles of our nation's rivers and streams*, 37 Environmental Engineering Science 173 (2020).
[178] Supra note 50.
[179] Supra note 114.
[180] J.S. Perkin et al., *Groundwater declines are linked to changes in Great Plains stream fish assemblages*, 114 Proceedings of the National Academy of Sciences of the United States of America 7373 (2017).

Declaration of Dr. S. Mažeika Patricio Sullextmin

greatest – are likely in many areas of the West where drier conditions and earlier snowmelt are

projected.[181] Across the conterminous western U.S., one-third of mapped perennial stream length

had been reduced to non-perennial streams by 2005 as a result of water withdrawals coupled with

climate and land-use changes, with declines up to 50% in the Southwest.[182] Climate change

leading to reduced mountain snowpack and increased evaporation has been recently implicated in

the approximately 20% decline in the Colorado River's mean annual flow in comparison to the

previous century;[183] the Upper Colorado River basin supplies water to around 40 million people

and supports approximately 16 million jobs.[184] These patterns are particularly alarming given that

recent findings suggest that southwestern North America – including broad swaths of the western

U.S. – is on a trajectory characteristic of historical megadroughts.[185]

54.    **Although estimates of waters no longer protected under the Rule may vary**
**based on the methods used, the weight of evidence points to substantial harm to U.S. waters**
**under the Rule.** Impairment or destruction of vulnerable aquatic ecosystems – which represent

16% of freshwater wetland area and up to 60% of stream length in the U.S.[186] – is not to be taken

lightly. Ecosystem services provisioned by these ecosystems will be impaired or lost, and

restoration will come at enormous financial costs and will require a long-term investment to

restore. For context, the economic value of ecosystem services provisioned by non-floodplain

wetlands has been estimated at $673 billion yr$^{-1}$.[187] **The Rule is dangerous to long-term**

[181] IPCC (Intergovernmental Panel on Climate Change). *Climate Change 2007: Impacts, adaptation and vulnerability*. M. Parry, O. Canziani, J. Palutikof, P. van der Linden, and C. Hanson (eds), Contribution of working group II to the fourth assessment report of the intergovernmental panel on climate change. Cambridge University Press, Cambridge, United Kingdom, and NY, NY, (2007). Found at: http://www.ipccwg2.org/; U.S. EPA. *National water program strategy, response to climate change*. EPA 800-R-08-001. Office of Water, Washington, DC. (2008); EPA, Office of Research and Development, Washington, DC. *Climate change effects on stream and river biological indicators: a preliminary analysis*. (2008) Doc No. EPA/600/R-07/ 085F.
[182] U.S. EPA, Washington, D.C., J.L. Stoddard et al, *Western streams and rivers statistical summary*. (2005) Doc No. EPA 620/R-05/006.
[183] P.C.D. Milly and K.A. Dunne. *Colorado River flow dwindles as warming-driven loss of reflective snow energizes evaporation*, 367 Science 1252 (2020).
[184] T. James et al., *The economic importance of the Colorado River to the basin region*, L. William Seidman Research Institute, Arizona State University, Tempe, AZ, (2014). Found at: https://businessforwater.org/wp-content/uploads/2016/12/PTF-Final-121814.pdf
[185] A.P. Williams et al., *Large contribution from anthropogenic warming to an emerging North American megadrought*, 368 Science 314 (2020).
[186] Supra note 14.
[187] Ibid.

sustainability of watersheds and aquatic resources, which is particularly poignant in a time of rapid climate change and other human-induced environment stressors.

55.    In conclusion, the Agencies have largely ignored the best available science, including their own scientists and the advice of their own SAB, to produce the Rule, which will remove protections for millions of miles of streams and more than 16 million acres of wetlands. This loss of protections will cause long-lasting and widespread harm to U.S. waters at a time when aquatic ecosystems have already been severely impaired and when there is increasing recognition that many policy and management efforts to protect and restore aquatic ecosystems are insufficient at halting their impairment.[188] In summary:

Based on the best available scientific evidence, it is my expert opinion, as well as the professional opinion of many scientists and aquatic professionals across the country, that the Rule will cause widespread and long-lasting harm to U.S. waters.

Executed on the 13th day of May, 2020, in Columbus, Ohio.

*Dr. S. Mažeika Patricio Sullivan*

Dr. S. Mažeika Patricio Sullivan

[188] W.V. Reid et al., *Millennium ecosystem assessment synthesis report*. Millennium ecosystem assessment. Island Press, Washington, (2005); N.L. Poff, *Managing for variability to sustain freshwater ecosystems*, 135 Journal of Water Resources Planning and Management 1 (2009).