1  PHILLIP R. DUPRÉ (D.C. Bar No. 1004746)
   phillip.r.dupre@usdoj.gov
2  HUBERT T. LEE (NY Bar No. 4992145)
   hubert.lee@usdoj.gov
3  Environmental Defense Section
   Environment & Natural Resources Division
4  U.S. Department of Justice
   4 Constitution Square
5  150 M Street, NE
   Washington, D. C. 20002
6  Telephone (202) 514-1806
   Facsimile (202) 514-8865
7

8

9  *Attorneys for Defendants*

10            **IN THE UNITED STATES DISTRICT COURT**
           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
11

12
   STATE OF CALIFORNIA, *et al.*
13
                        Plaintiffs,          Case No. 3:20-cv-03005-RS
14
              v.                             **OPPOSITION TO PLAINTIFFS' MOTION**
15                                           **FOR PRELIMINARY INJUNCTION**

16 ANDREW R. WHEELER, as the                 Date:  June 18, 2020
   Administrator of the United States        Time:  1:30 p.m.
17 Environmental Protection Agency, *et al.*  Dep't: San Francisco, Courtroom 3, 17th Floor
                                             Judge: Hon. Richard Seeborg
18                      Defendants.

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

Table of Authorities ........................................................................................................... iii

Glossary ............................................................................................................................. ix

Introduction ........................................................................................................................ 1

Background ......................................................................................................................... 3

   A.   Clean Water Act ....................................................................................................... 3

     1.  CWA Permitting Programs .................................................................................. 3

     2.  Water Quality Standards and Total Maximum Daily Loads ............................ 4

   B.   Prior Regulatory Definitions of "Waters of the United States" and Litigation ..................... 4

     1.  The 1980s Regulations and Legal Challenges to Those Regulations .............................. 4

     2.  The 2015 Rule ..................................................................................................... 6

     3.  The Repeal Rule .................................................................................................. 6

   C.   Navigable Waters Protection Rule ......................................................................... 7

Standard of Review ............................................................................................................ 8

Summary of Argument ....................................................................................................... 9

Argument .......................................................................................................................... 10

I.   The States Have Not Shown That They Are Likely to Obtain Relief on the Merits. ................ 10

   A.   The NWPR Is Entitled to Deference Under *Chevron*. ........................................ 10

     1.  The Relevant Portions of the Clean Water Act Are Ambiguous. ..................... 10

     2.  The Agencies' Revised Regulatory Definition of "Waters of the United States" Is a Reasonable Construction of Ambiguous Statutory Terms. ........................ 11

     3.  Supreme Court Precedent Supports the Agencies' Development of a New Regulatory Definition of "Waters of the United States." ............................. 11

     4.  The NWPR Is Consistent with the Text of the Clean Water Act. ................... 13

   B.   The NWPR Is Neither Arbitrary nor Capricious. ................................................ 16

     1.  The Agencies' Decision Not to Incorporate the "Significant Nexus" Test into the NWPR Was Well-Explained. ................................................................... 16

2.    The Connectivity Report Does Not Preclude the Agencies' Revised Regulatory Definition of "Waters of the United States." ............................................................ 18

3.    The Rule's "Typical Year" Requirement and "Ephemeral" and "Intermittent" Definitions Are Reasonable and Provide Clarity. ................................................... 21

4.    Interstate Waters Not Connected to a Traditionally Navigable Water Were Reasonably Excluded from the Regulatory Definition. .................................................. 23

II.    The States Have Failed to Meet Their Burden of Showing More Than a Mere Possibility of Irreparable Harm. .......................................................................................................... 25

A.    Plaintiffs Can Prove No Imminent Environmental Injury. .................................... 25

1.    CWA Permits Will Continue Protecting Navigable Waters Under the NWPR. ............. 25

2.    The CWA's Structure Ensures Water Quality Standards Will Be Met. ......................... 27

B.    Plaintiffs' Declarants Fail to Support a Finding of Irreparable Harm. ................................. 28

C.    Plaintiffs' Voluntary Efforts to Revise Their Water Pollution Control Programs Do Not Constitute Irreparable Harm. .................................................................................... 34

D.    Plaintiffs Fail to Demonstrate Irreparable Harm to Their Proprietary and Economic Interests. ........................................................................................................................... 35

E.    Plaintiffs' Allegations of Specific Harm Are General Criticisms of the NWPR and Should Be Addressed Upon the Full Administrative Record. ....................................................... 36

III.    The Balance of Equities Weighs in Favor of the Agencies, and Issuance of an Injunction Would Harm the Public Interest. .................................................................................. 36

IV.    Equity and the Constitution Require Injunctive Relief to Be Limited. .................................... 38

A.    Nationwide Relief Is Inappropriate. .................................................................... 38

B.    Relief Should Be Narrowly Tailored, Including by Geography and Provision. .................. 39

C.    The Structure of the CWA and Comity Concerns Support Limited Relief. ...................... 40

Conclusion ........................................................................................................................ 40

1

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alliance for the Wild Rockies v. Cottrell,*

632 F.3d 1127 (9th Cir. 2011) ................................................................. 8

*American Trucking Ass'ns v. City of Los Angeles,*

559 F.3d 1046 (9th Cir. 2009) ................................................................. 8

*Baltimore Gas & Elec. Co. v. NRDC,*

462 U.S. 87 (1983) ..................................................................... 22, 29

*Califano v. Yamasaki,*

442 U.S. 682 (1979) ........................................................................ 39

*California v. Azar,*

911 F.3d 558 (9th Cir. 2018) ................................................................ 38

*Catskill Mountains Chapter of Trout Unlimited, Inc.,*

846 F.3d 942 (2d Cir. 2017) ................................................................. 15

*Chamber of Commerce of U.S. v. EPA,*

642 F.3d 192 (D.C. Cir. 2011) ........................................................... 31, 33

*Chevron, U.S.A., Inc. v. NRDC,*

467 U.S. 837 (1984) ................................................................ 10, 11, 12

*Citizens to Preserve Overton Park v. Volpe,*

401 U.S. 402 (1971) ........................................................................ 9

*City & Cty. of San Francisco v. Trump,*

897 F.3d 1225 (9th Cir. 2018) ............................................................... 38

*Clapper v. Amnesty Int'l USA,*

568 U.S. 398 (2013) ....................................................................... 34

*Clark v. Rameker,*

134 S. Ct. 2242 (2014) ..................................................................... 24

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*

563 F.3d 466 (D.C. Cir. 2009) ........................................................... 31, 33

*Ctr. for Food Safety v. Vilsack,*

    *636* F.3d 1166 (9th Cir. 2011) ................................................................ 28

*Cty. of Maui, Haw. v. Haw. Wildlife Fund,*

    140 S. Ct. 1462 (2020) ........................................................... 14, 21, 25

*E. Bay Sanctuary Covenant v. Trump,*

    950 F.3d 1242 (9th Cir. 2020) ................................................................ 37

*Entergy Corp. v. Riverkeeper, Inc.,*

    556 U.S. 208 (2009) ................................................................................ 11

*Envtl. Def. Fund, Inc. v. Costle,*

    657 F.2d 275 (D.C. Cir. 1981) ................................................................. 9

*F.C.C. v. Fox Television Stations, Inc.,*

    556 U.S. 502 (2009) ..................................................................... 16, 17, 18

*Georgia v. Pruitt,*

    326 F. Supp. 3d 1356 (S.D. Ga. 2018) ..................................................... 6

*Georgia v. Wheeler,*

    418 F. Supp. 3d 1336 (S.D. Ga. 2019) ........................................... 1, 6, 23

*Greater Yellowstone Coal. v. Flowers,*

    321 F.3d 1250 (10th Cir. 2003) ............................................................. 34

*In re EPA and Dep't of Def. Final Rule,*

    803 F.3d 804 (6th Cir. 2015), *vacated by* 713 F. App'x 489 (2018) ........ 6

*Lujan v. Defenders of Wildlife,*

    504 U.S. 555 (1992) ............................................................................... 31

*Macon Cty. Samaritan Mem'l Hosp. v. Shalala,*

    7 F.3d 762 (8th Cir. 1993) ............................................................... 20, 23

*Madsen v. Women's Health Ctr., Inc.,*

    512 U.S. 753 (1994) ............................................................................... 39

*Marsh v. Or. Nat. Res. Council,*

    490 U.S. 360 (1989) ................................................................................. 9

iv

*Mayo Found. for Med. Educ. & Research v. United States*,

    562 U.S. 44 (2011) ............................................................................................................ 11

*Mazurek v. Armstrong*,

    520 U.S. 968 (1997) ................................................................................................... 25, 36

*Monsanto Co v Geertson Seed Farms*,

    561 U.S. 139 (2010) ................................................................................................... 38, 39

*Morrison v. Nat'l Austl. Bank Ltd.*,

    561 U.S. 247 (2010) ........................................................................................................ 14

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,

    463 U.S. 29 (1983) ......................................................................................................... 23

*Nat'l Ass'n of Mfrs.v. Dep't of Def.*,

    138 S. Ct. 617 (2018) ................................................................................................... 6, 40

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,

    545 U.S. 967 (2005) ................................................................... 1, 2, 9, 10, 11, 12, 13

*North Dakota v. EPA*,

    127 F. Supp. 3d 1047 (D.N.D. 2015) ................................................................................. 6

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,

    636 F.3d 1150 (9th Cir. 2011) ......................................................................................... 28

*Pronsolino v. Nastri*,

    291 F.3d 1123 (9th Cir. 2002) ........................................................................................... 4

*Rapanos v. United States*,

    547 U.S. 715 (2006) ......................................... 1, 2, 5, 7, 9, 11, 12, 15, 17, 19, 25

*Rodriguez v. United States*,

    480 U.S. 522 (1987) ........................................................................................................ 15

*Sierra Club v. U.S. Army Corps of Eng'rs*,

    990 F. Supp. 2d 9 (D.D.C. 2013) ................................................................................ 33, 37

*Sierra Club v. U.S. Dep't of Agric., Rural Utils. Serv.*,

    841 F. Supp. 2d 349 (D.D.C. 2012) ................................................................................. 33

v

*Sierra Forest Legacy v. Rey*,

    577 F.3d 1015 (9th Cir. 2009) ................................................................. 8

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,

    531 U.S. 159 (2001) ............................................... 5, 11, 12, 13, 24

*Stormans, Inc. v. Selecky*,

    586 F.3d 1109 (9th Cir. 2009) ............................................................. 37

*Texas v. EPA*,

    389 F. Supp. 3d 497 (S.D. Tex. 2019) ................................................. 6

*Texas v. EPA*,

    No. 3:15-cv-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018).................... 6

*Titaness Light Shop, LLC v. Sunlight Supply, Inc.*,

    585 F. App'x 390 (9th Cir. 2014) ....................................................... 35

*Trump v. Hawaii*,

    138 S. Ct. 2392 (2018) ........................................................................ 38

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,

    136 S. Ct. 1807 (2016) ............................................................. 1, 12, 17

*U.S. Dep't of Def. v. Meinhold*,

    510 U.S. 939 (1993)............................................................................ 39

*United States v. Eurodif S.A.*,

    555 U.S. 305 (2009)............................................................................ 12

*United States v. Nat'l Treasury Emps. Union*,

    513 U.S. 454 (1995)............................................................................ 38

*United States v. Riverside Bayview*,

    474 U.S. 121 (1985)............................................................... 4, 11, 13

*Winter v. NRDC*,

    555 U.S. 7 (2008)......................................................................... 8, 33

vi

**Rules**

Fed. R. Civ. P. 65(d) ........................................................................................... 31

**Statutes**

5 U.S.C. § 706(2)(A), (C) ...................................................................................... 9

33 U.S.C. § 1251 *et. seq.* ....................................................................................... 3

33 U.S.C. § 1251(a) .................................................................................. 2, 3, 13, 14

33 U.S.C. § 1251(b) .................................................................................. 2, 3, 13, 14

33 U.S.C. § 1311 ...................................................................................................... 3

33 U.S.C. § 1311(a) ................................................................................................. 3

33 U.S.C. § 1311(a)(1) ........................................................................................... 24

33 U.S.C. § 1311(b)(1)(C) ....................................................................................... 4

33 U.S.C. § 1313(a) ........................................................................................... 4, 24

33 U.S.C. § 1313(b) ................................................................................................. 4

33 U.S.C. § 1313(c)(1) ............................................................................................. 4

33 U.S.C. § 1313(d) ................................................................................................. 4

33 U.S.C. § 1313(d)(1)(A) ....................................................................................... 4

33 U.S.C. § 1313(d)(1)(B) ....................................................................................... 4

33 U.S.C. § 1314 ...................................................................................................... 3

33 U.S.C. § 1316 ...................................................................................................... 3

33 U.S.C. § 1317 ...................................................................................................... 3

33 U.S.C. § 1342 ...................................................................................................... 3

33 U.S.C. § 1344(a) ................................................................................................. 4

33 U.S.C. § 1344(d) ................................................................................................. 4

33 U.S.C. § 1362(7) .................................................................................. 1, 4, 13, 24

33 U.S.C. § 1362(11) ............................................................................................... 3

33 U.S.C. § 1362(12) ...................................................................................... 3

33 U.S.C. § 1363 ............................................................................................. 24

33 U.S.C. § 1367(7) ................................................................................. 3, 7, 24

91 Stat. 1567, 1575 Public Law 95–217 (1977) ........................................... 14

**Code of Federal Regulations**

40 C.F.R. § 122.44(d)(1)(vii)(A) ..................................................................... 4

40 C.F.R. § 130.2(j) .......................................................................................... 4

40 C.F.R. § 130.7(b)(1)...................................................................................... 4

40 C.F.R. § 130.7(d)(1) ..................................................................................... 4

40 C.F.R. § 131.10(b) ...................................................................................... 27

**Federal Registers**

42 Fed. Reg. 37,122 (July 19, 1977)................................................................. 4

51 Fed. Reg. 41,251 (Nov. 13, 1986)................................................................ 4

53 Fed. Reg. 20,764 (June 6, 1988) .................................................................. 4

80 Fed. Reg. 37,054 (June 29, 2015) ............................................... 6, 19, 20, 21

84 Fed. Reg. 4154 (Feb. 14, 2019) ................................................................. 23

84 Fed. Reg. 56,626 (Oct. 22, 2019)................................................................ 6

85 Fed. Reg. 22,250 (Apr. 21, 2020) ................................. 7, 8, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 37

