1  XAVIER BECERRA
   Attorney General of California
2  SARAH E. MORRISON
   ERIC KATZ
3  Supervising Deputy Attorneys General
   CATHERINE M. WIEMAN, SBN 222384
4  TATIANA K. GAUR, SBN 246227
   ROXANNE J. CARTER, SBN 259441
5  JESSICA BARCLAY-STROBEL, SBN 280361
   BRYANT B. CANNON, SBN 284496
6  Deputy Attorneys General
     300 South Spring Street, Suite 1702
7    Los Angeles, CA  90013
     Telephone: (213) 269-6329
8    Fax: (916) 731-2128
     E-mail:  Tatiana.Gaur@doj.ca.gov
9  *Attorneys for Plaintiff State of California, by and*
   *through Attorney General Xavier Becerra and*
10 *California State Water Resources Control Board*

11 *[Additional Plaintiffs and Counsel listed on*
   *Signature Page]*

   LETITIA JAMES
   Attorney General of the State of New York
   PHILIP BEIN
   Senior Counsel
   TIMOTHY HOFFMAN*
   Senior Counsel
     Office of the Attorney General
     Environmental Protection Bureau
     28 Liberty Street
     New York, NY 10005
     Telephone: (716) 853-8465
     Fax: (716) 853-8579
     Email: Timothy.Hoffman@ag.ny.gov
   *Attorneys for Plaintiff State of New*
   *York*

12

# IN THE UNITED STATES DISTRICT COURT

13

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15  STATE OF CALIFORNIA, BY AND THROUGH
    ATTORNEY GENERAL XAVIER BECERRA AND
16  CALIFORNIA STATE WATER RESOURCES
    CONTROL BOARD, STATE OF NEW YORK,
17  STATE OF CONNECTICUT, STATE OF ILLINOIS,
    STATE OF MAINE, STATE OF MARYLAND,
    STATE OF MICHIGAN, STATE OF NEW JERSEY,
18  STATE OF NEW MEXICO, STATE OF NORTH
    CAROLINA EX REL. ATTORNEY GENERAL
19  JOSHUA H. STEIN, STATE OF OREGON, STATE
    OF RHODE ISLAND, STATE OF VERMONT,
20  STATE OF WASHINGTON, STATE OF
    WISCONSIN, COMMONWEALTHS OF
21  MASSACHUSETTS AND VIRGINIA, THE NORTH
    CAROLINA DEPARTMENT OF ENVIRONMENTAL
22  QUALITY, THE DISTRICT OF COLUMBIA, AND
    THE CITY OF NEW YORK,

                                        Plaintiffs,
23
            v.
24
    ANDREW R. WHEELER, AS ADMINISTRATOR
25  OF THE UNITED STATES ENVIRONMENTAL
    PROTECTION AGENCY; UNITED STATES
26  ENVIRONMENTAL PROTECTION AGENCY; R.
    D. JAMES, AS ASSISTANT SECRETARY OF THE
27  ARMY FOR CIVIL WORKS; AND UNITED
    STATES ARMY CORPS OF ENGINEERS,

28                                      Defendants.

Case No. 3:20-cv-03005-RS

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION OR STAY**

Date:        June 18, 2020
Time:        1:30 pm
Dept:        San Francisco Courthouse,
             Courtroom 3 – 17th Floor
Judge:       The Honorable Richard
             Seeborg

Action Filed:  5/1/2020

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.  The States and Cities Are Likely to Succeed on the Merits................................... 2

    A.  The 2020 Rule Is Arbitrary and Capricious ................................................. 2

        1.  The 2020 Rule Disregards the Clean Water Act's Primary Objective to Protect Water Quality. .................................................. 2

            a.  The Rule's Elimination of CWA Protection for Many Tributaries and Wetlands Is Contrary to the CWA's Objective. ................................................. 3

            b.  The Agencies May Not Rely on the RPA or EA to Support the 2020 Rule. ................................................. 5

        2.  The 2020 Rule's "Typical Year" Requirement and Distinction Between Intermittent and Ephemeral Streams Are Arbitrary and Capricious. ................................................ 5

        3.  The Agencies Failed to Consider the Significant Reliance Interests Engendered by Their Long-Standing Implementation of the Significant Nexus Standard. ...................... 6

    B.  The 2020 Rule Is Unlawful Because the Agencies' Interpretation of "Waters of the United States" Is Contrary to the CWA............................ 7

        1.  As Found by a Majority of the Justices in Rapanos, the Interpretation of "Waters of the United States" in the 2020 Rule Is Impermissible. ........................................................... 7

        2.  The 2020 Rule Is Not Justified on the Basis of Constitutional Concerns and Is Unsupported by the CWA's Text, Structure and Purpose. ......................................... 8

        3.  The Rule's Exclusion of Interstate Waters Is Contrary to Law. ..................................................................................... 10

II.  The States and Cities Established that the 2020 Rule Threatens Imminent and Irreparable Harm ........................................................................................ 11

    A.  The 2020 Rule Threatens to Cause Immediate and Irreparable Environmental Harm .................................................................................. 12

        1.  The Agencies Have Not Demonstrated that CWA Permits Will Continue to Protect Water Quality. ....................................... 13

        2.  Water Quality Standards and TMDLs Will Not Ensure Protection of Water Quality After the 2020 Rule Becomes Effective. ................................................................................. 14

    B.  The Agencies Do Not Address All the Harms the States and Cities Identified Due to Increased Water Pollution ................................. 15

    C.  The 2020 Rule Harms the States and Cities by Severely Disrupting Their Water Pollution Control Programs ..................................................... 19

    D.  The 2020 Rule Threatens Irreparable Harm to the States' and Cities' Proprietary and Economic Interests.............................................. 20

III.  The Balance of Equities and the Public Interest Weigh in Favor of the States and Cities ................................................................................................. 21

i

1

## TABLE OF CONTENTS
(continued)

2
**Page**

3    IV.    Nationwide Relief is Both Necessary and Appropriate ........................................ 23

4    CONCLUSION .................................................................................................................. 25

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

CASES

*All for the Wild Rockies v. Cottrell*
632 F.3d (9th Cir. 2011)..................................................................2, 11, 16, 21

*Arizona Cattle Growers' Ass'n v. Salazar*
606 F.3d 1160 (9th Cir. 2010).........................................................................3

*Bark v. United States Forest Service*
958 F.3d 865 (9th Cir. 2020)...........................................................................6

*California ex rel. Lockyer v. U.S. Dep't of Agric.*
575 F.3d 999 (9th Cir. 2009)...................................................................11, 15

*California v. Azar*
911 F.3d 558 (9th Cir. 2018)...............................................19, 21, 23, 24

*California v. Azar*
950 F.3d 1067 (9th Cir. 2020).........................................................................7

*Chamber of Commerce of U.S. v. EPA*
642 F.3d 192 (D.C. Cir. 2011) ......................................................................18

*City & Cty. of San Francisco v. Trump*
897 F.3d 1225 (9th Cir. 2018).................................................................23, 24

*Clapper v. Amnesty Int'l USA*
568 U.S. 398 (2013) ......................................................................................19

*County of Maui v. Hawaii Wildlife Fund*
140 S. Ct. 1462 (2020) .....................................................................9, 10, 13

*East Bay Sanctuary Covenant v. Trump*
950 F.3d 1242 (9th Cir. 2020)........................................................................22

*Encino Motorcars, LLC v. Navarro*
136 S. Ct. 2117 (2016) ....................................................................................7

*Envt'l Def. Ctr., Inc. v. E.P.A.*
344 F. 3d 832 (9th Cir. 2003)..........................................................................2

*FCC v. Fox Television Stations, Inc.*
556 U.S. 502 (2009) ........................................................................................3

*Georgia v. Wheeler*
418 F. Supp. 3d 1336 (S.D. Ga. 2019) .........................................................10

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*
736 F.3d 1239 (9th Cir. 2013).................................................................................12

*INS v. Cardoza-Fonseca*
480 U.S. 421, 447 n. 30 (1987)..................................................................................9

*Madsen v. Women's Health Ctr., Inc.*
512 U.S. 753 (1994)................................................................................................24

*Mazurek v. Armstrong*
520 U.S. 968 (1997)................................................................................................21

*Mercy Catholic Med. Ctr v. Thompson*
380 F.3d 142 (3d Cir. 2004)......................................................................................2

*Monsanto Co. v. Geertson Seed Farms*
561 U.S. 139 (2010)................................................................................................24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto, Ins. Co.*
463 U.S. 43 (1983)...............................................................................................2, 5

*Nat. Res. Def. Council v. U.S. E.P.A.*
526 F.3d 591 (9th Cir. 2008)......................................................................................9

*Nat'l Ass'n. for the Advancement of Colored People v. Trump*
298 F. Supp. 3d 209 (D.D.C. 2018) ..........................................................................7

*Nat'l Wildlife Fed'n v. Burford*
835 F.2d 305 (D.C. Cir. 1987)....................................................................11, 14, 17

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
886 F.3d 803 (9th Cir. 2018)....................................................................................12

*National Cable & Telecommunications Ass'n v. Brand X Internet Services.*
545 U.S. 967 (2005).............................................................................................7, 8

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*
565 F.3d 683 (10th Cir. 2009)....................................................................................5

*NRDC v. EPA*
735 F.3d 873 (9th Cir. 2013)......................................................................................5

*Office of Communication of the United Church of Christ v. FCC*
779 F.2d 702 (D.C. Cir. 1985)....................................................................................2

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*
636 F.3d 1150 (9th Cir. 2011)...................................................................................................15

*Rapanos v. United States*
547 U.S. 715 (2006) ....................................................................................................... *passim*

*S.A. v. Trump*
363 F. Supp. 3d 1048 (N.D Cal. 2018) .......................................................................................7

*Sierra Club v. U.S. Army Corps of Eng'rs*
990 F. Supp. 2d 9 (D.D.C. 2013) .....................................................................................19, 22

*State v. Bureau of Land Mgmt.*
286 F. Supp. 3d 1054 (N.D. Cal. 2018) ...................................................................................12

*Trump v. Hawaii*
138 S. Ct. 2392 (2018)..............................................................................................................24

*Trump v. Int'l Refugee Assistance Project*
137 U.S. 2080 (2017) ................................................................................................................24

