XAVIER BECERRA
Attorney General of California
SARAH E. MORRISON
ERIC KATZ
Supervising Deputy Attorneys General
CATHERINE M. WIEMAN, SBN 222384
TATIANA K. GAUR, SBN 246227
ROXANNE J. CARTER, SBN 259441
JESSICA BARCLAY-STROBEL, SBN 280361
BRYANT B. CANNON, SBN 284496
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013
  Telephone: (213) 269-6329
  Fax: (916) 731-2128
  E-mail:  Tatiana.Gaur@doj.ca.gov
*Attorneys for Plaintiff State of California, by
and through Attorney General Xavier Becerra
and California State Water Resources Control
Board*

[Additional Counsel listed on signature page]

LETITIA JAMES
Attorney General of the State of New
York
PHILIP BEIN (*admitted pro hac vice*)
Senior Counsel
TIMOTHY HOFFMAN (*admitted pro hac vice*)
Senior Counsel
  Office of the Attorney General
  Environmental Protection Bureau
  28 Liberty Street
  New York, NY 10005
  Telephone: (716) 853-8465
  Fax: (716) 853-8579
  Email: Timothy.Hoffman@ag.ny.gov
*Attorneys for Plaintiff State of New York*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA BY AND THROUGH ATTORNEY GENERAL XAVIER BECERRA AND CALIFORNIA STATE WATER RESOURCES CONTROL BOARD, STATE OF NEW YORK, STATE OF CONNECTICUT, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA EX RE. ATTORNEY GENERAL JOSHUA H. STEIN, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, STATE OF WISCONSIN, COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA, THE NORTH CAROLINA DEPARTMENT OF ENVIRONMENTAL QUALITY, THE DISTRICT OF COLUMBIA, AND THE CITY OF NEW YORK,** | **Case No. 3:20-cv-03005-RS**<br><br>**PLAINTIFFS' REPLY TO STATE INTERVENORS IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION OR STAY**<br><br>Date:      June 18, 2020<br>Time:     1:30 pm<br>Dept:     San Francisco Courthouse,<br>             Courtroom 3 – 17th Floor<br>Judge:    The Honorable Richard<br>             Seeborg<br>Action Filed:  5/1/2020 |
|                      Plaintiffs,<br><br>   v.<br><br>**ANDREW R. WHEELER, AS ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; R. D. JAMES, AS ASSISTANT SECRETARY OF THE ARMY FOR CIVIL WORKS; AND UNITED STATES ARMY CORPS OF ENGINEERS,**<br><br>                    Defendants. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 1

I. The States and Cities Are Likely to Succeed on the Merits................................... 1

    A. The 2020 Rule Is Arbitrary and Capricious. ................................................ 1

        1. The Agencies Failed to Consider Their Own Prior Findings.......... 1

        2. The Agencies Failed to Consider the Act's Primary Purpose
           to Protect Water Quality. ...................................................................... 2

        3. The "Typical Year" Requirement Lacks a Rational Basis............... 4

    B. The 2020 Rule is Unlawful Because Its Interpretation of "Waters of
        the United States" Is Contrary to the CWA. ......................................... 5

        1. As Found by a Majority of the Justices in Rapanos, the
           Interpretation of "Waters of the United States" in the 2020
           Rule is Impermissible............................................................................. 5

        2. State Intervenors Fail to Justify the Exclusion of Interstate
           Waters. ...................................................................................................... 7

II. The States and Cities Established that the 2020 Rule Threatens Imminent
    and Irreparable Harm ............................................................................................. 8

    A. State Intervenors' Arguments Are Premised on Misstatements of
        Law......................................................................................................... 9

    B. State Intervenors Fail to Address Most of the States' and Cities'
        Environmental Harms. ........................................................................ 11

        1. State Intervenors' Speculation that Existing Laws in Some
           States May Mitigate Some of the 2020 Rule's Harms Is
           Unavailing. ........................................................................................... 12

        2. State Intervenors Do Not Refute the States' and Cities'
           Showing That States Cannot Fill the Regulatory Gap Left
           By the 2020 Rule Before Its Effective Date................................... 14

    C. The 2020 Rule Will Harm the States' and Cities' and Non-Party
        States' Economic, Programmatic, Sovereign, and Proprietary
        Interests. .............................................................................................. 15

        1. State Intervenors Cannot Argue That the Economic Harms
           Created by the 2020 Rule Are Not Irreparable When They
           Made the Opposite Argument in Challenging the 2015 Rule. ....... 16

        2. State Intervenors Do Not Rebut the Harms to the States' and
           Cities' Sovereign and Proprietary Interests.................................... 17

III. The Public Interest and Balance of the Equities Weigh in Favor of
    Preliminary Injunction or Stay........................................................................... 17

IV. A Nationwide Injunction or Stay Is Necessary and Warranted ......................... 19

CONCLUSION ......................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*All. for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011)....................................................................................9

*Arkansas v. Oklahoma*
503 U.S. 91 (1991)......................................................................................................8

*Bair v. Cal. State DOT*
867 F.Supp.2d 1058 (N.D. Cal. 2012) .......................................................................1

*California Energy Comm'n v. Dep't of Energy*
585 F.3d 1143 (9th Cir. 2009)....................................................................................4

*California ex rel. Lockyer v. U.S. Dep't of Agric.*
575 F.3d 999 (9th Cir. 2009).......................................................................................9

*California v. Azar*
911 F.3d 558 (9th Cir. 2018).......................................................................10, 11, 16

*California v. Trump*
407 F. Supp. 3d 869 (N.D. Cal. 2019) .....................................................................10

*California v. U.S. Dep't of Health & Human Servs.*
941 F.3d 410 (9th Cir. 2019).....................................................................................12

*Caribbean Marine Servs. Co. v. Baldrige*
844 F.2d 668 (9th Cir. 1988).....................................................................................10

*Chevron, U.S.A., Inc. v. NRDC*
467 U.S. 837 (1984)....................................................................................................5

*City of Milwaukee v. Illinois*
451 U.S. 304 (1981)................................................................................................7, 8

*Ctr. for Food Safety v. Vilsack*
636 F.3d 1166 (9th Cir. 2011)...................................................................................10

*D.C. v. U.S. Dep't of Agric.*, —— F.3d ——, 2020 WL 1236657 ..................................................18
D.D.C. Mar. 13, 2020

*Dep't of Commerce v. New York*
139 S. Ct. 2551 (2019)........................................................................................11, 14

# TABLE OF AUTHORITIES
### (continued)

Page

*DHX, Inc. v. Allianz AGF MAT, Ltd.*
425 F.3d 1169 (9th Cir. 2005)..................................................................................................6

*Duarte Nursery, Inc. v. United States Army Corps of Engineers*
No. 2:13-CV-02095-KJM-DB, 2017 WL 1105993 (E.D. Cal. Mar. 24, 2017)......................6

*EPA v. California ex rel. State Water Res. Control Bd.*
426 U.S. 200 (1976).................................................................................................................2

*Georgia v. McCarthy*
Case No. 2:15-cv-79 (S.D. Ga. July 21, 2015), ECF No. 32 ...................................................16

*Georgia v. Pruitt*
326 F. Supp. 3d 1356 (S.D. Ga. 2018)..................................................................................16

*Georgia v. Wheeler*
418 F. Supp. 3d 1336 (S.D. Ga. 2019)....................................................................................7

*Hamilton v. State Farm Fire & Cas.*
270 F.3d 778 (9th Cir. 2001)..................................................................................................17

*Idaho Farm Bureau Fed'n v. Babbitt*
58 F.3d 1392 (9th Cir. 1995)..................................................................................................17

*Idaho v. Coeur d'Alene Tribe*
794 F.3d 1039 (9th Cir. 2015)................................................................................................17

*Illinois v. City of Milwaukee*
406 U.S. 91 (1972) ...............................................................................................................7, 8

*Illinois v. City of Milwaukee*
731 F.2d 403 (7th Cir. 1984)....................................................................................................7

*Int'l Paper Co. v. Ouellette*
479 U.S. 481 (1987).................................................................................................................8

*Kansas v. United States*
249 F.3d 1213 (10th Cir. 2001)..............................................................................................17

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*
634 F.2d 1197 (9th Cir. 1980)................................................................................................10

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992)...............................................................................................................10

iii

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Marks v. United States*
430 U.S. 188 (1977)..............................................................................................6

4

5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983)............................................................................................3, 4

6

7

*Nat'l Wildlife Fed'n v. Burford*
835 F.2d 305 (D.C. Cir. 1987) (*Burford*)..........................................................9, 10

8

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
422 F.3d 782 (9th Cir. 2005)................................................................................12

9

10

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
886 F.3d 803 (9th Cir. 2018).............................................................................9, 10

11

*National Cable & Telecommunications Ass'n v. Brand X Internet Services.*
545 U.S. 967 (2005)..............................................................................................5

12

13

*Northern California River Watch v. City of Healdsburg*
496 F.3d 993 (9th Cir. 2007) (*Healdsburg*)........................................................6, 7

14

*NRDC v. EPA*
735 F.3d 873 (9th Cir. 2013)..................................................................................4

15

16

*Privitera v. California Bd. of Med. Quality Assur.*
926 F.2d 890 (9th Cir. 1991)..................................................................................9

17

18

*Rapanos v. United States*
547 U.S. 715 (2006)...................................................................................5, 6, 7, 19

