UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA, et al.,

Plaintiffs,

v.

ANDREW WHEELER, et al.,

Defendants.

Case No. 20-cv-03005-RS

**ORDER DENYING MOTION FOR PRELIMINARY RELIEF**

## I. INTRODUCTION

This case is a challenge to a new rule that will substantially narrow the definition of what are "waters of the United States" subject to federal regulation under the Clean Water Act. Plaintiffs seek a court order preventing the new rule from taking effect, pending a determination on the merits of the case. Plaintiffs point to significant irreparable harms that will occur before the litigation is resolved, if the rule is legally invalid but allowed to go into operation now. Were the court tasked with the question of whether the new rule represents wise environmental policy or the best approach to protecting water resources that could be supported by scientific data, the result might be different. The court's narrow role, however, is only to evaluate whether the rule has been adopted in compliance with the requirements of the Administrative Procedure Act. In that context, plaintiffs have not made a sufficient showing to support an injunction or an order delaying the effective date of the new rule.

United States District Court
Northern District of California

## II. BACKGROUND

Congress enacted the Clean Water Act (CWA or Act) in 1972. The Act's stated objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 86 Stat. 816, 33 U.S.C. § 1251(a). The Act further declares, "[i]t is the policy of Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter." § 1251(b). By its terms, the Act applies only to "the waters of the United States, including the territorial seas."[1] The Environmental Protection Agency and the Army Corps of Engineers (the Agencies or defendants) both have responsibilities under the Act for regulating activities that may affect the waters of the United States.

The rule being challenged in this litigation is The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (April 21, 2020) (2020 Rule or Rule), which is scheduled to take effect on June 22, 2020. While the parties dispute how much acreage of wetlands and how many miles of waterways will be removed from regulation under the CWA by adoption of the 2020 Rule, there is no quarrel that it represents a substantial pullback from the scope of jurisdiction the Agencies have historically asserted.

*The 1980s Rule*

The Corps first promulgated regulations defining "waters of the United States" in the 1970s. *See, e.g.*, 42 Fed. Reg. 37,122, 37,144 (July 19, 1977). In the late 1980s, the Agencies adopted regulatory definitions of that statutory phrase substantially similar to the 1977 definition. *See* 51 Fed. Reg. 41,251 (Nov. 13, 1986) (Corps regulations); *see also* 53 Fed. Reg. 20,764 (June 6, 1988) (EPA's codification of nearly identical regulatory text). The parties refer to this as the

---

[1]  More specifically the Act prohibits discharge of pollutants into "navigable waters," which are then defined as "the waters of the United States, including the territorial seas." The import of the word "navigable" is discussed further below.

1    1980s Rule.

2        The Agencies' application of the 1980s rule came under Supreme Court scrutiny three

3    times. First, in *United States v. Riverside Bayview*, 474 U.S. 121 (1985), the Court deferred to the

4    Corps' assertion of jurisdiction over wetlands "actually abut[ting]" a traditional navigable water.

5    *Id.* at 131-35 & n.9 (1985). Several years later, in *Solid Waste Agency of Northern Cook County v.*

6    *U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"), the Court rejected the Corps'

7    assertion of jurisdiction over non-navigable, isolated, intrastate waters. It held that the term

8    "navigable" must be given meaning within the context and application of the CWA. *Id.* at 171-72;

9    *see also id.* at 167-68 ("[T]o rule for [the Corps], we would have to hold that the jurisdiction of the

10   Corps extends to ponds that are not adjacent to open water . . . [T]he text of the statute will not

11   allow this."). In 2003, the Agencies issued guidance for applying the 1980s Rule in light of the

12   limitations imposed by *SWANCC* (the *SWANCC* Guidance).