**Miscellaneous**

*Fed. Prac. & Proc.* § 2948.1................................................................... 33, 34

## **GLOSSARY**

| | |
|---|---|
| 2015 Rule | Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) |
| APA | Administrative Procedure Act |
| CWA | Clean Water Act |
| EA | Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States" |
| Mot. | Plaintiffs' Notice of Motion and Motion for a Preliminary Injunction or Stay; Memorandum of Points and Authorities (May 18, 2020) |
| NPDES | National Pollutant Discharge Elimination System |
| NWPR | Navigable Waters Protection Rule, 85 Fed. Reg. 22,250 (Apr. 21, 2020) |
| RPA | Resource and Programmatic Assessment for the Navigable Waters Protection Rule: Definition of "Waters of the United States" |
| RTC | Agencies' Response to Comments regarding the NWPR |
| TMDL | Total Maximum Daily Load |
| WQLS | Water Quality-Limited Segment |
| WQS | Water Quality Standard(s) |

1    Defendants Andrew R. Wheeler, as the Administrator of the United States Environmental

2  Protection Agency ("EPA"); EPA; R. D. James, as Assistant Secretary of the Army for Civil Works;

3  and United States Army Corps of Engineers (the "Corps," and collectively "Agencies") hereby

4  submit their opposition to Plaintiffs' Notice of Motion and Motion for Preliminary Injunction or Stay;

5  Memorandum of Points and Authorities (Dkt. No. 30) (hereinafter "Mot.").

## INTRODUCTION

7    Moving to enjoin the Agencies' new Navigable Waters Protection Rule ("NWPR"), Plaintiffs

8  have failed to cite—let alone address—one of the critical Supreme Court precedents for the correct

9  resolution of these claims. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S.

10  967, 980 (2005). The Clean Water Act asserts jurisdiction over "'navigable waters' [which] means

11  the waters of the United States." 33 U.S.C. § 1362(7). But the Agencies' regulations for applying

12  these famously ambiguous terms have been subject to legal dispute for over 30 years, reaching the

13  Supreme Court multiple times. *See*, *e.g.*, *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct.

14  1807, 1816 (2016) (Kennedy, J., concurring) (calling the application of these terms "notoriously

15  unclear"). And the Agencies' most recent attempt to define these terms in 2015 was held "unlawful,"

16  contrary to the text of the CWA, and remanded to the Agencies. *Georgia v. Wheeler*, 418 F. Supp. 3d

17  1336, 1372 (S.D. Ga. 2019). Before its repeal, nearly a half dozen courts had stayed or enjoined the

18  2015 Rule because of the likelihood of successfully invalidating the rule on such grounds.

19    Heeding the lesson of this failure, the Agencies went back to the text and structure of the

20  CWA. They promulgated the NWPR. The central fallacy of Plaintiffs' complaint and motion is that

21  the NWPR's unifying legal theory is somehow foreclosed by opinions of a majority of the justices in

22  *Rapanos v. United States*, 547 U.S. 715 (2006). That is simply wrong. This claim apparently stems

23  from an incomplete understanding of administrative law. "A court's prior judicial construction of a

24  statute trumps an agency construction otherwise entitled to *Chevron* deference ***only if*** the prior court

25  decision holds that its construction follows from the ***unambiguous*** terms of the statute and thus

26  leaves no room for agency discretion." *Brand X*, 545 U.S. at 982 (emphasis added). But no Supreme

27  Court precedent states that the CWA's use of the term "navigable waters" unambiguously *precludes*

28  the Agencies from defining "'navigable waters' mean[ing] the waters of the United States" on a

1

1    theory of "sufficient surface water connection to traditional navigable waters or the territorial seas."

2    85 Fed. Reg. 22,250, 22,252 (Apr. 21, 2020). In fact, in *Rapanos*, Chief Justice Roberts chastised the

3    Agencies for failing to use the "generous leeway by the courts in interpreting the statute" to

4    "develop[] *some* notion of an outer bound to the reach of their authority" following the Court's

5    *SWANCC* decision. 547 U.S. at 758 (Roberts, C.J., concurring) (emphasis in original).

6         In promulgating the NWPR, the Agencies heeded Chief Justice Roberts. They established, for

7    the first time, such an outer bound. Plaintiffs may not agree with it. But "judicial precedent [does not]

8    foreclose an agency from interpreting an ambiguous statute, as the [Plaintiffs here] assume[] it

9    could." *Brand X*, 545 U.S. at 982. Applying this proper understanding of federal administrative law,

10   nothing in *Rapanos* unambiguously precludes the Agencies' new, entirely reasonable interpretation of

11   the CWA. Plaintiffs desperately suggest that the overall "objective" of the CWA to improve water

12   quality can negate the Agencies' consideration of "the policy of the Congress to recognize, preserve,

13   and protect the primary responsibility and rights of States to prevent, reduce, and eliminate pollution"

14   and other considerations. *See* 33 U.S.C. § 1251(a) & (b). But it does not. Plaintiffs' claims cannot

15   overcome the deference the courts owe the Agencies under *Chevron*.

16        Nor was there a need for the Agencies to more thoroughly address the "scientific evidence" of

17   the legally-flawed 2015 Rule than they did in the NWPR. In 2015, the Agencies marshalled that

18   evidence to try and apply a "significant nexus" test, endorsed by a single Justice. But those findings,

19   which the Agencies did consider when promulgating the NWPR, do not refute the reasonableness of

20   the Agencies' latest action. And the Agencies surely did appropriately consider, and thoroughly

21   explain, their treatment of this and other science. Their extensive analysis and discussion supporting

22   the NWPR span ***more than 1,500 pages*** across the rule's preamble, the Resource and Programmatic

23   Assessment, the Economic Analysis, and Response to Comments.

24        On the issue of harm, Plaintiffs grossly distort the immediate, real-world environmental

25   effects of the NWPR. Long-established regulatory requirements of the Act will continue to assure that

26   water quality is maintained in the major waterways cited by Plaintiffs. Discharges to those waters will

27   be regulated as before—regardless of whether certain ephemeral features or nonadjacent wetlands are

28   no longer jurisdictional. And discharges to non-jurisdictional waters will continue to be subject to

1  CWA regulation when conveyed to jurisdictional waters. Thus, the NWPR fully and carefully

2  implements the Agencies' obligation to protect water quality.

3          Plaintiffs fail to meet the high bar of demonstrating irreparable harm. And, they certainly have

4  not demonstrated that the rule will cause them such *imminent* harm as to warrant a preliminary

5  injunction. So the Court should reject Plaintiffs' request to decide the effects of the NWPR solely on

6  the basis of their one-sided declarations. Instead, the merits of this dispute should properly be heard

7  through cross-motions for summary judgment, after fulsome review of the administrative record. This

8  is the generally-accepted practice under the Administrative Procedure Act ("APA").

9          Lastly, while no injunctive relief is appropriate, it certainly should not be imposed nationwide,

10  nor should such relief affect more provisions of the NWPR than necessary. Equitable relief must be

11  narrowly tailored. It should only apply to a specific cause of irreparable harm demonstrated by

12  Plaintiffs. And the Court must balance the harms and public interest. It is not in the public interest for

13  this Court to broadly continue uncertainty by enjoining the NWPR in the many states that wish the

14  Agencies' well-founded CWA jurisdictional lines in effect.

## BACKGROUND

### A.      Clean Water Act

17          Congress enacted the CWA, 33 U.S.C. § 1251 et seq., with the objective of restoring and

18  maintaining the chemical, physical, and biological integrity of the Nation's waters, *id*. § 1251(a),

19  while declaring its policy to "recognize, preserve, and protect the primary responsibilities and rights

20  of States to prevent, reduce, and eliminate pollution." *Id*. § 1251(b). The Act prohibits "the discharge

21  of any pollutant by any person," 33 U.S.C. § 1311(a), to "navigable waters" defined as "the waters of

22  the United States." 33 U.S.C. § 1362(7).

### 1.   CWA Permitting Programs

24          Two programs are key to implementing the Act's prohibition on the unauthorized discharge of

25  pollutants to "navigable waters." 33 U.S.C. §§ 1311(a), 1362(12). The EPA or authorized states issue

26  National Pollutant Discharge Elimination System ("NPDES" or "section 402") permits for the

27  discharge of pollutants other than dredged or fill material. *Id*. § 1342. NPDES permits control water

28  pollution using two different strategies. The first, the "technology-based" approach, requires effluent

1    limitations based on specific process-based controls. *Id.* §§ 1311, 1314, 1316-17, 1362(11). The

2    second controls point source discharges by directing that NPDES permits include limits sufficiently

3    stringent to implement applicable water quality standards. 33 U.S.C. § 1311(b)(1)(C); 40

4    C.F.R. § 122.44(d)(1)(vii)(A). For discharges of dredged or fill material to "waters of the United

5    States," the Secretary of the Army acting through the Corps, or a state or tribe with an assumed

6    program, may issue "section 404" permits. 33 U.S.C. § 1344(a), (d), (g).

7           **2.   Water Quality Standards and Total Maximum Daily Loads**

8       States adopt water quality standards ("WQS") for particular waterbodies or waterbody

9    segments within their boundaries. 33 U.S.C. § 1313(a), (b) & (c)(1). States then identify, and

10    prioritize, water-quality-limited segments ("WQLSs"), *i.e.*, segments that do not meet water quality

11    standards even after implementation of technology-based effluent limitations. *Id.* § 1313(d)(1)(A) &

12    (B); 40 C.F.R. §§ 130.2(j) & 130.7(b)(1). States submit their WQLSs in lists ("section 303(d) lists")

13    to EPA on a biennial basis. 40 C.F.R. § 130.7(d)(1). Additionally, states are to develop a Total

14    Maximum Daily Load ("TMDL") for each impaired waterbody and the particular pollutant causing

15    the impairment. 33 U.S.C. § 1313(d). TMDLs function primarily as planning devices. *See Pronsolino*

16    *v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002). Each TMDL represents a goal to be implemented by

17    adjusting pollutant discharge requirements in individual permits and/or by nonpoint source controls.

18      **B.   Prior Regulatory Definitions of "Waters of the United States" and Litigation**

19       The Agencies have issued multiple regulations defining "waters of the United States," the

20    principal term in the CWA's definition of "navigable waters." 33 U.S.C. § 1362(7).

21          **1.   The 1980s Regulations and Legal Challenges to Those Regulations**

22       The Corps first promulgated regulations defining "waters of the United States" in the 1970s.

23    *See, e.g.*, 42 Fed. Reg. 37,122, 37,144 (July 19, 1977). In the late 1980s, the Agencies adopted

24    regulatory definitions of that statutory phrase substantially similar to the 1977 definition. *See* 51 Fed.

25    Reg. 41,251 (Nov. 13, 1986) (Corps regulations); *see also* 53 Fed. Reg. 20,764 (June 6, 1988) (EPA's

26    codification of nearly identical regulatory text).

27       Over time, the Agencies refined their application of the regulatory definition of "waters of the

28    United States," as informed by three Supreme Court decisions. In *United States v. Riverside Bayview*,

4

the Court deferred to the Corps' assertion of jurisdiction over wetlands "actually abut[ting]" a traditional navigable water. 474 U.S. 121, 131-35 & n.9 (1985). But in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"), the Court rejected the Corps' assertion of jurisdiction over non-navigable, isolated, intrastate waters.  It held that the term "navigable" must be given meaning within the context and application of the CWA. *Id.* at 171-72; *see also id.* at 167-68 ("[T]o rule for [the Corps], we would have to hold that the jurisdiction of the Corps extends to ponds that are not adjacent to open water . . . [T]he text of the statute will not allow this.").

Most recently, in *Rapanos*, the Court assessed the Corps' assertion of jurisdiction over wetlands pursuant to the 1980s regulations. *Rapanos*, 547 U.S. at 719-20, 729-30 (Scalia, J., plurality). Both the plurality and Justice Kennedy determined that the cases should be remanded for failure to establish jurisdiction. *Id.* at 757; *id.* at 786-87 (Kennedy, J., concurring). The dissent would have upheld the Corps' finding of jurisdiction. *Id.* at 810 (Stevens, J., dissenting). The plurality stated that "the traditional term 'navigable waters' . . . carries *some* of its original substance" and "includes, at bare minimum, the ordinary presence of water." *Id.* at 734 (emphasis in original). The plurality would have limited "waters of the United States" to traditional navigable waters and those "relatively permanent bod[ies] of water connected to traditional interstate navigable waters'" or "wetlands with a continuous surface connection" to a such a relatively permanent water. *Id.* at 739, 742. The plurality would exclude from jurisdiction "[w]etlands with only an intermittent, physically remote hydrologic connection to 'waters of the United States.'" *Id.* at 742.

In concurring, Justice Kennedy agreed the CWA has limits. He reasoned that the CWA's jurisdiction extends to waters that have a "'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 759 (Kennedy J., concurring). But Justice Kennedy rejected the dissent's view that the CWA "would permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." *Id.* at 778. In both *SWANCC* and in the plurality and concurring opinions in *Rapanos*, the Supreme Court expressed principles reflecting the outer limits of CWA jurisdiction. No Agency regulation can exceed these statutory limits.