*United States v. Ensminger*
567 F.3d 587 (9th Cir. 2009)....................................................................................................10

*Winter v. Nat. Res. Defense Council, Inc.*
555 U.S. 7 (2008) ......................................................................................................................21

**STATUTES**

33 United States Code
§ 1251(a) .............................................................................................................................2, 9, 10
§ 1251(b) ...................................................................................................................................9
§ 1313(a) .................................................................................................................................11
§ 1313(b)(1)(C) .......................................................................................................................15
§ 1313(d)(1)(C) .......................................................................................................................15
§ 1362(14) ...............................................................................................................................13
§ 1362(14) ...............................................................................................................................13

Clean Water Act
§ 101(a) .....................................................................................................................................9
§ 101(b) .....................................................................................................................................9

# TABLE OF AUTHORITIES
## (continued)

**Page**

§ 303(a) ...............................................................................................10, 11
§ 401 .........................................................................................................20
§ 402 ...................................................................................................14, 20
§ 404 ...................................................................................................14, 20

Administrative Procedure Act
§ 705 .........................................................................................................23

**OTHER AUTHORITIES**

80 Federal Register
37,054 (June 29, 2015)..............................................................................7
37,057 (June 29, 2015)..........................................................................3, 7
37,058 (June 29, 2015)..............................................................................3

84 Federal Register
4154 (Feb. 14, 2019)............................................................................7, 10
4171 (Feb. 14, 2019)................................................................................10
4197 (Feb. 14, 2019)..................................................................................7
4198 (Feb. 14, 2019)..................................................................................7

85 Federal Register
22,250 ........................................................................................................9
22,262 ........................................................................................................9
22,269 ........................................................................................................9
22,271 ........................................................................................................9
22,272 ........................................................................................................9
22,274 ........................................................................................................5
22,283 ........................................................................................................9
22,285 ........................................................................................................9
22,287 ........................................................................................................9
22,292 ........................................................................................................6
22,297 ..................................................................................................13, 19
22,292-94 ...................................................................................................6
22,308 ........................................................................................................9
22,332 ...................................................................................................3, 5

Ariz. Rev. Stat. Ann. § 49-104(A)(16) ............................................................17

Utah Code Ann. § 19-5-105 ..............................................................................17

https://19january2017snapshot.epa.gov/www3/region9/water/tmdl/lower_eel/LER-
TMDL-final-121807-signed.pdf ..................................................................15

## TABLE OF AUTHORITIES
### (continued)

**Page**

https://www.dec.ny.gov/docs/water_pdf/nycphos.pdf;
https://www.dec.ny.gov/docs/water_pdf/jan09crotontmdl.pdf................................15

https://www.epa.gov/sites/production/files/2017-09/documents/nh-
governor_sununu_2017-06-19_1.pdf.......................................................16

U.S. EPA, *Connectivity of Streams and Wetland to Downstream Waters: A Review
and Synthesis of the Scientific Evidence* (Jan. 2015), *available at*
http://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=296414 (2015
Connectivity Report)........................................................2, 3, 4

U.S. EPA, *Technical Support Document for the Clean Water Rule: Definition of
Waters of the United States* 164 (May 27, 2015) (2015 TSD).................3, 4

*Resource and Programmatic Assessment for the Navigable Waters Protection
Rule: Definition of "Waters of the United States"* (Jan. 23, 2020), EPA-HQ-
OW-2018-0149. (RPA).........................................................3, 5, 14, 16

*Economic Analysis for the Navigable Waters Protection Rule: Definition of Waters
of the United States* (Jan. 22, 2020) (EA)
https://www.epa.gov/sites/production/files/2020-
01/documents/econ_analysis_-_nwpr.pdf.................................3, 5, 14, 19

**INTRODUCTION**

This Court should grant the States' and Cities' Motion (ECF No. 30) and stay the effective date of the 2020 Rule or enjoin its implementation during this litigation. The States and Cities are likely to succeed on the merits of their claims, because the 2020 Rule is arbitrary and capricious and not in accordance with law.  Even though the primary objective of the Clean Water Act (CWA or Act) is to restore and maintain water quality, the Agencies disregarded their previous factual findings, which demonstrated the critical need to protect categories of waters that the 2020 Rule excludes from the Act's scope. The science previously developed by the Agencies should have been central to any reasoned determination of how to attain the Act's objective, yet—with the exception of a few self-serving references—the Agencies instead ignored that body of science.

The Rule's interpretation of "waters of the United States" is also a flatly unreasonable construction of the Act as found by a majority of the Justices in *Rapanos v. United States*, 547 U.S. 715 (2006).  In their Opposition, the Agencies focus on a straw man argument—that the Act is purportedly unambiguous—that the States and Cities did not make.  Rather, the States and Cities argue the Agencies have adopted an unreasonable interpretation of an ambiguous statutory phrase and that Supreme Court caselaw proves that conclusion.  The Agencies also irrationally adopted vague and unworkable terminology for assessing a water's jurisdictional status that will cause confusion, contrary to the Agencies' stated objective of increasing predictability.

The States and Cities have also demonstrated that the 2020 Rule will cause imminent, significant and irreparable harm to the States' and Cities' environmental, programmatic, proprietary and economic interests during this litigation, if not stayed or otherwise preliminarily enjoined.  In attempting to contest this extensive evidence of harm, the Agencies argue that this Court should evaluate the States' and Cities' irreparable harm based on a standard that does not apply to preliminary injunctions, mount improper hearsay objections, and attempt to recast their own equivocal statements. Nor have the Agencies refuted the States' and Cities' demonstration that the balance of equities weighs in their favor and that a nationwide injunction is necessary to prevent widespread degradation of the Nation's waters. The Court should thus grant a preliminary injunction or stay of the 2020 Rule.

1

**ARGUMENT**

2        With unrebutted evidence, the States and Cities met the requirements for a preliminary

3   injunction or a stay: (1) "'serious questions going to the merits;'" (2) "balance of hardships that

4   tips sharply towards the plaintiff;" (3) "likelihood of irreparable injury" absent injunctive relief;

5   and (4) "the injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d

6   1127, 1135 (9th Cir. 2011).

7   **I.      THE STATES AND CITIES ARE LIKELY TO SUCCEED ON THE MERITS**

8        **A.      The 2020 Rule Is Arbitrary and Capricious**

9                **1.      The 2020 Rule Disregards the Clean Water Act's Primary Objective
                 to Protect Water Quality.**

10        Protection of water quality is the key directive of Congress to the Agencies in the CWA.

11   33 U.S.C. § 1251(a); *see Envt'l Def. Ctr., Inc. v. EPA*, 344 F. 3d 832, 877 (9th Cir. 2003).  Yet,

12   contrary to that clear mandate, the Agencies failed to address the abundant evidence before them,

13   including scientific evidence developed since 2015, demonstrating that the 2020 Rule will do the

14   opposite: it will degrade rather than protect water quality.  Mot. at 14-17; ECF No. 30-18 (Sullivan

15   Decl.) ¶¶ 21-51. That error represents a paradigmatic example of the type of arbitrary and

16   capricious rulemaking the APA forbids.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*

17   *Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (*State Farm*); *Mercy Catholic Med. Ctr v. Thompson*, 380

18   F.3d 142, 158 (3d Cir. 2004); *Office of Communication of the United Church of Christ v. FCC*,

19   779 F.2d 702, 707 (D.C. Cir. 1985).

20        In particular, the Agencies disregarded and countermanded their extensive prior factual

21   findings in the 2015 Connectivity Report, which (contrary to the Agencies' current effort) sought

22   to further the Act's primary purpose by examining "the connectivity and mechanisms by which

23   streams and wetlands, singly or in the aggregate, affect the physical, chemical, and biological

24   integrity of downstream waters."  Connectivity Report at ES-1.  The Agencies claim that they

25   "considered and discussed" the Connectivity Report and "scientific information" but their

26   conclusory, misleading references to that information in the Rule's preamble (*see* Opp. at 18-19)

27   show their failure to meaningfully consider the information that should have been most critical to

28

2

1   determining the CWA's proper scope of coverage.  The Agencies also attempt to support the 2020

2   Rule by citing to portions of their "Resource and Programmatic Assessment" (RPA) and

3   "Economic Analysis" (EA) for the Rule, but they expressly disavowed the RPA and EA as bases

4   for the Rule.  85 Fed. Reg. at 22,332.

5               a.      **The Rule's Elimination of CWA Protection for Many**
                        **Tributaries and Wetlands Is Contrary to the CWA's Objective.**
6

7           The Agencies previously determined that tributary streams—the great majority of which

8   are headwater streams—as well as wetlands, are functionally connected to and combine to strongly

9   affect the chemical, physical, and biological integrity of downstream navigable waters.  Mot. at

10  10-12 (citing to Connectivity Report at ES-2 to ES-3, ES-5, ES-13); *see* 80 Fed. Reg. at 37,057-

11  58; 2015 TSD at 164-171.  But, contrary to the Act's objective, the 2020 Rule ignores those key

12  findings and eliminates CWA protection for entire categories of upstream waters without reasoned

13  explanation.  *See* Sullivan Decl. ¶¶ 2, 5-7, 11, 17-19, 24, 34, 50; *F.C.C. v. Fox Television Stations,*

14  *Inc.*, 556 U.S. 502, 537 (2009) (agencies cannot disregard or countermand their previous factual

15  determinations without reasoned explanation); *Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d

16  1160, 1163 (9th Cir. 2010) (court "need not defer to the agency when the agency's decision is

17  without a substantial basis in fact")  The Agencies seek to omit that decisive fact by arguing that

18  they "never said that *all* upstream waters and wetlands are 'vital,'" just "that 'upstream waters' of

19  'downstream' waters are *as a category* 'vital.'"  Opp. at 21 (emphasis in original).  In fact, the

20  2020 Rule removes from the Act's protections *entire categories* of waters, namely all ephemeral

21  streams and all non-floodplain wetlands.  Sullivan Decl. ¶¶ 4-5, 24, 34.