19

20

*Robertson v. U.S.*
139 S. Ct. 1543 (2019)...........................................................................................6

21

*S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*
625 F.2d 231 (9th Cir. 1980)................................................................................10

22

23

*Sierra Forest Legacy v. Sherman*
646 F.3d 1161 (9th Cir. 2011).........................................................................11, 17

24

*St. John's United Church of Christ v. FAA*
520 F.3d 460 (D.C. Cir. 2008).........................................................................10, 11

25

26

*Sw. Center for Biological Diversity v. U.S. Forest Service*
100 F.3d 1443, 1450 (9th Cir. 1996).......................................................................1

27

28

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Davis*
825 F.3d 1014 (9th Cir. 2016) (en banc)................................................................6, 7

*United States v. HVI Cat Canyon, Inc.*
314 F. Supp. 3d 1049 (C.D. Cal. 2018) .................................................................6

*United States v. Robertson*
875 F.3d 1281 (9th Cir. 2017)..............................................................................6

*Wild Fish Conservancy v. Irving*
221 F. Supp. 3d 1224 (E.D. Wash. 2016) ..............................................................4

**STATUTES**

5 United States Code
§ 553(c) ..............................................................................................................17

33 United States Code
§ 1251-1387 ........................................................................................................13
§ 1313(a) .............................................................................................................7
§ 1365(a) .............................................................................................................14
§ 1370 .................................................................................................................18

Clean Water Act
§ 101(b) ...............................................................................................................2
§ 303(a) ...............................................................................................................7

**LEGISLATIVE HISTORY**

S. Rep. No. 92-414, 92d Cong. 1st Sess. 7 (1972)........................................................7

**OTHER FEDERAL AUTHORITIES**

84 Federal Register
56,626 (Oct. 22, 2019) .........................................................................................5
56,660 (Oct. 22, 2019) .........................................................................................5

85 Federal Register
22,250..................................................................................................................3
22,269..................................................................................................................3, 4
22,274..................................................................................................................5
22,775..................................................................................................................5

**STATE STATUTES AND AUTHORITIES**

Ariz. Rev. Stat. Ann. § 41-1052(D)(9) ......................................................................13

v

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3      Ark. Code Ann. § 8-1-203(b) ................................................................................13

4      Colo. Rev. Stat. § 25-8-504(1)-(2)(a) ...................................................................13

5      Exec. Order No. 01.01.1996.03 (1996) ................................................................13

6      N. J. Exec. Order No. 2 .........................................................................................13

7      Exec. Order No. 1996-1 (Feb. 6, 1996) ...............................................................13

8
       Fla. Stat. Ann. § 403.061(7), (31) ........................................................................13
9
       Ga. Code Ann. § 12-5-22(13) ...............................................................................13
10
       Idaho Code Ann. § 39-3601 ..................................................................................13
11
       Ind. Code § 13-14-9-3 ...........................................................................................13
12
       Iowa Code § 455B.173 ..........................................................................................13
13
       Ky. Rev. Stat. Ann. § 13A.120(1)(a), (4) .............................................................13
14
       Me. Rev. Stat. Ann. Title 38, § 341-H(3) ............................................................13
15
       Minn. Stat. Ann. § 103G.127 ...............................................................................13
16
       Miss. Code Ann. § 49-17-34(2)-(3) ......................................................................13
17
       Mont. Code Ann. § 75-5-203 ................................................................................13
18
       Nev. Rev. Stat. Ann. § 233B.0603(1)(a)(9) .........................................................13
19
       N.C. Gen. Stat. § 150B-19.3 .................................................................................13
20
       Ohio Rev. Code Ann. § 121.39 .............................................................................13
21
       Okla. Stat. Title 27A, § 1-1-206 ...........................................................................13
22
       Or. Rev. Stat. § 468B.110(2) ................................................................................13
23
       S.D. Codified Laws § 1-40-4.1 .............................................................................13
24
       S. Rep. No. 92-414, 92d Cong. 1st Sess. 7 (1972)................................................7
25
       Tenn. Code Ann. § 4-5-226(k) ..............................................................................13
26
       Tex. Water Code Ann. § 26.017(5).......................................................................13
27

28

## TABLE OF AUTHORITIES
### (continued)

**Page**

Utah Code Ann. § 19-5-105 ...........................................................................................13

Va. Code Ann. § 62.1-44.15:1 ......................................................................................13

W. Va. Code § 22-1-3a .................................................................................................13

Wisc. Stat. Ann. § 283.11(2) ........................................................................................13

https://azdeq.gov/node/6566 .........................................................................................15

**FEDERAL AGENCY DOCUMENTS**

https://www.epa.gov/sites/production/files/2015-
05/documents/technical_support_document_for_the_clean_water_rule_1.pdf ........................2

https://www.epa.gov/sites/production/files/2020-01/documents/rpa_-_nwpr_.pdf.......................3

U.S. EPA, Chesapeake Bay TMDL Fact Sheet, available at
https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-tmdl-fact-sheet ..........................12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

State Intervenors do not refute the States' and Cities' showing that a preliminary injunction or stay of the 2020 Rule is warranted. Accordingly, the Court should grant the States' and Cities' Motion for a Preliminary Injunction or Stay (Motion) and enjoin or stay the Rule nationwide.

**ARGUMENT**

**I.   THE STATES AND CITIES ARE LIKELY TO SUCCEED ON THE MERITS**

**A.   The 2020 Rule Is Arbitrary and Capricious.**

**1.   The Agencies Failed to Consider Their Own Prior Findings.**

State Intervenors fail to refute the States' and Cities' showing that the Rule arbitrarily and capriciously disregards water quality protection—the central objective of the Act—by removing from the Act's scope, without explanation, entire categories of waters that the Agencies previously found are critical for maintaining downstream water quality.  *See* ECF No. 30 (Mot.) at 9-13; ECF No. 148 (Plaintiffs' Reply in Support of Motion for Preliminary Injunction or Stay) (Reply) at 2-3. State Intervenors' repetition of the Agencies' conclusory claims that they "used the Connectivity Report to inform certain aspects" of the 2020 Rule and "acknowledg[ed] the ecological" benefit of some waters (ECF No. 107-1 (State Intervenors' Opp.) at 17-18) illustrates that the Agencies parroted words and phrases from their prior findings while disregarding their meaning and their underlying scientific bases.  *See* ECF No. 30-18 (Sullivan Decl.) ¶ 13 ("Although the Agencies state that they 'looked to science to inform other aspects of the final rule,' the end result is a rule that largely opposes or misinterprets previous science-based recommendations.") (emphasis and citation omitted).[1]  Simply mouthing the words while disregarding their substance does not constitute meaningful consideration.

In the rare instance when the Agencies do engage with their prior findings, they misrepresent them, as do State Intervenors.  For example, contrary to State Intervenors' characterization (State Intervenors' Opp. at 17), there is no connectivity gradient "test."  There is

---

[1] The Sullivan Declaration is relevant not only to document the widespread irreparable harm the 2020 Rule will cause but also to demonstrate that the Agencies failed to consider relevant factors, including scientific matters, and inadequately explained their decision.  *Bair v. Cal. State DOT*, 867 F.Supp.2d 1058, 1067-68 (N.D. Cal. 2012), citing *Sw. Center for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996).

1

1   instead a single Science Advisory Board (SAB) figure illustrating the basic concept that

2   connections between upstream and downstream waters vary.  Reply at 3-4.  The States and Cities

3   explained how the Agencies misrepresented and improperly used that single, hypothetical

4   illustration to remove CWA protection for vast numbers of streams and wetlands, contrary to the

5   Agencies' prior factual findings.  *Id.*; Mot. at 13-14.  That SAB figure does not justify reducing the

6   scope of protected waters because the Agencies ignored their own and the SAB's previous

7   findings that even infrequently flowing streams and more distant wetlands have significant,

8   cumulative consequences for the integrity of downstream waters.  Sullivan Decl. ¶¶ 7, 14.  Nor

9   have the Agencies offered any cogent explanation for dismissing their prior findings that (i)"[t]he

10  incremental effects of individual streams and wetlands are cumulative across entire watersheds and

11  therefore must be evaluated in context with other streams and wetlands," and (ii) "[d]ownstream

12  waters are the time-integrated result of all waters contributing to them."  2015 TSD at 102.[2]

13          **2.      The Agencies Failed to Consider the Act's Primary Purpose to
                       Protect Water Quality.**

14

15          State Intervenors mistakenly argue that the Agencies considered the Act's primary

16  objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's

17  waters" by relying on cooperative federalism and state authority.  State Intervenors' Opp. at 21-23.

18  While states have an important role in the implementation of the Act, the States and Cities have

19  shown that the Rule employs a distorted federalism that is inconsistent with the Act, contradicted

20  by caselaw interpreting Section 101(b), and is harmful to states.  Mot. at 24-26; *see EPA v.*

21  *California ex rel. State Water Res. Control Bd.,* 426 U.S. 200, 202-03 (1976). State Intervenors'

22  argument that a "state-focused approach" will protect the Nation's waters (State Intervenors' Opp.

23  at 23) ignores that Congress enacted the CWA to replace the previous ineffective "state-focused

24  approach" that was plagued by uneven state enforcement and lack of protective federal standards.

25  Mot. at 4-5, 25-26; Reply at 10 n.2.  And, the fact that the Agencies considered state roles and

26  authorities (State Intervenors' Opp. at 22) does not establish that the Agencies considered the

27  Act's primary water quality objective, which is required by the Administrative Procedure Act.  *See*

28  _____
        [2] https://www.epa.gov/sites/production/files/2015-
    05/documents/technical_support_document_for_the_clean_water_rule_1.pdf.