13       Most recently, in *Rapanos v. United States*, 547 U.S. 715 (2006), a fractured court

14   produced three separate articulations of the outer limits of the Corp's jurisdiction over wetlands. A

15   four-justice plurality held that the consolidated cases before the Court should be remanded for

16   failure to establish jurisdiction. *See id.* at 757 (Scalia, J., plurality). Applying a different test,

17   Justice Kennedy also concluded remand was appropriate, and he therefore concurred in the

18   judgment. *See id.* at 786-87 (Kennedy, J., concurring). The dissent would have upheld the Corps'

19   finding of jurisdiction. *See id.* at 810 (Stevens, J., dissenting). The Agencies subsequently issued

20   guidance instructing that the 1980s Rule should be applied in light of *Rapanos* by adhering to

21   Justice Kennedy's approach (the *Rapanos* Guidance).

22

23       *The 2015 Rule*

24       In 2015, the Agencies revised the regulatory definition of "waters of the United States."

25   *See* Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29,

26   2015) (2015 Rule). When promulgating the 2015 Rule, the Agencies stated an intent to adopt the

27   test set out in Justice Kennedy's *Rapanos* concurrence, which permitted jurisdiction over wetlands

28

and waters that were not navigable in the traditional sense only where they had a "significant nexus" to waters that are or were navigable in fact, or that could reasonably be made navigable. Therefore, to establish that waters and wetlands covered by the scope of the Rule's text would have such a "nexus," the Agencies prepared a scientific literature review. The EPA's Office of Research and Development produced a report entitled "Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence" (the Connectivity Report) which considered over 1200 peer-reviewed publications. The Agencies also relied on an independent review of the Connectivity Report by EPA's Science Advisory Board (SAB). The Connectivity Report made a case for the importance of upstream non-navigable waters and wetlands, and described how they impact downstream navigable waters.

Multiple parties sought judicial review of the 2015 Rule in courts across the country. One court of appeals and multiple district courts stayed or enjoined the 2015 Rule, concluding plaintiffs established a likelihood of successfully invalidating the rule. *See In re EPA & DOD Final Rule*, 803 F.3d 804, 808 (6th Cir. 2015), *vacated by* 713 F. App'x 489 (2018)[2]; *Oregon Cattlemen's Ass'n v. EPA*, No. 3:19-cv-564, Dkt. No. 58 (July 26, 2019), *vacated as moot,* Dkt. No. 81 (D. Or. Mar. 2, 2020); *Texas v. EPA*, No. 3:15-cv-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356 (S.D. Ga. 2018); *North Dakota v. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015); *North Dakota v. EPA*, No. 3:15-cv-59, Dkt. No. 250 (D.N.D. Sept. 18, 2018). Two courts eventually ruled on summary judgment that the 2015 Rule was "unlawful" and remanded it to the Agencies. *Georgia v. Wheeler*, 418 F. Supp. 3d at 1372; *Texas v. EPA*, 389 F. Supp. 3d 497, 504-06 (S.D. Tex. 2019).

---

[2] The Supreme Court reversed the Sixth Circuit's jurisdictional determination, holding that challenges must be brought in district courts. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 624 (2018).

*The Repeal Rule*

In 2017, the Agencies began reconsidering the 2015 Rule, which was stayed at the time. They conducted a notice-and-comment rulemaking process. Before issuing a new rule, however, the Agencies issued a rule repealing the 2015 Rule and reinstating the pre-2015 Rule regulatory definition of "waters of the United States." 84 Fed. Reg. 56,626 (Oct. 22, 2019) ("Repeal Rule"). The Repeal Rule went into effect on December 23, 2019. *Id*. Although multiple parties sought judicial review of the Repeal Rule in various district courts, it and its reinstatement of the earlier regulations, remains in force pending the 2020 Rule taking effect. As such, the current governing regime is essentially the 1980s Rule as modified by the *SWANCC* Guidance and the *Rapanos* Guidance.

*The 2020 Rule*

On January 23, 2020, the Agencies signed the final 2020 Rule revising the definition of "waters of the United States." The Agencies contend the Rule is intended "to end the decades of disputes and uncertainty surrounding the scope of these terms and to provide more administrable rules." They insist the Rule defines the limits of federal jurisdiction "consistent with the Constitution, CWA, and case law," and that it "establishes categorical bright lines to improve regulatory clarity."

The 2020 Rule defines the "waters of the United States" as: "(1) The territorial seas and traditional navigable waters; (2) tributaries of such waters; (3) certain lakes, ponds, and impoundments of jurisdictional waters; and (4) wetlands adjacent to other jurisdictional waters (other than waters that are themselves wetlands)." 85 Fed. Reg. at 22,273. The Rule also specifies "exclusions for many water features that traditionally have not been regulated, and define[s] the operative terms used in the regulatory text." *Id*. at 22,270; *see also id*. at 22,340-41 (regulatory text to be codified). "Ephemeral features" are categorically excluded under the 2020 Rule. *Id*. at 22,340. Discharges of pollutants to such non-jurisdictional waters, however, remain regulated under the Rule if those discharges are conveyed to downstream navigable waters. *Id*. at 22,297.