**2. The 2015 Rule**

In 2015, the Agencies revised the regulatory definition of "waters of the United States." *See* Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule"). When promulgating the 2015 Rule, the Agencies professed reliance on Justice Kennedy's "significant nexus" discussion as the legal touchstone for the 2015 Rule. Thus, to establish that waters and wetlands covered by the scope of the Rule's text would always have such a "nexus," the Agencies prepared a scientific literature review—the "Connectivity Report"—to support exerting federal jurisdiction over certain waters. *See id.* at 37,062.

Multiple parties sought judicial review of the 2015 Rule in courts across the country. A court of appeals and multiple district courts stayed or enjoined the 2015 Rule, concluding plaintiffs established a likelihood of successfully invalidating the rule. *See In re EPA & DOD Final Rule*, 803 F.3d 804, 808 (6th Cir. 2015), *vacated by* 713 F. App'x 489 (2018)[1]; *Or. Cattlemen's Ass'n v. EPA*, No. 3:19-cv-564, Dkt. No. 58 (July 26, 2019), *vacated as moot,* Dkt. No. 81 (D. Or. Mar. 2, 2020); *Texas v. EPA*, No. 3:15-cv-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356 (S.D. Ga. 2018); *North Dakota v. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015); *North Dakota v. EPA*, No. 3:15-cv-59, Dkt. No. 250 (D.N.D. Sept. 18, 2018). In addition, both courts that ruled on summary judgment motions concluded that the 2015 Rule was "unlawful" and remanded the 2015 Rule back to the Agencies. *Georgia v. Wheeler*, 418 F. Supp. 3d at 1372; *Texas v. EPA*, 389 F. Supp. 3d 497, 504-06 (S.D. Tex. 2019). The various grounds given by the Georgia district court included that "the definition of waters of the United States in the [2015] WOTUS Rule extends beyond the [Agencies'] authority under the CWA." *Georgia*, 418 F. Supp. 3d at 1360.

**3. The Repeal Rule**

In 2017, the Agencies began reconsidering the 2015 Rule, which was stayed at the time. They conducted a notice-and-comment rulemaking process. And, partially responding to the district court orders remanding the 2015 Rule, the Agencies issued a rule repealing the 2015 Rule and reinstating

---

[1] The Supreme Court reversed the Sixth Circuit's jurisdictional determination, holding that challenges must be brought in district courts. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 624 (2018).

the pre-2015 Rule regulatory definition of "waters of the United States." 84 Fed. Reg. 56,626 (Oct. 22, 2019) ("Repeal Rule"). The Repeal Rule went into effect on December 23, 2019. *Id*. Multiple parties sought judicial review of the Repeal Rule in various district courts. But the Repeal Rule, and its reinstatement of the earlier regulations, remains in effect.

### C.      Navigable Waters Protection Rule

On January 23, 2020, the Agencies signed the final Navigable Waters Protection Rule ("NWPR") revising the definition of "waters of the United States," a term that is the principal component of the CWA's definition of "navigable waters." 33 U.S.C. § 1362(7). This rule is intended to end the decades of disputes and uncertainty surrounding the scope of these terms and to provide more administrable rules. The NWPR was published in the Federal Register on April 21, 2020, and goes into effect on June 22, 2020. 85 Fed. Reg. 22,250 (Apr. 21, 2020).

The NWPR defines the limits of federal jurisdiction consistent with the Constitution, CWA, and case law. It establishes categorical bright lines to improve regulatory clarity. Specifically, the Rule defines the "waters of the United States" included in the CWA definition of "navigable waters" as: "(1) The territorial seas and traditional navigable waters; (2) tributaries of such waters; (3) certain lakes, ponds, and impoundments of jurisdictional waters; and (4) wetlands adjacent to other jurisdictional waters (other than waters that are themselves wetlands)." 85 Fed. Reg. at 22,273. The Rule also specifies "exclusions for many water features that traditionally have not been regulated, and define[s] the operative terms used in the regulatory text." *Id.* at 22,270; *see also id.* at 22,340-41 (regulatory text to be codified). Ephemeral features are categorically excluded under the NWPR. *Id.* at 22,340. But discharges of pollutants to such non-jurisdictional waters remain regulated under the Rule if those discharges are conveyed to downstream navigable waters. *Id.* at 22,297.

In developing the Rule's definition of "waters of the United States," the Agencies were guided by the Act's policies and objectives; case law, including both the plurality and concurring opinions in *Rapanos*; scientific principles; and administrability. They balanced Congress' goal to restore and maintain the integrity of the Nation's waters while maintaining the states' primary responsibilities and rights to prevent, reduce, and eliminate pollution and to plan the development and use of their land and water resources. And the Agencies thoroughly explained their decisions in technical

7

1   analyses and legal discussion spanning more than 1,500 pages across their final rule preamble,[2] the

2   Resource and Programmatic Assessment ("RPA"), the Economic Analysis, and a Response to

3   Comments document.[3]

4           Plaintiffs initiated this lawsuit on May 1, 2020. They seek declaratory and injunctive relief

5   under the APA. The Complaint asserts that the NWPR is: (1) impermissible under *Rapanos*, Compl.

6   ¶¶ 90-94; (2) arbitrarily inconsistent with the Agencies' prior findings, *id.* ¶¶ 96-102; and (3) contrary

7   to the CWA's objective, *id.* ¶¶ 104-10. On May 18, 2020, Plaintiffs filed a motion for preliminary

8   injunction. Dkt. No. 30. Other parties seek judicial review of the NWPR in other courts.[4]

9                              **STANDARD OF REVIEW**

10          To obtain a preliminary injunction, Plaintiffs "must establish that [they are] likely to succeed

11  on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that

12  the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v.*

13  *NRDC*, 555 U.S. 7, 20 (2008). Courts must consider all four *Winter* factors, *see Sierra Forest Legacy*

14  *v. Rey*, 577 F.3d 1015, 1019 (9th Cir. 2009), and may not issue an injunction based on the mere

15  possibility of irreparable injury. *See Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052

16  (9th Cir. 2009).[5]

17

18  ───────────────────

19  [2] The pre-publication version of the final rule is 340 pages long. This then required 279 columns of
    the Federal Register, spanning 93 pages. 85 Fed. Reg. at 25,250.

20  [3] Resource and Programmatic Assessment for the NWPR, Jan. 23, 2020 at 79, (hereinafter "RPA");
    Economic Analysis for the NWPR, January 22, 2020 at 94-163, (hereinafter "EA") (The RPA and EA

21  are available at https://www.epa.gov/nwpr/navigable-waters-protection-rule-supporting-documents);
    Response to Comments, *available at* https://beta.regulations.gov/document/EPA-HQ-OW-2018-

22  0149-11574 (hereinafter "RTC").

23  [4] *See, e.g.*, *Colorado v. EPA*, No. 1:20-cv-01461 (D. Colo., filed May 22, 2020); *Conservation Law*
    *Found v. EPA*, No. 1:20-10280 (D. Mass., filed Apr. 29, 2020); *Chesapeake Bay Found. v. Wheeler*,

24  No. 1:20-cv-01064 (D. Md., filed April 27, 2020); *N.M. Cattle Growers' Ass'n v. EPA*, No. 1:19-cv-
    00988 (D.N.M., supp. compl. filed Apr. 27, 2020). Motions for preliminary injunctions have been

25  filed in two of these cases to date. *See N.M. Cattle Growers' Ass'n*, Dkt. 30 (D.N.M. May 26, 2020);

26  *Colorado*, Dkt. No. 7 (D. Colo. May 28, 2020).

27  [5] Although the United States believes this standard is erroneous after *Winter*, in the Ninth Circuit, as
    an alternative, a plaintiff may demonstrate "'serious questions going to the merits' and a hardship

28  balance that tips sharply toward the plaintiff . . ., assuming the other two elements of the *Winter* test
    are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

1

2

3

4

5

6

7

8

9

10

Further, in assessing Plaintiffs' likelihood of success on the merits, the Court must apply the standard of the APA, 5 U.S.C. § 706(2)(A), (C), under which agency action may be overturned only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376 n.21 (1989); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971). Review under this standard is "highly deferential" and "presumes the agency's action to be valid." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981). The Court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416. "The court is not empowered to substitute its judgment for that of the agency." *Id.*

11

## SUMMARY OF ARGUMENT

12

13

14

15

16

17

18

19

20

21

What constitutes a "water of the United States" is a textbook example of statutory ambiguity for which agencies are "delegat[ed] authority to . . . fill the statutory gap in reasonable fashion." *Brand X*, 545 U.S. at 980. Thus, the only question for this Court is whether the Agencies' revised definition is a plausible construction of the CWA. "[A]n agency construction" will "trump" even prior *judicial* decisions unless such a holding "follow[ed] from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982. "Waters of the United States" is ambiguous. The NWPR is well within the "generous leeway by the courts" for agencies to "develop[] *some* notion of an outer bound to the reach of their authority." *Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring) (emphasis in original). The Court may not second-guess the Agencies' exercise of discretion.

22

23

24

25

26

27

28

Moreover, Plaintiffs' alternative—that the CWA is best served by adhering to the more ambiguous 30-year old regulations that have been the subject of critical Supreme Court opinions—is not in the public interest, not logically compelling, and not supported by the case law. Plaintiffs quibble with certain aspects of the NWPR. They complain that measuring surface flow in a "typical year" is not a perfectly bright line. But the Agencies made a reasonable attempt to provide a clear test for categorically covered and excluded waters. They explained why. And these delegated

1    interpretative and technical judgments are entitled to great deference by courts. Accordingly,

2    Plaintiffs cannot succeed on the merits of their challenge to the NWPR.

3        This Court should also deny Plaintiffs' request because they failed to meet the high bar of

4    demonstrating likely and imminent irreparable harm upon the effective date of the Rule. Indeed, as

5    explained more thoroughly below, Plaintiffs' claims lack any specificity as to where, when, and how

6    discharges of pollutants will allegedly occur and go unchecked as a result of this Rule.

7        Lastly, Plaintiffs' demand for a nationwide injunction against all the provisions of the

8    NWPR—impacting states that are not in this proceeding—is clearly overbroad. It should be rejected

9    out of hand. Discharges to the navigable waters of downstream states continue to be regulated by the

10   CWA—even if ephemeral channels and non-adjacent wetlands upstream are not jurisdictional under

11   federal law. Relief must be specifically limited to protecting only the imminent harms that Plaintiffs

12   have proven by actual evidence before this Court.

13                                   **ARGUMENT**

14   **I.    The States Have Not Shown That They Are Likely to Obtain Relief on the Merits.**

15          **A.    The NWPR Is Entitled to Deference Under *Chevron*.**

16        Where, as here, a challenged rule contains an agency's interpretation of statutory language,

17   the Court reviews that interpretation pursuant to *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).

18   At Step One, the Court must determine "whether Congress has directly spoken to the precise question

19   at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the

20   agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. "[I]f the

21   statute is silent or ambiguous with respect to the specific issue," the Court proceeds to Step Two to

22   determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at

23   843. The NWPR reflects a reasonable interpretation of CWA § 1362(7)'s definition of "'navigable

24   waters' mean[ing] the waters of the United States" under *Chevron* and *Brand X*.

25              **1.  The Relevant Portions of the Clean Water Act Are Ambiguous.**

26        To determine whether a statute is ambiguous under *Chevron* Step One, courts employ "tools

27   of statutory construction" to ascertain if "Congress had an intention on the precise question"; for that

28   "must be given effect." *Chevron*, 467 U.S. at 843 n.9. Here, Plaintiffs do not even contend "waters of

10

the United States" is unambiguous. Such an argument would now be waived. Regardless, the Supreme Court undisputedly establishes that ambiguity. *See Riverside Bayview*, 474 U.S. at 133; *SWANCC*, 531 U.S. at 170-71; *Rapanos*, 547 U.S. at 752 (plurality) (the Act "is in *some* respects ambiguous") (emphasis in original); *id.* at 780 (Kennedy, J., concurring) (referencing "ambiguity in the phrase 'navigable waters'"); *id.* at 796 (Stevens, J., dissenting) (referencing "ambiguity inherent in the phrase 'waters of the United States'").

### 2.   The Agencies' Revised Regulatory Definition of "Waters of the United States" Is a Reasonable Construction of Ambiguous Statutory Terms.

The question at *Chevron* Step Two is "whether the agency's answer [to the interpretive question] is based on a permissible construction of the statute." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 54 (2011) (quoting *Chevron*, 467 U.S. at 843). This need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (emphasis in original). Interpreting ambiguous language "involves difficult policy choices"; so judicial deference is critical as "agencies are better equipped to make [such choices] than courts." *Brand X*, 545 U.S. at 980. Indeed, a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982.

Here, the Agencies are entitled to wide deference. Interpreting "waters of the United States" notoriously involves the "difficult policy choices" contemplated by *Brand X*. In fact, Chief Justice Roberts specifically noted that the Agencies are "afforded generous leeway" for "developing *some* notion of an outer bound" in interpreting the CWA's jurisdiction. *Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring) (emphasis in original). The NWPR is a reasonable interpretation of the ambiguous phrase "waters of the United States" within the term "navigable waters" because it is consistent with the text, structure, objective, and policies of the Act and is technically well supported and explained.

### 3.   Supreme Court Precedent Supports the Agencies' Development of a New Regulatory Definition of "Waters of the United States."

Plaintiffs argue that the Supreme Court's decision in *Rapanos*, including Justice Kennedy's

---

11

"significant nexus" test and the Ninth Circuit's adoption of that test, bars the Agencies' interpretation in the NWPR. This is entirely wrong. Controlling Supreme Court precedent on administrative law establishes that *Rapanos* does not preclude the Agencies from promulgating a new regulatory definition. *Brand X*, 545 U.S. at 982. The Plaintiffs ignore this fundamental principle and case law and have thus waived any contest of its application here.