22          The Agencies also argue that their prior findings and science informed the 2020 Rule's

23  severely restrictive definition of "tributary" (Opp. at 19) but that is belied by the Rule's

24  elimination of CWA protections for all ephemeral streams "despite their importance and the risks

25  associated with their impairment that have been widely recognized, including by EPA."  Sullivan

26  Decl. ¶ 24.  The Agencies claim that they eliminated ephemeral streams from their new definition

27  of "tributary" based on the "connectivity gradient."  Opp. at 19. The connectivity gradient to

28  which the Agencies refer, however, was a single Science Advisor Board hypothetical illustration,

3

1   which the Agencies misrepresented (*see* Sullivan Decl. ¶ 7) to justify eliminating CWA

2   protections for all ephemeral streams and all non-floodplain wetlands.  And, as explained in

3   Section I.A.2, the Agencies have abandoned their prior evidentiary findings in favor of difficult-to-

4   measure flow requirements in a "typical year" that are inconsistent with established science

5   regarding waters' functional connectivity.

6         The 2020 Rule also imposes surface water flow requirements for streams that

7   fundamentally conflict with the CWA's objective and the Agencies' prior findings.  The Rule will

8   eliminate CWA protections for 4.8 million miles of streams and millions of acres of wetlands

9   nationwide. Mot. at 1, 30-31.  Far from being "unfounded" or "wild speculation," as the Agencies

10  claim (Opp. at 20), these expected impacts are based on expert studies, including studies that

11  enhance the National Hydrography Dataset and the National Wetlands Inventory.  *See* Sullivan

12  Decl. ¶¶ 3, 21-22, 24, 38-39, 44-46; ECF No. 68 (American Fisheries Society *et al.* Amicus Brief).

13  The Agencies fail to explain in their Opposition how the 2020 Rule's exclusion of these waters

14  squares with the Act's objective and the Agencies' prior findings detailing the importance of those

15  waters, including how they significantly affect downstream rivers by minimizing downstream

16  flooding or by contributing flow.  2015 TSD at 246-47; Connectivity Report at 1-10, 3-5, 3-7, 3-

17  23, 3-28.

18        The 2020 Rule also requires that, to receive the Act's protection, a wetland must touch a

19  downstream water, or have a direct surface water connection to it.  This restriction is directly

20  contradicted by the Agencies' prior findings that many non-abutting and otherwise functionally

21  connected wetlands significantly affect the integrity of downstream waters.  Connectivity Report

22  at 4-2, 4-5, 6-6 to 6-7; Sullivan Decl.  ¶¶ 11, 13, 15-16, 18, 34, 41.  The Agencies reveal in their

23  Opposition the alarming position that many wetlands are little more than pits in the ground,

24  suitable for filling without the necessity of a CWA permit.  Opp. at 26.  The Agencies also claim

25  that they considered "inundation by flooding" to "establish[] jurisdiction."  *Id.* at 19. But, contrary

26  to the Act's objective, the Rule makes non-jurisdictional millions of acres of wetlands whose

27  critical flood mitigation functions will be lost as these newly unprotected wetlands are filled,

28  putting people and property across the nation at increased risk of flooding.  Sullivan Decl. ¶¶ 15,

4

1    34, 48, 50; Mot. at 36-37.

2              **b.    The Agencies May Not Rely on the RPA or EA to Support the
                       2020 Rule.**
3

4          The Agencies also attempt to support the 2020 Rule by citing to portions of their RPA and

5    EA for the Rule.  Opp. at 20.  But the Agencies expressly disavowed the EA and RPA as bases for

6    the Rule.  85 Fed. Reg. at 22,332 ("the final rule is not based on the information in the agencies'

7    [EA or [RPA]"); 22,335 ("the agencies are not relying on the [EA] . . . as a basis for this final

8    rule"); RPA at 6 ("[t]he agencies have not relied on the information presented in the RPA and EA

9    as an independent basis" for the Rule).  Accordingly, the Agencies' prior contemporaneous

10   rulemaking statements foreclose their post-hoc attempt to use the RPA or EA to justify the Rule.

11   *State Farm*, 463 U.S. at 50 ("[A]n agency's action must be upheld, if at all, on the basis articulated

12   by the agency itself"); *NRDC v. EPA,* 735 F.3d 873, 877 (9th Cir. 2013) (court's review must

13   "begin[] and end[] with the reasoning that the agency relied upon in making th[e] decision"); *New*

14   *Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (a court

15   must "exclude post-hoc rationalizations concocted by counsel in briefs or argument").[1]

16             **2.    The 2020 Rule's "Typical Year" Requirement and Distinction
                       Between Intermittent and Ephemeral Streams Are Arbitrary and
17                     Capricious**

18          The Agencies have not rebutted the States' and Cities' argument that the use of "typical

19   year" to define jurisdictional waters is arbitrary and unworkable.  Mot. at 18-19.  They identify no

20   reason in the record why limiting protected waters to conditions that are not too dry or too wet

21   serves the Act's objective, nor do the Agencies evaluate whether those limitations would cause

22   adverse impacts to downstream waters.  The Agencies state that "typical year" is determined based

23   on precipitation data (Opp. at 22), but the final Rule changed the definition to include unspecified

24   ──────────────────

25       [1] The Agencies' unlawful attempt to rely on the RPA is particularly curious since it, in fact,
     reveals that the Rule will harm water quality and will undermine major CWA programs for
26   protecting water quality by drastically reducing the jurisdictional "waters of the United States" and
     reducing water quality protections provided by the Act's permitting, water quality certification and
27   oil spill control programs.  Mot. at 14-17; RPA at 59 ("many CWA programs—including water
     quality standards, state and tribal [Section] 401 certification programs, discharge permits, and oil
     spill prevention and planning programs—apply only to waters subject to CWA jurisdiction").
28

                                                    5

1    "other climatic variables" as well.  85 Fed. Reg. at 22,274.  The Agencies provide no methodology

2    for incorporating such ill-defined variables into the calculation of the typical year.  Instead they

3    offer only vague assertions that they "will consider and use the best available data and

4    information, which provides the most accurate and reliable representative information for the

5    aquatic resource in question, to determine 'typical year.'"  *Id.* at 22,275.  As a result, the typical

6    year requirement is helplessly vague and will thus yield arbitrary and capricious decision-making.

7    *See Bark v. United States Forest Service*, 958 F.3d 865, 872 (9th Cir. 2020) (vague and uncertain

8    environmental analysis held arbitrary and capricious).

9         Nor can the Agencies' decision to rely on the typical year concept be rationalized on the

10   basis that NOAA has been collecting climate data for 30-year time frames.  *See* Opp. at 22.  There

11   is nothing to suggest that NOAA developed its database to be used by the Agencies to define

12   protected waters under the Act.  And nothing in the 2019 Rule and all prior regulations defining

13   waters of the United States has employed the typical year concept.

14        The Agencies claim that distinctions between ephemeral and intermittent streams would

15   give "further clarity" to defining streams (Opp. at 23), but they have provided no evidence to

16   support that argument.  Instead, in the Rule's preamble, the Agencies list a hodgepodge of tools to

17   identify ephemeral and intermittent streams without explaining how and whether any of these tools

18   should be used.  85 Fed. Reg. at 22,292-94 (providing a long list of tools).  The Rule sets forth no

19   objective methodology for determining whether a stream is ephemeral or intermittent and is

20   therefore unlawfully vague and arbitrary and capricious.  *See Bark*, 958 F.3d at 872.

21              **3.**     **The Agencies Failed to Consider the Significant Reliance Interests**
                           **Engendered by Their Long-Standing Implementation of the**
22                         **Significant Nexus Standard.**

23        The Agencies fail to demonstrate in their Opposition that they have considered the States'

24   and Cities' reliance on the Agencies' long-standing use of the significant nexus standard.  Instead,

25   the Agencies assert that reliance was not justified because the regulations defining "waters of the

26   United States" were "notoriously unclear" and the Agencies planned to revise them.  Opp. at 17-

27   18.  A general statement in 2008 that "the agencies were considering rewriting the regulations"

28   (Opp. at 18 n.7) hardly insulates the Agencies from engendering reliance interests generated over a

6

1  decade of implementation.  In fact, the Agencies concede that they have used the significant nexus

2  standard to make jurisdictional determinations since *Rapanos* in 2006.  *Id.* at 18.  Indeed, under the

3  Agencies' 2019 Rule, which is currently in effect, the significant nexus standard is still used.  80

4  Fed. Reg. 37,054, 37,057 (June 29, 2015); 84 Fed. Reg. 4154, 4197-98 (Feb. 14, 2019).  Given the

5  Agencies' long-standing use of the significant nexus standard, reliance by the States and Cities on

6  it is unquestionably reasonable.  *See Nat'l Ass'n. for the Advancement of Colored People v.*

7  *Trump*, 298 F. Supp. 3d 209, 240 (D.D.C. 2018) (beneficiaries had significant reliance interests

8  based on a five-year-old government program).

9      The Agencies arguments that the States and Cities could not have relied on the significant

10  nexus standard because it was not included in regulations until the 2015 Rule have no merit.  Opp.

11  at 18.  While the codification date is correct, the Agencies established the significant nexus

12  standard as their lodestar in their 2008 *Rapanos* Guidance, and reliance interests that agencies

13  must address can be engendered by agency policies or regulations alike.  *See Encino Motorcars,*

14  *LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).

15      The Agencies' claim that they only needed to "thoroughly explain[] the reasons for

16  abandoning the significant nexus standard" to address reliance interests is also wrong.  Opp. at 18.

17  An agency must provide its reasons for promulgating a rule *and* acknowledge and evaluate

18  reliance interests based on its prior position.  *See California v. Azar*, 950 F.3d 1067, 1113 (9th Cir.

19  2020) (citing *Encino Motorcars*, 136 S. Ct. at 2126); *S.A. v. Trump*, 363 F. Supp. 3d 1048 (N.D

20  Cal. 2018).  The Agencies failed to do so here. Rather, the Agencies simply state that they

21  "disagree … that states have reliance interests," thereby conceding they did not consider those

22  interests.  Opp. at 18.  Since that position is unquestionably refuted by the record, this concession

23  establishes yet another way in which the Agencies acted arbitrarily and capriciously.