                                                   2

1  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

2  (*State Farm*) (a regulation is arbitrary and capricious if the agency "entirely failed to consider an

3  important aspect of the problem").

4        The only evidence cited by State Intervenors to show that the Agencies considered the

5  Act's objective consists of two sentences, summarily concluding that "[t]he CWA's longstanding

6  regulatory permitting programs, coupled with the controls that States, Tribes and local entities

7  *choose* to exercise over their land and water resources, … and the CWA's non-regulatory

8  measures will continue to address pollution" and "[t]hese programs and measures collectively

9  pursue the objective" of the Act.  State Intervenors' Opp. at 22 (citing 85 Fed. Reg. 22,250, 22,269

10  (Apr. 21, 2020) (emphasis added).  The Agencies, however, provide no analysis to support these

11  perfunctory conclusions.

12        The Agencies' acknowledgment that some states may *choose not* to regulate waters

13  excluded by the 2020 Rule contradicts the assertion that reliance on state regulatory authority will

14  advance the Act's objective.  *See* 85 Fed. Reg. at 22,269.  States Intervenors point to various

15  statements in the Rule that states will regulate excluded waters. State Intervenors' Opp. at 22.

16  Even if true, which they are not, *see infra* Part II.B.1 (describing flaws in State Intervenors' state-

17  law-based mitigation argument), these statements do not explain how state regulation of these

18  waters would be sufficient to meet the Act's objective.  Moreover, any claim that states can fill the

19  regulatory gap created by the 2020 Rule is belied by the Agencies' admission in their Resource

20  and Program Assessment (RPA)[3] that, while "[s]ome states may adjust their current practices in

21  light of" the 2020 Rule, "the agencies are not able to predict with any precision what changes

22  might result."  RPA at 46.  And even if the Agencies could rely on the RPA, while it identifies

23  state water quality regulations and programs, the RPA does not explain how protective these

24  programs and regulations are in comparison to the CWA.  Thus, the RPA does not provide any

25  support for the conclusion that a patchwork of state laws is the equivalent of the strong nationwide

26  floor set under the CWA to ensure the Act's objective is met.  The Agencies therefore did not

27

28          [3] https://www.epa.gov/sites/production/files/2020-01/documents/rpa_-_nwpr_.pdf

3

1    demonstrate that state authority to regulate water resources will achieve the Act's objective.[4]

2        Faced with lack of support in the record, State Intervenors attempt to rely on their state

3    statutes and declarations to demonstrate that the Agencies considered the objective of the CWA.

4    *See* State Intervenors' Opp. at 23 (referring to Section II.A.2 of the State Intervenors' Opp.).  State

5    Intervenors' declarations and statutes cannot be used *post hoc* to justify the Agencies' actions.

6    *State Farm*, 463 U.S. at 50 ("[A]n agency's action must be upheld, if at all, on the basis articulated

7    by the agency itself"); *NRDC v. EPA,* 735 F.3d 873, 877 (9th Cir. 2013) (court's review must

8    "begin[] and end[] with the reasoning that the agency relied upon in making th[e] decision").

9        Accordingly, the Agencies' failure to provide analysis to support their conclusion that the

10    2020 Rule will advance the Act's primary objective is arbitrary and capricious.  *See California*

11    *Energy Comm'n v. Dep't of Energy*, 585 F.3d 1143, 1153 (9th Cir. 2009) (agency's failure to

12    evaluate data to decide whether a petitioner meets statutory requirements is arbitrary and

13    capricious because the agency "failed to consider an important factor or aspect of the problem");

14    *Wild Fish Conservancy v. Irving*, 221 F. Supp. 3d 1224, 1233-34 (E.D. Wash. 2016) (agency's

15    conclusion that climate change is less likely to affect stream flows was arbitrary and capricious

16    because the agency "failed to consider an important aspect of the problem" when it failed to

17    analyze the "potential effects of climate change on stream flows").

18        **3.**     **The "Typical Year" Requirement Lacks a Rational Basis.**

19      State Intervenors criticize the States' and Cities' argument that the typical year

20     requirement lacks a rational basis and is vague and unworkable (Mot. at 18-19; Reply at 5-6) by

21     characterizing it as "impermissible flyspecking."  State Intervenors' Opp. at 24.  But their claim

22           [4] As for the Act's regulatory programs, also purportedly relied on by the Agencies to
23    conclude that the 2020 Rule will advance the Act's objective (State Intervenors' Opp. at 22; 85
Fed. Reg. at 22,269), the States and Cities have clearly demonstrated that the Rule weakens all of
24    the CWA's key regulatory programs, thereby undermining the Act's objective. *See* Mot. at 14-17.
Indeed, the Agencies repeatedly acknowledge that they ignored the only water quality information
25    they compiled in connection with the 2020 Rule.  Reply at 5 (Agencies did not rely on the RPA
and the Economic Analysis as bases for the Rule).  The Agencies also purportedly relied on the
26    Act's non-regulatory programs, such as "grant, research, nonpoint source, groundwater, and
watershed planning programs," as another basis for the Agencies' conclusion that the 2020 Rule
27    will meet the Act's objective. State Intervenors' Opp. at 22; 85 Fed. Reg. at 22,269.  But the
Agencies have provided no explanation how these non-regulatory programs will ensure the Act's
28    objective is met in the face of the severe limitations on CWA protections under the Rule.

1    that the 2020 Rule provided "detailed guidance" on the use of typical year is belied by the record:

2    the typical year includes precipitation data and "other climactic variables" but in addition to that,

3    the Agencies "will consider and use" other information, "such as drought indices" or other

4    measures that "may conflict" with "precipitation totals," as well as  "the best available data and

5    information, which provides the most accurate and reliable representative information for the

6    aquatic resource in question." 85 Fed. Reg. 22,274-75.  No further guidance or methodology is

7    provided for using any of these uncertain and open-ended concepts to calculate typical year.  As a

8    result, the typical year requirement is vague and will thus yield arbitrary and capricious decision-

9    making.  Reply at 5-6.  In addition, State Intervenors point out that the typical year device "was a

10   good way" for the Agencies to effectuate the "relatively permanent waters that contribute surface

11   water flow" requirement in the Rule that is based on the plurality opinion in *Rapanos v. United*

12   *States*, 547 U.S. 715 (2006) (*Rapanos*).  State Intervenors' Opp. at 23.  But the States and Cities

13   have demonstrated that the plurality opinion is an impermissible interpretation of the Act.[5]

14       **B.   The 2020 Rule is Unlawful Because Its Interpretation of "Waters of the**
            **United States" Is Contrary to the CWA.**

15

16       **1.   As Found by a Majority of the Justices in *Rapanos*, the Interpretation**
                **of "Waters of the United States" in the 2020 Rule is Impermissible.**

17           As the States and Cities have explained, the 2020 Rule is not "based on a permissible

18   construction of the statute" and fails under the second step of *Chevron, U.S.A., Inc. v. NRDC*, 467

19   U.S. 837, 838 (1984). Mot. at 21-24. As the States and Cities have also explained, their argument

20   does not run afoul of *National Cable & Telecommunications Ass'n v. Brand X Internet*

21   *Services.,* 545 U.S. 967 (2005), because they do not ask the Court to adopt Justice Kennedy's

22   significant nexus standard in *Rapanos* but instead to rule that the Agencies may not adopt the

23           [5] The States and Cities have demonstrated that the Agencies failed to consider their
     reliance interests. Mot. at 19-20; Reply at 6-7. State Intervenors' arguments to the contrary (State
24   Intervenors' Opp. at 21 n.8) miss the mark.  The States and Cities have in fact identified the
     specific interests that the Agencies ignored.  Mot. at 19-20; Reply at 6-7.  Further, the fact that
25   some states encouraged the Agencies to revise the prior rules does not undermine the States' and
     Cities' reliance on the Agencies' use of the significant nexus standard.  *Id.*  In fact, the Agencies
26   themselves have highlighted their long-standing use of that standard and states' familiarity with
     it. *See* 84 Fed. Reg. 56,626, 56,660 (Oct. 22, 2019) ("The agencies have been applying the 1986
27   regulations consistent with the Supreme Court's decisions in *SWANCC* and *Rapanos* and
     informed by the agencies' corresponding guidance for over a decade. The agencies, their co-
28   regulators, and the regulated community are thus familiar" with this regulatory regime.)

                                              5

1    plurality standard in *Rapanos* because a majority of the Justices found that standard to be

2    inconsistent with the Act's text, structure, and purpose. Reply at 7-8.

3         State Intervenors claim that the rejection of the *Rapanos* plurality opinion's reasoning by

4    five Justices in *Rapanos* has no precedential value because four of those Justices were dissenters.

5    State Intervenors' Opp. at 11-14. They are wrong.  In *Northern California River Watch v. City of*

6    *Healdsburg*, 496 F.3d 993, 999 (9th Cir. 2007) (*Healdsburg*), the Ninth Circuit applied the

7    analysis of *Marks v. United States*, 430 U.S. 188 (1977), to determine that Justice Kennedy's

8    concurrence in *Rapanos* was controlling because, in consideration of the position of all nine

9    Justices, Justice Kennedy's opinion was the "narrowest ground to which a majority of the justices

10   would assent if forced to choose in almost all cases." *Id.* at 999.