United States District Court
Northern District of California

1   The Agencies contend that in developing the new definition they were "guided by the

2   Act's policies and objectives; case law, including both the plurality and concurring opinions in

3   *Rapanos*; scientific principles; and administrability." The Agencies claim they have balanced

4   Congress' goal "to restore and maintain the integrity of the Nation's waters while maintaining the

5   states' primary responsibilities and rights to prevent, reduce, and eliminate pollution and to plan

6   the development and use of their land and water resources." The Agencies point to "technical

7   analyses and legal discussion" in some 1,500 pages of the Rule preamble, a Resource and

8   Programmatic Assessment ("RPA"), an Economic Analysis, and a Response to Comments

9   document, to argue they adequately explained and justified the basis of the 2020 Rule and its

10  departure from prior policy.

11  Plaintiffs in this action are seventeen states, the North Carolina Department of

12  Environmental Quality, the District of Columbia, and the City of New York. Twenty-three other

13  states have been permitted to intervene in this action in support of the 2020 Rule.[3]

14  As noted, plaintiffs seek declaratory and injunctive relief under the Administrative

15  Procedures Act (APA). Their complaint asserts the 2020 Rule is arbitrarily inconsistent with the

16  Agencies' prior findings, and contrary to the meaning and objectives of the CWA.[4]

17

18                          III. LEGAL STANDARDS

19  A. Injunctions

20  An application for preliminary injunctive relief requires the plaintiff to "establish that he is

21  likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

22  preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

23

24  ────────────────

25  [3] Motions for leave to intervene brought by other interested parties remain under submission and
    will be decided in due course. In the interim, briefs of those proposed intervenors have been
    considered in the nature of *amicus* briefs.

26
27  [4] Other challenges to the 2020 Rule have been filed in a number of district courts, and at least one
    other motion for a preliminary injunction is pending.

28                                          ORDER DENYING PRELIMINARY RELIEF
                                            CASE NO.  20-cv-03005-RS

public interest." *Winter v. N.R.D.C., Inc.*, 555 U.S. 7, 21-22 (2008). The Ninth Circuit has clarified, however, that courts in this Circuit should still evaluate the likelihood of success on a "sliding scale." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) ("[T]he 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*."). As quoted in *Cottrell*, that test provides that, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," provided, of course, that "plaintiffs must also satisfy the other [*Winter*] factors" including the likelihood of irreparable harm. *Id*. at 1135.

Here, defendants note their disagreement with the *Cottrell* "sliding scale" standard, although they do not argue this court is free to disregard it. As will appear, the determination here is that plaintiffs have not shown a likelihood of success and that to the extent they arguably have shown serious questions going to the merits, the balance of hardships does not tip so strongly to one side as to warrant preliminary relief. Accordingly, defendants will not have been prejudiced by application of the *Cottrell* standard.

### B. Section 705

As an alternative to their request for a traditional injunction precluding the Agencies from implementing the 2020 Rule, plaintiffs also seek an order under section 705 of the APA. That section authorizes a court "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." As suggested by the text of the statute and conceded by plaintiffs, the prerequisites for issuance of an order under section 705 are substantively identical to those for issuance of a preliminary injunction. The parties were asked to provide supplemental briefing, however, on the question of whether the concerns that apply when a court is considering issuing a so-called "nationwide injunction" apply equally to an order issued under the express statutory authority of

section 705 to "postpone the effective date of an agency action." While plaintiffs have presented some compelling arguments that an order under section 705 properly stays agency action as a whole, without regard to geography or the identity of the particular plaintiffs, ultimately this case does not require resolution of that question.

### C. The APA

Under section 706 of the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D). Accordingly, the decision-making process that ultimately leads to the agency action must be "logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). Courts should be careful, however, not to substitute their own judgment for that of the agency. *Suffolk Cty. v. Sec'y of Interior*, 562 F.2d 1368, 1383 (2d Cir. 1977). Ultimately, a reviewing court may uphold agency action "only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015). Post hoc rationalizations may not be considered. *American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981). In evaluating APA claims, courts typically limit their review to the administrative record existing at the time of the decision. *Sw. Ctr. for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996); *accord Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1117 (9th Cir. 2007).