Neither *Riverside Bayview, SWANCC*, nor *Rapanos*, purports to constrain the power of the Agencies to interpret the scope of the CWA. *SWANCC* held that the "Migratory Bird Rule"—the application of the 1986 regulatory definition of "waters of the United States" to isolated, intrastate waters—was outside the boundary of CWA jurisdiction. 531 U.S. at 174; *id*. at 176-77 (Stevens, J., dissenting) (describing the majority's decision as "invalidat[ing] the 1986 migratory bird regulation as well as the Corps' assertion of jurisdiction over all waters except for actually navigable waters, their tributaries, and wetlands adjacent to each"). And in *Rapanos*, eight justices did not adopt the "significant nexus" standard because they concluded it was not grounded in the text of the CWA or should not supplant agency regulations. *E.g.*, 547 U.S. at 756 (plurality) (reasoning that the "significant nexus" standard "simply rewrites the statute"); *id*. at 807 (Stevens, J., dissenting) (opining that the "significant nexus" standard should not "replace regulatory standards that have been in place for over 30 years"). Moreover, as explained above, the Supreme Court or various justices found ambiguity in the phrase "'navigable waters' mean[ing] the waters of the United States" in those same cases, and thereafter.  *E.g.*, *Hawkes*, 136 S. Ct. at 1816. No member of the Court expressed the view that the CWA leaves no room for the Agencies to carve out a new rule.

To be sure, *Rapanos*, *SWANCC*, and *Riverside Bayview* articulated principles that served as guideposts for the Agencies' rulemaking. *See* 85 Fed. Reg. at 22,255-57. The Agencies particularly analyzed the common themes in the fractured *Rapanos* decision. *Id*. at 22,268 (finding "commonalities" between the plurality's and Justice Kennedy's opinions). But neither *Rapanos* nor any other case can be read to say the CWA unambiguously precludes the Agencies' new interpretation. "[A] court's choice of one reasonable reading of an ambiguous statute does not preclude an implementing agency from later adopting a different reasonable interpretation." *United States v. Eurodif S.A.*, 555 U.S. 305, 315 (2009). This principle stems from *Chevron*. This

1  "established a 'presumption that Congress, when it left ambiguity in a statute meant for
2  implementation by an agency, understood that the ambiguity would be resolved, first and foremost,
3  by the agency, and desired the agency (rather than the courts) to possess whatever degree of
4  discretion the ambiguity allows.'" *Brand X*, 545 U.S. at 982 (citation omitted). Accordingly, under
5  *Brand X*, the Agencies were empowered to reconsider their prior statutory interpretation after a fresh
6  look at the statute's text, context, and structure, but not unduly constrained by prior precedents.

7  **4.  The NWPR Is Consistent with the Text of the Clean Water Act.**

8  The NWPR is first and foremost based on the text of the statute, though informed by the
9  Supreme Court. In 1972, Congress defined "navigable waters" as "waters of the United States,
10 including the territorial seas." 33 U.S.C § 1362(7). Congress' authority to regulate water derives from
11 Constitutional authority to regulate the "channels of interstate commerce" under the Commerce
12 Clause. 85 Fed. Reg. at 22,262. But when assessing the scope of CWA jurisdiction over wetlands, the
13 Supreme Court recognized that Congress intended to exercise its statutory authority to regulate at
14 least some "waters" that would not actually be "'navigable' under the classical understanding of that
15 term." *Id.* (citing *Riverside Bayview*, 474 U.S. at 133). "[T]he term 'navigable' nonetheless reflects
16 'what Congress had in mind as its authority for enacting the CWA.'" *Id.* (citing *SWANCC*, 531 U.S.
17 at 172). The Supreme Court further explained that nothing in the CWA's legislative history indicates
18 that "Congress intended to exert anything more than its commerce power over navigation." *Id.* (citing
19 *SWANCC*, 531 U.S. at 168 n.3). The NWPR avoids regulating non-navigable, isolated, intrastate
20 waters that lack a sufficient connection to navigable waters. Congress also sought "to preserve and
21 protect" the power of states to regulate water resources and land within their borders. 33 U.S.C.
22 § 1251(b). So the NWPR also honors that policy. At bottom, its "unifying legal theory"—consistent
23 with this statutory text—asserts "federal jurisdiction over those waters and wetlands that maintain a
24 sufficient surface water connection to traditional navigable waters." 85 Fed. Reg. at 22,301.

25 Notably, essentially the only *actual text* of the CWA that Plaintiffs invoke to try to argue the
26 NWPR is unreasonable under *Chevron* are the congressional "goals" for the CWA. Mot. at 14 (citing
27 33 U.S.C. § 1251(a)). But contrary to Plaintiffs' claim, the Agencies gave extensive consideration to
28 the "objective" of the Act "to restore and maintain the chemical, physical, and biological integrity of

13

the Nation's waters." *Id*. § 1251(a). And they thoroughly explained how the NWPR's interpretation would implement that objective, while also balancing and implementing Congress' other policy directives expressed in other statutory text. Plaintiffs suggest the generalized objective of CWA § 1251(a) can override the Agencies' delegated discretion to balance these statutory elements and policy considerations. They do not. "It is [a court's] function to give the statute the effect its language suggests, however modest that may be; not to extend it to admirable purposes it might be used to achieve." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 270 (2010).

Instead, the Agency's consideration of the important role of states is entirely consistent with the statute. Congress recognized that states play a fundamental role in maintaining water quality and implementing the Act. *See Cty. of Maui, Haw. v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1471 (2020) ("[T]he . . . [CWA] indicates that, as to groundwater pollution and nonpoint source pollution, Congress intended to leave substantial responsibility and autonomy to the States."); *see also* 33 U.S.C. § 1251(b) (policy "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution" and "to plan the development and use . . . of land and water resources"). Plaintiffs dismiss the import of § 1251(b), contending it merely speaks to states' role in implementing the CWA. That makes no sense. For § 1251(b) not only "recognize[s]" the "rights of States"; it also calls for "preserv[ing], and protect[ing] the . . . rights of States," including "to plan the development and use . . . *of land*."[6] *Id.* (emphasis added). Thus, the NWPR reasonably balances the CWA's statutorily-stated "objective" to address water quality while preserving traditional state authority.

Plaintiffs also contend that adopting an interpretation of the CWA that does not reach ephemeral features will tragically impact the water quality of their States. This is refuted by the technical record developed by the Agencies. First, the NWPR's definition of "tributary" is based on key principles established by both the plurality and concurring opinions in *Rapanos*. *See* 85 Fed. Reg.

---

[6] Indeed, the fact that 1251(b) was included in the Act in 1972, but the authority to administer Section 404 was not added until 1977 indicates that Section 101(b), 33 U.S.C. § 1251(b), as a whole refers to "something beyond the subsequently added state administration program of 33 U.S.C. 1344(g)–(l)." *Rapanos*, 547 U.S. at 737 (citations omitted); 91 Stat. 1567, 1575 Public Law 95–217 (1977).

14

1   at 22,289 (citing Justice Kennedy's statement that "mere hydrologic connection should not suffice in

2   all cases") (internal citations omitted). Second, the Act's longstanding NPDES permitting program

3   will continue to address the discharge of pollutants that flow downstream into waters of the United

4   States. *See* 85 Fed. Reg. at 22,289 ("The agencies believe that a CWA section 402 permittee currently

5   discharging to a jurisdictional water that becomes nonjurisdictional under this final rule would likely

6   remain subject to the requirements of the Act."); RPA at 79. And the CWA's non-regulatory

7   measures will continue to address pollution of the nation's waters generally. *See* 85 Fed. Reg. at

8   22,253 (discussing non-regulatory program provisions). These programs collectively pursue the

9   objective of maintaining the integrity of the nation's waters, which the Agencies endorse as a

10   fundamental objective of the Act. Additionally, states, tribes, and local entities can choose to exercise

11   their own programs that further enhance the quality of all waters within their borders. *See* RPA

12   Appendix A; EA at 37. The administrative record reflects that many states do so. *Id.*

13         At bottom then, Plaintiffs' only statutory argument is—or must be, because of *Chevron* and

14   *Brand X*—that the general water quality objectives of the CWA in § 1251(a) *unambiguously* override

15   the Agencies' discretion to otherwise balance and interpret the definition of "navigable waters." That

16   is obviously wrong and has been rejected by other courts. In *Catskill Mountains Chapter of Trout

17   Unlimited, Inc. v. EPA*, for example, that court held that EPA's interpretation of a CWA rule

18   concerning water transfers was reasonable—notwithstanding "that, as the plaintiffs argue, the Water

19   Transfers Rule's interpretation of the Clean Water Act is not the interpretation best designed to

20   achieve the Act's overall goal of restoring and protecting the quality of the nation's water." 846 F.3d

21   492, 501 (2d Cir. 2017). The Second Circuit sustained EPA's rule anyway. It was "an interpretation

22   supported by valid considerations: The Act does not require that water quality be improved whatever

23   the cost or means, and the Rule preserves state authority over many aspects of water regulations." *Id.*;

24   *see also Rodriguez v. United States*, 480 U.S. 522, 525-56 (1987) ("no legislation pursues its

25   purposes at all costs"). Here, too, nothing in the text of the CWA unambiguously precludes the

26   Agencies from interpreting the Act to leave certain aspects of water quality regulation beyond federal

27   control and within the traditional powers of the states. *See, e.g.*, *Rapanos*, 547 U.S. at 755-56

28   (plurality) ("[C]lean water is not the *only* purpose of the statute. So is the preservation of primary

15

1 | state responsibility for ordinary land-use decisions.") (emphasis in original). So *Chevron* leaves

2 | Plaintiffs no likelihood of success.

3 | **B.      The NWPR Is Neither Arbitrary nor Capricious.**

4 | Clearly aware that their statutory arguments are totally without merit, Plaintiffs' motion buries

5 | those arguments beyond page 20. Curiously, Plaintiffs' motion instead leads with their inaccurate

6 | allegations about the Agencies' purported record failures. On this, Plaintiffs primarily assert that the

7 | NWPR is "arbitrary and capricious" because the Agencies purportedly did not provide enough

8 | explanation for their policy change, or sufficiently discuss the science used in support of the failed

9 | 2015 Rule like the "Connectivity Report." Plaintiffs further resort to unsupported hyperbole in

10 | predicting dire impacts to water quality and their supposed "reliance" interests. These unsupported

11 | arguments—refuted by the administrative record—must be rejected.

12 | **1.   The Agencies' Decision Not to Incorporate the "Significant Nexus" Test into
the NWPR Was Well-Explained.**

13 |

14 | Plaintiffs complain that the Agencies changed a "long-standing" position and about their

15 | "reliance" on that prior position. Mot. at 19-20. To be sure, the NWPR removes the bedeviling

16 | "significant nexus" concept for identifying "navigable waters." But Plaintiffs freely *admit* that the

17 | "Agencies are 'free to change their existing policies.'" *Id.* at 9. And to change that policy, an agency

18 | must merely provide "a satisfactory explanation for its action." *F.C.C. v. Fox Television Stations,*

19 | *Inc.*, 556 U.S. 502, 513 (2009) (internal quotation marks and citation omitted). This does not require

20 | reasons any "more substantial than those required to adopt a policy in the first instance." *Id.* at 514.

21 | Thus, an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are

22 | *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute,

23 | that there are good reasons for it, and that the agency *believes* it to be better." *Id.* at 515 (emphasis

24 | original). Here, Plaintiffs do not and cannot show the Agencies' explanation fails this standard.

25 | When promulgating the NWPR, the Agencies followed APA procedures. And the Agencies'

26 | ***more than 1,500 pages*** of Final Rule preamble, RPA and appendices, EA, and RTC documents

27 | thoroughly explained why "the agenc[ies] believe[ the NWPR] to be better" than a significant nexus

28 | test. *Id.* That is all the law requires of them. The primary "summary of the key elements of this final

1   rule" alone spanned 61 pages (each containing three columns) of the Federal Register. 85 Fed. Reg. at

2   22,273-334. The Agencies further analyzed the legal opinions of numerous courts as to the infirmities

3   of the 2015 Rule, including notably the decision of the Southern District of Georgia. That court had

4   granted summary judgment against the 2015 Rule and remanded it to the Agencies for failing to

5   implement the legal limits on the scope of the CWA. *E.g.*, *id.* at 22,272. The Agencies also analyzed

6   relevant Supreme Court cases—including how Justice Kennedy's concurring opinion and the

7   plurality opinion share commonalities in *Rapanos* which the NWPR applied. *E.g.*, *id.* at 22,268.

8        So there can be no real dispute that the Agencies' extensive explanation for setting aside the

9   significant nexus inquiry passes APA review. It included how "replacing the multi-factored case-

10  specific significant nexus analysis with categorically jurisdictional and categorically excluded waters

11  in the final rule provides clarifying value for members of the regulated community." *See*, *e.g.*, 85 Fed.

12  Reg. at 22,270. The Agencies also observed that eight justices rejected the significant nexus standard

13  because it was not grounded in the CWA or should not supplant agency rulemaking. *See* RTC: Legal

14  Arguments at 60-68. And the Agencies explained how they "used the Connectivity Report to inform

15  certain aspects of the definition of 'waters of the United States,' but recognize that science cannot

16  dictate where to draw the line between Federal and State Waters." 85 Fed. Reg. at 22,288. In these,

17  and on scores of other pages, the Agencies thoroughly explained why the "Connectivity Report" and

18  other science did not preclude—but supported—the NWPR. *E.g.*, *id.* at 22,288-95.