24      **B.**    **The 2020 Rule Is Unlawful Because the Agencies' Interpretation of**
                    **"Waters of the United States" Is Contrary to the CWA.**

25

26          **1.**    **As Found by a Majority of the Justices in *Rapanos*, the Interpretation**
                          **of "Waters of the United States" in the 2020 Rule Is Impermissible.**

27      The Agencies fare no better in their attempt to justify their distorted interpretation of the

28  Act. To begin, they argue that *National Cable & Telecommunications Ass'n v. Brand X Internet*

7

*Services.*, 545 U.S. 967 (2005) (*Brand X*), precludes the States and Cities from relying on *Rapanos*, Opp. at 11-12, but that misconstrues the States' and Cities' argument.  The Agencies contend that the States and Cities have run afoul of *Brand X* by arguing that the Agencies may not adopt a new regulatory definition and that the Agencies are bound by the significant nexus standard in Justice Kennedy's concurring opinion. *See* Opp. at 11-12.  But the States and Cities do not ask the Court to set aside the 2020 Rule because it is a new interpretation or because it fails to adopt the significant nexus standard.  Instead they ask the Court to invalidate the Rule because it is based on the interpretation of "waters of the United States" in the plurality opinion in *Rapanos* that was rejected by a majority of the Justices as inconsistent with the Act's text, structure, and purpose. Mot. at 21.  *Brand X* did *not* give an agency license to adopt an interpretation of a statute that a court—especially the Supreme Court—has already found to be an impermissible construction.

The question at *Chevron*'s second step is whether the Agencies' interpretation of "waters of the United States" is reasonable.  Mot. at 20; Opp. at 11.  Here, that question was answered by the majority of the Justices in *Rapanos*: Justice Kennedy's concurrence found that the plurality's test was "inconsistent with the Act's text, structure, and purpose," 547 U.S. at 776, and Justice Stevens' four-person dissent found that that test was "'without support in the language and purposes of the Act or in our cases interpreting it.'" *Id.* at 800 (quoting Kennedy concurrence).

While it is true that "[n]o member of the Supreme Court expressed the view that the CWA leaves no room to carve out a new rule" (Opp. at 12), the Agencies did not carve out a *new* rule here. Instead, they adopted the *Rapanos* plurality's test.  And while they also argue at length why that test is consistent with the CWA (Opp. at 13-15), they fail to acknowledge that a majority of the Justices of the Supreme Court have found that it is not.  Because the 2020 Agencies' construction of "waters of the United States" is inconsistent with the CWA, it is invalid under *Chevron*'s second step.

2.    **The 2020 Rule Is Not Justified on the Basis of Constitutional Concerns and Is Unsupported by the CWA's Text, Structure and Purpose.**

Because a majority of the Justices in *Rapanos* found impermissible the interpretation of "waters of the United States" the Agencies now adopt, the Court need not conduct any further analysis under *Chevron*.  Even if the Court does so, the Agencies' new interpretation is "'entitled to considerably less deference'" because it departs radically from their prior "consistently held agency view." *Nat. Res. Def. Council v. U.S. E.P.A.*, 526 F.3d 591, 602–03 (9th Cir. 2008) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 447 n. 30 (1987)). In any case, as the States and Cities have shown, the Agencies' reasons for changing their interpretation are not supported by the Act's text, structure, or purpose.  Mot. at 24-28.

The Agencies argue that the "sufficient surface water connection" required by the 2020 Rule reflects the limits of the Commerce Clause.  Opp. at 13.  That argument was rejected in Justice Kennedy's concurrence and Justice Stevens' dissent in *Rapanos*.  547 U.S. at 782-83 (compliance with the "significant nexus" standard "will raise no serious constitutional or federalism difficulty" and "prevents problematic applications of the statute" that could raise such concerns) (Kennedy, J.), 803 ("the plurality suggests that the canon of constitutional avoidance applies because the Corps' approach might exceed the limits of our Commerce Clause authority" but that concern "is plainly not warranted here") (Stevens, J.); *see also* Mot. at 37-38.

The Agencies also argue, without any citation to the administrative record, that they gave "extensive consideration to the 'objective' of the Act to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'"  Opp. at 13-14 (quoting 33 U.S.C. § 1251(a)).  As discussed above in Section I.A.1, they did not.  Instead, they simply and repeatedly stated in a conclusory fashion that the Rule balances the integrity of the Nation's waters with the rights of States, as required by Section 101(b) of the Act, 33 U.S.C. § 1251(b).  *See* 85 Fed. Reg. at 22,250, 22,262, 22,269, 22,271, 22,272, 22,283, 22,285, 22,287, 22,308.

Section 101(b)—which sets forth a "policy," not the Act's "objective," § 101(a), 33 U.S.C. § 1251(a)—does *not* limit the scope of "waters of the United States" based on states' rights. Mot. at 24-26.  The Supreme Court's recent decision in *County of Maui v. Hawaii Wildlife Fund*,

9

140 S. Ct. 1462 (2020) makes that point too.  The Court recognized, citing Section 101(b), that "Congress intended to leave substantial responsibility and *autonomy* to the States" with regard to "land," "groundwater," and "nonpoint source[] pollution." *Id.* at 1471, 1476 (emphasis in original).  Thus, *County of Maui* makes clear that Section 101(b) refers to the rights of states to regulate groundwater, land, and nonpoint source pollution, not the "regulation of identifiable sources of pollutants entering navigable waters" addressed by the 2020 Rule. *See id.*

Finally, the Agencies claim that the States and Cities argue that "the general water quality objectives of the CWA in § 1251(a) *unambiguously* override the Agencies' discretion to otherwise balance and interpret the definition of 'navigable waters.'" Opp. at 15 (emphasis in original).  The States and Cities have made no such argument.  Instead, as discussed in Section I.A.1, they argue that Agencies were required to consider protection of water quality and did not do so.[2]

Thus, even if the Court considers the Agencies' reasons for changing their interpretation of "waters of the United States," those reasons do not justify the 2020 Rule.

### 3.    The Rule's Exclusion of Interstate Waters Is Contrary to Law.

The Agencies fail to rebut the States' and Cities' argument that the removal of interstate waters as a category of jurisdictional waters is contrary to law.

The Agencies first contend they were required to remove interstate waters because the Southern District of Georgia found the interstate waters provisions of the 2015 Rule unlawful.  Opp. at 23; *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1358-60 (S.D. Ga. 2019).  But the Agencies' decision to propose the removal of interstate waters *pre-dated* the Southern District of Georgia's remand by more than 6 months, *see* 84 Fed. Reg. 4154, 4171 (Feb. 14, 2019) (proposing to remove the interstate waters category), demonstrating that the Agencies were not motivated by that court's ruling.  Further, *Georgia* is neither correct nor binding. *See United States v.*

---

[2] The Agencies argue that they relied on both the plurality opinion and Justice Kennedy's concurrence in *Rapanos* to exclude ephemeral streams.  Opp. at 14-15.  But, while they refer to observations made by Justice Kennedy in their discussion of those streams, the test they used was the plurality's test. *See* Mot. at 23.  The Agencies' contentions that states, tribes, and local entities can protect those streams also misses the mark.  Opp. at 15.  Even if true, that does not relieve the Agencies of their obligation to interpret the Act consistent with its text and purpose, nor does it address the irreparable harm that the States and Cities will suffer due to pollution from upstream states or from in-state pollution while they are establishing new regulatory programs.

10

1   *Ensminger*, 567 F.3d 587, 591 (9th Cir. 2009) ("'a district court opinion does not have binding

2   precedential effect,' especially one from another federal circuit") (citations omitted).

3        The Agencies' attempt to misconstrue Section 303(a) of the Act to justify their exclusion of

4   interstate waters similarly misses the mark.  The Agencies argue that Section 303(a)'s reference to

5   "water quality standard in place before 1972" precludes the protection of interstate waters as a

6   category because, starting in 1972, Congress defined the scope of CWA jurisdiction with the term

7   "navigable waters."  Opp. at 24.  But Section 303(a), which was added in 1972, did not indicate

8   congressional intent to cease protecting interstate waters under the CWA but, rather, extended

9   those protections by requiring that water quality standards for interstate waters prior to 1972

10  remain in effect.  33 U.S.C. § 1313(a); Mot. at 28-29.

11       Indeed, the protection of interstate waters as a category is mandated by the Act's text,

12  structure, and purpose, and by controlling caselaw.  Mot. at 28-29.  Save for their argument about

13  Section 303(a), refuted above, the Agencies failed to address the States' and Cities' legal

14  arguments.  Indeed, the Agencies' other justifications for the exclusion of interstate waters,

15  including the decision not to rely on "congressional acquiescence" and the concern that regulating

16  interstate waterbodies as a category will protect some smaller waterbodies, are irrelevant because

17  they do not address the key issue here—whether the exclusion of interstate waters as a category

18  was contrary to the law.

19  **II.    THE STATES AND CITIES ESTABLISHED THAT THE 2020 RULE THREATENS
          IMMINENT AND IRREPARABLE HARM**

20

21       Under the Ninth Circuit's "serious questions" test, the States and Cities need only

22  demonstrate a *likelihood* of irreparable injury at *any point* prior to resolution of the merits to obtain

23  a preliminary injunction to preserve the status quo until adjudication of the merits.  *All. for the*

24  *Wild Rockies*, 632 F.3d at 1131-32.  Contrary to the Agencies' assertions (Opp. at 26, 28), the

25  injury need not occur immediately upon the 2020 Rule's effective date nor must the injury be

26  "permanent"; "[e]nvironmental injury, by its nature" is often "irreparable" and is therefore

27  sufficient for a preliminary injunction.  *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d

28  999, 1020 (9th Cir. 2009) (quotation omitted); *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 323-

1    324 (D.C. Cir. 1987) (affirming preliminary injunction where agency action did "not immediately

2    open the lands to exploitation") (*Burford*).

3        Here, the States and Cities identified four types of irreparable injuries they will suffer prior

4    to adjudication of the merits: environmental, programmatic, proprietary, and economic interests.

5    Mot. at 29-38.

6        As to the States' and Cities' environmental and economic injuries, the Agencies do not

7    seriously engage with the evidence supporting the Motion, but rather urge the Court to ignore

8    some or all of it as hearsay, lacking personal knowledge, or outside the administrative record.  The

9    Agencies' hearsay and personal knowledge arguments (Opp. at 28-30) lack merit because

10   irreparable harm may be shown by "expert declarations" and even inadmissible evidence.  *Nat'l

11   Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 886 F.3d 803, 823 (9th Cir. 2018) (affirming grant

12   of preliminary injunction); *Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239,

13   1250 n.5 (9th Cir. 2013) ("reject[ing]" argument that "irreparable harm" can be shown only by

14   "admissible evidence" because "the rules of evidence do not apply strictly to preliminary

15   injunction proceedings").  As to the Agencies' administrative record arguments (Opp. at 3; Opp. to

16   Pls'. Req. for Judicial Notice), this Court is not limited to the administrative record and may

17   consider properly submitted[3] non-record evidence in assessing the propriety of injunctive relief.