11        Ten years later, in *United States v. Robertson,* the Ninth Circuit reaffirmed the validity of

12   *Healdsburg* and held that CWA jurisdiction was properly established "under the 'significant

13   nexus' test set forth in Justice Kennedy's concurrence in *Rapanos*."  875 F.3d 1281, 1292 (9th

14   Cir. 2017).  Rejecting the same argument that State Intervenors raise here (State Intervenors'

15   Opp. at 11-12), the Ninth Circuit held that "*Healdsburg* remains valid and binding precedent"

16   even after *United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016) (en banc), which had interpreted

17   *Marks*.  *Robertson*, 875 F.3d at 1292.  As the Ninth Circuit explained, "*Davis* did not forbid

18   consideration of dissents while engaging in the *Marks* analysis." *Id.* at 1291. While *Robertson*

19   was vacated and remanded due to the defendant's death, 139 S. Ct. 1543, a vacated decision

20   continues to have persuasive value, especially where, as here the decision merely reaffirmed prior

21   Circuit precedent.  *DHX, Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1176 (9th Cir. 2005).

22        State Intervenors' arguments that *Healdsburg* was "overruled" by *Davis* and that

23   *Robertson* was "incorrectly" decided have been rejected by the district courts in the Ninth Circuit

24   to have considered the issue.  Opp. at 14.  These courts follow *Robertson* to hold that "*Davis* does

25   not undermine the continuing validity of *City of Healdsburg*," and they thus "apply Justice

26   Kennedy's significant nexus test in determining whether the [waters] at issue are" covered by the

27   CWA.  *United States v. HVI Cat Canyon, Inc.*, 314 F. Supp. 3d 1049, 1057 (C.D. Cal. 2018);

28   *Duarte Nursery, Inc. v. United States Army Corps of Engineers*, No. 2:13-CV-02095-KJM-DB,

6

1    2017 WL 1105993, at *6 (E.D. Cal. Mar. 24, 2017) (granting summary judgment against

2    defendants because "*Davis* did not have the effect of overruling *Healdsburg*").

3        State Intervenors also argue that the 2020 Rule's exclusion of ephemeral streams and

4    wetlands that do not abut navigable waters is consistent with the Act.  State Intervenors' Opp. at

5    6-10.  But the Agencies relied impermissibly on the *Rapanos* plurality, which a majority of the

6    Justices rejected, to exclude those waters.  Mot. at 23.  While State Intervenors suggest that the

7    Rule relied on both the plurality and Justice Kennedy's concurrence, that is not what the Agencies

8    said they did.  *See id.*

9        **2.    State Intervenors Fail to Justify the Exclusion of Interstate Waters.**

10       The plain language of Section 303(a) of the CWA protects interstate waters, regardless of

11   navigability.  33 U.S.C. § 1313(a) ("[i]n order to carry out the purpose of this chapter, any water

12   quality standard applicable to *interstate waters*…shall remain in effect") (emphasis added); Reply

13   at 11.  The inclusion of interstate waters in the section that sets forth the Act's foundational water

14   quality standards requirements demonstrates that interstate waters are protected by the Act.

15   Rather than address this textual argument, State Intervenors, like the Agencies, claim that under

16   *Georgia v. Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019) the 2020 Rule reasonably excludes

17   interstate waters as a category of "waters of the United States."  *Georgia* is neither binding on this

18   Court nor correct because it did not consider Section 303(a)'s plain language.  Reply at 10-11.

19       Indeed, protection of interstate waters as a category effectuates not only the Act's

20   language but also Congress's purpose in enacting the 1972 Amendments, which was to expand

21   federal protection of waters.  *See* S. Rep. No. 92-414, 92d Cong. 1st Sess. 7 (1972) (prior

22   mechanisms for abating water pollution "ha[d] been inadequate in every vital respect"); *see also*

23   *City of Milwaukee v. Illinois*, 451 U.S. 304, 319 (1981) (the 1972 Amendments "established a

24   'comprehensive program for controlling and abating water pollution'").  Protection of interstate

25   waters is a longstanding feature of federal water pollution law.  The "Federal Water Pollution

26   Control Act as it existed prior to the 1972 Amendments …. 'ma[de] it clear that it is federal, not

27   state, law that in the end controls the pollution of interstate *or* navigable waters." *Illinois v. City*

28   *of Milwaukee*, 731 F.2d 403, 408 (7th Cir. 1984) (emphasis added) (quoting *Illinois v. City of*

7

1   *Milwaukee*, 406 U.S. 91, 102 (1972)).  Given that Congress's purpose in the 1972 Amendments

2   was to expand federal protections for waters, and that prior to the Amendments the Act already

3   protected navigable and interstate waters as separate categories, the Act necessarily continued to

4   protect interstate waters after 1972, in addition to navigable waters.

5           State Intervenors' critique of the Supreme Court cases cited by the States and Cities

6   misses the mark.  States Intervenors' Opp. at 15.  These cases show that the Act "establish[ed] an

7   all-encompassing program of water pollution regulation" for all interstate waters, regardless of

8   navigability.  *City of Milwaukee*, 451 U.S. at 317; *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 486,

9   488 (1987) ("the Act applies to virtually all surface water in the country" and "the regulation of

10  interstate water pollution is a matter of federal, not state, law"); *Arkansas v. Oklahoma*, 503 U.S.

11  91, 110 (1991) ("interstate water pollution is controlled by *federal* law" and "the Act's purpose

12  [is] authorizing the EPA to create and manage a uniform system of interstate water pollution

13  regulation").  State Intervenors do not rebut these propositions.

14  **II.     THE STATES AND CITIES ESTABLISHED THAT THE 2020 RULE THREATENS**
        **IMMINENT AND IRREPARABLE HARM**
15

16          State Intervenors do not dispute that there will be "environmental harm resulting from the

17  2020 Rule's withdrawal of federal regulatory jurisdiction," but merely speculate that states'

18  existing laws may "suffice" to fill the regulatory gap.  State Intervenors' Opp. at 27.  State

19  Intervenors' arguments fail for several reasons.  First, they are premised on misstatements of law.

20  Second, State Intervenors' declarations concerning eight states[6] fail to rebut the States' and Cities'

21  21 declarations, including detailed scientific analysis by Dr. Sullivan establishing that all states

22  will suffer serious environmental harm during the pendency of this case.  Mot. at 30-31.[7]  Third, in

23  addition to environmental harms, the States and Cities identified other types of irreparable injuries

24  they will suffer prior to adjudication of the merits—economic, programmatic, proprietary harms—

25  which are the same harms State Intervenors themselves invoked to obtain a preliminary injunction

26  enjoining the 2015 Rule interpreting the same statutory text at issue here.  Mot. at 29-38.

27          [6] State Intervenors offer declarations concerning Georgia, Alabama, Indiana, Nebraska,
    Oklahoma, South Dakota, Texas, and Wyoming.

28          [7] *See also* ECF No. 68 (American Fisheries Society *et al.* Amicus Brief) at 14-15.

8

1   **A. State Intervenors' Arguments Are Premised on Misstatements of Law.**

2   The irreparable injury prong only requires the States and Cities to show *likelihood* of injury

3 at *any point* prior to resolution of the merits. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

4 1131-32 (9th Cir. 2011). State Intervenors' contrary arguments are based on four misstatements of

5 law. State Intervenors' Opp. 24-27, 31-32.

6   First, the States and Cities need not prove there will be increases in pollution or wetlands

7 destruction "at the moment the Rule goes into effect." State Intervenors' Opp. at 26-27. To the

8 contrary, irreparable injury can be shown by the risk of a "future event" occurring during the

9 pendency of the litigation. *Privitera v. California Bd. of Med. Quality Assur.*, 926 F.2d 890, 893

10 (9th Cir. 1991); *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 323-324 (D.C. Cir. 1987)

11 (affirming preliminary injunction where agency action did "not immediately open the lands to

12 exploitation") (*Burford*). Accordingly, the State Intervenors' six declarations professing ignorance

13 of the pollution that will enter their own states waters "at the moment the Rule goes into effect"

14 are beside the point. State Intervenors' Opp. at 26-27.

15   Second, there is no "special," heightened standard for irreparable injury where a plaintiff

16 challenges "deregulatory action," such as the Agencies' withdrawal of CWA jurisdiction here.

17 State Intervenors' Opp. at 24. Courts have upheld preliminary injunctions in cases challenging

18 deregulation of environmental laws precisely because "[e]nvironmental injury, by its nature" is

19 often "irreparable" and is therefore sufficient for a preliminary injunction. *California ex rel.*

20 *Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1020 (9th Cir. 2009) (quotation omitted).