IV. DISCUSSION

### A. Success on the merits

As noted above, agency rules are subject to being set aside under the APA if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Here,

United States District Court
Northern District of California

plaintiffs contend the 2020 rule is "arbitrary and capricious" because in their view the Agencies

lacked an adequate scientific and factual basis for changing their policy so dramatically. Plaintiffs

also point to various specific aspects of the rule that they contend are not rational or reasonable.

Plaintiffs separately argue the 2020 rule is otherwise "not in accordance with the law" because,

they insist, it is inconsistent with the "text, structure, and purpose" of the Clean Water Act. The

latter point will be addressed first, because it implicates the available guidance from the Supreme

Court, which then indirectly bears on the issues of "arbitrary and capricious."


1. *Accordance with the law*

Although the meaning of "waters of the United States" in the Clean Water Act has been

extensively addressed in no fewer than three Supreme Court cases, the validity of the 2020 rule

presents a completely new question. In the prior cases, the issue was always whether the agencies

had gone *too far* in extending the scope of federal regulation. Now, the question is whether the

agencies have not gone far enough. So, while some guiding principles may be distilled from

existing precedents, this is largely a blank slate.

The one point on which everyone agrees—"everyone" meaning the parties in this case and

all of supreme court justices who have written or joined opinions on the issue—is that "navigable

waters" does not in fact mean navigable waters in the ordinary sense a layperson might expect.

"[T]he Act's term 'navigable waters' includes something more than traditional navigable waters.

We have twice stated that the meaning of 'navigable waters' in the Act is broader than the

traditional understanding of that term." *Rapanos*, 547 U.S. at 731. As a result, the challenge in

interpreting the meaning of "waters of the United States" lies in reconciling the fact that it must

consist of something more than just waters that are navigable or could reasonably be made so,

with the fact that it must have *some* limitations.

The phrase, therefore, is indisputably ambiguous. As a result, the court is compelled to

1    apply *Chevron* deference when evaluating whether the Agencies' interpretation of it is lawful.[5]

2    The Supreme Court has explained *Chevron* deference as follows:

3
4              In *Chevron*, this Court held that ambiguities in statutes within an
               agency's jurisdiction to administer are delegations of authority to the
5              agency to fill the statutory gap in reasonable fashion. Filling these
               gaps, the Court explained, involves difficult policy choices that
6              agencies are better equipped to make than courts . . . . If a statute is
               ambiguous, and if the implementing agency's construction is
7              reasonable, *Chevron* requires a federal court to accept the agency's
               construction of the statute, even if the agency's reading differs from
8              what the court believes is the best statutory interpretation.

9    *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

10   Furthermore, and of particular relevance here, *Brand X* explained "[a]gency inconsistency

11   is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework."

12   *Id.* At 981. The Court elaborated:

13
14             Unexplained inconsistency is, at most, a reason for holding an
               interpretation to be an arbitrary and capricious change from agency
15             practice under the Administrative Procedure Act . . . . For if the
               agency adequately explains the reasons for a reversal of policy,
16             change is not invalidating, since the whole point of *Chevron* is to
               leave the discretion provided by the ambiguities of a statute with the
17             implementing agency . . . . An initial agency interpretation is not
               instantly carved in stone. On the contrary, the agency . . . must
18             consider varying interpretations and the wisdom of its policy on a
               continuing basis . . . for example, in response to changed factual
19             circumstances, or a change in administrations . . . . That is no doubt
               why in *Chevron* itself, this Court deferred to an agency
20             interpretation that was a recent reversal of agency policy.

21

22   *Brand X*, 545 U.S. at 981–82 (quotes and citations omitted).

23   Finally, one more important principle emerges from *Brand X*. "A court's prior judicial

24   construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference

25   only if the prior court decision holds that its construction follows from the unambiguous terms of

26

27   ───────────────
     [5] *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984).

28
                                                        ORDER DENYING PRELIMINARY RELIEF
                                                        CASE NO. 20-cv-03005-RS

the statute and thus leaves no room for agency discretion." *Id.* at 982.