19       Plaintiffs have similarly failed to demonstrate that their supposed reliance interests are

20  sufficient to force the Agencies to keep the "significant nexus" standard. To be sure, if an agency's

21  "prior policy has engendered serious reliance interests," an agency may not ignore them. *Fox*, 556

22  U.S. at 515. But such reliance *does not* preclude an agency from changing policy. An agency must

23  merely provide a "detailed justification" for changing such a policy, notwithstanding that there are

24  reliance interests in the prior policy. *Id.* Here, the Agencies fully provided that justification.

25       Preliminarily, the decades of debate and repeated calls for the Agencies to address the

26  "notoriously unclear" scope of CWA jurisdiction precludes any justifiable reliance in a permanent

27  continuation of the post-*Rapanos* regime.  *Hawkes*, 136 S. Ct. at 1816 (Kennedy, J., concurring). In

28  fact, Justice Kennedy himself expressed that his case-specific "significant nexus" test was not the

---

17

only appropriate means for determining CWA jurisdiction. His opinion said this might only be necessary "[a]bsent more specific regulations" from the Agencies. *Rapanos*, 547 U.S. at 782 (Kennedy, J., concurring). Although the Agencies applied this standard and the *Rapanos* plurality reasoning after that case, they provided notice they were looking to rewrite the regulations.[7]

In addition, the "significant nexus" standard itself did not appear in the regulatory definition of "waters of the United States" until 2015. And, crucially, the 2015 Rule was enjoined nationwide from October 2015 to February 2018. It was then suspended by administrative action nationwide— then further enjoined in about half the country due to ongoing litigation—before the Agencies repealed it in 2019. *See supra* Background Part I.B.2.  There was other notice the Agencies were embarking on a new rulemaking. This further bars justifiable reliance. As early as February 2017, the President issued E.O. 13778, directing the Agencies to reconsider the definition of "waters of the United States" consistent with Justice Scalia's opinion in *Rapanos*. *See* RTC: Legal Arguments at 29.

Regardless, the Agencies thoroughly explained their reasons for discarding the "significant nexus" practice notwithstanding prior use and experience with it. *See*, *e.g.*, *id.* at 29 *et seq.* ("The agencies disagree with the commenter who stated that states have reliance interests in the preexisting definition of 'waters of the United States' that the agencies have not addressed.").  This is all the law required of the Agencies, even if there was "reliance." *Fox*, 556 U.S. at 515.

### 2.  The Connectivity Report Does Not Preclude the Agencies' Revised Regulatory Definition of "Waters of the United States."

Plaintiffs also charge that the NWPR arbitrarily "disregarded" or "ignored" prior Agency documents like the Connectivity Report of 2015 and the findings therein. Mot. at 10-13. This is flatly refuted by the record. Regardless, the Agencies reasonably concluded that the mere presence of a hydrologic connection between waters is not sufficient to establish CWA jurisdiction.

*First,* the record supporting the Agencies' decision to promulgate the NWPR includes extensive scientific information that the Agencies considered and discussed about hydrologic

---

[7] The Agencies' jurisdictional guidance following *Rapanos* stated the Agencies were considering re-writing the regulations. *See* CWA Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States* at 3 (Dec. 2, 2008), *available at* https:// www.epa.gov /sites/production/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf.

connectivity and water quality. This included, specifically, numerous pages addressing the Connectivity Report highlighted by the Plaintiffs. *E.g.*, 85 Fed. Reg. at 22,288-91. For example, using that Report, the Agencies analyzed the "connectivity gradient" and potential consequences between perennial, intermittent, and ephemeral streams and downstream waters within a tributary system. *E.g.*, *id*. at 22,288. The "tributary" definition also took into consideration the connectivity gradient. And the Agencies' decision to set that term at its final scope "rest[ed] upon a reasonable inference of ecological interconnection" between those tributaries and paragraph (a)(1) waters. *See Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring). The Agencies further looked to the Report, other principles of hydrologic connectivity, and longstanding practice to define the flow classifications (perennial, intermittent, ephemeral) used throughout the regulation, the incorporation of inundation by flooding to serve as surface water connections establishing jurisdiction, and the use of the "typical year" concept that relies upon a large body of precipitation and other climatic data to inform what may be within a normal range for a particular geographic region. *E.g.*, 85 Fed. at 22,288. The Agencies also are relying on other science to implement the NWPR. They are developing tools and scientific-based approaches to identify flow classification and typical year conditions. *Id*. Thus, contrary to Plaintiffs' claims, the Agencies' decisions in support of the NWPR were informed by science and thoroughly discuss the Connectivity Report. *Id*. at 22,271, 22,288.

 ***Second***, the Agencies nevertheless clearly and reasonably explained that the decision to finalize the NWPR required a balancing of many factors and evidence beyond a scientific connection. *E.g.*, 85 Fed. Reg. at 22,288. This included the statutory limits on the Agencies' legal authority, including the CWA text and structure. *E.g.*, *id*. at 22,283-89. It also required consideration of what would provide clarity to those regulated and regulating, what would be efficiently administrable, what would sufficiently embody the statutory link to what is "navigable," and what would give due deference and respect for state authority. *See supra* Argument Part I. So the administrative record entirely refutes Plaintiffs' assertion that the Agencies ignored "inconvenient factual determinations." As even the Agencies admitted in 2015, science alone simply cannot dictate where to draw the line between federal and state waters. 80 Fed. Reg. at 37,055 (Final Rule Preamble for 2015 Rule). In fact, even the 2015 Rule "interpretation [wa]s based not only on legal precedent and the best available

19

1   peer-reviewed science, but also on the agencies' technical expertise and extensive experience in

2   implementing the CWA over the past four decades." *Id.* And EPA's Scientific Advisory Board

3   similarly stressed in 2015: "'significant nexus' is a legal term, not a scientific one." *Id*. at 37,065. The

4   Connectivity Report itself found that "science does not provide a precise point along the continuum at

5   which waters provide only speculative or insubstantial functions to downstream waters." *Id*. at

6   37,090.

7       ***Third***, case law supports the Agencies' decision to draw lines leaving some waters or

8   wetlands with a scientific connection to other waters nevertheless beyond CWA jurisdiction. The

9   Agencies explained how *SWANCC* and *Rapanos* require this. *Id.* at 22,262-71. The Agencies also

10  reasonably considered what would provide regulatory clarity and fair and predicable notions of the

11  limits of jurisdiction. *See, e.g.*, *id.* at 22,270; RTC: Legal Arguments at 64-68, 114-15. As the Eighth

12  Circuit has stressed, "bright-line tests are a fact of regulatory life." *Macon Cty. Samaritan Mem'l*

13  *Hosp. v. Shalala*, 7 F.3d 762, 768-69 (8th Cir. 1993) (holding agencies reasonably may "sacrifice

14  some case-by-case precision in favor of a regime that is relatively easy to administer and promotes

15  nationwide uniformity"). Thus, the mere fact that the Agencies took into account more than science to

16  craft a bright-line test does not demonstrate that the definition is unreasonable under the APA.

17      ***Fourth***, Plaintiffs' wild speculation that "4.8 million miles of streams and millions of acres of

18  wetlands" will lose protection (Mot. at 1) is unfounded. The Agencies acknowledge that certain

19  aspects of the NWPR may result in narrower CWA jurisdiction than a "significant nexus" test. But

20  the datasets Plaintiffs rely upon, such as the National Hydrography Dataset or the National Wetlands

21  Inventory, are not a sufficient technical basis upon which to level their charge. *See* RPA at 35-39; EA

22  at 48-52.  In fact, former EPA Administrator McCarthy (for President Obama) testified to Congress

23  that the maps Plaintiffs rely upon are "not used to determine jurisdiction and not intended to be used

24  for jurisdiction," "are not relevant to the jurisdiction of the 'waters of the U.S.," and "are not

25  consistent with how we look at the jurisdiction of the [CWA]." 85 Fed. Reg. at 22,330. Plaintiffs also

26  ignore protections built into the rule that will preclude many of their speculative harms. They

27  repeatedly suggest that discharges to non-jurisdictional ephemeral streams will result in increased

28  pollution in downstream navigable waters. *See, e.g.*, Mot. at 10-12. But the NWPR is clear that

1    discharges of pollutants to ephemeral streams will still require a section 402 permit—even where the

2    receiving reach of the stream is not itself jurisdictional—if the pollutants will travel downstream to

3    jurisdictional waters. 85 Fed. Reg. at 22,277-80. The Supreme Court's recent decision in *County of*

4    *Maui* confirms this. 140 S. Ct. at 1476-77 (holding CWA applies to discharges to non-jurisdictional

5    groundwater that reach navigable waters by a "functional equivalent" of direct discharge).

6          *Fifth*, Plaintiffs' assertion that the Agencies "ignored" or "disregarded" prior findings from

7    promulgating the 2015 Rule is based on exaggeration (and even misrepresentation) of what the

8    Agencies previously wrote. The first page of Plaintiffs' brief charges that the NWPR eliminates

9    coverage for waters the Agencies said were "vital" in 2015. Mot. at 1. That is not correct. The

10   Agencies did say that "upstream waters" of "downstream" waters are *as a category* "vital" to the

11   water quality of "downstream" waters *as a category*. 80 Fed. Reg. at 37,054. That is obvious. But the

12   Agencies never said that *all* upstream waters or wetlands are "vital." To the contrary, the

13   Connectivity Report identified a "continuum" along which waters fall, and, again, acknowledged a

14   point thereon where "waters provide only speculative or insubstantial functions to downstream

15   waters" that science cannot identify. *Id.* at 37,090. Nor did the Agencies say in 2015—as Plaintiffs

16   inaccurately claim—that CWA jurisdictional coverage of ephemeral waters and wetlands is

17   "essential" to protect water quality. Mot. at 2. The Agencies did note it is "essential" that "discharge

18   of pollutants be controlled at the source." 80 Fed. Reg. at 37,061 & 37,056. But the NWPR will

19   continue to do this. As explained, the CWA continues to regulate discharges that reach waters of the

20   United States, even if a source isn't discharging directly to a jurisdictional water. 85 Fed. Reg. at

21   22,277-80.

22         In short, it was entirely reasonable (and not arbitrary) for the Agencies to consider various

23   factors to develop the NWPR. Plaintiffs' pretension that the Connectivity Report or critical science

24   was "ignored" or disregarded without explanation to promulgate the NWPR is refuted by the record.

### 3.   The Rule's "Typical Year" Requirement and "Ephemeral" and "Intermittent" Definitions Are Reasonable and Provide Clarity.

27         One aspect of the NWPR that depends on hydrologic science is the concept of "typical year."

28   After strangely calling the notoriously elusive "significant nexus" standard "accepted science,"

---

21

1   Plaintiffs quibble with the Agencies' new technical mechanism to help identify "waters of the United

2   States." "Typical year" is an entirely reasonable, longstanding hydrologic concept based on

3   established scientific principles that helps address the difficult problem of establishing a uniform

4   national definition. *See Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983) (holding "a

5   reviewing court must generally be at its most deferential" to an agency's technical determinations

6   "within its area of special expertise").

7        The "typical year" is a well understood and applied concept in the scientific community. *See*

8   85 Fed. Reg. at 22,273-74. It will provide a more predictable framework by which to establish federal

9   jurisdiction over relatively permanent waters that contribute surface water flow to waters identified in

10   paragraph (a)(1) of the Rule. *Id.* And utilizing the "typical year" concept allows one national

11   regulatory definition. This permits the NWPR to span climatic and hydrological variability, while

12   limiting variation that might occur from assessments done during different times of the year and in

13   different years. *See* RTC: Typical Year at 4, 6.

14        Contrary to Plaintiffs' unsupported assertion that this element is "unworkable," the delegated,

15   expert Agencies found that the methodology for calculating "typical year" is based on longstanding

16   practices that are established and transparent. The Agencies identified a general methodology for

17   calculating "typical year." To determine if a water feature is being assessed during normal

18   precipitation conditions, the Agencies will first determine whether the three 30-day precipitation

19   totals in its geographic area preceding the observation date fall within the 30th and 70th percentiles

20   for totals from the same date range over the preceding 30 years. *Id.* at 22,274. The Agencies will then

21   use weighted condition values from the three 30-day periods to determine precipitation normality.

22        The Agencies reasonably selected thirty years. This is the most common and recognized

23   timeframe used in other climatic data programs (*e.g.*, NOAA's National Climatic Data Center climate

24   normals, which are based on World Meteorological Organization requirements). 85 Fed. Reg. at

25   22,274. Additionally, under longstanding practice since *Rapanos*, the Agencies already consider the

26   effects of climatic conditions such as drought when assessing the flow regime of tributaries. *Id.* at

27   22,293 n. 46. Using a 30-year rolling average is also advantageous precisely because it is a dynamic

28   calculation aimed to capture changes in climate trends. *See id.* at 22,275. So this methodology does

account for the putative concerns Plaintiffs raise here.

Plaintiffs quibble that there may be times where the Agencies may have to deviate from this general methodology. Mot. at 28. That does not render the use of "typical year" arbitrary and capricious. The Agencies rightfully concluded that a completely inflexible, one-size-fits-all approach to defining "typical year" is neither realistic nor required. *See Macon Cty.*, 7 F.3d at 768-69 ("[W]e cannot condemn as arbitrary and capricious the [agency's] decision to sacrifice some case-by-case precision in favor of a regime that is relatively easy to administer and promotes nationwide uniformity."). Furthermore, the Agencies expect to provide a publicly-available tool for calculating normal precipitation and climatic conditions. 85 Fed. Reg. at 22,293. This tool will offer increased accessibility and transparency for the regulated community.