18   *State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1074 n.7 (N.D. Cal. 2018).  Accordingly,

19   this Court should consider all 21 declarations submitted by the States and Cities.

20       **A.    The 2020 Rule Threatens to Cause Immediate and Irreparable
              Environmental Harm**

21

22       The Agencies offer no declarations or arguments to rebut the detailed scientific analysis by

23   Dr. Sullivan establishing the widespread and serious environmental harm that the Rule threatens to

24

25       [3] In contrast, the Agencies fail to properly submit any non-record evidence to support their
     claim that unspecified "state laws or continuing obligations" might mitigate the States' and
26   Cities' harms.  Opp. at 31-32.  The Agencies' unexplained citations to two states' websites
     expressing their "commitments" to restoring two watersheds fail to show that those two states
27   have the authority or capacity to prevent all the harms to those watersheds that the 2020 Rule will
     cause.  *See, e.g.,* Opp. at 32 nn.14 & 15 (citations to the websites of state agencies).

28

1    cause during the pendency of this case.  Mot. at 30-31.[4]  Instead they offer meritless assertions that

2    various provisions of the CWA and other laws will be instantly triggered to prevent the harm.

3           **1.      The Agencies Have Not Demonstrated that CWA Permits Will
               Continue to Protect Water Quality**
4

5           The Agencies assert that environmental injury will be avoided because newly-allowed

6    pollution of upstream waters will "remain regulated" if those pollutants travel to downstream

7    waters.  Opp., 7, 25.  But the Rule's preamble provides no such certainty; there, the Agencies state

8    that permits for pollution discharges to non-jurisdictional waters "*may* no longer be required . . .

9    [or] *may* still be required if the non-jurisdictional feature conveys a discharge of pollutants from a

10   point source" to downstream jurisdictional waters.  85 Fed. Reg. at 22,297 (emphasis added).  This

11   equivocal statement, underscored by the practical difficulties associated with tracing pollution

12   back to upstream sources to establish the basis for a CWA permit, shows that the Agencies'

13   assurance of continued regulation of pollutants under the CWA after the 2020 Rule's effective date

14   is unfounded.

15          Moreover, to require CWA permits for a discharge into a non-jurisdictional ephemeral

16   stream, EPA or an authorized state will need to prove the ephemeral stream is itself a "point

17   source," 33 U.S.C. § 1362(14), and identify the source of pollutants emptying into the stream,

18   possibly far upstream.  Even if a new Section 402 permit is issued, it would only protect waters

19   downstream of the point of discharge from the ephemeral stream to a jurisdictional water, leaving

20   the ephemeral stream itself unprotected.  Nothing in the record suggests that EPA has even begun

21   investigation of the many current CWA permits for ephemeral streams that will no longer be

22   within the new, drastically limited jurisdiction of the Act.  The observation in Justice Kavanaugh's

23   concurrence in *County of Maui* that polluters cannot "evade the permitting requirement" for

24   "watercourses that lie upstream of covered waters" is not to the contrary.  Opp. at 25.  The

25   Agencies have failed to show that the EPA or an authorized state *can* impose a "permitting

26   requirement" for all waters that will lose jurisdictional status under the 2020 Rule and, given the

27   time, effort, and possible litigation involved in establishing such requirements, it is very unlikely

28   _____
             [4] *See also* ECF No. 68 (American Fisheries Society *et al.* Amicus Brief) at 14-15.

13

1    the responsible agency will be able to impose such permitting requirements before the 2020 Rule

2    goes into effect.

3         The Agencies acknowledge there will be more dredge and fill activities in wetlands, but

4    wrongly claim that the States and Cities can "ensure" water quality standards are met after the

5    2020 Rule becomes effective.  Opp. at 26.  But they ignore the fact that the Rule's effective date

6    does not provide sufficient time and resources to fill the regulatory gap.  Mot. at 35.  The

7    Agencies' claim that relatively few wetlands will be affected by the Rule (Opp. at 26) rests on the

8    EA, which is riddled with errors and biases.  *See* ECF No. 55-1 (Institute for Policy Integrity

9    Amicus Brief).  The Agencies also rely on the EA and the RPA to speculate as to how the Rule

10   will affect the States' and Cities' operation of their water and wetlands programs.  Opp. at 25-27.

11   This speculation cannot overcome the declarations of the States and Cities about the formidable

12   difficulties they will face in filling the regulatory gap the 2020 Rule creates.  Mot. at 35.

13        The Agencies' contention that the States and Cities failed to identify a single discharger that

14   will no longer be subject to permit requirements is specious.  Opp. at 26.  For example, in New

15   Mexico, current Section 402 pollutant discharge controls include stormwater general permits for

16   over 1,000 facilities.  ECF No. 30-16 (Roose Decl.) ¶ 9.  Because of the Rule, 25 to 45 percent of

17   these stormwater general permits and 50 percent of the individual permits will no longer be in

18   force.  *Id.* ¶¶ 9-10. Regardless, it is not the States' and Cities' burden to catalogue potential

19   dischargers; "[g]iven the breadth of the agency's action" and "the enormity of the land affected" it

20   is enough that the Rule "leave[s] no prohibitions" to protect "water quality" on *some* lands.

21   *Burford*, 835 F.2d at 323-324.

22              **2.    Water Quality Standards and TMDLs Will Not Ensure Protection of**
                       **Water Quality After the 2020 Rule Becomes Effective**
23

24        The Agencies incorrectly claim that water quality standards (WQS), Total Maxium Daily

25   Loads (TMDLs), and Section 402 (or NPDES) permits will address all water quality harms that

26   would be caused by the Rule.  Opp. at 27-8.  First, these arguments are limited to Section 402

27   programs only and have no bearing on the significant wetland destruction the Rule allows due to

28   lost protections under Section 404.  Second, the Agencies offer no evidence showing that these

                                          14

measures will be in place upon the 2020 Rule's effective date; in fact, they frequently take years to implement and achieve results.  As discussed above, crafting new Section 402 permits for pollutants discharging via newly non-jurisdictional waters will be at best difficult and at worst impossible.  Impacts on water quality could be addressed by modifying other Section 402 permits in a watershed to make them more stringent, 33 U.S.C. § 1313(b)(1)(C), but permittees will resist and necessary administrative proceedings will take time.  Alternatively, TMDLs could be developed for the impacted watershed. *See* 33 U.S.C. § 1313(d)(1)(C).  But TMDLs often take years to complete and implement. For example, TMDLs for phosphorus in the New York City Watershed were proposed in 2002, but it took until 2009 to develop a viable implementation plan.[5] Similarly, a TMDL for sediment and temperature in the Eel River in California was adopted by EPA 15 years after the river was found to be impaired.[6]  Moreover, TMDLs will not address upstream pollution because downstream states lack the authority to impose TMDLs on dischargers in upstream states. Mot. at 34.

>    **B.    The Agencies Do Not Address All the Harms the States and Cities Identified Due to Increased Water Pollution**

The Agencies assert that the States and Cities must identify "specific discharges of pollutants," show that those "specific discharges would imminently cause" harm, and that "those injuries will occur."  Opp. at 28-29.  Controlling precedent, discussed above, holds otherwise, which is why "the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Lockyer*, 575 F.3d at 1020 (quotation omitted).  The lone case cited by the Agencies is not to the contrary, as it did not discuss environmental harm and, in fact, affirmed the type of *prohibitive* injunctive relief the States and Cities seek here.  *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).

The States' and Cities' Motion offered six examples of how the 2020 Rule would allow upstream states to pollute their waters.  Mot. at 33.  The Agencies do not address each example,

---

[5] *See* https://www.dec.ny.gov/docs/water_pdf/nycphos.pdf; https://www.dec.ny.gov/docs/water_pdf/jan09crotontmdl.pdf.
[6] See https://19january2017snapshot.epa.gov/www3/region9/water/tmdl/lower_eel/LER-TMDL-final-121807-signed.pdf.

1    but instead cherry-pick a few sentences from some of the declarations.  Having failed to rebut *all*

2    of the States' and Cities' evidence, the Agencies' argument is essentially that "there are other areas

3    . . . that are not harmed," which is not a basis to dispute "irreparable injury resulting from

4    environmental harm."  *All. for the Wild Rockies*, 632 F.3d at 1135.  Regardless, the States and

5    Cities address each of the arguments in turn.

6        *First*, the Agencies' provide no evidence to support their claim that Dr. Sullivan relied on

7    "unreliable assumptions."  Opp. at 29.  In fact, Dr. Sullivan relied on multiple lines of evidence

8    and numerous expert studies documenting the importance of water resources and the Rule's

9    harmful impact on them, and his estimate that 4.8 million miles of streams and millions of acres of

10   wetlands will go unprotected because of the Rule is similarly documented.  Sullivan Decl. ¶¶ 3,

11   24.  The Agencies argue (incorrectly)[7] that the RPA refutes that estimate but the RPA only

12   claimed that the Agencies could not quantify the Rule's impacts. Opp. at 29.  The Agencies'

13   inability to quantify impacts that the States and Cities quantified does not rebut the States' and

14   Cities' showing.

15       *Second*, despite asserting that all 21 declarants lack "personal knowledge or other adequate

16   foundation," the Agencies only attack one.  Opp. at 29-30.  As to that one, the Agencies are

17   incorrect in asserting that the Rule will not result in increased development that would impact New

18   Hampshire wetlands that are upstream of plaintiffs Massachusetts and Maine because New

19   Hampshire will use its authority to issue dredge and fill permits to prevent harm.  *Id.* at 32.  The

20   Agencies' own records show otherwise, as the Governor of New Hampshire told the Agencies that

21   "[w]ith a narrower definition [of waters of the United States], citizens wanting to make alterations

22   to land and water will more often only need to apply for state permits, saving them considerable

23   cost and time. … The reduction in costs and time will promote business development within the

24   state and stimulate New Hampshire's economy."[8]  Thus, New Hampshire's permitting authority

25   will not prevent the Rule from increasing wetland loss in that state because the Rule facilitates

26   development activity in wetlands no longer subject to federal protections.