21 Moreover, State Intervenors cite no case denying a preliminary injunction where state plaintiffs

22 identify the types of environmental and economic harms at issue here. The sole case State

23 Intervenors cite discussing such harms actually *affirmed* a preliminary injunction sought by

24 Oregon. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018).

25   Third, there is no merit to State Intervenors' claim that "deregulation is not itself an

26 environmental harm" because "such harm would have to come from third parties." State

27 Intervenors' Opp. at 24. To the contrary, in *Burford*, the D.C. Circuit affirmed a preliminary

28 injunction against the lifting of protections on millions of acres of land to prevent private activities

9

1  from destroying wildlife habitat, water quality, and other environmental receptors.  835 F.2d at

2  324.  The Court ruled that plaintiff need not "proffer specific evidence as to each tract of land" that

3  could be harmed by the leasing or purchasing of lands by third parties in light of "the breadth of

4  the agency's action, the enormity of the land affected, the duration of the Program, and the

5  preliminary nature of the proceeding."  *Id.*  In fact, irreparable harm does not require a showing

6  that the "action sought to be enjoined is the exclusive cause of the injury."  *Nat'l Wildlife Fed'n*,

7  886 F.3d at 819.  None of the three cases State Intervenors cite involved deregulation, much less

8  environmental harms.  Rather, the business plaintiffs in those cases failed to establish irreparable

9  injury because they offered only speculation about economic harm in cases that either did not

10  challenge a government regulation[8] or challenged the *expansion* of federal regulation.[9]  These

11  cases are easily distinguishable from the case here which challenges federal action that will cause

12  environmental injury.  *See, e.g.*, *California v. Trump*, 407 F. Supp. 3d 869, 902–03 (N.D. Cal.

13  2019) (irreparable injury shown because federal agencies' plan to build barrier on nation's border

14  would "alter the existing landscape" and distinguishing *Vilsack* because there the business owners'

15  "alleged harm was a biological impossibility").

16         Fourth, the other cases cited by State Intervenors do not support their claim that the States

17  and Cities must make a special showing to obtain a preliminary injunction because their harms

18  purportedly stem from third parties' actions.  State Intervenors' Opp. at 25-26.  These cases

19  address neither the type of claims brought here nor injunctive relief; rather, they apply the

20  "substantially more difficult" test for "standing" where a plaintiff is "not himself the object of the

21  government action or inaction he challenges."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562

22  (1992); *S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 625 F.2d 231, 238-239 (9th Cir.

23  1980); *St. John's United Church of Christ v. FAA*, 520 F.3d 460, 461 (D.C. Cir. 2008).  Here,

24  standing is undisputed.[10]

25         [8] *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202
   (9th Cir. 1980); *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1173 (9th Cir. 2011).

26         [9] *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 671-72, 675 (9th Cir. 1988).

27         [10] Contrary to State Intervenors' assertion, the standing cases they cite are no substitute for
   precedent regarding irreparable injury in preliminary injunction analysis.  State Intervenors' Opp.

28  26 n.9.  While sometimes the same *facts* can prove both standing and irreparable injury, *see*
   *California v. Azar*, 911 F.3d 558, 571-572 (9th Cir. 2018), they are different legal standards.

1       To the extent standing cases are relevant, the principle that "third parties will likely react in

2  predictable ways" applies here.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019)

3  (states had standing to challenge a federal agency's use of a citizenship question because the

4  harm—a loss of federal funding due to a likely undercounting of residents—was fairly traceable to

5  the federal action, even though the undercounting would be due to the third-parties' failure to

6  complete census forms).  Likewise, the harm here "does not rest on mere speculation about the

7  decisions of third parties; it relies instead on the predictable effect of Government action on the

8  decisions of third parties." *Id.*  The States and Cities have shown both standing and irreparable

9  injury because, even if third parties' actions provide the causal link between the Agencies'

10  deregulation and the States' and Cities' harm, a "causal chain does not fail simply because it has

11  several 'links.'" *California*, 911 F.3d at 571-572 (states showed standing and irreparable injury

12  given that some women "will lose some" insurance coverage under federal rule, as it was not

13  speculative that "women who lose coverage will seek contraceptive care through state-run

14  programs"); *see Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178-79 (9th Cir. 2011)

15  (California's injury was not "speculative" where "its territory" would "be affected by" federal

16  agency action relaxing logging restrictions because the predictable result of that action was that

17  "logging will occur soon somewhere in the State").

18       **B.**    **State Intervenors Fail to Address Most of the States' and Cities'**
19             **Environmental Harms.**

20       State Intervenors, like the Agencies, incorrectly claim the States and Cities must identify

21  "likely polluters that are poised to exploit" the loss of federal protection under the 2020 Rule.

22  State Intervenors' Opp. at 26, 31.  As discussed above, controlling precedent holds otherwise and

23  the State Intervenors' cases are inapposite.  Regardless, the States and Cities did "identif[y]

24  pollution sources in upstream states that will flow into downstream waters as a result of the 2020

25  Rule[]" (Reply at 14, 17), including a likelihood of wetland loss in New Hampshire that will affect

26

27

28

downstream Plaintiff Maine (*id.* at 16)—two states highlighted by State Intervenors (State Intervenors' Opp. at 31).[11]

Moreover, the States and Cities offered 21 declarations, including expert testimony, showing that "*all* states will be significantly impacted" by the 2020 Rule and that the "harms threatened by the Rule will be extensive, long-lasting, and nationwide." Sullivan Decl. ¶¶ 3, 21 (emphasis added). Like the Agencies, State Intervenors do not address the States' and Cities' six examples of the threatened harm of upstream pollution or any of the expert testimony, but instead cherry-pick a few sentences from some of the declarations.[12] Having failed to rebut *all* of States' and Cities' evidence, State Intervenors' arguments are unavailing. *See* Reply at 16.

### 1.   State Intervenors' Speculation that Existing Laws in Some States May Mitigate Some of the 2020 Rule's Harms Is Unavailing.

State Intervenors speculate that existing state laws "*may* well suffice to prevent any threatened environmental harm resulting from" the 2020 Rule because a minority of States define the "state waters" they regulate "more broadly than 'waters of the United States.'" State Intervenors' Opp. at 27:15-17 and nn.11-12, 28:3-29:17, 32:12-24 (emphasis added). This argument fails because it does not refute the harms in other states, as those harms alone would satisfy the States' and Cities' burden given that irreparable injury exists "irrespective of the magnitude of the injury." *California v. U.S. Dep't of Health & Human Servs.*, 941 F.3d 410, 431 (9th Cir. 2019). Regardless, State Intervenors' argument fails even as to the handful of states they highlight.

---

[11] Contrary to State Intervenors' claim, the States and Cities did identify harms from upstream sources to Chesapeake Bay and to the Potomac River, which is part of the Chesapeake Bay watershed. Seltzer Decl. ¶¶ 21-26; Sullivan Decl. ¶ 49 (identifying negative impact of 2020 Rule on Chesapeake Bay DPS Atlantic Sturgeon); Currey Decl. ¶¶ 3-7. State Intervenors also are incorrect to suggest the States and Cities must show pollution would be "in concentrations significant enough to matter." State Intervenors' Opp. at 31. That is not the standard for a preliminary injunction and, regardless, the Chesapeake Bay multistate TMDL requires reductions by amount (i.e. pounds) rather than concentration, so that any increase in pollutants contributes to the harm. *See* U.S. EPA, Chesapeake Bay TMDL Fact Sheet, available at https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-tmdl-fact-sheet.

[12] Even if State Intervenors had offered expert testimony, that would not be a basis to deny relief, as the Ninth Circuit has upheld a preliminary injunctive based on environmental harm even where both sides offered "conflicting evidence" and "differing opinions by various experts." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 795 (9th Cir. 2005).

12

First, State Intervenors have not shown that *all* waters that will lose protection under the 2020 Rule—such as all ephemeral and many wetlands—qualify as "state waters" in the states identified, and the few state laws cited show otherwise.  In fact, declarations from 5 of the 8 states submitted by State Intervenors do not even claim that their state laws cover ephemeral streams, ECF Nos. 107-4, 107-6, 107-7, 107-8, and 107-12, and 6 of the declarations do not claim that their states require dredge and fill permits for wetlands, ECF Nos. 107-4, 107-6, 107-7, 107-9, 107-10, and 107-12.Tellingly, State Intervenors do not contend the definition of "state waters" used by each state is *coextensive* with the definition of "waters of the United States" that the 2020 Rule *eliminates*.  Rather, State Intervenors claim that *some* waters that will lose protection might qualify as "state waters."  Opp. at 27:15-17.  But even that claim is incorrect because it ignores exclusions from the definition of "state waters" or limitations on state agencies' enforcement authority.  For example, State Intervenors' quotation from the definition of State Intervenor Georgia's "waters of the state" (State Intervenors' Opp. at 28) omits text that *excludes* waters that sit entirely within a person or corporation's property.  Ga. Code Ann. § 12-5-22(13).  In contrast, the CWA has no such limitation.  In noting that Plaintiff Wisconsin has a broad definition of state waters, State Intervenors likewise fail to mention that Wisconsin law dictates that the state "shall comply with and not exceed the requirements of the federal water pollution control act, 33 U.S.C. 1251 to 1387, and regulations adopted under that act."  Wisc. Stat. Ann. § 283.11(2).

Second, even assuming some waters that lose CWA protection will qualify as "state waters," State Intervenors have not shown that these waters will be subject to the same *level* of protection that they enjoyed under federal law prior to the 2020 Rule.  Nor could State Intervenors credibly make such a claim, as at least 27 states have laws connecting or limiting state regulatory standards to those in the Clean Water Act.[13]  Those 27 states include the states that State Intervenors assert

---

[13] Of these 27 states, 8 are Plaintiffs in this action (Maine, Maryland, New Jersey, North Carolina, Oregon, Pennsylvania, Wisconsin, and Virginia) and 12 are State Intervenors (Arkansas, Idaho, Indiana, Kentucky, Mississippi, Montana, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Utah).  These 27 states' laws are listed as follows, with Plaintiffs underlined and State Intervenors in bold. Va. Code Ann. § 62.1-44.15:1; **Ky.** Rev. Stat. Ann. § 13A.120(1)(a), (4); **Miss.** Code Ann. § 49-17-34(2)-(3); N.C. Gen. Stat. § 150B-19.3; Minn. Stat. Ann. § 103G.127; Wisc. Stat. Ann. § 283.11(2); **Tex.** Water Code Ann. § 26.017(5); Iowa Code § 455B.173; Colo. Rev. Stat. § 25-8-504(1)-(2)(a); **S.D.** Codified Laws § 1-40-4.1; Ariz. Rev. Stat.