Here, plaintiffs acknowledge that *Chevron* deference applies. They then argue, however, that the 2020 Rule does not survive review even under *Chevron* because, in their view, it is not a *reasonable* interpretation of the statute. Plaintiffs' argument rests heavily on the notion that the 2020 Rule largely adopts the position of the *Rapanos* plurality, and that the other five justices agreed the plurality's standard was not appropriately grounded in the statute. Plaintiffs' argument fails for multiple reasons. First, it is suspect to attempt to cobble together a holding from the concurrence and the dissent. *See generally Marks v. United States*, 430 U.S. 188, 193 (1977), ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (quotation and citation omitted)).

More fundamentally, even if the concurrence and the dissent can be read together to stand for the proposition that the *Rapanos* plurality's articulation of the maximum permissible reach of the statute is an improper construction, a holding that the Agencies *must* construe the statute more broadly is a bridge too far. Finally, nothing in either the *Rapanos* concurrence or the dissent—or in the two read together—can be characterized as a holding "that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982.

In the absence of precedent construing what *must* be included as "waters of the United States," plaintiffs are left with little more than policy arguments that the narrowness of the 2020 Rule serves poorly to carry out the objectives of the CWA. As compelling as those arguments may be, they do not provide a sufficient basis for a court to substitute its judgment for the policy choices of the Agency. Had Congress chosen to speak more clearly about how broadly CWA jurisdiction was to extend, or if the CWA did not contemplate the balancing of interests in pursuit of its ultimate goals, it might be possible to characterize the 2020 Rule as an "unreasonable" interpretation. At least at this juncture and on the current record, however, plaintiffs have not

United States District Court
Northern District of California

1  shown they are likely to succeed in making that claim.

2        Finally, plaintiffs contend the 2020 Rule is contrary to law insofar as it excludes from its

3  scope interstate waters that do not otherwise qualify for protection.[6] Plaintiffs insist that waters or

4  wetlands that cross state lines have always been subject to federal jurisdiction. While that may

5  otherwise be so, the CWA did not employ "interstate" in its definition of "navigable waters" or to

6  describe "waters of the United States." Accordingly, plaintiffs have not shown a likelihood of

7  success on the merits of their claim that the 2020 Rule is "otherwise contrary to law."

8

9                2. *Arbitrary and capricious*

10        Plaintiffs present four basic arguments that the 2020 Rule is arbitrary and capricious. First,

11  plaintiffs contend the Agencies have not adequately justified the fundamental change in policy and

12  their discounting of the scientific evidence they previously marshalled in support of the 2015 Rule.

13  As set out above, Agencies are not precluded from reversing course "since the whole point of

14  *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing

15  agency." *Brand X,* 545 U.S. at 982. Indeed, a policy change may be permissible simply because

16  there has been a "change in administrations."

17        The requirement is only that agencies must *explain* the basis for their change, and

18  defendants have adequately done so here. The need for a new rule was manifest, and had been for

19  decades. The 1980s rule had been cut back by the courts, leaving a patchwork of regulations and

20  "guidance" documents. The 2015 Rule had been rejected by courts. Certainly, the Agencies could

21  have promulgated a new rule that remained expansive while attempting to address the concerns

22  courts had raised about the outer limits of jurisdiction under the CWA. It is no secret that a

23  motivating factor in choosing to go the opposite direction was a "change in administrations," but

24  that does not make it improper.[7]

25  _____

26  [6] Although plaintiffs present this as an issue of potentially great effect, the Agencies contend it
actually would apply in very few instances.

27  [7] The Supreme Court's decision yesterday in *Department of Homeland Security v. Regents of the*

28

1   Plaintiffs' arguments that the Agencies disregarded the scientific evidence they previously

2   had gathered is ultimately a policy disagreement as well. The Agencies have articulated reasons

3   they contend the science does not compel a different result, but the real difference in opinion is

4   whether the statute clearly compels the Agencies to extend federal regulation to the broadest

5   permissible extent under the Commerce Clause, in the name of providing *all* of the benefits for

6   water quality the science suggests might be achievable. Because the Agencies may reasonably

7   conclude they have no such statutory duty, discounting evidence of possible benefits is not plainly

8   arbitrary or capricious.