Plaintiffs also complain that the NWPR is irrational because it defines "ephemeral" and "intermittent" in a manner with which they are not satisfied. Mot. at 29. Again, the Agencies' technical judgments here must receive the highest level of judicial deference. In prior regulatory definitions of "waters of the United States," "ephemeral" and "intermittent" were not defined. *See* 85 Fed. Reg. at 22,274. Yet scientists, consultants, and other water resource professionals, including agency staff, have used terms like "intermittent," and "ephemeral" for decades in the field. *Id.* at 22,293. Indeed, the Agencies have used these terms to evaluate the jurisdictional status of waters for more than a decade, in accordance with the 2008 *Rapanos* Guidance. And given how frequently those terms are used throughout the regulatory definition of "waters of the United States," the Agencies reasonably defined them to give further clarity. *See Motor Vehicle Mfrs. Ass'n of the U.S v. State Farm*, 463 U.S. 29, 43 (1983).

### 4. Interstate Waters Not Connected to a Traditionally Navigable Water Were Reasonably Excluded from the Regulatory Definition.

The Plaintiffs also argue that the removal of "interstate waters" as a separate category of jurisdictional waters was inappropriate. Mot. at 28-29. This is without merit. Indeed, in light of the Southern District of Georgia's remand of the 2015 Rule's "interstate waters" provision as "unlawful," *Georgia*, 418 F. Supp. 3d at 1358-60, it was unreasonable to do otherwise. But in the proposed and final rules, the Agencies described in detail the legal infirmities with categorically asserting CWA

23

1  jurisdiction over all interstate waters. 84 Fed. Reg. 4,154, 4,171-72 (Feb. 14, 2019); 85 Fed. Reg. at

2  22,283-86. This included the Georgia court's holding that "the inclusion of all interstate waters in the

3  definition of 'waters of the United States,' regardless of navigability, extends the Agencies'

4  jurisdiction beyond the scope of the CWA because it reads the term navigability out of the CWA."

5  *Georgia*, 418 F. Supp. 3d at 1358.

6       The Plaintiffs nevertheless try to invoke the term "interstate waters" in section 303(a) of the

7  CWA, 33 U.S.C. § 1313(a), to support their claim. Mot. at 28. This hurts, not helps, their position.

8  That provision expressed that certain water quality standards *in place before 1972* would remain in

9  effect. But from 1972 forward, Congress specifically chose the term "navigable waters" to frame

10  federal regulatory jurisdiction, not "interstate waters." 33 U.S.C. §§ 1311(a)(1), 1362(7), 1363.

11  Section 1313(a) and its reference to "interstate waters" must therefore be interpreted to refer to

12  something *different* from the "navigable waters" of § 1362(7); *see Clark v. Rameker*, 134 S. Ct. 2242,

13  2248 (2014) ("A statute should be construed so that effect is given to all its provisions, so that no part

14  will be inoperative or superfluous.").

15       The Agencies gave other reasons for the change. Until NWPR, the Agencies relied on the

16  doctrine of congressional acquiescence to maintain "interstate waters" as a separate category of

17  waters of the United States. 85 Fed. Reg. at 22,283. But the Agencies now explain there is a better

18  reading. Because Congress selected the term "navigable waters" in the 1972 amendments to the Act,

19  the broader category "interstate waters" cannot be equated to "navigable waters." *Id*. And the

20  Supreme Court explicitly rejected the Agencies' reliance on congressional acquiescence in *SWANCC*

21  when they tried to extend jurisdiction to isolated pits used by migratory birds. 531 U.S. at 169-71.

22       Moreover, under Plaintiffs' theory, even the smallest, isolated wetland or pond—even pits like

23  *SWANCC*—could be federally regulated if they happen to lie on state boundaries. Neither the text of

24  the CWA and its application to "navigable waters," nor legal precedent, supports such a conclusion.

25  And the practical consequence of this change is grossly exaggerated. Many lakes and ponds that lie

26  on state lines already fall into one of the new regulation's other paragraph (a) categories for

27  jurisdiction under the NWPR. *See* 85 Fed. Reg. at 22,273 (including certain "Lakes and ponds" and

28  "Adjacent wetlands"). Thus, the Agencies reasonably concluded that the regulation of interstate

waters as a standalone category of "waters of the United States" both lacks an adequate foundation in the text of the Act and is of limited practical consequence. And this removal is entirely reasonable and explained. 85 Fed. Reg. at 22,282-86. Plaintiffs have no likelihood of successfully showing this, or any other of the Agencies' actions or explanations, is arbitrary and capricious.

## II.   The States Have Failed to Meet Their Burden of Showing More Than a Mere Possibility of Irreparable Harm.

Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). Plaintiffs' speculation and hyperbole proves no imminent injury pending orderly summary judgment proceedings.

### A.   Plaintiffs Can Prove No Imminent Environmental Injury.

#### 1.   CWA Permits Will Continue Protecting Navigable Waters Under the NWPR.

Plaintiffs allege that "by excluding numerous waters from the Act's jurisdiction, the NWPR allows upstream states to pollute [Plaintiffs'] waters without federal controls under the Section 402 and 404 permit programs." Mot. at 33. With respect to the section 402 permit program, this is incorrect, as the Agencies anticipated and explained:

> One potential effect of the final rule that may be *misunderstood by the public* and the regulated community is that existing NPDES permits may still be needed even if an existing jurisdictional water, such as an ephemeral stream that was found to have a significant nexus to a TNW under the 2019 Rule/*Rapanos* Guidance practice, may no longer be jurisdictional under the final rule. That is because the test for NPDES permit coverage is whether a release of a pollutant from a point source travels to a water of the United States. If a pollutant is conveyed through an ephemeral stream to a jurisdictional water, an NPDES permit may likely still be required.

Agencies' RPA at 79 (emphasis added). The Agencies explained this "longstanding approach," which holds that discharges to a water that "is nonjurisdictional but conveys pollutants to downstream jurisdictional waters" may still be regulated because that water "may be a point source that subjects a discharger . . . to section 402 permitting requirements." 85 Fed. Reg. at 22,297. In fact, Justice Kavanaugh recently noted this same aspect of the CWA in *County of Maui*, 140 S. Ct. at 1478. "[P]olluters [can]not 'evade the permitting requirement of § 1342(a) simply by discharging their pollutants into noncovered intermittent watercourses that lie upstream of covered waters.'" *Id.*

25

1 (Kavanaugh, J., concurring) (quoting *Rapanos*, 547 U.S. at 742-43).

2      Discharges of dredged or fill material to waters no longer considered jurisdictional will no

3 longer require section 404 permits. Unlike pollutants regulated by section 402 (*e.g.* nitrogen), dredged

4 or fill material, "which is typically deposited for the sole purpose of staying put, does not normally

5 wash downstream," *Rapanos*, 547 U.S. at 744. Plaintiffs instead assert that filled wetlands would be

6 less effective at filtering pollutants, thus affecting downstream waters. Mot. at 33. But, Plaintiffs

7 ignore that, as discussed *infra*, Argument Part II.A.2., states would still retain tools to ensure that

8 WQS for downstream jurisdictional waters continue to be met.

9      Notably, Plaintiffs fail to actually identify a single discharger under the section 402 or 404

10 permit programs that will no longer be subject to permit requirements. But the Agencies, in the

11 course of the rulemaking, did assess the extent to which section 402 and 404 permits would be

12 impacted by the NWPR through case studies of three watersheds (Ohio River Basin, Lower Missouri

13 River Basin, and Rio Grande River Basin). Their conclusions, set forth in detail in the Agencies'

14 Economic Analysis (from pages 94 through 171), rebut Plaintiffs' overheated assertions. For

15 example, of the 1,474 section 402 permits the Agencies looked at in these watersheds, *only four*

16 would be impacted by the NWPR. EA at 113, 139, 157. Similarly, the Agencies reviewed the effect

17 of the NWPR on section 404 permits issued in these same watersheds. The Agencies reviewed 3,388

18 section 404 permits issued from 2011-2015. They found that only 195—around just six percent—

19 would potentially be affected by the NWPR. *Id*. at 114-15, 141, 159.

20      The Agencies' expert technical review reflects that the NWPR will not have a significant

21 impact on the majority of CWA section 402 or 404 permits, and certainly not in the short term. And

22 the NWPR does not itself modify any permits—which remain in force and bind their holders. To the

23 extent permits may be affected by any changes in jurisdiction under the NWPR, permittees must first

24 seek modification of existing permits pursuant to applicable procedures. *See* RPA at 79 (discussing

25 permit modification as a result of the NWPR). But any ultimate changes to permits will not happen

26 *immediately* upon the NWPR's effective date. And Plaintiffs have offered no evidence that such

27 modifications, if they occur, will result in irreparable harm—let alone irreparable harm requiring an

28 injunction before full briefing to this Court on the administrative record.

1    Lastly, state programs may well require permits for certain discharges to state waters

2 regardless of the NWPR. *See* 85 Fed. Reg. at 22,318 ("[C]ertain waters and features . . . not subject to

3 regulation under the CWA . . . are or could be subject to State or tribal jurisdiction . . . ."); *see also*

4 RPA at 47. In the Economic Analysis, the Agencies addressed such state responses to the NWPR. *See*

5 EA at Table II-4 and Table II-2. The assessment found that 13 of the 17 Plaintiff states[8] have NPDES

6 authorization and an absence of broad legal restrictions for regulating aquatic resources.  As the

7 Agencies judged, presumably these states—mostly plaintiffs here—are likely to continue to regulate

8 discharges to surface waters that will no longer be jurisdictional. The assessment also found that 14 of

9 the 17 Plaintiff states[9] already have a state-level dredged and fill program and regulate "waters of the

10 state" more broadly than the CWA.  The Agencies interpreted these states as being likely to continue

11 the state's permitting practices, which may already regulate beyond the NWPR.

### 2.   The CWA's Structure Ensures Water Quality Standards Will Be Met.

13    Plaintiffs speculate that the NWPR's reframing of jurisdiction will significantly impact their

14 ability to meet water quality standards. Again, the record refutes this. First, as discussed above, states

15 must establish WQS for "waters of the United States" within their borders and WQS ***must consider***

16 ***the downstream effects on other jurisdictions***. *See* 40 C.F.R. § 131.10(b). So the substantive

17 requirements of WQS that states must have in place for "waters of the United States" *are not* affected

18 or excused by this rule. Second, even if under the NWPR certain discharges will no longer be covered

19 by the CWA (although potentially covered by state laws), States cannot ignore any increased

20 pollution that causes an exceedance of WQS. Should that occur, states will need to adjust their

21 TMDLs to ensure that the underlying WQS are met. The Agencies' technical analysis (ignored by

22 Plaintiffs) explained this:

23       TMDLs for impaired waters consist of waste load allocations for point sources, load
         allocations for nonpoint sources, and a margin of safety. *Changes in jurisdiction may*
24       *prompt questions regarding the status of waste load allocations and load allocations in*
         *existing TMDLs*, as well as water quality-based effluent limits in existing NPDES
25       permits that are based on a current TMDL waste load allocation. *This has the potential*
         *to prompt requests for TMDL revisions that may shift additional pollutant reduction*
26

27

28 [8] CA, NY, CT, IL, ME, MD, MI, NJ, OR, RI, VT, VA, and WA.
   [9] CA, NY, CT, IL, ME, MD, MA, MI, NJ, OR, RI, VT, VA, and WA.

*responsibility to those sources discharging to jurisdictional waters.* As noted elsewhere, however, existing dischargers may still require NPDES permits if pollutants are conveyed downstream to jurisdictional waters even if the intervening water or feature is not jurisdictional.

RPA at 63 (emphasis added).

Because pollution conveyed downstream to a jurisdictional waterbody remains covered by the CWA—even if initially discharged somewhere non-jurisdictional—the record thus disproves the suggestion that the CWA's existing permits, WQS, and other protections will disappear in light of NWPR for any waters where they allege harm. For example, Plaintiffs try to assert that discharges to ephemeral tributaries of the Colorado River in upstream states, *e.g.*, Arizona, will be a source of harm to California. Mot. at 33. This example proves the opposite. The Colorado River will remain a "water of the United States." So any discharges of pollutants reaching the Colorado River—or its jurisdictional tributaries—from a point source without a permit will ***still*** be prohibited. Even if such discharges were allowed, if they led to exceedance of WQS, upstream states are obligated to adjust TMDLs and wasteload allocations for the Colorado River to meet the same WQS after the effective date of the NWPR. Ironically, Plaintiffs assert possible harms to themselves from having to do this same thing. *See* Mot. at 30 (Plaintiffs "will likely have to develop stricter TMDLs to address this water quality deterioration . . . imposing additional burdens and costs on State agencies . . . .").

**B.      Plaintiffs' Declarants Fail to Support a Finding of Irreparable Harm.**

Plaintiffs' one-sided, speculative, and hearsay-rife declarations are not sufficient to support a finding of *imminent*, *permanent* harm prior to orderly summary judgment proceedings. So there is no evidence before this Court that (1) identifies any specific discharges of pollutants that will occur as a result of the NWPR,[10] (2) describes how those specific discharges would imminently cause the Plaintiffs actual environmental injury, or (3) informs how those injuries will occur prior to this

---

[10] Without identifying specific discharges, it is impossible to tell whether any injury flowing from those discharges would result from the NWPR or would have happened anyway under the current regulatory regime which allows discharges under CWA sections 402 and 404.

Court's ability to adjudicate the merits of Plaintiffs' claims.[11] Without presenting evidence on each of these three steps, Plaintiffs cannot meet their high bar. *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("An injunction will not issue if the person or entity seeking injunctive relief shows a mere 'possibility of some remote future injury,' . . . a 'conjectural or hypothetical' injury.").