27       [7] *See* ECF No. 68 (American Fisheries Society *et al.* Amicus Brief) at 8-11.
         [8] https://www.epa.gov/sites/production/files/2017-09/documents/nh-
28   governor_sununu_2017-06-19_1.pdf.

1    *Third,* as explained above in the beginning of Section II.B, the States and Cities need not

2    identify "specific discharges" resulting from the 2020 Rule, much less a specific "wastewater

3    treatment plant" or "stormwater system."  Opp. at 30.  The States and Cities identified pollution

4    sources in upstream states that will flow into their waters as a result of the 2020 Rule's severe

5    reduction of CWA jurisdiction. [9]  For example, the Amargosa River that flows from Nevada into

6    California, which is ephemeral for the majority of its length, is influenced by land use activities

7    that may discharge pollutants, such as mining, Nevada's largest working dairy farm, and toxic

8    waste disposal site leakage from the Yucca Mountain Repository.[10]  That is more than enough to

9    show "irreparable harm."  *See Burford*, 835 F.2d at 323-324 (plaintiffs need not "proffer specific

10   evidence as to each tract of land, detailing just how the [agency's] action would cause" irreparable

11   harm to obtain preliminary injunction enjoining agency action that jeopardizes "water quality").

12        Similarly, the Agencies do not dispute that, as the Bishop Declaration explained, states on

13   the Colorado River Basin—such as Arizona and Utah—have no or limited authority to impose

14   restrictions more stringent than the CWA.  ECF No. 30-10 (Bishop Decl.) ¶ 21; Sullivan Decl. ¶ 8.

15   For example, Arizona's laws and regulations can be "no more stringent than the corresponding

16   federal law that addresses the same subject matter."  Ariz. Rev. Stat. Ann. § 49-104(A)(16).

17   Likewise, Utah, absent specified conditions, may not make a rule "for the purpose of

18   administering a program under the federal Clean Water Act" that is "more stringent than the

19   corresponding federal regulations which address the same circumstances."  Utah Code Ann. § 19-

20   5-105.  Over 81% of waterways in the Southwest—where Arizona and Utah are located—are

21   ephemeral or intermittent and would stand to lose coverage under the 2020 Rule.  Sullivan Decl. ¶

22   3.  That would impact states downstream, such as California, which rely on the Colorado River for

23   drinking water and agricultural water supplies.  Bishop Decl. ¶ 21.

24

25        [9] In a one-sentence footnote, the Agencies attack a paragraph in the Roose Declaration for
     providing plenty of facts about discharges from the "Ruidoso Downs Wastewater Treatment Plant
26   and Ruidoso Racetrack" but not the legal analysis explaining "why" the 2020 Rule makes it likely
     the affected waters will no longer be subject to CWA permitting requirements.  Opp. 30 n.13.
27   But it is not a declarant's burden to provide legal analysis which, in any event, is in the States'
     and Cities' Motion.
28        [10] ECF No. 30-20 (Parmenter Decl.) ¶¶ 5-6, 12-13; ECF No. 30-12 (Greene Decl.) ¶ 12.

17

Nor do the two out-of-circuit cases the Agencies cite support their claim that there is a special showing required where harms result from the acts of third parties.  Opp. at 31.  Those cases do not address injunctive relief but rather the "substantially more difficult" test for "standing" where a petitioner is "not the object of an alleged government action."  *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 201 (D.C. Cir. 2011).  Here, standing is undisputed. Moreover, in the Ninth Circuit, irreparable harm does not require a showing that the "action sought to be enjoined is the exclusive cause of the injury."  *Nat'l Wildlife Fed'n*, 886 F.3d at 819.

*Fourth*, the Agencies mistakenly assert that plans to restore the Chesapeake Bay and Nanticoke River Watershed ameliorate the harm to waters caused by wetland destruction and discharges upstream that the Rule threatens.  Opp. at 32.  The existence of plans to improve water quality does not rebut the harm additional pollution and wetland filling will have on water quality during the pendency of this case.  Equally unavailing is the Agencies' reference to "CWA obligations to adjust WQS, set TMDLs, and adjust waste loading impacting downstream states – regardless of the definition of "waters of the United States."  *Id.*  As discussed in Section II.A.2 above, all of these state regulatory efforts take significant time to implement.  Accordingly, these programs will not prevent harm to water quality during the pendency of this case.

*Fifth*, the Agencies erroneously criticize one of the four declarations addressing harms to California's waters as mere "speculation" because the declarant occasionally uses the terms "may" or "could."  Opp. at 33.  But the Agencies ignore the other declarations that both confirm the risk to California's waters from activities within its borders[11] and in Nevada[12] and aver that the 2020 Rule "will have a negative impact on water quality" on other States and Cities.[13]  Moreover, any qualifiers in a declaration are due entirely to the confusion created by the 2020 Rule's lack of clarity and the Agencies' lack of guidance on its implementation.  Indeed, as explained in Section II.A.1, while the Rule concedes that some waters will lose coverage, the Agencies did not identify the specific waters that would not be covered but rather indicated that the CWA "may no longer"

---

[11] ECF No. 30-2 (Ferranti Decl.) ¶¶ 10, 16 ("landowners will fill and destroy" waters).
[12] ECF No. 30-12 (Greene Decl.) ¶ 12 (identifying "mining" and other pollution sources).
[13] *See, e.g.*, ECF No. 30-17 (Jacobson Decl.) ¶ 14; ECF No. 30-6 (Siebert Decl.) ¶ 7 ("14.8 percent of wetlands in Wisconsin[] will lose federal protection").

18

or "may still" apply based on case-specific determinations.  *See* 85 Fed. Reg. at 22,297.

*Sixth*, the Agencies incorrectly argue that the States' and Cities' showing here is akin to the "bald allegations of concrete injury to flora and fauna" in *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013).  Opp. at 34.  But there, the plaintiffs failed to offer *any* declarations showing injury; instead, they submitted declarations from residents who lived near a pipeline indicating they were "sincerely worried about the harm that an oil spill might cause."  *Sierra Club*, 990 F. Supp. 2d at 41 & n.18.  In contrast, the States and Cities have offered 21 declarations, including expert testimony, identifying the environmental and other injuries they will suffer if the Rule goes into effect.

### C.   The 2020 Rule Harms the States and Cities by Severely Disrupting Their Water Pollution Control Programs

None of the Agencies' arguments refutes the States' and Cities' evidence that the 2020 Rule will immediately disrupt regulatory programs in their jurisdictions.

*First*, the Agencies misstate the law by claiming that the 2020 Rule's severe disruption to the States' and Cities' water pollution control programs is not a "cognizable, irreparable injury."  Opp. at 34.  In fact, because states cannot recover the monetary costs of regulatory gap-filling, this economic harm is irreparable.  *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (economic harm is irreparable when "states will not be able to recover monetary damages connected to" a federal rule.)  The Agencies concede that the 2020 Rule forces the States and Cities to choose between: (1) taking no action in response to the 2020 Rule, meaning "the public would forgo water quality and wetland benefits," or (2) making regulatory changes that "will likely incur some transition costs in the short run, and some of the cost of implementing programs will be transferred from the federal government to the states."  EA at 44-45.  To argue that this choice between harm to the public's water quality versus the unrecoverable economic costs of new regulatory programs is a "voluntary action" is disingenuous.[14]

As to the facts, the Agencies are likewise mistaken that the regulatory upheaval and

---

[14] The Agencies cite a case that is not to the contrary, as it did not address injunctive relief but simply held that standing was not shown because the harm was "non-imminent."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 421 (2013).  Standing here is undisputed.

1   economic costs identified in the States' and Cities' declarations results from "voluntary action"

2   rather than the 2020 Rule.  Opp. at 34. The Agencies ignore the harm caused by the 2020 Rule due

3   to the States' reliance on federal permitting.  For example, because New Mexico does not operate

4   a Section 402 program, maintaining the same level of water quality protections would require New

5   Mexico to construct a vast regulatory program by June 22, 2020.  Roose Decl., ¶¶ 6, 10, 19-22.

6   Other States (to the extent their current laws allow it) would also likely have to create the

7   regulatory structure necessary to fill the regulatory gap left by the 2020 Rule.[15]

8       *Second*, the States' and Cities' declarations showed that they have developed protocols with

9   the Army Corps to efficiently process federal Section 404 permits and state Section 401

10   certifications together, and that the Rule will impose on them additional administrative costs and

11   burdens because they will lose Army Corps participation.  Mot. at 36.  The Agencies admit that

12   "some streamlining for combined state and federal permitting may no longer occur" and assert that

13   state and federal programs might not be "coextensive."  Opp. at 34.  But the differences in

14   program coverage "are currently very little" (ECF No. 30-3 (Horbert Decl.) ¶ 6), and the Agencies

15   offer no competent evidence rebutting the significant overlap of state and federal programs.  *See*

16   ECF No. 30-11 (Baskin Decl.) ¶ 20.  Moreover, administration costs will increase because of the

17   expected increase in requests for jurisdictional determinations.  Siebert Decl. ¶ 18.

18       *Third*, the Agencies offer no declaration to undermine the reality that more TMDLs will be

19   needed to address water quality problems caused by the Rule.  In fact, they acknowledge that the

20   "States have an ongoing obligation to assess their water quality" under the program (Opp. at 35)

21   and do not dispute the costliness of the TMDL process to states.  *See* Baskin ¶ 16.

22       **D.    The 2020 Rule Threatens Irreparable Harm to the States' and Cities'
             Proprietary and Economic Interests**

23       The Agencies acknowledge that "wetlands generally mitigate flooding" but incorrectly

24   dismiss the risk to state property by suggesting that state or local floodplain requirements "*may*

25   separately prohibit filling of wetlands."  Opp. at 35 (emphasis added).  They ignore the fact that

26

27   _____

        [15] ECF No. 30-5 (Smith Decl.) ¶ 17; Siebert Decl. ¶ 6; Bishop Decl. ¶¶ 27-29, 32-33;
28   Baskin Decl. ¶¶ 11-14, 19-22; ECF No. 30-13 (Driscoll Decl.) ¶¶ 5-7, 11; ECF No. 30-14 (Currey
     Decl.) ¶¶ 10-11; Jacobson Decl. ¶¶ 30, 32-33; ECF No. 30-19 (Mrazik Decl.) ¶ 6.

the Rule will remove CWA protections for all *non-floodplain* wetlands and that these upland

wetlands also protect property located within floodplains from the risk of flooding.  Sullivan Decl.