1   will be able to fill the regulatory gap left by the 2020 Rule.  In addition, State Intervenors do not

2   claim that any of the state laws they identify have the type of penalties and enforcement

3   mechanisms, including citizens suits, that are available under the CWA.

4        State Intervenors argue that "the *level* of regulation" by states is irrelevant because the

5   States' and Cities' concern is purportedly limited to "the *scope* of the 'waters of the United

6   States.'"  State Intervenors' Opp. at 30 n.16.  Not so.  By arguing that the States' and Cities'

7   environmental harms depend on how third parties respond to the 2020 Rule, State Intervenors have

8   put at issue the question whether states' level of regulation is less robust than the CWA.  The

9   CWA provides for monetary and other penalties and allows citizens to enforce CWA violations if

10  federal agencies do not. 33 U.S.C. § 1365(a).  If state laws cover waters that lose CWA protection

11  but lack the penalties and enforcement mechanisms provided by the CWA, "third parties will

12  likely react in predictable ways"—they will be more willing to pollute, even if doing so is

13  "unlawful" under state law.  *Dep't of Commerce*, 139 S. Ct. at 2566.

14              **2.    State Intervenors Do Not Refute the States' and Cities' Showing That
                        States Cannot Fill the Regulatory Gap Left By the 2020 Rule Before
15                      Its Effective Date.**

16       Even if some states have authority to regulate "state waters" that will lose CWA protection,

17  State Intervenors have failed to show that such states "can and will" exercise that authority in time

18  to prevent the environmental harms the States and Cities identified.  State Intervenors' Opp. at 30.

19       As to any authority that State Intervenors might exercise, none of them have identified *any*

20  *action* they will take to fill the regulatory gap they admit the 2020 Rule creates, and any inaction

21  will leave both their waters and the waters downstream vulnerable. For example, the States and

22  Cities offered expert testimony showing that "93% of the 2,399 vernal pools mapped in [State

23  Intervenors] Tennessee, Alabama, and Georgia were located on unprotected lands" and therefore

24  would lose CWA jurisdiction.  Sullivan Decl. ¶ 27.  These facts are undisputed by Tennessee,

25  Ann. § 41-1052(D)(9); **Idaho** Code Ann. § 39-3601; Or. Rev. Stat. § 468B.110(2); Me. Rev. Stat.
    Ann. tit. 38, § 341-H(3); N.J. Exec. Order No. 2 (Gov. Christie), Jan. 20, 2010; Md. Exec. Order
26  No. 01.01.1996.03 (1996); Pa. Exec. Order No. 1996-1 (Feb. 6, 1996); W. Va. Code § 22-1-3a;
    Fla. Stat. Ann. § 403.061(7), (31); **Tenn.** Code Ann. § 4-5-226(k); **Ind.** Code § 13-14-9-3; **Ohio**
27  Rev. Code Ann. § 121.39; **Ark.** Code Ann. § 8-1-203(b); **Okla.** Stat. tit. 27A, § 1-1-206; **Mont.**
    Code Ann. § 75-5-203; Nev. Rev. Stat. Ann. § 233B.0603(1)(a)(9); and **Utah** Code Ann. § 19-5-
28  105.

                                            14

1   which filed no declaration, and the declarations from Georgia and Alabama indicate their agencies

2   are completely "unaware" of these "risks of harm or pollution" posed by the 2020 Rule to their

3   state waters.  ECF No. 107-4 (Capp Decl.) ¶ 8; ECF No. 107-6 (Kitchens Decl.) ¶ 2.  Even more

4   worrisome, Georgia claims its "regulatory and permitting schemes would not be significantly

5   affected" by the 2020 Rule despite also admitting that Georgia "regulate[s]" state waters that will

6   lose CWA protection.  Capp. Decl. ¶ 4.  Alabama likewise claims that the 2020 Rule will not

7   affect its "economic/proprietary interests."  Kitchens Decl. ¶ 4.

8        As to other states, State Intervenors offer no evidence to rebut the States' and Cities'

9   declarations showing that the Rule's effective date leaves insufficient time and resources to fill the

10   regulatory gap left by the Rule.   Mot. at 35.  Such regulatory changes take time and resources, as

11   even non-party states have recognized in responding to the 2020 Rule.  For example, State

12   Intervenors' claim that Arizona's existing laws will suffice to protect ephemeral streams (State

13   Intervenors' Opp. at 27 and n.12) is belied by Arizona's own agencies, who are still "developing"

14   a "program" to respond to the 2020 Rule that will "need approval from the Arizona legislature."[14]

15   In the meantime, downstream states such as California will suffer.  Reply at 17.

16        Accordingly, if the 2020 Rule becomes effective, states will be forced to choose between

17   suffering either environmental harm (if they take no action) or economic harm (if they take action

18   to fill the regulatory gap created by the 2020 Rule).  *Id.* at 19-20.  Because a state's effort to fill a

19   regulatory gap alone constitutes an economic harm, as explained in Section II.C below, State

20   Intervenors are wrong to claim that the State and Cities can avoid injury by simply

21   "collaborat[ing] on a solution."  State Intervenors' Opp. at 31-32.  Moreover, states that take

22   action but are downstream of states that take no action will suffer both environmental and

23   economic harms.

24     **C.   The 2020 Rule Will Harm the States' and Cities' and Non-Party States'
          Economic, Programmatic, Sovereign, and Proprietary Interests.**

25

26        In addition to environmental harms, the States and Cities offered evidence showing they will

27   also be immediately subject to irreparable economic, programmatic, sovereign, and proprietary

28        ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
              [14] https://azdeq.gov/node/6566

15

1    injuries, if the 2020 Rule goes into effect.  Mot. at 20 n. 24, 29-38; Reply at 12-21.  State

2    Intervenors offer no evidence to rebut this showing.  Instead, State Intervenors resort to

3    characterizing all non-environmental harms as "second-order implications of alleged

4    environmental harms."  State Intervenors' Opp. at 26, 29-30.  State Intervenors' argument fails for

5    the same reasons as does the Agencies' similar theory that all non-environmental harms are

6    "voluntary action" (Reply at 19-20) and because State Intervenors invoked these same harms to

7    obtain a preliminary injunction against the 2015 Rule interpreting the same CWA text.

8              **1.      State Intervenors Cannot Argue That the Economic Harms Created
                       by the 2020 Rule Are Not Irreparable When They Made the Opposite
9                      Argument in Challenging the 2015 Rule.**

10        Regulatory gap-filling is a quintessential economic harm that constitutes irreparable injury

11   because "states will not be able to recover monetary damages connected to" a federal rule.

12   *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

13        Given that State Intervenors previously obtained a preliminary injunction of the 2015 Rule

14   by arguing that such non-environmental harm constitutes irreparable injury, this Court should not

15   countenance their attempt to argue the opposite position here.  State Intervenors' Opp. at 4, 35

16   n.18.  In 2018, relying on a motion and supporting declarations from State Intervenors Georgia,

17   Alabama, West Virginia, Indiana, Kentucky, South Carolina, Utah, and Kansas,[15] a court found

18   that State Intervenors "will suffer an irreparable harm in the form of unrecoverable monetary

19   harm" if they "incur monetary losses as a result of" the 2015 Rule.  *Georgia v. Pruitt*, 326 F. Supp.

20   3d 1356, 1367 (S.D. Ga. 2018).  Yet, State Intervenors now argue that states' costs incurred to

21   respond to the Agencies' rulemaking interpreting "waters of the United States" is not an

22   irreparable harm.  State Intervenors' Opp. at 4, 35 n.18.  They are precluded from taking that

23   position now because the court "accept[ed]" State Intervenors' earlier position that such costs

24   constitute an irreparable remedy, that position is "clearly inconsistent" with State Intervenors'

25   present one, and it would be inequitable for State Intervenors to have obtained injunctive relief

26   _____
            [15] *See, e.g., Georgia v. McCarthy*, Case No. 2:15-cv-79 (S.D. Ga. July 21, 2015), ECF No.
27   32 at 21-24 (Mem. in Supp. of Mot. for Prelim. Inj.); ECF 32-3 (Thomas C. Stiles Decl. at ¶ 15)
     ("[Kansas] will be irreparably harmed because," absent "the Rule's requirements, [Kansas] will
     deploy these resources to critical and priority waters to implement state laws and state
28   programs.").

1    using an argument they now claim is legally unsupportable.  *See Hamilton v. State Farm Fire &*

2    *Cas.*, 270 F.3d 778, 782 (9th Cir. 2001).