9   Second, plaintiffs contend the 2020 Rule "disregards" the primary objective of the CWA to

10   protect water quality. This, however, adds little to the arguments they have already made. That the

11   Agencies now choose a different approach, and a different balance between federal and state

12   responsibilities does not mean they have disregarded the primary objective of the statute in an

13   arbitrary or capricious manner that is likely to warrant setting aside the Rule.

14   Third, plaintiffs take issue with two specific aspects of the 2020 rule. They complain the

15   requirement that a non-navigable water source must contribute surface water flow to a

16   jurisdictional water in a "typical year" irrationally excludes wetlands that flood in periodic events,

17   and that the term "typical year" is inadequately defined in any event. Similarly, plaintiffs contend

18   the Rule provides no workable methodology to distinguish between "ephemeral" streams, which

19   are categorically excluded from coverage, and "intermittent" streams, which are not. Plaintiffs

20   have made some showing that these provisions of the 2020 Rule may lack clarity and present

21

22   *Univ. of California*, 2020 WL 3271746, at *5 (U.S. June 18, 2020) provides an instructive
contrast. There, the Court found an agency failed adequately to explain and justify a policy change
23   in a brief memorandum issued by the director. Here, the agencies engaged in a full notice and
comment rulemaking process, generating a fulsome record of the basis for the policy change.
24   Another aspect of the *DHS v Regents* decision is also relevant here. The Court stated: "We do not
decide whether DACA or its rescission are sound policies. The wisdom of those decisions is none
25   of our concern . . . . We address only whether the agency complied with the procedural
requirement that it provide a reasoned explanation for its action." 2020 WL 3271746, at *17
26   (quotations and citations omitted). Likewise, the wisdom of the 2020 Rule, and whether it is a
sound policy, is not the subject of review here.
27

28

United States District Court
Northern District of California

1    some administrability challenges. Those potential issues, however, are not sufficient to conclude

2    the Rule should be preliminarily enjoined as arbitrary and capricious.

3         Finally, plaintiffs fault the Agencies for not addressing "reliance interests" that may have

4    arisen under their prior policy approach. Although it may not have been anticipated that the

5    Agencies would reverse course to the degree they have, given the long uncertainty about the

6    permissible scope of federal regulation under the CWA, it is difficult to see how significant

7    cognizable reliance interests would have arisen. In any event, to the extent some such interests did

8    arise, plaintiffs have not shown how they would invalidate the 2020 Rule.

9

10        B.   Irreparable harm and other factors

11        Had plaintiffs made a stronger showing on the merits, the interest in preserving the status

12   quo would count heavily towards providing preliminary relief, either as a traditional injunction or

13   as a stay order under section 705. Although substantial environmental harm might only

14   accumulate over a period of time, it is reasonable to assume that some of the effects of

15   withdrawing federal protection for some waters and wetlands will begin to manifest immediately,

16   and certainly over the course of time this action is likely to be pending. That said, the agencies and

17   the intervenor states, have raised substantial challenges to the adequacy of the showing of

18   irreparable harm, particularly insofar as it rests on a number of speculative assumptions.

19   Additionally, unless section 705 is read to permit a stay of the rule without regard to particular

20   geographic impacts, plaintiffs likely have failed to show that the harms to which they point apply

21   with equal force in all parts of the country, which could have a bearing on the propriety of a so-

22   called "nationwide injunction."

23        The balance of equities or hardships may also lean somewhat in plaintiffs' favor, given the

24   interest in maintaining the status quo, and the lack of any special urgency necessitating immediate

25   implementation of the 2020 Rule. That does not weigh so heavily, however, as to overcome the

26   lack of a stronger showing on the merits.

27        Finally, under the circumstances of this case, the question of whether an injunction would

28
     United States District Court
     Northern District of California

1    be "in the public interest" is subsumed in the other factors. This is because even though an invalid

2    rule would not serve the public interest, a valid rule could not be enjoined based only on a court's

3    assessment that it was not good public policy.

4

5                                            V. CONCLUSION

6           The motion for a preliminary injunction or an order staying the effective date of the 2020

7    Rule is denied.

8

9    **IT IS SO ORDERED**.

10

11   Dated: June 19, 2020

12

13                                                    RICHARD SEEBORG
                                                     United States District Judge