**First**, Plaintiffs' Declarants rely on unreliable assumptions regarding the scope of waters no longer protected under the NWPR. For that reason, Plaintiffs' allegation that "4.8 million miles of streams and millions of acres of wetlands" will lose protection (Mot. at 1) is unfounded. *See* Argument I.B.2. Plaintiffs' assertion is largely derived from the U.S. Geological Survey's National Hydrography Dataset (NHD) and the U.S. Fish and Wildlife Service's National Wetlands Inventory (NWI). The NHD and NWI are national datasets reflecting the potential location of streams, rivers, lakes, and wetlands. However, the expert analysis of the Agencies (owed great deference by courts, *Baltimore Gas*, 462 U.S. at 103) explains critical technical differences that cannot be resolved, even imperfectly, within these datasets. For example, the NHD does not differentiate between intermittent or ephemeral flows in most parts of the country. Additionally, the NWI uses a different definition of "wetlands" than EPA and the Corps' longstanding (and unchanged) regulatory definition. The NHD and NWI thus cannot indicate the scope of CWA jurisdiction and must not be misused for that purpose.[12] RPA at 34-35. For such reasons, the Agencies did not perform an analysis of the final rule using the NHD and NWI datasets. RPA at 35.

**Second**, Plaintiffs' Declarants have no personal knowledge or other adequate foundation for their conclusory assertions. They do not know and show that, as a result of the NWPR, **any** third parties will imminently discharge pollutants or fill wetlands, which in turn will cause them immediate, actual environmental injury before this Court can consider summary judgment. The Declaration of Kathleen M. Baskin is typical of this failure. She speculates:

---

[11] Even assuming standing at this stage, "a plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011).

[12] This is a long-standing position, predating the 2015 Rule. *See, e.g.*, U.S. EPA, Mapping the Truth, THE EPA BLOG (Aug. 28, 2014), *available at* https://blog.epa.gov/2014/08/28/mapping-the-truth/.

> The New Rule eliminates from . . . federal protections certain critical waters in the States upstream of Massachusetts . . . that impact the health and integrity of Massachusetts' water resources. The reduction in the Clean Water Act's coverage is thus likely to result in increased upstream development activities, destruction of wetland resources that filter pollutants, and pollutant discharges that will have adverse impacts . . . .

Baskin Decl. ¶ 7 (Dkt. No. 30-11). Under Federal Rule of Evidence 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." But Baskin, typical of all the Declarants, fails to set forth foundation for her statement. She merely speculates that the NWPR will lead to "upstream development activities, destruction of wetland resources . . . , and pollutant discharges" that will impact Massachusetts. Baskin Decl. ¶ 7. She demonstrates no firsthand knowledge of potential development activities in Vermont or New Hampshire (two upstream states she identifies). And she has certainly not established that any such development would imminently occur—and injure Massachusetts. This Court must not grant a disruptive injunction on such facially insufficient evidence.

*Third*, Plaintiffs fail to identify specific discharges that will occur as a result of the NWPR, either within the Plaintiff States or in upstream states. A careful reading of their declarations identifies no wastewater treatment plant, stormwater system, or other activity that will discharge pollutants reaching any water of their states as a result of the NWPR.[13] The Declaration of Jonathan Bishop similarly exemplifies these failures. He says:

> According to the Environmental Law Institute May 2013 50-State Survey, most of the states in the Colorado River Basin—Arizona, Colorado, Nevada, Utah, and Wyoming—have state laws that impose limitations on the ability to regulate waters beyond the Clean Water Act. Because ephemeral tributaries to the Colorado River would lose Clean Water Act protections under the 2020 Rule, it is expected that higher pollutant loads will enter the Colorado River as a result of the 2020 Rule.

Bishop Decl. ¶ 21 (Dkt. No. 30-10). But even assuming that Bishop accurately summarized the Environmental Law Institute's report (obvious hearsay for the truth of the matters asserted), Bishop

---

[13] Although Roose identifies the "Ruidoso Downs Wastewater Treatment Plant and Ruidoso Racetrack," Roose Decl. ¶¶ 16-17 (Dkt. No. 30-16), these discharges are not only currently ongoing, but she fails to explain why these discharges wouldn't remain subject to permitting requirements as she also alleges that the pollutants will eventually reach jurisdictional waters.

30

does not know if that seven-year-old information is still accurate. Further, the "ephemeral tributaries" to which Bishop refers were not categorically jurisdictional under the Agencies' 2008 *Rapanos* Guidance. More importantly, his statement that "higher pollutant loads will enter the Colorado River as a result of the 2020 Rule" is unsupported by any factual predicates that could lead to this conclusion. What projects or sources will lead to the higher pollutant loads? When? Why will continuing permit schemes and state law not prevent this? Bishop has no answers. And even if Plaintiffs had shown upstream discharges of pollutants to the Colorado River reaching Arizona, Bishop in his declaration does not demonstrate that the Colorado River would no longer be suitable for the ways in which California relies on it, *e.g.*, municipal water supplies, and actually ***injure*** California. *See* Bishop Decl. at ¶¶ 20-21.

Plaintiffs' lack of evidence of specific discharges is particularly relevant given that their allegations of harm are contingent upon the actions of third parties. "Because any injury . . . hinges on actions taken by [third parties], [Plaintiffs] carry 'the burden of adducing facts showing that those third-party choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 201 (D.C. Cir. 2011) (quoting *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 477 (D.C. Cir. 2009)) (discussing injury for purposes of standing). Plaintiffs have a particularly high burden to demonstrate harm where "causation . . . hinge[s] on the actions of 'independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict. *Ctr. for Biological Diversity*, 563 F.3d at 477-78 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). By failing to point to any specific discharges—and explaining how they would cause environmental injury—this Court is unable to address the relevant factors under *Winter* or comply with Federal Rule 65's "Contents" requirements to issue an injunction. Fed. R. Civ. P. 65(d).

***Fourth***, Plaintiffs' declarations do not address why state laws or continuing obligations under the CWA—not dependent on the definition of "waters of the United States"—do not preclude immediate harm from such discharges pending summary judgment. *See* RTC: Legal Arguments at 29 ("The CWA does not occupy the field of surface water quality regulation, and therefore the absence of federal regulatory jurisdiction by no means precludes states and tribes from imposing stringent

31

1    controls over waters . . . ."). This failure is particularly telling where Plaintiffs allege environmental

2    injury from discharges in upstream states. For instance, the Declarations supporting Plaintiffs'

3    assertion that "water flowing downstream from New Hampshire . . . threatens pollution of . . .

4    downstream states' waters," Mot. at 33, reflect a concern that interstate waters will no longer be

5    protected as an independent category under the NWPR, Witherell Decl. ¶ 9 (Dkt. No. 30-8); Baskin

6    Decl. ¶ 9. But neither Declarant acknowledges that New Hampshire has a broad definition of "waters

7    of the state," which specifically includes waters that reach state borders. RPA, Appendix A at 51-52

8    (citing N.H. Rev. Stat. 482-A and 485-A:2(XIV)), *available at* https://www.epa.gov/sites/

9    production/files/2020-01/documents/rpa_finalappendices.pdf. New Hampshire "[h]as state authority

10   to issue permits for dredged and fill activities in surface waters and wetlands, including isolated

11   waters"—and does. *Id.* So these Declarants affirmatively do **not** show immediate and irreparable

12   injury by any change from the NWPR. Similarly, Maryland speculates of potential harm to the

13   Nanticoke River Watershed from the *hypothetical* filling of wetlands in Delaware pending summary

14   judgment and general harm to the Chesapeake Bay from numerous upstream states. Mot. at 33. But,

15   Maryland fails to address the impact of Delaware's commitment to restoring the Nanticoke River

16   watershed and the wetlands therein,[14] or other States' commitments to Chesapeake Bay restoration.[15]

17       And even where Plaintiffs' Declarants acknowledge state-specific protections for upstream

18   waters, Mot. at 33 (citing Dow Decl. at 13-15 (Dkt. No. 30-7), which admits New York's

19   independent protection for wetlands larger than 12.4 acres), Declarants still ignore (or don't know

20   about—which reflects why their speculation of injury is inadmissible and should be set aside) the

21   broader, continuing CWA obligations to adjust WQS, set TMDLs, and adjust total waste loading

22   impacting downstream states—regardless of the definition of "waters of the United States." *See* RPA

23   at 63. Indeed, the failure to identify specific discharges of pollutants that will imminently injure is

24   even more telling given the widespread harm alleged by Plaintiffs. Plaintiffs assert that "[t]he 2020

25   _____

26   [14] Delaware DNREC, Restoration of the Nanticoke River Watershed, http://www.dnrec.delaware.gov/
     Admin/DelawareWetlands/Pages/NanticokeWatershed.aspx (last visited May 28, 2020).

27   [15] *E.g.,* Pennsylvania's Chesapeake Bay Plan, Department of Environmental Protection,

28   https://www.dep.pa.gov/Business/Water/Pennsylvania%E2%80%99s%
     20Chesapeake%20Bay%20Program%20Office/Pages/default.aspx (last visited May 28, 2020).

Rule will likely cause significant and widespread harm to the Nation's waters . . . ." Mot. at 30. But, if "widespread harm" is waiting to occur on June 22, 2020—the effective date of the rule—Plaintiffs should now have had no trouble identifying specific instances.

*Fifth*, Plaintiffs' Declarants effectively admit their allegations are mere speculation. They repeatedly qualify them, asserting merely that certain actions could or may occur. This is not evidence of actual, imminent, irreparable injury. The Declaration of Steve Parmenter provides a useful example.[16] Parmenter declares that "surface flow in the Amargosa River ***may*** propagate toxic spills . . . , and other pollutants to all downstream points," such as California. Parmenter Decl. ¶ 12 (emphasis added) (Dkt. No. 30-20). He further declares that "[d]redge and fill activity in the ephemeral portions of the Amargosa River in Nevada ***could*** destabilize channel gradient," *id.* ¶13 (emphasis added), and that "channel changes in the [Amargosa] . . . ***could*** substantially impact the numbers of [the Amargosa Vole]," *id.* ¶ 17 (emphasis added). "These are just the kind of declarations that [others courts] rejected as insufficient," because declaring that actions may or could occur "fail[s] to show '. . . actual, imminent, or 'certainly impending' injury.'" *Chamber of Commerce of U.S.*, 642 F.3d at 202 (quoting *Ctr. for Biological Diversity*, 563 F.3d at 478).

Notably, Plaintiffs cite *Sierra Club v. U.S. Dep't of Agriculture, Rural Utilities Service*, for the proposition that "pollution itself constitutes irreparable harm." Mot. at 33. They fail to discuss the particulars of that case. *Sierra Club* actually illustrates Plaintiffs' wholesale failure to justify an injunction here. The Court granted preliminary relief based upon a declaration "which contain[ed] ***specific***, ***detailed*** estimates of various pollutants that would be emitted . . . ***and the resulting harms***." 841 F. Supp. 2d 349, 359 (D.D.C. 2012) (plaintiffs made "detailed submissions on other pollutants") (emphasis added). But here, "Plaintiffs' sound and fury regarding the land that [may] be cleared and the wetlands that may be altered does not signify that any of these environmental effects will be permanent or irreversible, as the preliminary injunction standard requires." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013) (rejecting preliminary injunction where injury

---

[16] Despite the infirmities of Parmenter's declaration, Plaintiffs rely on him for one of their six examples of harm from upstate waters. *See* Mot. at 33-34 (citing Parmenter Decl.).

depended upon "bald allegations of concrete injury to flora and fauna" from pipeline).

In sum, Plaintiffs fail to "demonstrate that in the absence of a preliminary injunction, 'the applicant is likely to suffer irreparable harm *before a decision on the merits can be rendered.*'" *Winter*, 555 U.S. at 22 (quoting *Fed. Prac. & Proc.* § 2948.1, p. 139). Because there is no evidence that the merits cannot be orderly resolved before the speculated harms might be permanent, "there is no need for interlocutory relief." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1260 (10th Cir. 2003) (quoting *Fed. Prac. & Proc.* § 2948.1, p. 139-49).

### C.   Plaintiffs' Voluntary Efforts to Revise Their Water Pollution Control Programs Do Not Constitute Irreparable Harm.

Plaintiffs also try to allege harm because the NWPR will supposedly disrupt their regulatory programs in three ways. None establish irreparable harm for an injunction, either.

*First*, Plaintiffs allege disruption from regulatory changes the Plaintiffs would make in response to the Rule. With respect to the purported time and cost of these activities by Plaintiffs, given that this is *voluntary* action, that is hardly cognizable, irreparable injury. *Accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402, 264 (2013) ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."). Regardless, Plaintiffs fail to show that any such efforts must be so substantial and urgently conducted pending orderly resolution by summary judgment as to justify the extraordinary remedy of a preliminary injunction.

*Second*, Plaintiffs specifically note that "[m]any of the States have developed protocols with the Army Corps to efficiently process federal and state approvals [for projects]," and that "[u]nder the 2020 Rule, federal participation will cease in many cases, raising the costs and administrative burdens to the States." Mot. at 36. To the extent state and federal jurisdiction diverges due to the NWPR (although jurisdiction already diverges today in many States), some streamlining for combined state and federal permitting may no longer occur. But, again, the evidence fails to demonstrate immediate, irreparable harm. The declarations supporting this conclusion, *see* Mot. 36 n.63, only address three states, Rhode Island, Massachusetts, and Wisconsin. But, Rhode Island's and Massachusetts' regulations are not *currently* coextensive with federal regulation. *See* Horbert Decl. ¶ 6 (Dkt. No. 30-

34

3); Baskin Decl. ¶ 10. So this harm is purely theoretically and inapplicable to them. And Wisconsin does not assert that its permits will diverge from federal permits. Siebert Decl. ¶ 18 (Dkt. No. 30-6).

**Third**, supported only by the declaration of Baskin in regards specifically to Massachusetts, Plaintiffs assert they "will likely have to develop stricter TMDLs to address this water quality deterioration, undermining gains made by existing TMDLs and imposing additional burdens and costs on State agencies and regulated entities." Mot. at 36. It is conceivable that certain TMDLs may be adjusted at some point. But this fails demonstrate immediate and permanent harm *caused by* the NWPR. States have an ongoing obligation to assess their water quality. If necessary, they develop new or revised TMDLs for impaired waters identified on their CWA section 303(d) list. *See supra* Argument Part II.A.2. So Plaintiffs fail to demonstrate that any needed revisions in Massachusetts— which themselves are speculative—would occur *as a result of* the NWPR and imminently and irreparably injure that State.