¶¶ 5, 34.  Moreover, under New York's Floodplain Construction requirements (*see* Opp. at 35 n.

17), development within floodplains is not generally prohibited.  Rather, "[p]rivate development is

subject to local floodplain development permits."  *Id.*

The Agencies do not dispute the harm to the States' and Cities' economic interests from the

Rule.  Mot. at 36-37.  Nor do they dispute the proprietary and trustee interests the States and Cities

have in their wildlife.  *Id.* at 37-38.  They claim that other statutes would protect wildlife from loss

of habitat caused by the filling of wetlands under the Rule, but point only to the Endangered

Species Act (ESA).  Because most wildlife are not protected by the ESA, the Agencies have not

undermined the States' and Cities' showing of risk of harm to their wildlife.

## I.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF THE STATES AND CITIES

The Agencies provide no evidence or argument that tips the balance of the equities and

public interest in their favor.  As a preliminary matter, the Agencies incorrectly contest the

sufficiency of support for the States and Cities' argument that the balance of the equities and the

public interest warrant the relief they seek.  Opp. at 36-37.[16]  In fact, when the federal government

is a party, courts "consider the balance of equities and the public interest together."  *California v.

Azar*, 911 F.3d at 581 (citations omitted).

Substantively, the Agencies are incorrect that the balance of equities favors denial of the

Motion.  Opp. at 37.  The Agencies assert only that it would be "burdensome" to require them to

implement the Act differently in different jurisdictions, and "unfair" to "permit certain dissenter

states to extinguish a years-long effort to formulate a uniform national policy that can achieve

consistency and clarity for the rest of the country."  *Id.*  Accordingly, the Agencies conclude, the

---

[16] The Agencies cite *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), for the proposition that the States and Cities "must carry the burden of persuasion as to each element '*by a clear showing*'." Opp., 36 (emphasis in original).  But *Mazurek* merely states that a court should not grant a preliminary injunction unless the movant carries the burden of persuasion "by a clear showing."  *Mazurek*, 520 U.S. at 972.  A party meets the burden of persuasion if it meets the test set forth in *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7 (2008); *All. for the Wild Rockies*, 632 F.3d at 1135.

21

1  "public interest is best served by" denial of the relief the States and Cities seek.  *Id*.  But

2  conspicuously absent from the Agencies' opposition are facts to support this argument.  Nor do the

3  Agencies object to, or provide any facts to contradict, the declarations submitted by the States and

4  Cities that clearly explain the immediate, irreparable harm that will occur if the 2020 Rule goes

5  into effect and the necessity of maintaining the status quo pending resolution of this action.

6      Neither of the cases cited by the Agencies to support their claim that an injunction is

7  inappropriate is instructive here.  First, the Agencies rely on *East Bay Sanctuary Covenant v.*

8  *Trump*, 950 F.3d 1242, 1281-82 (9th Cir. 2020) for the assertion that courts "refuse injunctive

9  relief that would undermine … public good." Opp. at 37.  But that case upheld the district court's

10  grant of a preliminary injunction on facts analogous to those here: the Departments of Justice and

11  Homeland Security had jointly adopted a rule which, combined with a presidential proclamation,

12  stripped asylum eligibility from migrants crossing into the country between designated ports of

13  entry (i.e., changed the existing law).  *East Bay Sanctuary*, 950 F. 3d, at 1259-60.  The Ninth

14  Circuit found that the rule unlawfully conflicted with the text and purpose of the Immigration and

15  Nationality Act and issued an injunction. *Id.* at 1273.

16      Second, the Agencies again cite the out-of-circuit case *Sierra Club v. U.S. Army Corps of*

17  *Eng'rs*, 990 F. Supp. 2d 9, 43 (D.D.C. 2013), this time to argue that the balance of equities and

18  public interest here require denial of the preliminary injunction.  Opp. at 37.  There, the court

19  denied a request for a preliminary injunction in part because it concluded that the public interest

20  and balance of equities weighed in the agencies' favor. The court's decision was based on a

21  conclusion that there was no merit to plaintiffs' underlying claims and that plaintiffs failed to

22  allege any specific harm, instead identifying likely harm based upon analogies to other pipeline

23  projects.  *Sierra Club*, 990 F. Supp. 2d at 42-43.  *Sierra Club* thus is distinguishable and not

24  binding.

25      Contrary to the Agencies' assertion, the States and Cities do not disagree that the public

26  interest is relevant to the Court's determination; rather, the disagreement is about what is in the

27  public interest.  Opp. at 37.  The Motion explains how the public interest would best be served by

28  protecting the Nation's waters through maintaining the status quo during this litigation. Mot. at

22

38-39.  Both the public interest and the balance of equities here tip heavily toward issuance of an injunction or stay preventing implementation of the 2020 Rule.

Finally, to the extent the Agencies argue it is contrary to the public interest to issue an injunction that would apply the 2020 Rule in some states but not others (Opp. at 37), the nationwide injunction requested by the States and Cities, discussed below, addresses that concern.

## IV.   NATIONWIDE RELIEF IS BOTH NECESSARY AND APPROPRIATE

A nationwide injunction or stay is both necessary and appropriate given the immediate and irreparable harm to the States and Cities and the Nation's waters if the 2020 Rule goes into effect.[17]  Mot. at 39-40.  In response, the Agencies contend that a nationwide injunction is "not appropriate," especially on the "speculative record" here.  Opp. at 37.  But, as explained in Section II, there is nothing speculative about the evidence of nationwide harms provided by the States and Cities.  And given that water and water pollution do not observe political boundaries, an injunction that protects the integrity of all national waters is appropriately tailored.

The three cases the Agencies cite do not support their claim that "nationwide relief is generally inappropriate."  Opp. at 38.  The harm alleged in *California v. Azar*, 911 F.3d at 582, was purely economic.  Moreover, the Ninth Circuit there found that a nationwide injunction was unjustified because plaintiffs provided no evidence of economic harm to other states.  Accordingly, "an injunction that applies only to the plaintiff states would provide complete relief to them."  *Id*. at 584.  In contrast, the 2020 Rule causes widespread environmental degradation in every state, and it is undisputed that increased pollution in one state has downstream consequences on water quality in other states.  *See* Sullivan Decl. ¶ 3.  Unlike in *California v. Azar*, a nationwide injunction is thus required to provide complete relief to the States and Cities.

The Agencies' reliance on *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018), is similarly unavailing.  While the Ninth Circuit declined to uphold a nationwide permanent injunction in that case, it, too, focused on the economic nature of the harm, as well as a finding that the record evidence showed only local harms and was "not sufficiently

---

[17] The Agencies do not address the States and Cities' alternative request for a stay under Section 705 of the APA.

23

1  developed on the nationwide impact of the Executive Order." *Id.* at 1244.   Here, in contrast, the

2  States' and Cities' water quality will be affected by activities in neighboring states and the relief

3  sought is a preliminary, not a permanent injunction.

4           Moreover, while Justice Thomas questioned district courts' authority to issue nationwide

5  injunctions in a concurring opinion in *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018), that

6  concurrence does not unsettle the Ninth Circuit's rule that nationwide injunctions are appropriate

7  when, as here, a narrower remedy would not afford complete relief.

8           The parties agree that injunctive relief should be "no more burdensome to the defendant

9  than necessary to provide complete relief *to the plaintiffs.*"  Opp. at 39; *Trump v. Int'l Refugee*

10 *Assistance Project,* 137 S. Ct. 2080 (2017).  The Agencies argue for a narrowly tailored injunction,

11 "limited to preventing specific instances of imminent and permanent environmental injury that

12 Plaintiffs have proven."  Opp. at 39. [18]  But the Ninth Circuit requires that injunctive relief redress

13 the entirety of harm demonstrated by a plaintiff.  *See, e.g.*, *California v. Azar*, 911 F.3d at 582; *Cf.*

14 *City & Cty. of San Francisco*, 897 F.3d at 1244.  Here, a limited injunction will not address the

15 entirety of the widespread, nationwide harms detailed in the record and declarations. The Agencies

16 assert that the States' and Cities' failure to carve Hawaii out of their request for relief shows the

17 overbreadth of that request, since Hawaii (among other states), has no impact on water quality in

18 the States and Cities.  Opp. at 39.[19]  However, the Agencies do not dispute that many states are

19 upstream of the States and Cities.  *See* Mot. at 33-34.  An injunction that covers all but a very few

20 states is neither equitable nor practical, because, while some states may suffer "greater loss in

21 federal protection, all states will be significantly impacted" and "harms threatened by the Rule will

22 be extensive, long-lasting, and nationwide." Sullivan Decl. ¶¶ 3, 21.  Moreover, the States and

23

24          [18] The Agencies go so far as to suggest that injunctive relief should be so narrowly
    tailored that it should address only specific watersheds within the States and Cities.  Opp. at 39.
25  But neither of the cases upon which the Agencies rely support such a drastic limitation to the
    relief sought in the face of evidence that widespread harm is threatened absent an injunction. *See*
26  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010); *Madsen v. Women's Health*
    *Ctr., Inc.,* 512 U.S. 753, 765 (1994).
27          [19] The Agencies similarly argue that the Rule would not harm some other states because a
    "cursory look at a watershed map shows that numerous states flow directly to the ocean."  Opp. at
28  39.  But the States and Cities have demonstrated that the Rule threatens loss of water quality
    protections and harm to streams and wetlands both within and among all states across the country.