3          Nor can State Intervenors fault the States and Cities for not incurring the harm of costs and

4    programmatic disruption *more than three years ago* when President Trump issued his February 28,

5    2017 Executive Order, even though the Agencies were still applying the previous regulations

6    defining waters of the United States.  State Intervenors' Opp. at 30.  If that Executive Order

7    predetermined the rulemaking outcome, the 2020 Rule would violate the APA requirement for

8    meaningful public participation.  *See* 5 U.S.C. § 553(c); *Idaho Farm Bureau Fed'n v. Babbitt*, 58

9    F.3d 1392, 1404 (9th Cir. 1995).

10         **2.      State Intervenors Do Not Rebut the Harms to the States' and Cities'**

11         **Sovereign and Proprietary Interests.**

12         State Intervenors likewise fail to rebut the States' and Cities' showing of harms to their

13   sovereign and proprietary interests.  Mot. at 36-38.  Those interests are at stake because, upon the

14   effective date of the 2020 Rule, "the applicability of" federal law to certain geographic areas is in

15   question.  *Sierra Forest*, 646 F.3d at 1178–79.  Because states "maintain[] concrete interests

16   spanning [their] entire territory" their "unique proprietary interests will invariably be affected by"

17   a federal rule, as action pursuant to that rule "will occur soon somewhere in the State[s]."  *Id*.  The

18   issue here is whether a federal regulation properly identifies what areas are "waters of the United

19   States" under the CWA.  Because "[t]he answer to this question will affect the sovereign rights

20   and regulatory powers of all involved," there is a "likelihood of irreparable harm."  *Kansas v.*

21   *United States*, 249 F.3d 1213, 1227-28 (10th Cir. 2001) *cited with approval in Idaho v. Coeur*

22   *d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015).

23   **III.    THE PUBLIC INTEREST AND BALANCE OF THE EQUITIES WEIGH IN FAVOR OF**

24   **PRELIMINARY INJUNCTION OR STAY**

25         Contrary to State Intervenors' assertions (State Intervenors' Opp. at 33-34), the States and

26   Cities clearly have shown that the public interest and the balance of the equities support issuance

27   of preliminary injunctive relief to maintain the status quo.  Immediate and irreparable harm to the

28   environment will occur if the 2020 Rule goes into effect: waters previously protected with CWA

17

1    pollution controls will become unregulated, leaving them susceptible to irreversible degradation,

2    and downstream states will have no recourse to protect themselves from upstream pollution. *See*

3    Sullivan Decl., *passim*.[16]

4          State Intervenors miss the mark by asserting that their sovereign interests in protecting

5    their waters weigh against preliminary injunctive relief.  State Intervenors' Opp. at 33.  First, State

6    Intervenors have not shown that a preliminary injunction or stay would adversely affect those

7    interests.  Moreover, the slew of inapposite cases to which State Intervenors cite (State

8    Intervenors' Opp. at 33) do not address the CWA's cooperative federalism framework which

9    establishes a national floor of water quality protections and specifically authorizes states to

10    continue protecting their waters in addition to and beyond the controls afforded by the Act.  33

11    U.S.C. § 1370.  Here, the 2020 Rule improperly eliminates broad categories of waters from that

12    federal regulatory structure.  A preliminary injunction will maintain the status quo between federal

13    and state roles under the CWA and will maintain the Act's federal floor of water quality

14    protections to prevent the likelihood of water pollution impacting downstream states. Thus, the

15    states' sovereign interests are served by an injunction or stay and do not outweigh the public's

16    interest in ensuring a strong national floor of water quality protections.

17          The State Intervenors assert that maintaining the status quo will "likely impede the States'

18    stewardship of their natural resources" (State Intervenors' Opp. at 33), apparently because they

19    will have to continue to discharge their regulatory responsibilities under the 2019 Rule by

20    reviewing permit applications—review they concede is "important" where a federal agency

21    "lacks local expertise."  ECF No. 107-9 (Parfitt Decl.) ¶11.  But they cite no authority for the

22    proposition that continuing to perform regulatory functions that maintain the Nation's water

23    quality is against the public interest.  Regardless, any purported burden pales in comparison to the

---

24          [16] State Intervenors vaguely argue that the purported "debate over the extent to which the

25    Constitution confers on district courts the power to enter universal injunctive relief" is "reason
enough to limit any relief this Court might grant to the plaintiffs' States."  State Intervenors' Opp.

26    at 34.  Given the "countless federal cases" extending injunctive relief to non-plaintiffs, this
argument should be rejected and "seen for what it is: a bold and bald-faced effort to restrict the
exercise of Article III judicial power to aggrandize that of the executive branch." *D.C. v. U.S.*

27    *Dep't of Agric.*, —— F.3d ——, ——, 2020 WL 1236657, at *38-39 (D.D.C. Mar. 13, 2020)
(ordering both nationwide preliminary injunction and a stay under Section 705 in challenge to

28    federal rule).

1    environmental and other harms—detailed in the States' and Cities' 21 declarations—that will

2    occur if the 2020 Rule goes into effect.

3          Nor are State Intervenors correct the public interest will be served by the purported

4    "clarity and predictability that the 2020 Rule brings."  State Intervenors' Opp. at 33.  In fact, the

5    2020 Rule will create more uncertainty and confusion.  Mot. at 18-19; Reply at 5-6.

6    **IV.   A NATIONWIDE INJUNCTION OR STAY IS NECESSARY AND WARRANTED**

7          The States and Cities have shown that enjoining the 2020 Rule only within the States and

8    Cities will not afford complete relief, and that concerns of workability and practicality support a

9    nationwide injunction.  Mot. at 39-40; Reply at 24-25.  State Intervenors argue that the litigation

10   history of the 2015 Rule demonstrates the viability of piecemeal injunctive relief here. Opp. at 34-

11   35.[17]  In fact, State Intervenors gloss over the significant differences between the impacts of the

12   2015 Rule and 2020 Rule that are critical to the necessary scope of relief in this case.

13         The 2015 Rule largely maintained or slightly expanded the scope of protected waters

14   compared to the 1980s regulations and the Agencies' *Rapanos* and *SWANCC* guidances.  Any

15   purported harms due to the 2015 Rule were thus intrastate only: in the form of subjecting more

16   projects to permitting requirements, which may have increased in-state regulatory costs but

17   improved water quality.  In contrast, because the 2020 Rule narrows the scope of waters protected

18   by the CWA, it will cause interstate harms.  By limiting the scope of waters covered, and thereby

19   also limiting the number of activities subject to the CWA, the 2020 Rule makes it likely that

20   activities in one state will impact water quality in another downstream state because, overall, water

21   quality is likely to decrease.[18]  Because of these differences, injunctive relief limited to a

22   requesting state with regard to the 2015 Rule would have afforded that state complete relief from

23   _____

24   [17] State Intervenors mistakenly suggest that the 2015 Rule is the "status quo" that will
     continue in place if the Court grants the requested relief.  State Intervenors' Opp. at 33.  But it is
25   the 2019 Rule, which re-promulgated regulations that had been in place since the 1980s and with
     which the state and the regulated community are quite familiar, that will continue to be applied if
     the 2020 Rule is enjoined or stayed during this litigation.
26         [18] As an example, discharges in New Hampshire that are newly allowed by the 2020 Rule
     will flow downstream and harm Massachusetts' water quality.  Reply at 16.  Likewise, pollution
27   discharged into Nevada, Arizona, and Utah waters will flow downstream and harm California's
     waters—a point that State Intervenors do not dispute.  *Id.* at 17.  Thus, to get complete relief,
28   Massachusetts needs redress for harms stemming from activity beyond its borders.

19

1   the alleged impacts (i.e. increased in-state costs), because they were *intra*-state impacts only, while

2   injunctive relief limited to just the States and Cities with regard to the 2020 Rule will not afford

3   the States and Cities complete relief from the alleged impacts, which they have shown are both

4   inter- and intra-state. Mot. at 33-36; *See* Declaration of Jennifer Nalbone (Nalbone Decl.), Ex. A

5   (25 states are upstream of Plaintiff states).

6         State Intervenors further assert that "[t]he 2020 Rule's effects in Georgia or Alabama …

7   seem quite unlikely to cause any ill effects for any of the plaintiffs—the closest of which are

8   Virginia and Illinois, several states away and decidedly *up*stream." State Intervenors' Opp. at 34

9   (emphasis in original). However, Georgia and Alabama are in fact both upstream of at least one

10  Plaintiff state. *See* Nalbone Decl., Ex. A. Moreover, State Intervenors do not dispute that the

11  overwhelming number of the 50 States are either within a shared watershed or upstream of the

12  States and Cities. Thus, an injunction that applies only to the States and Cities will not prevent

13  immediate and irreparable degradation of water quality within their borders, or prevent the

14  dredging and filling of irreplaceable wetlands, and an injunction that covers all but a very few

15  States is neither equitable nor practical. See Sullivan Decl. *passim*; Nalbone Decl., Ex. A.

16        The fundamental basis for the States' and Cities' request for nationwide injunctive relief is

17  the nature of water, which unquestionably flows downstream and across state boundaries, and the

18  fact that if the 2020 Rule goes into effect, that de-regulation will cause irreparable harm to water

19  quality nationwide. The public interest and balance of the equities here thus strongly favor broad

20  injunctive relief that temporarily prevents implementation of the 2020 Rule nationwide and

21  ensures that no irreparable harm to the environment occurs while this litigation is pending.

22                                  **CONCLUSION**

23       For the reasons set forth above, the Court should grant the States' and Cities' Motion and

24  preliminarily enjoin or stay the 2020 Rule.