### D.   Plaintiffs Fail to Demonstrate Irreparable Harm to Their Proprietary and Economic Interests.

Plaintiffs further assert harms to their proprietary and economic interests. Mot. at 36. These, too, fail to meet the high bar for injunctive relief pending resolution of the merits.

First, although Plaintiffs are correct that wetlands generally help mitigate flooding, Plaintiffs offer only "conclusory or speculative allegations [that] are not enough" to establish immediate, irreparable harm from this. *Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir. 2014). Plaintiffs fail to explain why other state and local regulations do not mitigate potential increased flood risk from development, notwithstanding the NWPR. Plaintiffs point to development in New York wetlands as a source of increased flooding risk. *See, e.g.*, Nechamen Decl. But, again, Plaintiffs fail to tell the Court that New York has floodplain construction requirements that may separately prohibit filling of wetlands.[17]

Second, Plaintiffs' allegations regarding harm to wildlife are—again—the same "conclusory or speculative allegations [that] are not enough" to establish irreparable harm. *Titaness Light Shop*,

---

[17] N.Y. Dep't of Environmental Conservation, Floodplain Construction Requirements, https://www.dec.ny.gov/lands/40576.html (last visited May 28, 2020); *see also* RPA, App. A at 56-58.

35

585 F. App'x at 391. This speculation of harm also fails because Plaintiffs fail to take account of other protections for wildlife that remain in place regardless of the regulatory definition of "waters of the United States." As EPA noted in the RPA with regard to species that are listed as endangered or threatened under the Endangered Species Act ("ESA"), "Section 9 of the ESA[, which prohibits 'takings' of endangered species,] applies regardless of the resources at issue, and *the scope of CWA jurisdiction does not modify or affect that core provision* . . . ." RPA at 101 (emphasis added).

E.   **Plaintiffs' Allegations of Specific Harm Are General Criticisms of the NWPR and Should Be Addressed Upon the Full Administrative Record.**

On April 15, 2019, a group of 14 states and the District of Columbia—all Plaintiffs— submitted their opposition to the proposed rule to the Agencies. Comment Letter of Attorneys Generals, (April 15, 2019), *available at* https://beta.regulations.gov/document/EPA-HQ-OW-2018-0149-5467. It generally set forth the same arguments regarding harm that the Plaintiffs set forth here. *Compare id.* at 14-20 (asserting the Rule's reduced protections will harm them) *with* Mot. at 30-34 (same).

The Agencies, after considering the submissions by Plaintiffs—including the concerns raised here during the rulemaking—fully addressed them in the administrative record. Thus, Plaintiffs' allegations of irreparable harm are really a thinly-veiled attempt to circumvent the Agencies' extensive review based on speculative and conclusory statements. They make essentially no attempt to grapple with the Agencies' extensive analysis in the record.

Courts admittedly have the ability to find harm to Plaintiffs in an APA case absent reviewing the full record. But here Plaintiffs try to end-run the normal principles of judicial review. They have simply recast as irreparable harm their policy disagreements with the NWPR—arguments that the Agencies considered and appropriately responded to during the rulemaking. Instead, the Court should set an appropriate briefing schedule for summary judgment, on the administrative record, which the Court could instead expedite to ensure that review of issues are not unduly delayed.

III.   **The Balance of Equities Weighs in Favor of the Agencies, and Issuance of an Injunction Would Harm the Public Interest.**

The balancing of equities and public interest prongs are not just restatements of other prongs; they are independent, required elements. *Mazurek*, 520 U.S. at 972 (plaintiffs must carry the burden

36

1   or persuasion as to each element "*by a clear showing*") (emphasis in original) (citation omitted). If

2   the impact of an injunction reaches beyond the parties, carrying potential for public consequences—

3   as the nationwide injunction sought here unquestionably does—"the public interest will be relevant to

4   whether the district court grants the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F.3d

5   1109, 1139 (9th Cir. 2009).

6        Here, the balance of equities and public interest weigh against an injunction. No nationwide

7   injunction is permissible as a general matter—but especially on this speculative record. And

8   enjoining the NWPR in only certain states or districts would result in different regulatory definitions

9   simultaneously in effect, in different parts of the country. As exemplified by the 2015 Rule being

10   enjoined in only some states, this creates uncertainty and disruption. So there should be no injunction

11   pending a complete review, although allowing the NWPR to come into effect in only certain states

12   would be preferable to a nationwide injunction so that some states may obtain the immediate public

13   benefits of the NWPR.  *See, e.g.*, 85 Fed. Reg. at 22,252 (explaining the NWPR "provides clarity and

14   predictability for Federal agencies, States, Tribes, the regulated community, and the public.").

15        In the context of preliminary injunction analysis, courts routinely recognize the public interest

16   in the efficient and uniform administration of laws. And they refuse injunctive relief that would

17   undermine such public good. *See*, *e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1281-82

18   (9th Cir. 2020) ("The government has a compelling interest in ensuring that injunctions—such as the

19   one granted here—do not undermine separation of powers by blocking the Executive's lawful ability"

20   to administer its laws); *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. at 43 (denying a

21   preliminary injunction when "the public has an interest in regulatory efficiency" that comes with a

22   uniform permitting system, which could be undermined by a preliminary injunction).

23        It would be burdensome to require the Agencies to implement the CWA differently in

24   different jurisdictions, and unfair to permit certain dissenter states to extinguish a years-long effort to

25   formulate a uniform national policy that can achieve consistency and clarity for the rest of the

26   country. That is especially so for those regulated persons whose activities cross state lines—which is

27   one of the key objectives of federal regulation. So the public interest is best served by refusing such

28   an injunction in favor of an orderly review of the merits of the NWPR on summary judgment.

1  **IV.  Equity and the Constitution Require Injunctive Relief to Be Limited.**

2       While inconsistent regulatory regimes are disruptive, any injunctive relief must still be no

3  more extensive to a defendant than necessary to provide complete relief to plaintiffs. *See United*

4  *States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 478 (1995). So, "[i]f a less drastic remedy (such

5  as partial or complete vacatur of [an agency's challenged] decision) was sufficient to redress

6  respondents' injury, no recourse to the additional and extraordinary relief of an injunction was

7  warranted." *Monsanto Co v Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). Here, no injunctive

8  relief is warranted. But any injunctive relief would have to be specifically tailored to address ***only*** the

9  ***specific*** regulatory provisions purportedly creating imminent, irreparable harm that is sufficiently

10  proven by a Plaintiffs' declarant—though there are none.

11       **A.  Nationwide Relief Is Inappropriate.**

12       Plaintiffs' request for a nationwide injunction is clearly overbroad and should be easily

13  rejected. To begin with, nationwide relief is generally inappropriate. *See California v. Azar*, 911 F.3d

14  558, 582 (9th Cir. 2018) (reversing district court grant of nationwide relief); *Trump v. Hawaii*, 138 S.

15  Ct. 2392, 2425 (2018) (Thomas, J., concurring) (questioning district courts' authority to enter

16  nationwide injunctions). And, to get such relief, Plaintiffs need facts to support nationwide scope.

17  *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (vacating nationwide

18  injunction because record does not support its scope).

19       Plaintiffs fail to meet this high bar. They simply assert that "because the Nation's waters are

20  highly interconnected, only nationwide injunction or stay will ensure full relief to the States and

21  Cities." Mot. at 40. But the record rejects a need for nationwide relief to remedy harm to these

22  particular Plaintiffs. While Plaintiffs' generalized statements regarding the connectivity of certain

23  waters is not wholly unfounded, it is far from sufficient. The examples cited do not prove that

24  Plaintiffs will be irreparably harmed by activity in each of the 33 other states who are not Plaintiffs

25  here. Indeed, no Declarant makes such a statement. They tellingly make only far more limited

26  assertions, *see, e.g.*, Dow Decl. (discharges in New York may harm New Jersey). Some State

27  Plaintiffs—Connecticut, Illinois, Vermont and Virginia—submitted no evidence of harm.

28       The over breadth of Plaintiffs' request for nationwide relief is well illustrated by their

1   assertion that the NWPR must be enjoined in Hawaii—separated from the rest of the states by the

2   Pacific Ocean—in order to prevent irreparable harm to Plaintiffs. But, even within the contiguous 48

3   states, it simply does not follow that discharges in *every* state are likely to affect Plaintiffs. Even a

4   cursory look at a national watershed map shows numerous states—most notably all the Gulf Coast

5   States—whose waters flow directly to an ocean or only through non-Plaintiffs states to the ocean.[18]

6   For instance, waters in Texas generally flow to the Gulf of Mexico. But, in any event, those waters

7   never reach any of the Plaintiffs states.

8   **B.     Relief Should Be Narrowly Tailored, Including by Geography and Provision.**

9   Paralleling the rule under Article III, the rule in equity is that injunctions "be no more

10   burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v.*

11   *Women's Health Ctr., Inc.,* 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682,

12   702 (1979)); *see U.S. Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993) (granting stay of military-wide

13   injunction except as to individual plaintiff).

14   First, with respect to alleged environmental injury (Mot. at 30-34), Plaintiffs have failed to

15   demonstrate irreparable harm at all—let alone harm that will occur *before* this Court can rule on the

16   merits. But any injunction would have to be limited to preventing specific instances of imminent and

17   permanent environmental injury that Plaintiffs have proven. For instance, if the Court believed

18   California established irreparable harm to the Amargosa River (though California has not), any

19   injunctive relief should *only* apply to that River's watershed. The Supreme Court directs a "less

20   drastic remedy" when "sufficient to redress [plaintiff]s' injury." *Geertson Seed*, 561 U.S. at 166.

21   Second, with respect to Plaintiffs' supposed disruption of their water pollution control

22   programs (Mot. at 34-36), that certainly cannot give rise to a nationwide injunction. If irreparable

23   harm is demonstrated by only *some* states, it cannot be imputed to all. And that certainly cannot be

24   grounds for an injunction covering non-plaintiff States that **want** the NWPR promptly implemented.

25   As to the asserted divergence between state and federal permitting programs resulting in cost and

26   administrative burdens to the states, the declarations in support of this only cover Wisconsin,

27

28

---

[18] *E.g.*, U.S. Geological Survey, Watershed Map, https://water.usgs.gov/wsc/map_index.html.

39

1  Massachusetts and Rhode Island. *See supra* Argument Part II.C. As such, even assuming those

2  declarations establish irreparable harm on the asserted ground—and they do not—relief must be

3  limited to those specific states. *See Madsen*, 512 U.S. at 765. The same particularity must be used to

4  examine and limit any injunction premised on Plaintiffs asserting proprietary or economic interests

5  irreparably imperiled.

6      **C.**    **The Structure of the CWA and Comity Concerns Support Limited Relief.**

7      When weighing the balance of harms and public interest, the Court should also consider the

8  interests of non-plaintiff states when considering the scope of relief. Many expressed support for the

9  approach taken in the NWPR.[19] The CWA codifies cooperative federalism as a key component of the

10  approach to protecting the Nation's waters. In the absence of any actual evidence that non-party states

11  are imminently and actually going to undertake actions permanently harming the Plaintiff States,

12  enjoining the NWPR in their jurisdictions, without their support, is especially inappropriate.

13      Moreover, as the Supreme Court explained in *National Association of Manufacturers*, "even if

14  Congress sought to ensure national uniformity [under the CWA], it did not pursue that end at all

15  costs." 138 S. Ct. at 633-34. Thus, instead of consolidating challenges to CWA rules such as the

16  interpretation of "navigable waters" in a court of appeals, Congress directed that they be heard in

17  district courts throughout the Country. *Id.* Especially given the numerous other pending challenges to

18  the NWPR throughout the country, this Court should not preempt the separate consideration of these

19  questions by co-equal courts. Granting relief that is broader than necessary would do just that.

20  Accordingly, while no injunctive relief is warranted, any such relief must be circumscribed to the

21  remedying the specific showings, and specific provisions, challenged by particular Plaintiffs and

22  Declarants.

23                                  **<u>CONCLUSION</u>**

24      For the foregoing reasons, Plaintiffs' motion should be denied.

25  / / /

26  / / /

27  _____

28  [19] *See* Comment by the Attorneys General of Arizona, Texas, and Utah, April 24, 2019, *available at* https://beta.regulations.gov/document/EPA-HQ-OW-2018-0149-5322.

40

1    Dated: June 1, 2020                          Respectfully Submitted,

2                                                 JONATHAN D. BRIGHTBILL
3                                                 Principal Deputy Assistant Attorney General
                                                  Environment and Natural Resources Division
4
5    Of Counsel:                                  /s/Phillip R. Dupré
                                                  PHILLIP R. DUPRÉ (D.C. Bar No. 1004746)
6    MATTHEW Z. LEOPOLD                           HUBERT T. LEE (NY Bar No. 4992145)
     General Counsel                              U.S. Department of Justice
7    DAVID FOTOUHI                                Environment & Natural Resources Division
     Principal Deputy General Counsel             Environmental Defense Section
8    U.S. Environmental Protection Agency         4 Constitution Square
9    Washington, D.C.                             150 M Street, NE
                                                  Washington, D. C. 20002
10                                                phillip.r.dupre@usdoj.gov
11                                                hubert.lee@usdoj.gov
                                                  Telephone (202) 616-7501 (Dupré)
12                                                Telephone (202) 514-1806 (Lee)
                                                  Facsimile (202) 514-8865
13
14                                                Attorneys for Defendants
15
16
17
18
19
20
21
22
23
24
25
26
27
28

OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
CASE NO. 3:20-cv-03005-RS