24

1  Cities have shown that an injunction that applies only within their borders will not prevent

2  immediate and irreparable nationwide degradation of water quality or prevent widespread

3  dredging and filling of irreplaceable wetlands.  *Id.* ¶¶ 8, 21-51

4      Finally, the "structure of the CWA and comity concerns" do not "support denial of" the

5  States' and Cities' Motion either.  Opp. at 40.  The Agencies assert that because "many" of the

6  non-plaintiff states "expressed support for" the 2020 Rule and there are challenges to the 2020

7  Rule pending in other courts, nationwide relief would be too broad.  *Id.*  But that is beside the

8  point, because, again, a non-nationwide injunction would not protect the States and Cities from

9  suffering the harms they have identified that the 2020 Rule will cause.  And the Agencies' reliance

10 on the cooperative federalism embodied by the CWA (Opp. 40) cuts decidedly in the other

11 direction.  Indeed, cooperative federalism favors a nationwide injunction because irreparable harm

12 to the environment will occur across the country absent such relief and the Agencies point to no

13 actual harm to any state (or the federal government or any private party) by keeping the 2019 Rule

14 in place while the Court decides the merits.  After all, the 2019 Rule re-promulgated rules that had

15 been in place since the early 1980s and with which both state regulators and the regulated

16 community are quite familiar.

17                          **CONCLUSION**

18      The Court should grant the States' and Cities' Motion for Preliminary Injunction or Stay.

19

20

21

22

23

24

25

26

27

28

1  Dated:  June 8, 2020                                  Respectfully Submitted,

2                                                        XAVIER BECERRA
                                                         Attorney General of California
3                                                        SARAH E. MORRISON
                                                         ERIC KATZ
4                                                        Supervising Deputy Attorneys General
                                                         CATHERINE M. WIEMAN
5                                                        ROXANNE J. CARTER
                                                         JESSICA BARCLAY- STROBEL
6                                                        BRYANT B. CANNON
                                                         Deputy Attorneys General
7

8                                                        /s/ Tatiana K. Gaur
                                                         _____
9                                                        TATIANA K. GAUR
                                                         Deputy Attorney General
10                                                       *Attorneys for Plaintiff State of California, by
                                                         and through Attorney General Xavier
11                                                       Becerra and California State Water
                                                         Resources Control Board*

12  For the STATE OF NEW YORK                            For the STATE OF CONNECTICUT
13  LETITIA JAMES                                        WILLIAM TONG
    Attorney General of the State of New York            Attorney General
14  Philip Bein
    Senior Counsel                                        /s/ Matthew I. Levine
15                                                       _____
                                                         Matthew I. Levine
16   /s/ Timothy Hoffman                                 David H. Wrinn*
    _____                 Assistant Attorneys General
17  Timothy Hoffman*                                      Office of the Attorney General
    Senior Counsel                                        165 Capitol Avenue
18   Office of the Attorney General                      P.O. Box 120
     Environmental Protection Bureau                     Hartford, CT  06141-0120
19   28 Liberty Street                                    Telephone: (860) 808-5250
     New York, NY 10005                                   Email: Matthew.Levine@ct.gov
20   Telephone: (716) 853-8465                            Email: David.Wrinn@ct.gov
     Fax: (716) 853-8579
21   Email: Timothy.Hoffman@ag.ny.gov

22

23

24

25

26

27

28

For the STATE OF ILLINOIS
KWAME RAOUL
Attorney General

 /s/ Jason E. James
_____
Jason E. James (*admitted pro hac vice*)
Assistant Attorney General
Matthew J. Dunn
Chief, Environmental Enforcement/Asbestos
Litigation Division
 Office of the Attorney General
 Environmental Bureau
 69 West Washington, 18th Floor
 Chicago, IL 60602
 Telephone: (312) 814-0660
 Email: jjames@atg.state.il.us


For the STATE OF MARYLAND
BRIAN E. FROSH
Attorney General of Maryland

 /s/ Joshua M. Segal
_____
Joshua M. Segal*
Special Assistant Attorney General
 Office of the Attorney General
 200 St. Paul Place
 Baltimore, MD 21202
 Telephone: (410) 576-6446
 Email: jsegal@oag.state.md.us


For the STATE OF MAINE
AARON M. FREY
Maine Attorney General

 /s/ Jillian R. O'Brien
_____
Jillian R. O'Brien, Cal. SBN 251311
Assistant Attorney General
 6 State House Station
 Augusta, Maine 04333-0006
 Telephone: (207) 626-8800
 Email: Jill.OBrien@maine.gov


For the STATE OF MICHIGAN
DANA NESSEL
Attorney General of Michigan

 /s/ Daniel P. Bock
_____
Daniel P. Bock (*admitted pro hac vice*)
Assistant Attorney General
 Michigan Department of Attorney General
 Environment, Natural Resources and
 Agriculture Division
 P.O. Box 30755
 Lansing, MI 48909
 Telephone: (517) 335-7664
 Email: bockd@michigan.gov

For the STATE OF NEW JERSEY
GURBIR S. GREWAL
Attorney General

 /s/ Lisa Morelli
Lisa Morelli, Cal. SBN 137092
Deputy Attorney General
  Environmental Practice Group
  Division of Law
  R.J. Hughes Justice Complex
  25 Market Street, P.O. Box 093
  Trenton, New Jersey 08625
  Telephone: (609)376-2745
  Email: Lisa.Morelli@law.njoag.gov


For the STATE OF NORTH CAROLINA ex rel.
Attorney General Joshua H. Stein and for the
NORTH CAROLINA DEPARTMENT OF
ENVIRONMENTAL QUALITY
JOSHUA H. STEIN
Attorney General
Daniel S. Hirschman
Senior Deputy Attorney General

 /s/ Amy L. Bircher
Amy L. Bircher*
Special Deputy Attorney General
Marc Bernstein
Special Deputy Attorney General
  North Carolina Department of Justice
  P.O. Box 629
  Raleigh, NC 27602
  Telephone: (919) 716-6400
  Email: abircher@ncdoj.gov

For the STATE OF NEW MEXICO
HECTOR BALDERAS
Attorney General of New Mexico

 /s/ William Grantham
William Grantham (*admitted pro hac vice*)
Assistant Attorney General
  201 Third Street NW, Suite 300
  Albuquerque, New Mexico 87102
  Telephone: (505) 717-3520
  Email: wgrantham@nmag.gov


For the STATE OF OREGON
ELLEN F. ROSENBLUM
Attorney General of the State of Oregon

 /s/ Paul Garrahan
Paul Garrahan (*admitted pro hac vice*)
Attorney-in-Charge, Natural Resources
Section
  Oregon Department of Justice
  1162 Court St. NE
  Salem, OR 97301-4096
  Telephone: (503) 947-4593
  Fax:  (503) 378-3784
  Email: paul.garrahan@doj.state.or.us

For the STATE OF RHODE ISLAND
PETER F. NERONHA
Attorney General

/s/ Alison B. Hoffman
Alison B. Hoffman (*admitted pro hac vice*)
Special Assistant Attorney General
  Office of the Attorney General
  150 South Main Street
  Providence, RI 02903
  Telephone: (401) 274-4400
  Email: AHoffman@riag.ri.gov

For the STATE OF VERMONT
THOMAS J. DONOVAN, JR.
Attorney General of Vermont

/s/ Laura B. Murphy
Laura B. Murphy*
Assistant Attorney General
  109 State Street
  Montpelier, VT 05609
  Telephone: (802) 828-3186
  Email: laura.murphy@vermont.gov

For the STATE OF WASHINGTON
ROBERT W. FERGUSON
Attorney General

/s/ Ronald L. Lavigne
Ronald L. Lavigne (*admitted pro hac vice*)
Senior Counsel
  Office of the Attorney General
  2425 Bristol Court SW, 2nd Fl.
  Olympia, WA 98504
  Telephone: (305) 586-6751
  Email: ronald.lavigne@atg.wa.gov

For the STATE OF WISCONSIN
JOSHUA L. KAUL
Wisconsin Attorney General

/s/ Gabe Johnson-Karp
Gabe Johnson-Karp (*admitted pro hac vice*)
Assistant Attorney General
  Wisconsin Department of Justice
  P.O. Box 7857
  Madison, WI 53707
  Telephone: (608) 267-8904
  Email: johnsonkarpg@doj.state.wi.us

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

For the COMMONWEALTH OF
MASSACHUSETTS
MAURA HEALEY
Attorney General

 /s/ Seth Schofield
_____
Seth Schofield (*admitted pro hac vice*)
Senior Appellate Counsel
David S. Frankel (*admitted pro hac vice*)
Special Assistant Attorney General
   Energy and Environment Bureau
   Office of the Attorney General
   One Ashburton Place, 18th Flr.
   Boston, MA 02108
   Telephone: (617) 963-2436 / 2294
   Email: seth.schofield@mass.gov
   Email: david.frankel@mass.gov


For the DISTRICT OF COLUMBIA
KARL A. RACINE
Attorney General

 /s/ Brian Caldwell
_____
Brian Caldwell*
Assistant Attorney General
   Social Justice Section
   Office of the Attorney General
   for the District of Columbia
   441 Fourth Street N.W., Ste # 600-S
   Washington, D.C. 20001
   Telephone: (202) 727-6211
   Telephone: (202) 445-1952 (m)
   Email: brian.caldwell@dc.gov


*Application for admission pro hac vice
forthcoming.*

LA2020300885

For the COMMONWEALTH OF VIRGINIA
MARK R. HERRING
Attorney General
Donald D. Anderson
Deputy Attorney General
Paul Kugelman, Jr.
Senior Assistant Attorney General
Chief, Environmental Section

 /s/ David C. Grandis
_____
David C. Grandis*
Senior Assistant Attorney General
   Office of the Attorney General
   202 North Ninth Street
   Richmond, VA 23219
   Telephone: (804) 225-2741
   Email: dgrandis@oag.state.va.us


For the CITY OF NEW YORK
JAMES E. JOHNSON
Corporation Counsel of the City of New York

 /s/ Nathan Taylor
_____
Nathan Taylor*
   New York City Law Department
   100 Church Street, Rm 6-144
   New York, NY  10007
   Telephone: (646) 940-0736 (m)
   Telephone: (212) 356-2315
   Email: NTaylor@law.nyc.gov

Plaintiffs' Reply in Support of Motion for a Preliminary Injunction or Stay (3:20-cv-03005-RS)

# CERTIFICATE OF SERVICE

Case Name:     **State of California, et al. v. Andrew R. Wheeler, et al.**

Case No.:      **3:20-cv-03005-RS**

I hereby certify that on <u>June 8, 2020,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION OR STAY**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>June 8, 2020</u>, at Los Angeles, California.

| | |
|---|---|
| Ernestina Provencio | /s/ Ernestina Provencio |
| Declarant | Signature |

LA2020300885