25

26

27

28

1    Dated:  June 15, 2020                          Respectfully Submitted,

2                                                   XAVIER BECERRA
                                                    Attorney General of California
3                                                   SARAH E. MORRISON
                                                    ERIC KATZ
4                                                   Supervising Deputy Attorneys General
                                                    CATHERINE M. WIEMAN
5                                                   ROXANNE J. CARTER
                                                    JESSICA BARCLAY- STROBEL
6                                                   BRYANT B. CANNON
                                                    Deputy Attorneys General

7

8                                                   /s/ Tatiana K. Gaur
                                                    _____
9                                                   TATIANA K. GAUR
                                                    Deputy Attorney General
10                                                  *Attorneys for Plaintiff State of California, by
                                                    and through Attorney General Xavier
11                                                  Becerra and California State Water
                                                    Resources Control Board*

12

13   For the STATE OF NEW YORK               For the STATE OF CONNECTICUT
14   LETITIA JAMES                           WILLIAM TONG
     Attorney General of the State of New York   Attorney General
15   Philip Bein (*admitted pro hac vice*)
     Senior Counsel                            /s/ Matthew I. Levine
16                                              _____
                                                Matthew I. Levine
17    /s/ Timothy Hoffman                       David H. Wrinn*
     _____        Assistant Attorneys General
18   Timothy Hoffman (*admitted pro hac vice*)    Office of the Attorney General
     Senior Counsel                               165 Capitol Avenue
19    Office of the Attorney General              P.O. Box 120
      Environmental Protection Bureau             Hartford, CT  06141-0120
20    28 Liberty Street                           Telephone: (860) 808-5250
      New York, NY 10005                          Email: Matthew.Levine@ct.gov
21    Telephone: (716) 853-8465                   Email: David.Wrinn@ct.gov
      Fax: (716) 853-8579
22    Email: Timothy.Hoffman@ag.ny.gov

23

24

25

26

27

28

                                        21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

For the STATE OF ILLINOIS
KWAME RAOUL
Attorney General

 /s/ Jason E. James
Jason E. James (*admitted pro hac vice*)
Assistant Attorney General
Matthew J. Dunn
Chief, Environmental Enforcement/Asbestos
Litigation Division
 Office of the Attorney General
 Environmental Bureau
 69 West Washington, 18th Floor
 Chicago, IL 60602
 Telephone: (312) 814-0660
 Email: jjames@atg.state.il.us

For the STATE OF MARYLAND
BRIAN E. FROSH
Attorney General of Maryland

 /s/ Joshua M. Segal
Joshua M. Segal*
Special Assistant Attorney General
 Office of the Attorney General
 200 St. Paul Place
 Baltimore, MD 21202
 Telephone: (410) 576-6446
 Email: jsegal@oag.state.md.us

For the STATE OF MAINE
AARON M. FREY
Maine Attorney General

 /s/ Jillian R. O'Brien
Jillian R. O'Brien, Cal. SBN 251311
Assistant Attorney General
 6 State House Station
 Augusta, Maine 04333-0006
 Telephone: (207) 626-8800
 Email: Jill.OBrien@maine.gov

For the STATE OF MICHIGAN
DANA NESSEL
Attorney General of Michigan

 /s/ Daniel P. Bock
Daniel P. Bock (*admitted pro hac vice*)
Assistant Attorney General
 Michigan Department of Attorney General
 Environment, Natural Resources and
 Agriculture Division
 P.O. Box 30755
 Lansing, MI 48909
 Telephone: (517) 335-7664
 Email: bockd@michigan.gov

22

For the STATE OF NEW JERSEY
GURBIR S. GREWAL
Attorney General

/s/ Lisa Morelli
Lisa Morelli, Cal. SBN 137092
Deputy Attorney General
  Environmental Practice Group
  Division of Law
  R.J. Hughes Justice Complex
  25 Market Street, P.O. Box 093
  Trenton, New Jersey 08625
  Telephone: (609)376-2745
  Email: Lisa.Morelli@law.njoag.gov

For the STATE OF NORTH CAROLINA ex rel.
Attorney General Joshua H. Stein and for the
NORTH CAROLINA DEPARTMENT OF
ENVIRONMENTAL QUALITY
JOSHUA H. STEIN
Attorney General
Daniel S. Hirschman
Senior Deputy Attorney General

/s/ Amy L. Bircher
Amy L. Bircher*
Special Deputy Attorney General
Marc Bernstein
Special Deputy Attorney General
  North Carolina Department of Justice
  P.O. Box 629
  Raleigh, NC 27602
  Telephone: (919) 716-6400
  Email: abircher@ncdoj.gov

For the STATE OF NEW MEXICO
HECTOR BALDERAS
Attorney General of New Mexico

/s/ William Grantham
William Grantham (*admitted pro hac vice*)
Assistant Attorney General
  201 Third Street NW, Suite 300
  Albuquerque, New Mexico 87102
  Telephone: (505) 717-3520
  Email: wgrantham@nmag.gov

For the STATE OF OREGON
ELLEN F. ROSENBLUM
Attorney General of the State of Oregon

/s/ Paul Garrahan
Paul Garrahan (*admitted pro hac vice*)
Attorney-in-Charge, Natural Resources
Section
  Oregon Department of Justice
  1162 Court St. NE
  Salem, OR 97301-4096
  Telephone: (503) 947-4593
  Fax:  (503) 378-3784
  Email: paul.garrahan@doj.state.or.us

23

1

2   For the STATE OF RHODE ISLAND
    PETER F. NERONHA
3   Attorney General

4    /s/ Alison B. Hoffman
    Alison B. Hoffman (*admitted pro hac vice*)
5   Special Assistant Attorney General
      Office of the Attorney General
6      150 South Main Street
       Providence, RI 02903
7      Telephone: (401) 274-4400
       Email: AHoffman@riag.ri.gov
8

9

10  For the STATE OF WASHINGTON
    ROBERT W. FERGUSON
11  Attorney General

12   /s/ Ronald L. Lavigne
13  Ronald L. Lavigne (*admitted pro hac vice*)
    Senior Counsel
14    Office of the Attorney General
      2425 Bristol Court SW, 2nd Fl.
15    Olympia, WA 98504
      Telephone: (305) 586-6751
16    Email: ronald.lavigne@atg.wa.gov

17

18

For the STATE OF VERMONT
THOMAS J. DONOVAN, JR.
Attorney General of Vermont

 /s/ Laura B. Murphy
Laura B. Murphy (*admitted pro hac vice*)
Assistant Attorney General
  109 State Street
  Montpelier, VT 05609
  Telephone: (802) 828-3186
  Email: laura.murphy@vermont.gov

For the STATE OF WISCONSIN
JOSHUA L. KAUL
Wisconsin Attorney General

 /s/ Gabe Johnson-Karp
Gabe Johnson-Karp (*admitted pro hac vice*)
Assistant Attorney General
  Wisconsin Department of Justice
  P.O. Box 7857
  Madison, WI 53707
  Telephone: (608) 267-8904
  Email: johnsonkarpg@doj.state.wi.us

19

20

21

22

23

24

25

26

27

28

1

For the COMMONWEALTH OF
MASSACHUSETTS
MAURA HEALEY
Attorney General

2

3

4

 /s/ Seth Schofield

5

Seth Schofield (*admitted pro hac vice*)
Senior Appellate Counsel
David S. Frankel (*admitted pro hac vice*)
Special Assistant Attorney General
  Energy and Environment Bureau
  Office of the Attorney General
  One Ashburton Place, 18th Flr.
  Boston, MA 02108
  Telephone: (617) 963-2436 / 2294
  Email: seth.schofield@mass.gov
  Email: david.frankel@mass.gov

6

7

8

9

10

11

12

For the DISTRICT OF COLUMBIA
KARL A. RACINE
Attorney General

13

14

15

 /s/ Brian Caldwell

Brian Caldwell*
Assistant Attorney General
  Social Justice Section
  Office of the Attorney General
  for the District of Columbia
  441 Fourth Street N.W., Ste # 600-S
  Washington, D.C. 20001
  Telephone: (202) 727-6211
  Telephone: (202) 445-1952 (m)
  Email: brian.caldwell@dc.gov

16

17

18

19

20

21

22

*Application for admission pro hac vice
forthcoming.*

23

24

LA2020300885

25

26

27

28

For the COMMONWEALTH OF VIRGINIA
MARK R. HERRING
Attorney General
Donald D. Anderson
Deputy Attorney General
Paul Kugelman, Jr.
Senior Assistant Attorney General
Chief, Environmental Section

 /s/ David C. Grandis

David C. Grandis*
Senior Assistant Attorney General
  Office of the Attorney General
  202 North Ninth Street
  Richmond, VA 23219
  Telephone: (804) 225-2741
  Email: dgrandis@oag.state.va.us

For the CITY OF NEW YORK
JAMES E. JOHNSON
Corporation Counsel of the City of New York

 /s/ Nathan Taylor

Nathan Taylor*
  New York City Law Department
  100 Church Street, Rm 6-144
  New York, NY  10007
  Telephone: (646) 940-0736 (m)
  Telephone: (212) 356-2315
  Email: NTaylor@law.nyc.gov

# CERTIFICATE OF SERVICE

Case Name:    **State of California, et al. v. Andrew R. Wheeler, et al.**

Case No.:     **3:20-cv-03005-RS**

I hereby certify that on <u>June 15, 2020</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFFS' REPLY TO STATE INTERVENORS IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION OR STAY**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>June 15, 2020</u>, at Los Angeles, California.

<table>
<tr><td>Ernestina Provencio</td><td>/s/ Ernestina Provencio</td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

LA2020300885