1   XAVIER BECERRA
    Attorney General of California
2   SARAH E. MORRISON
    ERIC KATZ
3   Supervising Deputy Attorneys General
    CATHERINE M. WIEMAN, SBN 222384
4   TATIANA K. GAUR, SBN 246227
    ROXANNE J. CARTER, SBN 259441
5   JESSICA BARCLAY-STROBEL, SBN 280361
    BRYANT B. CANNON, SBN 284496
6   Deputy Attorneys General
     300 South Spring Street, Suite 1702
7    Los Angeles, CA  90013
     Telephone: (213) 269-6329
8    Fax: (916) 731-2128
     E-mail:  Tatiana.Gaur@doj.ca.gov
9   *Attorneys for Plaintiff State of California, by and*
    *through Attorney General Xavier Becerra and*
10  *California State Water Resources Control Board*

    LETITIA JAMES
    Attorney General of the
    State of New York
    PHILIP BEIN (*admitted pro hac vice*)
    Senior Counsel
    TIMOTHY HOFFMAN (*admitted pro hac vice*)
    Senior Counsel
    Office of the Attorney General
    Environmental Protection Bureau
    28 Liberty Street
    New York, NY 10005
    Telephone: (716) 853-8465
    Fax: (716) 853-8579
    Email: Timothy.Hoffman@ag.ny.gov
    *Attorneys for Plaintiff State of New York*

11  [Additional parties and counsel listed on signature pages]

12

13              IN THE UNITED STATES DISTRICT COURT

14          FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

| 16 | **STATE OF CALIFORNIA, et al.,** | **Case No. 3:20-cv-03005-RS** |
|----|----|----|
| 17 | Plaintiffs, | **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| 18 | v. | |
| 19 | | |
| 20 | **ANDREW WHEELER, et al.,** | Date:          June 3, 2021 |
| 21 | Defendants, | Time:          1:30 pm<br>Courtroom:  Courtroom 3 – 17th Floor |
| 22 | **STATE OF GEORGIA, et al.,** | San Francisco Courthouse<br>Judge:         The Honorable Richard Seeborg |
| 23 | Intervenor-Defendants | Action Filed:  May 1, 2020 |

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

Page

3    INTRODUCTION ..................................................................................................... 1

4    STATUTORY AND REGULATORY BACKGROUND ............................................ 2

      I.     The Clean Water Act .................................................................................... 2

5          II.    "Waters of the United States" – Previous Agency Rulemaking and
6                 Guidance, and Supreme Court Caselaw .................................................... 4

             A.    The 1980s Definition ...................................................................... 5

7                 B.    Supreme Court Decisions Regarding the 1980s Definition ............ 6

8                 C.    The 2008 *Rapanos* Guidance ........................................................ 8

9                 D.    The 2015 Clean Water Rule ............................................................ 8

             E.    The 2019 Rule ............................................................................... 11

10         III.   The 2020 Rule ............................................................................................ 11

11   STANDARD OF REVIEW ..................................................................................... 15

12   ARGUMENT .......................................................................................................... 17

      I.     The Agencies' Decisionmaking was Arbitrary and Capricious ............... 17

13                A.    The Agencies Did Not Examine or Explain Whether and How the
14                      2020 Rule's Narrower Definition of "Waters of the United States"
                   Meets the Act's Objective. ........................................................... 18

15                     1.    The Agencies' Decision to Exclude All Ephemeral Streams
16                           Was Arbitrary and Capricious. .......................................... 20

                  2.    The Agencies' Decision to Exclude Wetlands Without
17                           Direct Surface Water Connection Is Arbitrary and
                        Capricious. ......................................................................... 22

18                     3.    The "Typical Year" Requirement Is Arbitrary and
19                           Capricious. ......................................................................... 24

             B.    The Agencies Fail to Examine or Explain How the 2020 Rule's
20                        Narrower Definition of "Waters of the United States" Is Consistent
                     with CWA's Policy Regarding the Responsibilities and Rights of
21                        States. ........................................................................................... 25

             C.    The 2020 Rule Is Arbitrary and Capricious Because the Agencies
22                      Fail to Consider the States' and Cities' Reliance Interests. ......... 25

23         II.    The 2020 Rule Is an Impermissible Interpretation of the CWA .............. 28

             A.    The 2020 Rule Is Unreasonable Because It Excludes Ephemeral
24                      Streams. ....................................................................................... 29

25                     1.    The Rule Adopts the *Rapanos* Plurality's Exclusion of
                        Ephemeral Streams. ............................................................ 29

26                     2.    The Agencies' Exclusion of Ephemeral Streams Is Not
                        Entitled to Deference Because the Controlling Rule of Law
27                           from *Rapanos* Rejects Such Exclusion as Impermissible
                        Under the Act. ..................................................................... 30

28

i

1

**TABLE OF CONTENTS**
(continued)

2
**Page**

3       B.      Brand X Does Not Save the 2020 Rule....................................................... 31

4       C.      The Agencies' Interpretation of Section 101(b) and States' Rights
                and Responsibilities Under the Act Is Impermissible. .............................. 33

5       D.      The Agencies' Constitutional Concerns Do Not Justify the Rule............. 38

6       E.      The Rule's Exclusion of Interstate Waters as an Independent
                Category of "Waters of the United States" is Contrary to the Act's

7               Text, History, and Purpose. ...................................................................... 39

        III.    The 2020 Rule Harms the Interests of the States and Cities, Giving Them

8               Standing to Bring this Action................................................................... 41

9       CONCLUSION ................................................................................................................ 45

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

<u>Page</u>

3

CASES

4

*Akins v. FEC*
5
   101 F.3d 731 (D.C. Cir. 1996) (en banc) .................................................................32

6
*Altera Corp. & Subsidiaries v. Comm'r*
   926 F.3d 1061, 1075 (9th Cir. 2019)..............................................................1, 16, 17, 28

7

*Am. Wild Horse Pres. Campaign v. Perdue*
8
   873 F.3d 914 (D.C. Cir. 2017) .......................................................................................24

9
*Arkansas v. Oklahoma*
   503 U.S. 91 (1992) .......................................................................3, 4, 35, 40, 41
10

*Betchart v. Department of Fish & Game*
11
   158 Cal.App.3d 1104 (1984)..........................................................................................43

12
*California v. Azar*
13
   911 F.3d 558 (9th Cir. 2018)..........................................................................................42

14
*California v. Azar*
15
   950 F.3d 1067 (9th Cir. 2020).......................................................................................25

16
*California v. Block*
   690 F.2d 753 (9th Cir. 1982) ·········································································42

17
*California v. U.S. Dep't of the Interior*
18
   381 F. Supp. 3d 1153 (N.D. Cal. 2019) ........................................................................16

19
*Chem. Waste Mgmt., Inc. v. Hunt*
   504 U.S. 334 (1992).......................................................................................................38
20

*Chevron, U.S.A., Inc. v. NRDC*
21
   467 U.S. 837 (1984) ............................................................................................. *passim*

22
*City of Arcadia v. U.S. EPA*
23
   411 F.3d. 1103 (9th Cir. 2005).......................................................................................34

24
*City of Milwaukee v. Illinois*
   451 U.S. 304 (1981)..........................................................................................3, 34, 40
25

*Colorado v. EPA*
26
   445 F. Supp. 3d 1295 (D. Colo. 2020)..........................................................................32

27
*County of Maui v. Hawaii Wildlife Fund*
28
   140 S. Ct. 1462 (2020)...................................................................................................35

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3
*Ctr. for Biological Diversity v. NHTSA*
    538 F.3d 1172 (9th Cir. 2008)....................................................................................20
4

5
*Cuomo v. Clearing House Ass'n, LLC*
    557 U.S. 519 (2009)....................................................................................................31

6
*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*
    140 S. Ct. 1891 (2020).............................................................................18, 25, 27, 28
7

8
*Dist. of Columbia v. U.S. Dep't of Agric.*
    444 F. Supp. 3d 1 (D.D.C. 2020)...............................................................................23
9

10
*Encino Motorcars, LLC. v. Navarro*
    136 S. Ct. 2117 (2016).......................................................................................2, 16, 17

11
*EPA v. California ex. rel. State Water Resources Control Board*
    426 U.S. 200, 207 (1976)...........................................................................................35
12

13
*FCC v. Fox Television Stations, Inc.*
    556 U.S. 502 (2009) (*Fox*) .............................................................................. *passim*
14

15
*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*
    463 F. Supp. 3d 1011 (D. Alaska 2020)....................................................................23

16
*Georgia v. Wheeler*
    418 F. Supp. 3d 1336 (S.D. Ga. 2019).......................................................................41
17

18
*Golden State Transit Corp. v. City of Los Angeles*
    493 U.S. 103 (1989)....................................................................................................32
19

20
*Gresham v. Azar*
    950 F.3d 93 (D.C. Cir. 2020) ....................................................................................23

21
*Hodel v. Virginia Surface Min. & Reclamation Ass'n., Inc.*
    452 U.S. 264, 282 (1981)...........................................................................................39
22

23
*Illinois v. City of Milwaukee*
    731 F.2d 403 (7th Cir. 1984)......................................................................................40
24

25
*Int'l Paper Co. v. Ouellette*
    479 U.S. 481 (1987) (*Ouellette*)............................................................3, 4, 35, 40

26
*Judulang v. Holder*
    565 U.S. 42 (2011)......................................................................................................28
27

28

iv

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Kansas City v. Dep't of Housing & Urban Dev.*
    923 F.2d 188 (D.C. Cir. 1991) ............................................................................20

4

5

*Kimble v. Marvel Entm't, LLC*
    576 U.S. 446 (2015)............................................................................................32

6

*Lowe v. S.E.C.*
    472 U.S. 181 (1985)............................................................................................40

7

8

*Massachusetts v. EPA*
    549 U.S. 497 (2007)......................................................................................41, 42

9

10

*Mayo Found. for Med. Ed. & Research v. United States*
    562 U.S. 44 (2011).............................................................................................17

11

*Mercy Catholic Med. Ctr. v. Thompson*
    380 F.3d 142 (3d Cir. 2004)................................................................................20

12

13

*MikLin Enterprises, Inc. v, National Labor Relations Board*
    861 F.3d 812 (8th Cir. 2017)..........................................................................31, 32

14

15

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*
    460 U.S. 1 (1983)..........................................................................................29, 31

16

*Motor Vehicle Mfrs. Ass'n of U.S.A, Inc. v. State Farm Mut. Auto Ins. Co.*
    463 U.S. 29 (1983) ...................................................................................... *passim*

17

18

*Nat'l Ass'n of Mfrs. v. DOD*
    138 S. Ct. 617 (2018) ........................................................................................11

19

20

*National Cable & Telecomms Ass'n v. Brand X Internet Serv.*
    545 U.S. 967 (2005)......................................................................................31, 32

21

*Negusie v. Holder*
    555 U.S. 511 (2009)............................................................................................33

22

23

*N. Cal. Riverwatch v. City of Healdsburg*
    496 F.3d 993 (9th Cir. 2007)......................................................................29, 30, 32

24

25

*NRDC v. Costle*
    568 F.2d 1369 (D.C. Cir. 1977) ..........................................................................4

26

27

*Occidental Eng'g Co. v. I.N.S.*
    753 F.2d 766 (9th Cir. 1985) .............................................................................16

28

v

1

**<u>TABLE OF AUTHORITIES</u>**
(continued)

2

<u>Page</u>

3

*Ocean Advocates v. U.S. Army Corps of Eng'rs*
4
    402 F.3d 846 (9th Cir. 2004)...................................................................24

*Office of Commc'n of the United Church of Christ v. FCC*
5
    779 F.2d 702 (D.C. Cir. 1985) ...............................................................19

6
*Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*
7
    313 U.S. 508, 525-26 (1941).....................................................................38

8
*Organized Village of Kake v. U.S. Dep't of Agric.*
    795 F.3d 956 (9th Cir. 2015)....................................................................16
9

10
*Rapanos v. United States*
    547 U.S. 715 (2006) ....................................................................... *passim*

11
*San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*
12
    819 F. Supp. 2d 1077, 1084 (E.D. Cal. 2011) ........................................16

13
*San Luis & Delta-Mendota Water Authority v. Locke*
    776 F.3d 971 (9th Cir. 2014).....................................................................16
14

15
*Shanty Town Assocs. Ltd. P'ship v. EPA*
    843 F.2d 782 (4th Cir. 1988).....................................................................37

16
*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*
17
    531 U.S. 159 (2001) ....................................................................... *passim*

18
*The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*
19
    353 F.3d 1051 (9th Cir. 2003).....................................................28, 33, 39

20
*United States v. Ashland Oil & Transp. Co.*
    504 F.2d 1317 (6th Cir. 1974).....................................................................4

21
*United States v. Dailey*
22
    941 F.3d 1183 (9th Cir. 2019)...................................................................28

23
*United States v. Riverside Bayview Homes, Inc.*
    474 U.S. 121 (1985)..............................................................4, 6, 23, 36
24

25
*United States v. Robertson*
    975 F.3d 1281 (9th Cir. 2017)...................................................................30

26
*Vasquez v. Hillery*
    474 U.S. 254 (1986)...........................................................................29, 31
27

28

1

## TABLE OF AUTHORITIES
### (continued)

*Wickard v. Filburn*
   317 U.S. 111 (1942)........................................................................................38

STATUTES

5 United States Code
   § 706(2)(A).............................................................................................16, 38

33 United States Code
   § 1251(a)......................................................................................................2, 6
   § 1251(b)....................................................................................................*passim*
   § 1311(a)..........................................................................................................2
   § 1313................................................................................................3, 19, 36
   § 1313(a)....................................................................................................2, 39
   § 1321(b).........................................................................................................19
   § 1341................................................................................................3, 19, 36
   § 1341(a)(1)....................................................................................................35
   § 1342...........................................................................................................2, 3
   § 1342(a)...........................................................................................................3
   § 1342(b)............................................................................................3, 35, 36
   § 1344...........................................................................................................2, 3
   § 1344(a)...........................................................................................................3
   § 1344(h).....................................................................................................3, 36
   § 1362(6), (14)..................................................................................................3
   § 1362(7)...........................................................................................................2
   § 1362(12).........................................................................................................2
   § 1370...............................................................................33, 34, 35, 36, 37

Ariz. Rev. Stat. Ann.
   § 49-104(A)(16)..............................................................................................43

California Fish & Game Code
   § 1801.............................................................................................................44

Utah Code Ann.
   § 19-5-105......................................................................................................43

COURT RULES

Federal Rules of Civil Procedure
   Rule 1..............................................................................................................42
   Rule 25............................................................................................................42
   Rule 56..............................................................................................................1

1

## TABLE OF AUTHORITIES
### (continued)

2
Page

3   LEGISLATIVE HISTORY

4   *A Legislative History of the Water Pollution Control Act Amendments of 1972*,
5       Committee Print Compiled for the Senate Committee on Public Works by the
        Library of Congress, Ser. No. 93–1, p. 403 (1973) ............................................................4, 34

6   H.R. Rep. No. 92-911 at 818, S. Conf. Rep. No. 92-1236, at *3822...............................................36

7
    S. Rep. No. 92-414, 1971 WL 11307 (1971).................................................................2, 3, 36, 40
8
    OTHER AUTHORITIES
9
10  42 Fed. Reg. 37, 144 (July 19, 1977).............................................................................................4

11  45 Fed. Reg. 85,336 (Dec. 24, 1980) .............................................................................................4

12  47 Fed. Reg. 31,794 (July 22, 1982) ..............................................................................................4

13  51 Federal Register 41,206 (Nov. 13, 1986)...................................................................................5

14  53 Fed. Reg. 20,764 (June 6, 1988) ...............................................................................................4

15  68 Federal Register 1995 (Jan. 15, 2003) .......................................................................................5

16  80 Federal Register
17      37,055...................................................................................................................8, 9, 26
        37,057...................................................................................................................8, 9, 21
18      37,068..........................................................................................................................26
        37,068-69.....................................................................................................................21
19      37,079.....................................................................................................................21, 26
        37,080-81.....................................................................................................................26
20      37,104.................................................................................................................9, 10, 11
        37,104-06.......................................................................................................................9
21      37,105..........................................................................................................................13

22  82 Federal Register
23      34,899..........................................................................................................................11
        34,903..........................................................................................................................11
24
25  84 Federal Register
        4154.........................................................................................................................5, 41
        4171............................................................................................................................41
26      4198............................................................................................................................38
        56,626.................................................................................................................11, 26, 27
27      56,630.....................................................................................................................11, 27

28

1

## **TABLE OF AUTHORITIES**
### **(continued)**

2
**Page**

3          85 Federal Register

4              22,250 ........................................................................................................1, 17, 25

5              22,252 ..........................................................................................15, 17, 25, 34
             22,253 ....................................................................................................................37

6              22,261 ....................................................................................................................23
             22,262 ....................................................................................................................37

7              22,266 ....................................................................................................................15
             22,269 ..........................................................................................15, 25, 37, 38

8              22,271 ....................................................................................................................23

9              22,273 ..........................................................................................15, 25, 29, 38
             22,274 ............................................................................................................14, 24

10             22,278 ............................................................................................................15, 30
             22,279 ....................................................................................................................15

11             22,284 ....................................................................................................................40
             22,286 ............................................................................................................13, 40

12             22,288 ..........................................................................12, 19, 20, 22, 23
             22,289 ............................................................................................................15, 30

13             22,291 ....................................................................................................................15

14             22,292-94 ..............................................................................................................14
             22,296 ....................................................................................................................25

15             22,306-22,317 ....................................................................................................22
             22,308 ....................................................................................................................23

16             22,309 ....................................................................................................................15

17             22,310 ............................................................................................19, 20, 22
             22,314 ....................................................................................................................22

18             22,331 ....................................................................................................................15

19             22,332 ............................................................................................................15, 18
             22,335 ............................................................................................................15, 18

20             22,338 ............................................................................................................12, 13
             22,339 ....................................................................................................................14

21             22,341 ....................................................................................................................24

22         https://www.epa.gov/cwa-404/state-or-tribal-assumption-cwa-section-404-permit-
             program ....................................................................................................................3
23
         https://www.epa.gov/npdes/npdes-state-program-authority .........................................3
24
25

26

27

28

## <u>GLOSSARY</u>

| | |
|---|---|
| 1980s Regulations | Regulations issued in the 1970s and 1980s to define "waters of the United States" under the Clean Water Act. 42 Fed. Reg. 37, 144 (July 19, 1977); 45 Fed. Reg. 85,336 (Dec. 24, 1980); 47 Fed. Reg. 31,794 (July 22, 1982); 51 Fed. Reg. 41,206 (Nov. 13, 1986); 53 Fed. Reg. 20,764 (June 6, 1988). |
| 2015 Clean Water Rule or 2015 Rule | 80 Fed. Reg. 37,054 (June 29, 2015) (codified at 33 C.F.R. § 328.3 (2015) |
| 2019 Rule | 84 Fed. Reg. 4,154 (Feb. 14, 2019) |
| 2020 Rule or Rule | The Navigable Waters Protection Rule: Definition of "Waters of the United States 85 Fed. Reg. 22,250 (Apr. 21, 2020) (2020 Rule or Rule) |
| APA | Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* |
| AR | Administrative Record |
| Army Corps | United States Army Corps of Engineers |
| CWA or Act | Clean Water Act, 33 U.S.C. §1251 *et seq.* |
| Connectivity Report | EPA Office of Research and Development "Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence" |
| EA | Economic Analysis |
| EPA | United States Environmental Protection Agency |
| RPA | Resource and Programmatic Assessment |
| Science Board | EPA's Science Advisory Board |
| TSD | Technical Support Document for the Clean Water Rule: Definition of Waters of the United States (2015) |

x

1       <u>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**</u>

2       **TO ALL PARTIES AND COUNSEL OF RECORD:**

3       PLEASE TAKE NOTICE that, on June 3, 2021, at 1:30 pm, or as soon as it may be heard,

4 Plaintiffs, by and through their undersigned counsel, will, and hereby do, move for summary

5 judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This motion will be made

6 before the Honorable Judge Richard Seeborg, San Francisco Courthouse, Courtroom 3 – 17th

7 Floor, 450 Golden Gate Avenue, San Francisco, California 94102.

8       This motion is based the Memorandum of Points and Authorities, the declarations in

9 support filed herewith and previously in this matter, the administrative record for *The Navigable*

10 *Waters Protection Rule: Definition of "Waters of the United States,"* 85 Fed. Reg. 22,250 (Apr.

11 21, 2020) (2020 Rule or Rule), and the Court's entire file in this litigation.

12       <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

13       **INTRODUCTION**

14       Plaintiffs (the States and Cities) challenge the 2020 Rule which drastically narrows the

15 "waters of the United States" protected by the Clean Water Act (CWA or the Act). With the 2020

16 Rule the EPA and the Army Corps (collectively, the Agencies) exclude from CWA jurisdiction (1)

17 all ephemeral streams and any other streams that do not contribute surface flow to another water

18 covered by the Rule ("covered water") in a "typical year"; (2) most wetlands that do not have a

19 surface water connection to another covered water; and (3) interstate waters as an independent

20 category. The Rule is invalid under either of the two "distinct standards" that courts apply in

21 reviewing agency regulations: the standard for agency decisionmaking under *Motor Vehicle*

22 *Manufacturers Ass'n of U.S., Inc. v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29 (1983)

23 (*State Farm*), and the standard for statutory interpretation under *Chevron, U.S.A., Inc. v. NRDC*,

24 467 U.S. 837, 843 (1984) (*Chevron*). *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*,

25 926 F.3d 1061, 1075 (9th Cir. 2019) (citation omitted) (*Altera*).

26       The Agencies' decisionmaking is flawed for three independent reasons. First, the Agencies

27 fail to examine important factors or address their prior factual findings, as required by *State Farm*

28 and *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 538 (2009) (*Fox*). As the administrative

<div align="center">1</div>

1  record shows, while they state that the Rule balances the Act's objective of maintaining the

2  integrity of the Nation's waters with the rights and responsibilities of states, the Agencies fail to

3  examine how excluding all ephemeral streams and countless wetlands will impact water quality or

4  state rights and responsibilities.  Second, the Agencies ignore their prior factual findings about the

5  impact on downstream water quality of the ephemeral streams and wetlands that the Rule

6  excludes.  They also adopt a vague and uncertain "typical year" requirement that conflicts with

7  CWA's goal of protecting and enhancing water quality.  Third, the Agencies fail to examine the

8  reliance interests of the States and Cities, who have relied on prior long-standing definitions of

9  "waters of the United States" that included those streams and wetlands, as required by *Encino*

10 *Motorcars, LLC. v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (*Encino Motorcars*).

11      Alternatively, the 2020 Rule is unlawful under the *Chevron* standard for statutory

12 interpretation because it is based on an unreasonable and impermissible interpretation of the CWA

13 and conflicts with precedent.  By excluding many previously covered waters from CWA

14 protection, the Rule is contrary to the Act's text, structure, and purpose, and controlling Supreme

15 Court decisions.

16      Accordingly, the States and Cities are entitled to summary judgment vacating the Rule.

17                   **STATUTORY AND REGULATORY BACKGROUND**

18 **I.    THE CLEAN WATER ACT**

19      The CWA's "objective . . . is to restore and maintain the chemical, physical and biological

20 integrity of the Nation's waters." 33 U.S.C. § 1251(a).  To achieve this objective, the Act prohibits

21 discharges of pollutants from point sources to "navigable waters" without a permit or in violation

22 of a permit.  *Id.* §§ 1311(a), 1342, 1344, 1362(12).  "Navigable waters" are "the waters of the

23 United States, including the territorial seas."  *Id*. § 1362(7).  This includes interstate waters.  *Id.*

24 § 1313(a) (specifying that protections for interstate waters under the CWA "shall remain in effect"

25 without regard to navigability).

26      Before the CWA was enacted in 1972, states were primarily responsible for water pollution

27 control, with the federal government playing a limited role.  S. Rep. No. 92-414, at 2 (1971) (1971

28 WL 11307, at *3669).  In passing the Act, however, Congress recognized that this state-led

2

1  scheme had been "inadequate in every vital aspect," leaving many waters "severely polluted."

2  Congress responded by deliberately replacing the ineffective patchwork of state laws with the

3  CWA, "an all-encompassing program of water pollution regulation." *Id*. at 7 (1971 WL 11307, at

4  *3674); *City of Milwaukee v. Illinois*, 451 U.S. 304, 318 (1981). Through the Act, Congress

5  created a uniform "national floor" of water quality protection by establishing minimum pollution

6  controls for "waters of the United States." *Arkansas v. Oklahoma,* 503 U.S. 91, 110 (1992) (CWA

7  authorizes EPA "to create and manage a uniform system of interstate water pollution regulation").

8      The CWA requires permits for two categories of discharges to "waters of the United

9  States": (1) discharge of a "pollutant" from a "point source"; and (2) discharge of dredged or fill

10  material. 33 U.S.C. §§ 1342, 1344, 1362(6), (14). Permits for discharges from point sources are

11  issued under Section 402 by EPA or authorized states. *Id*. § 1342(a), (b). Permits for discharges

12  of dredged or fill material are issued under Section 404 by the Army Corps or authorized states.

13  *Id*. § 1344(a), (h). Nearly all states operate the Section 402 permit program, and nearly all states

14  rely on the Army Corps to operate the Section 404 permit program.[1]

15      The Act provides additional mechanisms for protecting "waters of the United States."

16  Under Section 303, states are required to establish water quality standards for waters within their

17  borders and impose additional pollution restrictions on waters that fail to meet those standards. 33

18  U.S.C. § 1313. Under Section 401, a project within a state that requires a federal license or permit

19  and that may result in a discharge into "waters of the United States" is required to obtain a "water

20  quality certification" from the state certifying that the project will comply with the Act and

21  applicable state laws. *Id.* § 1341. Section 404 dredge or fill permits by the Army Corps and

22  licenses for pipelines or hydropower projects by the Federal Energy Regulatory Commission are

23  among the federal permits triggering Section 401 state certification requirements. *Id.*

24      Nationwide controls are critical to protecting water quality in downstream states because

25  many of the Nation's waters cross state boundaries and downstream states have limited ability to

26  control water pollution sources in upstream states. *See Int'l Paper Co. v. Ouellette,* 479 U.S. 481,

27

28  [1] *See* https://www.epa.gov/npdes/npdes-state-program-authority; https://www.epa.gov/cwa-404/state-or-tribal-assumption-cwa-section-404-permit-program.

3

490-91 (1987) (*Ouellette*).  Those controls "prevent the 'Tragedy of the Commons' that might result if jurisdictions [could] compete for industry and development by providing more liberal limitations than their neighboring states."  *NRDC v. Costle*, 568 F.2d 1369, 1378 (D.C. Cir. 1977) (citation omitted).  Downstream states are disadvantaged if they have to impose more stringent controls to address pollution from upstream states to safeguard public health and welfare within their own borders.  *See United States v. Ashland Oil & Transp. Co.,* 504 F.2d 1317, 1326 (6th Cir. 1974).

Section 101(b) of the Act states Congress's policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce and eliminate pollution," and "to plan the development and use . . . of land and water resources."  33 U.S.C. § 1251(b).  The primary purpose of Section 101(b) is to provide for state implementation of the CWA permit programs.  *See A Legislative History of the Water Pollution Control Act Amendments of 1972*, Committee Print Compiled for the Senate Committee on Public Works by the Library of Congress, Ser. No. 93–1, p. 403 (1973) (hereinafter, Dkt. No. 31-1, Ex. P) (referencing Section 101(b) and the "responsibility of states to prevent and abate pollution by assigning them a large role in the national discharge permit system established by the Act").  Accordingly, within the CWA framework, state rights and responsibilities are carried out as part of "a regulatory partnership," *Ouellette,* 479 U.S. at 499, "between the States and the Federal Government animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'"  *Arkansas*, 503 U.S. at 101.

## II. "WATERS OF THE UNITED STATES" – PREVIOUS AGENCY RULEMAKING AND GUIDANCE, AND SUPREME COURT CASELAW

The CWA does not define "waters of the United States" and the Agencies have defined those waters by regulation and guidance.  Of relevance here, the Agencies defined those waters in regulations issued in the 1970s and 1980s (1980s definition).  42 Fed. Reg. 37, 144 (July 19, 1977); 45 Fed. Reg. 85,336 (Dec. 24, 1980); 47 Fed. Reg. 31,794 (July 22, 1982); 51 Fed. Reg. 41,206 (Nov. 13, 1986); 53 Fed. Reg. 20,764 (June 6, 1988).  The Supreme Court reviewed the 1980s definition in three decisions: *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121

4

1  (1985) (*Riverside Bayview*); *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of*

2  *Eng'rs*, 531 U.S. 159 (2001) (*SWANCC*); and *Rapanos v. United States,* 547 U.S. 715 (2006)

3  (*Rapanos*).  Following *SWANCC* and *Rapanos*, the Agencies issued guidance in 2003 and 2008,

4  respectively.  *See* 68 Fed. Reg. 1995 (Jan. 15, 2003) (*SWANCC* guidance); *Clean Water Act*

5  *Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell*

6  *v. United States* (Dec. 2, 2008) (*Rapanos* Guidance), Administrative Record (AR) EPA-HQ-OW-

7  2018-0149-11695.[2]

8       In 2015, the Agencies issued the Clean Water Rule (2015 Clean Water Rule or 2015 Rule).

9  80 Fed. Reg. 37,054 (June 29, 2015) (codified at 3113 C.F.R. § 328.3 (2015)).  In 2019, before

10  issuing the regulation under review here, the Agencies issued a regulation (2019 Rule) that

11  repealed the 2015 Rule and reverted to the 1980s definition.  84 Fed. Reg. 4154 (Feb. 14, 2019).

12       All three sets of regulations predating the 2020 Rule defined "waters of the United States"

13  to include navigable-in-fact or "traditionally navigable waters," interstate waters, and the territorial

14  seas.  Those regulations differed in their treatment of non-navigable tributaries and wetlands but

15  did not exclude all ephemeral streams and did not require wetlands to have a surface water

16  connection to other covered waters.

17       **A.  The 1980s Definition**

18       In addition to defining "waters of the United States" to include traditionally navigable

19  waters, interstate waters, and the territorial seas, the 1980s definition included tributaries of those

20  waters and wetlands that were "adjacent to" them, defining "adjacent" to mean "bordering,

21  contiguous, or neighboring."  *See* 51 Fed. Reg. 41,206 (Nov. 13, 1986) (codified at 33 C.F.R. §

22  328.3 (c) (1987)).

23  _____

24       [2] Documents in the Administrative Record contain the prefix EPA-HQ-OW-0149
   followed by the Docket Document ID.  Citations to the Administrative Record herein omit the
   prefix and cite only to the Docket Document ID.  Thus, document EPA-HQ-OW-2018-0149-

25  11695 will be cited as "AR 11695." All AR page citations are to the page number of the
   electronic PDF due to the inconsistent application of enumerated page numbers across the record.

26  All AR citations hyperlink to the www.regulations.gov URL provided in the Administrative
   Record Index. Dkt. No. 206-2.  For those www.regulations.gov pages containing multiple

27  documents, clarifying language identifies the referenced document. For www.regulations.gov
   pages that contain PDFs of both a cover letter to a public comment and the public comment itself,

28  the AR page citations are only to the PDF page number of the comment.

5

1

**B.    Supreme Court Decisions Regarding the 1980s Definition**

2      In *Riverside Bayview*, the Supreme Court unanimously held that wetlands adjacent to

3 traditionally navigable waters are "inseparably bound up" with such waters and thus properly

4 included in the regulatory definition of "waters of the United States."  474 U.S. at 134.  The Court

5 based its holding on the observation that "Congress chose to define the waters covered by the Act

6 broadly . . . as 'the waters of the United States,'" with the clear "inten[t] to repudiate limits that

7 had been placed on federal regulation by earlier water pollution control statutes."  *Id.* at 133.

8      The Court in *Riverside Bayview* emphasized that the Act's objective —"to restore and

9 maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C.

10 § 1251(a) —"incorporated a broad, systematic view of the goal of maintaining and improving

11 water quality," and that "the word 'integrity'. . . refers to a condition in which the natural structure

12 and function of ecosystems [are] maintained."  474 U.S. at 132 (citing legislative history).  Noting

13 "the evident breadth of congressional concern for protection of water quality and aquatic

14 ecosystems," the Court explained that, as Congress recognized, "[p]rotection of aquatic

15 ecosystems . . . demanded broad federal authority to control pollution, for '[w]ater moves in

16 hydrologic cycles and it is essential that discharge of pollutants be controlled at the source.'"  *Id.*

17 at 132-33 (citing legislative history).

18      In *SWANCC*, the Court held that the Agencies had incorrectly interpreted "waters of the

19 United States" to encompass isolated, intrastate ponded waters in abandoned sand and gravel pits

20 based solely on their use as habitat for migratory birds.  531 U.S. at 167.  The Court confirmed the

21 approach in *Riverside Bayview*, stating that it "found that Congress' concern for the protection of

22 water quality and aquatic ecosystems indicated its intent to regulate wetlands 'inseparably bound

23 up with the waters of the United States.'"  *Id.* at 167 (internal quotation marks omitted).  Thus, the

24 Court made clear that the Act protects adjacent wetlands because of their "significant nexus" to

25 traditional navigable waters.  *Id.*

26      In *Rapanos*, the Court revisited the scope of "waters of the United States" and issued

27 several opinions.  The four-Justice plurality would have limited "waters of the United States" to

28 "relatively permanent, standing or flowing bodies of water . . . [not] ephemeral flows of water,"

1   and "those wetlands with a continuous surface connection" to them.  *Id.* at 732-33, 742.  Justice

2   Kennedy disagreed, concluding in a concurring opinion that "waters of the United States" include

3   traditional navigable waters and other waters with a "significant nexus" to navigable waters.  *Id*. at

4   779.  Justice Kennedy found that the plurality's "relatively permanent" waters and "surface

5   connection" limitations were "inconsistent with the Act's text, structure and purpose."  *Id*. at 776.

6   Writing for four Justices in dissent, Justice Stevens found that the plurality's relatively-permanent-

7   waters and surface-connection limits were "without support in the language and purposes of the

8   Act or in our cases interpreting it."  *Id.* at 800 (quoting Justice Kennedy's concurrence).

9       Both Justice Kennedy's concurrence and Justice Stevens' dissent emphasized that defining

10  "waters of the United States" under the Act requires consideration of the critical functions

11  performed by streams and wetlands and how they affect the chemical, physical, and biological

12  integrity of downstream waters.  Pointing out that the plurality's requirements "made little

13  practical sense in a statute concerned with downstream water quality," Justice Kennedy noted that

14  in the western United States, "irregular flows" in streams that are "often-dry water-courses" have

15  significant downstream effects.  547 U.S. at 769.  He also repeatedly stressed the important

16  functions wetlands perform to maintain the integrity of downstream waters, including trapping and

17  neutralizing of pollutants, flood prevention, control of surface run-off and erosion, and nutrient

18  recycling.  *Id.* at 775, 777, 779.  And Justice Kennedy found that "wetlands [had] 'significant

19  effects on water quality and the aquatic ecosystem'" regardless of whether their "moisture

20  originat[ed]" in "flooding or permeation" from "neighboring waterways," and that "it may be the

21  absence of interchange of waters . . . that makes protection of the wetlands critical to the statutory

22  scheme."  *Id*. at 773-74, 775 (citations omitted).  Similarly, Justice Stevens repeatedly referenced

23  wetlands' functions such as "nesting, spawning, rearing and resting sites for  . . . species . . .

24  valuable storage areas for storm and flood waters . . . and provid[ing] significant water purification

25  functions" that "are integral to the 'chemical, physical, and biological integrity of the Nation's

26  waters.'"  *Id.* at 796 (citations omitted); *see id.* at 797-99, 803-04, 807-08.

27

28

7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.     The 2008 *Rapanos* Guidance**

In the 2008 *Rapanos* Guidance the Agencies explained that the "significant nexus" standard for identifying "waters of the United States" was the "controlling" standard, and required the Agencies to "focus[] on the integral relationship between the ecological characteristics" of tributaries and wetlands. *Rapanos Guidance*, AR 11695 at 3, 9.  The Agencies stated that, in addition to traditionally navigable waters, the territorial seas, and interstate waters, the "waters of the United States" include: (1) relatively permanent non-navigable tributaries of traditionally navigable waters; and (2) wetlands that are adjacent to traditionally navigable waters, including wetlands that have a shallow subsurface connection to them as well as wetlands that directly abut relatively permanent non-navigable tributaries.  *Id.* at 4-7.  The guidance further provided that the Agencies would rely on case-by-case "significant nexus" analyses to assess whether non-navigable tributaries that are not relatively permanent, including ephemeral streams, and their adjacent wetlands are "waters of the United States."  *Id.* at 8-11.

**D.     The 2015 Clean Water Rule**

The 2015 Clean Water Rule replaced the 1980s definition.  The rule defined the waters protected by the Act based on "the text of the statute, Supreme Court decisions, the best available peer-reviewed science, public input, and the agencies' technical expertise and experience."  80 Fed. Reg. at 37,055.  Like Justice Kennedy's concurrence in *Rapanos* and the *Rapanos* Guidance, the rule relied on the "significant nexus" standard.  *See* 80 Fed. Reg. at 37,057.

In promulgating the rule, the Agencies carefully relied upon a report prepared by EPA's Office of Research and Development, entitled "Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence" (Connectivity Report), which accounted for more than 1,200 peer-reviewed publications.  80 Fed. Reg. at 37,057; Connectivity Report, AR 11691.  The Agencies also relied on independent review of the Connectivity Report by an expert panel of EPA's Science Advisory Board (Science Board).  *Id*.

Utilizing their "technical expertise and practical experience in implementing the CWA [for] over 40 years," in 2015 the Agencies established "jurisdictional categories reflect[ing] the current state of the best available science [and] . . . based upon the law and Supreme Court

8

1    decisions." *Id.*  In addition to traditionally navigable waters, interstate waters, and the territorial

2    seas,[3] the 2015 Rule defined "waters of the United States" to cover: (1) non-navigable tributaries

3    to covered waters, including ephemeral streams, defining "tributary" as a water with sufficient

4    volume, frequency, and duration of flow to create the physical indicators of a bed and banks and

5    an ordinary high-water mark; (2) wetlands adjacent to otherwise covered waters, defining

6    "adjacent" as bordering, contiguous or neighboring, including wetlands with connections to other

7    waters through either surface water or "shallow subsurface water and groundwater flows"; and (3)

8    other waters based on case-specific significant nexus analyses.  80 Fed. Reg. at 37,104-06.  The

9    Agencies determined that all these waters "require[d] protection in order to restore and maintain

10   the chemical, physical or biological integrity of traditional navigable waters, interstate waters, and

11   the territorial seas." *Id.* at 37,055.

12         In 2015, the Agencies recognized that connections between waters "occur on a continuum

13   or gradient," *Id.* at 37,057, and made findings about those connections by considering the Act's

14   language and purpose, the significant nexus standard, and the best available science.  The

15   Agencies "characterize[d] the nature and strength of the chemical, physical, and biological

16   connections between upstream and downstream waters" by "identify[ing] the functions that waters

17   provide that can significantly affect the chemical, physical, or biological integrity" of downstream

18   waters.  *Id.* at 37,057; *see id.* at 37,067.  Critically, the Agencies found that the effects of upstream

19   waters on downstream water integrity are cumulative, resulting from "the accumulative

20   contribution of similar waters in the same watershed and . . . their functions considered over time."

21   *Id.* at 37,057; *see id.* at 37,063.  And the Agencies concluded that "[w]hen considering the effect of

22   an individual stream or wetland, all contributions and functions of that stream or wetland should

23   be evaluated cumulatively." *Id.* at 37,064.

24         Applying accepted scientific principles, the Agencies found in the 2015 Clean Water Rule

25   that tributaries, "including . . . ephemeral streams" are "waters of the United States" because "they

26   significantly affect the chemical, physical, or biological integrity" of downstream waters and are

27   therefore "vital" to downstream water integrity.  *Id.* at 37,063, 37,066, 37,068.  In particular, the

28   _____

     [3] The definition also included impoundments of these waters.  80 Fed. Reg. at 37,104.

9

1   Agencies explained that ephemeral streams protect the chemical integrity of downstream waters by

2   trapping and removing harmful chemical substances through absorption to stream sediments, and

3   transformation and export of nutrients and carbon to downstream waters.  *See id.* at 37,068-69.

4   Ephemeral streams protect the physical integrity of downstream waters by transporting water

5   downstream "into local storage compartments such as ponds, shallow aquifers . . . and regional

6   and alluvial aquifers . . . that are important sources of water for maintaining baseflow in rivers," *id.*

7   at 37,063; by transporting sediments, organic matter, and organisms to downstream waters; and by

8   retaining and attenuating floodwaters.  *See id*. at 37,068-69.  Further, ephemeral streams protect

9   downstream waters by performing biological functions that "are critical in the life-cycles of many

10  organisms capable of moving throughout river networks."  *Id.* at 37,069.  Notably, ephemeral

11  streams are necessary to the dispersal and migration of amphibians, plants, microorganisms, and

12  invertebrates as well as to providing food, habitat and refuge for numerous species of fish and

13  wildlife such as salmon populations.  *Id.* at 37,063, 37,069.

14      The Agencies also determined in the 2015 Clean Water Rule that wetlands within 100 feet

15  of a protected water or within the 100-year floodplain of a protected water, out to a distance of

16  1,500 feet, are "adjacent" waters and "waters of the United States."  *Id*. at 37,085-86.  The

17  Agencies concluded that these wetlands require the Act's protection because they are "integrated

18  with rivers via functions that improve downstream water quality."  *Id.* at 37,063.  The Agencies

19  identified multiple important chemical, physical, and biological functions performed by these

20  adjacent wetlands.  *Id*. at 37,085-86.  Critically, the Agencies recognized that the functional

21  connections between wetlands and downstream waters include physical connections both "through

22  surface water" and through "shallow subsurface water and groundwater flows," as well as

23  "biological and chemical connections."  *Id*. at 37,063.

24      For example, floodplain wetlands promote chemical integrity of waters through processes

25  such as "assimilation, transformation and sequestration of pollutants, including excess nutrients

26  and chemical contaminants such as pesticides and metals that can degrade downstream water

27  integrity."  *Id*. at 37,063.  The Agencies found that floodplain wetlands protect the physical

28  integrity of downstream waters through functions including "temporary storage of local

10

1  groundwater . . . releasing (desynchronizing) floodwaters, and containing large volumes of

2  stormwater, sediment, and contaminants in runoff that could otherwise negatively affect the

3  condition or function of downstream waters." *Id*.  And the Agencies determined that wetlands

4  perform biological functions that are key to downstream water quality, by serving as "integral

5  components of river food webs," and "providing nursery habitat for breeding fish and amphibians,

6  colonization opportunities for stream invertebrates, and . . . exchange of organic matter and

7  organisms . . . that are critical to river ecosystem function." *Id.*

8      In addition, the Agencies concluded  that "waters of the United States" could properly

9  encompass more distant non-floodplain wetlands and open waters (such as vernal pools) based on

10  a case-by-case significant nexus analysis because of their "numerous functions that benefit

11  downstream water integrity." *Id.*; *see id*. at 37,086-91.

12      The 2015 Rule was stayed nationwide by the Sixth Circuit until the Supreme Court

13  reversed that court's judgment for lack of jurisdiction. *See Nat'l Ass'n of Mfrs. v. DOD,* 138 S. Ct.

14  617 (2018).  During the stay the Agencies applied the 1980s definition and the *Rapanos* Guidance

15  to determine the jurisdictional status of waters.  84 Fed. Reg. 56,626, 56,630 (Oct. 22, 2019).

16      **E.   The 2019 Rule**

17      On October 22, 2019, the Agencies replaced the 2015 Clean Water Rule with the 2019

18  Rule, which reinstated a definition identical to the 1980s definition while advising that the 2019

19  Rule would be implemented in accordance with the *SWANCC* and *Rapanos* guidances.  84 Fed.

20  Reg. at 56,626.  The Agencies did not supplement or change their detailed factual findings in the

21  2015 Rule because they did "not intend to engage in substantive reevaluation of the definition of

22  'waters of the United States.'"  82 Fed. Reg. 34,899, 34,903 (July 27, 2017).

23  **III.  THE 2020 RULE**

24      The 2020 Rule continues to define "waters of the United States" to include traditionally

25  navigable waters and the territorial seas, but excludes many of the non-navigable tributaries and

26  wetlands that have been protected under every prior rule and guidance.  By the Agencies' own

27  estimates, the Rule excludes from the Act's protections 18% of the nation's streams (more than a

28  third of streams in the arid west) and over 50% of the nation's wetlands.  AR 11767 at 2-4, 9.  The

11

1    Rule also, for the first time in the history of the Agencies' interpretation of "waters of the United

2    States," excludes interstate waters as an independent category of jurisdictional waters.

3         *Ephemeral streams.* The 2020 Rule expressly excludes "ephemeral" streams from the

4    scope of protected waters, defining "ephemeral" as "surface water flowing or pooling only in

5    direct response to precipitation (e.g., rain or snowfall)."  85 Fed. Reg. at 22,338.  The Agencies

6    received numerous comments – including from scientific organizations, government agencies, and

7    environmental experts and advocates – identifying the chemical, physical, and biological

8    connections between ephemeral streams and downstream waters and the importance of ephemeral

9    streams for restoring and maintaining downstream waters' integrity.[4]

10        The Agencies claimed that the 2020 Rule's categorical exclusion of ephemeral streams

11   from "waters of the United States" was justified by a "connectivity gradient," 85 Fed. Reg. at

12   22,288, asserting that the Connectivity Report and the Science Board supported this conclusion by

13   recognizing that the connections between waters vary in degree based on multiple factors.  AR 386

14   at 64-65 (enumerated as 53-54).  However, there is nothing in the Connectivity Report or the

15   Science Board's review of it stating that ephemeral streams should be excluded based on the

16   connectivity gradient.  Instead, the Connectivity Report and the Science Board stressed the

17   important functional connections of ephemeral streams to downstream waters, and the significant

18   cumulative impacts that the abundant numbers of ephemeral streams have on downstream waters'

19   integrity.  *See* Connectivity Report, AR 11691 at 26-27, 46-47, 113-114 (enumerated as ES-5 to

20   ES-6, 1-10 to 1-11, 3-7 to 3-8); Science Board Review, AR 386 at 22, 25, 33-34 (enumerated as

21   11, 14, 22-23).  As the record shows, the Science Board and its members determined that the

22   Agencies ignored the actual conclusions of the Connectivity Report and misrepresented both the

---

23        [4] *See*, *e.g.*, Society for Freshwater Science, AR 8909 at 5; American Society of
     Ichthyologists and Herpetologists, AR 4275 at 1; 10,000 Years Institute, AR 10975 at 1;
24   Alliance for the Great Lakes, et al., AR 5131 at 2; New England Interstate Water Pollution
     Control Commission, AR 4875 at 5; The Nature Conservancy, AR 5061 at 2; Mississippi River
25   Network, AR 5454 at 2; Maine Association of Wetland Scientists, AR 4389 at 2; Laura S. Craig,
     PhD, Director of Science and Economics, American Rivers, et al., AR 4909 at 2; Washington
26   State Department of Ecology, et al., AR 4733 at 1; Maryland Department of the Environment, AR
     4901 at 3-4; California State Water Resources Control Board, AR 5198 at 2-5; Wisconsin
27   Department of Natural Resources, AR 5304 at 1; Alaska Chapter of the Society of Wetland
     Scientists, AR 11015 at 1; North Carolina Environmental Restoration Association, AR 3701 at 3;
28   Arizona Riparian Council, AR 9033; Defenders of Wildlife, AR 4346 at 2, 9.

1    Science Board's review and the Connectivity Report's explanation of the import of the

2    connectivity gradient.  *See* AR 3825 at 2-3; AR 8909 at 5; AR 3291 at 9; AR 11589, Attachment 1.

3    Similarly, the record includes multiple comments explaining that the functions of individual

4    streams and wetlands are cumulative across entire watersheds and must be evaluated collectively

5    in order to accurately assess their contributions to and effects on downstream waters' integrity.[5]

6         *Wetlands*.  The Rule includes only those wetlands that qualify as "adjacent wetlands,"

7    defined as wetlands either touching another covered water or inundated by flooding from another

8    covered water in a typical year.[6]  85 Fed. Reg. at 22,338.  Thus, the Rule excludes most wetlands

9    that do not touch or otherwise have a surface water connection to other covered waters.

10        The Agencies received numerous comments from professional and scientific organizations,

11   government agencies, and environmental research and advocacy organizations detailing the

12   importance of wetlands to downstream water quality.  Echoing the Agencies' own prior findings,

13   these commenters pointed out that wetlands, including those without a direct surface water

14   connection to other waters, perform multiple chemical, physical, and biological functions that are

15   vital for restoring and maintaining downstream waters' integrity.[7]

16        *The "typical year" requirement*.  The 2020 Rule includes non-navigable tributaries only if

17   they carry perennial or intermittent flows to otherwise covered waters in a "typical year."  85 Fed.

18   Reg. at 22,286.  Similarly, to be "waters of the United States" under the Rule, wetlands must

19   generally have a surface water connection to jurisdictional waters in a "typical year." *See id.* at

20

21        [5] *See, e.g.*, Delaware Riverkeeper Network, AR 4736 at 7-8; Wisconsin Wetlands
     Association, AR 5064 at 1; Society for Freshwater Science, AR 8909 at 3; The Nature
22   Conservancy, AR 5061 at 5-6; Society of Wetland Scientists, AR 4466 at 20; Natural Resources
     Defense Council, et al., AR 7673 at 24.
23        [6] The 2020 Rule provides that wetlands remain adjacent when they are physically
     separated from a jurisdictional water by a natural barrier, or by an artificial barrier that allows for
24   a direct hydrologic surface connection in a typical year.  *See* 85 Fed. Reg. at 22,338.  By
     imposing a direct surface connection requirement for artificial barriers, the Rule protects fewer
25   waters than the Agencies' previous adjacency provisions in the 1980s definition, the *Rapanos
     Guidance*, and the 2015 Clean Water Rule.  *Cf. Rapanos* Guidance, AR 11695 at 5; 80 Fed. Reg.
     at 37,105.
26        [7] *See, e.g.*, Society of Wetland Scientists, AR 4466 at 9, 10, 13, 16; American Fisheries
     Society, et al., AR 6851 at 2; Delaware Ornithological Society, AR 4414 at 2; National Wildlife
27   Federation, AR 6880 at 27; California State Water Resources Control Board, AR 5198 at 4;
     Society for Freshwater Science, AR 8909 at 3, 8; Natural Resources Defense Council, AR 7673 at
28   22; Ohio Wetlands Association, AR 4879 at 2; Waterkeeper Alliance, et al., AR 11318 at 67.

13

1    22,274. "Typical year" is defined as "when precipitation and other climatic variables are within

2    the normal periodic range . . . for the geographic area of the applicable aquatic resource based on a

3    rolling thirty-year period." *Id.* at 22,339.

4         Numerous professional and scientific organizations, government agencies, academic

5    experts, and environmental advocates submitted comments showing that the Rule's typical year

6    requirement diverges from actual present-day hydrological conditions that are driven by the

7    profound and accelerating shifts resulting from climate change.  Those commenters explained that

8    the Rule's retrospective typical year requirement (looking to the previous 30 years) fails to account

9    for ongoing changes in precipitation, increased storm intensity, and altered hydrologic patterns of

10   streams and wetlands that are apparent and intensified by climate change.[8]  In addition,

11   commenters explained that climate change is reducing overall stream flow, that this reduction in

12   stream flow will occur at a quickly increasing rate, and that this will convert a significant number

13   of perennial and intermittent streams into ephemeral streams that are left unprotected by the Rule.

14   *See*, *e.g.*, AR 7628 at 15; AR 1715 at 2; AR 4343 at 19, 21, 29-30; *see also* Dkt. No. 30-18 ¶ 4.

15        The 2020 Rule's definition of tributary based on stream flow in a "typical year"[9] also

16   disregards the Agencies' prior findings that a tributary is best evidenced by the well-recognized

17   physical indicators of a bed and bank and ordinary high-water mark.[10]

18        *Resource and Programmatic Assessment and Economic Analysis.*  The Agencies asserted

19   that they analyzed the effects and impacts of the 2020 Rule on water quality by preparing a

20   "Resource and Programmatic Assessment" (RPA) and an "Economic Analysis" (EA). *See* 85 Fed.

21   _____

22   [8] *See*, *e.g.*, American Fisheries Society, et al., AR 4256 at 3; The Nature Conservancy, AR 5061 at 19-20; North Carolina Association of Environmental Professionals, AR 5435, Attachment

23   2 at 1; American Rivers, AR 5108 at 2; New England Interstate Water Pollution Control Commission, AR 4875 at 3; Mississippi River Network, AR 5454 at 5; Maine Association of

24   Wetland Scientists, AR 4389 at 3; Association of California Water Agencies, AR 4280 at 5; California State Water Resources Control Board, AR 5198 at 6; Natural Resources Defense

25   Council, AR 7673 at 13, 15-19; Environmental Law and Policy Center, et al., AR 5453 at 5.
     [9] The Agencies provide a long list of tools and methods to determine whether a stream is

26   intermittent or ephemeral in a "typical year," but do not explain or specify how or whether any of them should be used and do not provide an objective methodology to make such a determination.

27   *See* 85 Fed. Reg. at 22,292-94.  Similarly, the Agencies do not explain or specify the "other climatic variables" or "geographic area" components of the typical year definition.

28   [10] *See* U.S. EPA, *Technical Support Document for the Clean Water Rule: Definition of Waters of the United States* (2015 TSD) at 235-43, AR 11395, Attachment F-9.

14

1   Reg. at 22,331.  But when issuing the Rule, the Agencies expressly disavowed the RPA and EA as

2   bases for the Rule.  *Id.* at 22,332 ("the final rule is not based on the information in the agencies

3   [EA] or [RPA]"), 22,335; EA, AR 11572 at 12 (enumerated as xi); RPA, AR 11573 at 8

4   (enumerated as 6).  By their own admission, the Agencies' reworking of the scope of the Act is not

5   tethered to any findings about the effects and likely consequences of the Rule on Act's objective to

6   protect and restore the quality and integrity of waters nationwide.

7       The RPA and EA illustrate how the Rule's severe reduction in covered waters results in

8   increased water pollution.  Acknowledging the breadth of the Rule's impacts, the RPA observed

9   that "many CWA programs—including water quality standards, state and tribal [Section] 401

10   certification programs, and oil spill prevention and planning programs—apply only to waters

11   subject to CWA jurisdiction."  RPA, AR 11573 at 61 (enumerated as 59).

12       The essential characteristics of the 2020 Rule are based not on an application of scientific

13   principles or a consideration of harms to impacted waters, but instead on a "unifying legal theory

14   for federal jurisdiction over those waters and wetlands that maintain a sufficient surface water

15   connection to traditional navigable waters or the territorial seas."  85 Fed. Reg. at 22,252.  The

16   Rule's exclusion of non-navigable waters—including streams and wetlands—that lack a specific

17   surface water connection to other jurisdictional waters is drawn directly from the *Rapanos*

18   plurality opinion that commanded only a minority of the Justices of the Supreme Court.  *See, e.g.*,

19   85 Fed. Reg. at 22,273 (citing "plurality decision in *Rapanos*" for "specific surface water

20   connection" requirement); *id.* at 22,289 ("the requirement that a tributary be perennial or

21   intermittent . . . reflects the [*Rapanos*] plurality's" opinion); *see also id.* at 22,266, 22,278-79,

22   22,309 (same).  According to the Agencies, adopting this legal approach "balance[s]" the CWA's

23   water quality objective with the rights of states, *id*. at 22,252, recognizes the Act's "non-

24   regulatory" provisions, *id*. at 22,269, and "avoid[s] . . . constitutional questions," *id*. at 22,291.

25                                **STANDARD OF REVIEW**

26       The Administrative Procedure Act (APA) authorizes a court to "hold unlawful and set

27   aside agency actions, findings and conclusions" found to be "arbitrary, capricious, an abuse of

28   discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Because this is "a

                                          15

1   case involving review of a final agency action under the APA, . . . the genuine dispute of material

2   fact standard for summary judgment normally is inapplicable." *California v. U.S. Dep't of the*

3   *Interior*, 381 F. Supp. 3d 1153, 1164 (N.D. Cal. 2019) (quotation marks and citation omitted).

4   Rather, "summary judgment is an appropriate mechanism for deciding the legal question of

5   whether the agency could reasonably have found the facts as it did," *Occidental Eng'g Co. v.*

6   *I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985), and the agency action is "otherwise consistent with the

7   APA standard of review." *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F.

8   Supp. 2d 1077, 1084 (E.D. Cal. 2011) (quotation marks omitted).

9       Courts apply two distinct standards under the APA: one standard evaluates the rationality

10   of the agency's decisionmaking process and a second standard tests the reasonableness of the

11   agency's interpretation of the statute implemented by the regulation.  *See Altera*, 926 F.3d at 1075

12   (citation omitted).  To be valid, an agency interpretation must meet both of these standards.

13       First, an agency's decisionmaking is unlawful under *State Farm* if, among other things, the

14   agency fails to examine important factors or relevant data.  463 U.S. at 43.  An agency must

15   "consider all relevant factors and offer an explanation for its conclusion that is grounded in the

16   evidence."  *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 998 (9th Cir. 2014)

17   (citing *State Farm*).  An agency's decisionmaking also is flawed if the agency disregards or

18   countermands its earlier factual findings without a reasoned explanation, "even when reversing a

19   policy after an election," and that explanation must be "more substantial" when the agency's

20   decision "rests on factual findings contradicting those" made previously.  *Organized Village of*

21   *Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 967-68 (9th Cir. 2015); *see also Fox*, 556 U.S. at 538.

22   An agency issuing a rule that abandons prior policy or practice must also take into account the

23   "serious reliance interests" engendered by the agency's prior position.  *Encino Motorcars*, 136 S.

24   Ct. at 2126.

25       Second, an agency's interpretation of ambiguous statutory language is unlawful under

26   *Chevron* if it is not based on a "permissible" construction of the statute, which "is examined in

27   light of the statute's text, structure and purpose."  *Altera*, 926 F.3d at 1076; *see also Chevron*, 467

28   U.S. at 843.  Impermissible agency statutory interpretations include those that are "unmoored from

16

1    the purposes and concerns of the underlying statutory regime," *Altera*, 926 F.3d at 1076 (citations

2    omitted), or are "arbitrary or capricious in substance," *Mayo Found. for Med. Ed. & Research v.*

3    *United States*, 562 U.S. 44, 53 (2011) (citation omitted).

4                                                    **ARGUMENT**

5            The 2020 Rule removes the Act's longstanding protections for vast numbers of diverse and

6    important streams and wetlands nationwide and will result in increased pollution and harm to the

7    integrity of downstream waters—including harm to drinking water and wildlife and increased risk

8    of flooding of property owned by the States and Cities.  As explained below in Section I, the Rule

9    should be vacated because the Agencies' decisionmaking is flawed under *State Farm*, *Fox*, and

10   *Encino Motorcars.*  As explained below in Section II, the Rule also should be vacated because the

11   Agencies' interpretation of the Act is unreasonable under *Chevron.*  And as explained below in

12   Section III, the States and Cities have standing to challenge the Rule.

13   **I.    THE AGENCIES' DECISIONMAKING WAS ARBITRARY AND CAPRICIOUS**

14           The decisionmaking process for the 2020 Rule was arbitrary and capricious in three ways.

15   First, contrary to the Agencies' claim that they redefined "waters of the United States" based on

16   the Act's objective, 85 Fed. Reg. at 22,250, the Agencies in fact do not give meaningful

17   consideration to that objective—"to restore and maintain the integrity of the nation's waters"—and

18   fail to provide reasoned explanation for their conclusion that the Rule's new exclusions would

19   further the Act's objective.  The Agencies also entirely disregard the factual findings they made in

20   2015 regarding the impacts of those now excluded waters on downstream water quality.  The

21   Rule's "typical year" requirement similarly fails to meet the requirements for reasoned agency

22   rulemaking because it limits protections for wetlands and streams impacting downstream waters in

23   conflict with the Act's objective, and is vague and uncertain.

24           Second, while the Agencies claim they considered one of the Act's policies regarding "the

25   primary responsibilities and rights of States," *see id.* at 22,252, 33 U.S.C. § 1251(b), they simply

26   repeat the statutory phrase without explanation or analysis of how the 2020 Rule's exclusion of

27   waters from the Act's protections serves that policy.

28           Third, the Agencies entirely fail to consider the States' and Cities' reliance interests

                                                        17

1    engendered by the prior, decades-long definition of "waters of the United States."

2        **A.    The Agencies Did Not Examine or Explain Whether and How the 2020**
         **Rule's Narrower Definition of "Waters of the United States" Meets the**
3        **Act's Objective.**

4            An agency's decisionmaking process is arbitrary and capricious when the agency has

5    "failed to consider an important aspect of the problem" or failed to "examine the relevant data and

6    articulate a satisfactory explanation for its action including a rational connection between the facts

7    found and the choice made." *State Farm*, 463 U.S. at 43 (quotation marks and citations omitted).

8    In explaining the basis for the 2020 Rule, the Agencies state that the Act's objective of

9    maintaining and restoring the integrity of the Nation's waters is an important aspect of defining

10   "waters of the United States." Despite asserting that they took water quality into account, the

11   Agencies in fact entirely disregarded their own analysis of the water quality impacts of the 2020

12   Rule. The Agencies also make unexplained and unsupported assertions that their prior analyses of

13   water quality impacts now show that ephemeral streams and wetlands without surface connections

14   to navigable waters should be excluded from "waters of the United States."

15           Although the Agencies conducted assessments of the water quality impacts of the 2020

16   Rule, they then chose not to rely on those assessments in their decisionmaking. In response to

17   public comments, the Agencies state that they assessed the impacts in their RPA and EA (AR

18   11574, Topic 1 at 112-13), but ignore the ways in which those assessments fatally undermine the

19   Rule when they flatly declare that "the final rule is not based on" and "the agencies are not relying

20   on" either the EA or the RPA. 85 Fed. Reg. at 22,332, 22,335. Because those impact assessments

21   consider the Rule's consequences for water quality, the Agencies refusal to rely on them is a

22   concession that the Rule's large reduction in the scope of water quality protection under the Act

23   was adopted with in explicit disregard for the foundational purpose of the Act. And having

24   disclaimed reliance on those impact assessments in the Rule, the Agencies cannot now use them—

25   or selected excerpts from them—to justify the Rule. *See Dep't of Homeland Sec. v. Regents of the*

26   *Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (*DACA*) ("It is a 'foundational principle of

27   administrative law' that judicial review of agency action is limited to 'the grounds that the agency

28   invoked when it took the action.'") (quoting *Michigan v. EPA*, 576 U.S. 743, 758-60 (2015)).

1       It is unsurprising that the Agencies disclaim reliance on the RPA and the EA because those

2 assessments show that removing all ephemeral streams and many wetlands from the Act's

3 jurisdiction will in fact harm downstream water quality by causing greater pollutant loads,

4 increased oil spill risks, degraded aquatic habitats, and negative effects on drinking water intakes.

5 AR 11572 at 129 (enumerated as 105). The assessments also show that, as a result of the

6 exclusion of those waters, states will no longer have the authority to review and certify projects

7 that require federal permits and may discharge into those waters, *see* 33 U.S.C. 1341, nor be

8 required to impose water quality standards, and measures to meet them, on those waters, *see id.*

9 § 1313, "result[ing] in reduced protection for aquatic ecosystems." RPA, AR 11573 at 64

10 (enumerated as 62). The assessments further demonstrate that the exclusion of previously

11 protected waters will result in elimination of oil spill prevention and preparedness requirements.

12 *See id.* § 1321(b); RPA, AR 11573 at 61, 64-66, 72-74 (enumerated as 59, 62-64, 70-72).

13       Once the Agencies chose to dispense with the only assessments that addressed the 2020

14 Rule's effects on water quality and the Rule's ability to achieve the Act's keystone objective, the

15 only analyses of water quality impacts left are the analyses they relied on for the 2015 Rule:

16 namely, the Connectivity Report and the Science Board's analysis of that report. Those analyses,

17 however, unequivocally demonstrate that ephemeral streams and wetlands without surface water

18 connections to other waters have significant water quality impacts on downstream waters. See

19 Connectivity Report, AR 11691 (as cited in Background, Section III); Science Board Review, AR

20 386 (same). Yet the Agencies forged ahead with the exclusion of those waters in the 2020 Rule,

21 claiming without explanation or support that those exclusions were based on "science." 85 Fed.

22 Reg. at 22,288, 22,310. In that process, the Agencies ignored not only the requirements of *State*

23 *Farm* but also of *Fox*, which holds that an agency's decision is arbitrary and capricious if it fails to

24 address the agency's prior factual findings. *See* 556 U.S. at 538.

25       By failing to meaningfully consider—and actually harming—the quality of the Nation's

26 waters, the Agencies in the 2020 Rule have acted irrationally because "[r]ational decision making

27 also dictates that the agency simply cannot employ means that actually undercut its own purported

28 goals." *Office of Commc'n of the United Church of Christ v. FCC*, 779 F.2d 702, 707 (D.C. Cir.

<center>19</center>

1   1985).  The Rule is arbitrary and capricious because it is "contrary to Congress's purpose in

2   enacting" the Act.  *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1197 (9th Cir. 2008);

3   *Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 158 (3d Cir. 2004) (holding agency

4   interpretation arbitrary where it "frustrates the regulatory goal").

5           **1.      The Agencies' Decision to Exclude All Ephemeral Streams Was
                      Arbitrary and Capricious.**
6

7           Rather than explaining how excluding ephemeral streams is consistent with the Act's

8   objective, the Agencies offer mere conclusions and fail to acknowledge their prior findings.  The

9   Agencies claim that the 2020 Rule's exclusion of ephemeral streams "relied on the available

10  science" and "rests upon a reasonable inference of ecological interconnection" with navigable

11  waters.  85 Fed. Reg. at 22,288, 22,310.  But they offer nothing by way of explanation or support

12  for that "inference."  Moreover, the "available science" is the Connectivity Report and the Science

13  Board's review of it, which both contradict any inference that ephemeral streams are categorically

14  not important for restoring or maintaining downstream water quality.  Indeed, the Connectivity

15  Report clearly shows that ephemeral streams perform multiple chemical, physical, and biological

16  functions that are vital to protecting the quality and integrity of traditional navigable waters.  *See*

17  Connectivity Report, AR 11691 at 26-27, 46-47, 113-114 (enumerated as ES-5 to ES-6, 1-10 to 1-

18  11, 3-7 to 3-8); Science Board Review, AR 386 at 22, 25, 33-34 (enumerated as 11, 14, 22-23).

19  As discussed above (pp. 8-11), the Agencies made findings regarding these important connections

20  between ephemeral streams and downstream waters in 2015, which they now fail to acknowledge.

21  Thus, the Agencies' decision to categorically exclude ephemeral streams is not supported by either

22  a reasoned explanation or relevant data, as required by *State Farm*, nor does it address the

23  Agencies' prior findings, as required by *Fox*.  Indeed, their conclusion is "flatly contradicted by

24  the agenc[ies'] own record."  *See Kansas City v. Dep't of Housing & Urban Dev.*, 923 F.2d 188,

25  194 (D.C. Cir. 1991) (citing *State Farm*, 463 U.S. at 43).

26          The Agencies also assert that their decision to exclude all ephemeral streams from the

27  Act's protections is supported by the "connectivity gradient," 85 Fed. Reg. at 22,288, a common-

28  sense concept that the connections between waters vary in degree based on multiple factors as

20

1   recognized by the Agencies in 2015.  *See* 80 Fed. Reg. at 37,057.  But the Agencies offer only

2   their conclusion that the connectivity gradient provides a scientific basis for the exclusion of

3   ephemeral streams; there is no explanation or basis in the record that shows how the "connectivity

4   gradient" in fact supports the Agencies' categorical exclusion.  Quite the contrary, the

5   Connectivity Report and the Science Board's review explain that the connectivity gradient does

6   not support removal of CWA protections for the waters excluded by the 2020 Rule and instead

7   demonstrates that non-navigable waters that flow infrequently can have significant impact on the

8   integrity of downstream waters.  The Connectivity Report found that "the evidence for

9   connectivity and downstream effects of ephemeral streams was strong and compelling."  AR

10  11691 at ES-7.  And the Science Board's review found that "[i]mportant cumulative effects are

11  exemplified by ephemeral flows in arid landscapes, low frequency events that may nevertheless

12  provide most of the subsidies to downgradient waters," AR 386 at 33 (enumerated as 22), and

13  emphasized "[t]he importance of considering waterbodies in the aggregate," including ephemeral

14  streams, "for evaluations of connectivity," *id*. at 22 (enumerated as 11).  Indeed, Science Board

15  members who reviewed the Connectivity Report in 2015 commented that the Agencies' 2020 Rule

16  "ignores or misrepresents much of the Connectivity Report and subsequent Science Board

17  Review," "misrepresents" the Science Board's hypothetical illustration of the connectivity

18  gradient, and "arrives at an erroneous conclusion" that is "not supported by the science, and

19  opposite the intent of the [Science Board]."  AR 3825 at 2-3.  In the 2020 Rule, the Agencies

20  provide no cogent reason to dismiss those pointed, authoritative rebukes of their attempt to rely on

21  this prior scientific work, and that fact is fatal to their effort to defend the Rule now.

22          The Rule's exclusion of ephemeral streams also disregards the Agencies' prior factual

23  findings that ephemeral streams with a bed, banks, and an ordinary high-water mark significantly

24  affect the chemical, physical, and biological integrity of downstream navigable waters and should

25  be included within the scope of "waters of the United States."  *See* 80 Fed. Reg. at 37,068-69,

26  37,079.  The Agencies previously found that tributaries, including upstream ephemeral waters,

27  "are significant enough that wetlands adjacent to them are likely, in the majority of cases, to

28  perform important functions for an aquatic system incorporating navigable waters."  2015 TSD,

21

1   AR 11395, Attachment F-9 at 71 (enumerated as 70), citing *Rapanos*, 547 U.S. at 781 (Kennedy,

2   J., concurring).  But in the 2020 Rule the Agencies assert, without any basis in fact, the exact

3   opposite: all ephemeral streams categorically *lack* sufficient connection to navigable waters, 85

4   Fed. Reg. at 22,288, and are *not* "significant enough that wetlands adjacent to them are likely, in

5   the majority of cases, to perform important functions for an aquatic system."  *Id*. at 22,310.

6   Because the Agencies have failed to provide a "reasoned explanation" for these new contradictory

7   findings that disregard their prior findings, the Rule is arbitrary and capricious.  *See Fox*, 556 U.S.

8   at 516, 537.

9              **2.     The Agencies' Decision to Exclude Wetlands Without Direct Surface**
               **Water Connection Is Arbitrary and Capricious.**
10

11          The Agencies' explanation of why they excluded wetlands without direct surface

12   connections to other waters from their redefinition of "waters of the United States" fares even

13   worse.  Although the Agencies assert that the redefinition "achieves the goals of the Act," 85 Fed.

14   Reg. at 22,314, their explanation regarding the wetlands covered by the 2020 Rule does not

15   mention, much less meaningfully consider, the impacts to downstream water quality that will

16   result from the lack of protections for newly-excluded wetlands.  *See id*. at 22,306-22,317.

17          Here, again, the Agencies claim that their decision to redefine adjacent wetlands covered

18   by the Act was "informed by science."  *Id.* at 22,314.  But while they refer to statements in the

19   Connectivity Report and the Science Board Review that wetlands closer to streams have a greater

20   impact on streams, they fail to provide any explanation of how they concluded that some wetlands

21   should be excluded.  *See id.*  Moreover, the Science Board in its official capacity, and its members

22   separately and in their professional capacities, have stated that the Agencies' line-drawing with

23   respect to wetlands "departs from established science," AR 11589, Attachment 1 at 3, and

24   disregards "[m]ultiple lines of evidence point[ing] to the importance of chemical and biological

25   connectivity between wetlands and downstream waters."  AR 3825 at 5.

26          In violation of the requirements of *Fox*, the Agencies disregard *all* of their prior findings,

27   discussed above (pp. 8-11), about the importance of shallow subsurface and groundwater

28   connections between wetlands and downstream waters.  AR 3825 at 5-6.  Those findings show that

                                                        22

1    the wetlands excluded by the Rule perform functions essential to maintaining the integrity of

2    traditional navigable waters, such as trapping pollutants, preventing flooding, and providing

3    habitat for numerous species.  *See, e.g.*, Connectivity Report, <u>AR 11691</u> at 23-25 (enumerated as

4    ES-2 to ES-4).  Indeed, the Agencies expressly found in 2015 that wetlands with "regular shallow

5    subsurface-water connection" to downstream waters "clearly affect" these waters, and "floodplain

6    wetlands are highly connected to streams and rivers through . . . shallow groundwater." *Id.* at 24,

7    192 (enumerated as ES-3, 4-39).  Because the Agencies "offer no new information or data to

8    justify [their] contrary finding" that CWA protection is *un*necessary for the excluded wetlands, the

9    Rule is arbitrary and capricious.  *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 463 F.

10   Supp. 3d 1011, 1020 (D. Alaska 2020).

11       In promulgating the 2020 Rule, the Agencies received numerous substantive public

12   comments detailing wetlands' many vital functions that impact downstream water integrity, the

13   similar functions performed by ephemeral streams, and the cumulative downstream effects of both

14   types of waters.  *See* pp. 11-15, *supra*.  Despite the "[v]oluminous evidence support[ing] the

15   commenters' view," the Agencies have "waved away those commenters' concerns and their

16   supporting evidence in a few sentences of defective argument."  *Dist. of Columbia v. U.S. Dep't of*

17   *Agric.*, 444 F. Supp. 3d 1, 23 (D.D.C. 2020).  The Agencies do not respond to these comments and

18   merely offer the conclusory phrase that the Rule was "informed by science" and repeat dozens of

19   times that "science cannot dictate where to draw the line between federal and state or tribal waters,

20   as those are legal definitions."  *See, e.g.*, Response to Comments, <u>AR 11574</u>, Topic 1 at 16, 40, 67,

21   115, 127, 134, 137; Topic 3 at 12; Topic 4 at 10; Topic 5 at 9; Topic 6 at 5; Topic 7 at 11; Topic 8

22   at 12, 14, 42; Topic 10 at 3, 22; Topic 11 at 33, 41, 74, 114; Topic 13 at 1, 8, 13; *see also* 85 Fed.

23   Reg. at 22,261, 22,271, 22,288, 22,308 (same).  Simply "[n]odding to the concerns raised by

24   commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned

25   decisionmaking."  *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020).  Importantly, as discussed

26   by the Supreme Court in *SWANCC*, *Riverside Bayview*, and *Rapanos*, and consistent with the

27   Act's text, purpose and intent, science is an essential factor in the Agencies' interpretation of the

28   scope of "waters of the United States."  *See* pp. 6-7, *supra*.  Rather than meaningfully considering

23

1   significant comments and extensive record evidence about the importance to downstream water

2   quality of the many wetlands and other waters the Rule excludes from the Act's protections, the

3   Agencies arbitrarily and capriciously "brushed aside critical facts" with conclusory responses.

4   *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017).

5           **3.      The "Typical Year" Requirement Is Arbitrary and Capricious.**

6           The 2020 Rule's requirement that "waters of the United States" have a surface water

7   connection to another protected water in a "typical year" is arbitrary and capricious.  The typical

8   year requirement excludes from the Act's protections waters that are essential to restore and

9   maintain downstream waters' integrity and is contrary to the evidence before the Agencies.

10  Purporting to encompass "times when it is not too wet and not too dry," 85 Fed. Reg. at 22,274,

11  the Agencies offer no factual support for the limiting principle they have selected.  By focusing on

12  the preceding thirty-year period, the "typical year" requirement ignores significant comments and

13  evidence about the substantial connectivity between waters during what are increasingly atypical

14  years (when compared to 30 years of historical data) resulting from climate change.  *See* pp. 13-

15  14, *supra*.  Wetlands that would otherwise function to trap pollutants and mitigate downstream

16  flooding, regardless of their surface water connection in a typical year, will lose protection because

17  of this arbitrary requirement.  *See* AR 4389 at 3; AR 5061 at 19; AR 5126 at 4-5; *see also* Dkt. No.

18  30-22 at 10-13; Dkt. No. 30-15 at 12-13.  The Rule also fails to explain the meaning of the "other

19  climatic variables" and "geographic area" components of the typical year definition, 85 Fed. Reg.

20  at 22,341, leaving identification of protected waters subject to "vague and uncertain analysis."

21  *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 869 (9th Cir. 2005).  The Agencies

22  thus have failed to "articulate a satisfactory explanation for [their] action including a 'rational

23  connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43.

24          **B.      The Agencies Fail to Examine or Explain How the 2020 Rule's Narrower
                      Definition of "Waters of the United States" Is Consistent with CWA's**
25          **Policy Regarding the Responsibilities and Rights of States.**

26          The Agencies claim that they balanced the CWA's objective against the Act's policy to

27  preserve and protect the "responsibilities and rights of states to prevent, reduce, and eliminate

28  pollution."  *See* 85 Fed. Reg. at 22,252, citing 33 U.S.C. § 1251(b).  As explained below (pp. 33-

                                                    24

1    38, *infra*), the policy cannot bear the weight the Agencies place on it: the policy reflects

2    Congress's intent that the states, rather than EPA, implement the Act's permitting programs and

3    thus does not provide any textual basis for narrowing the scope of "waters of the United States" in

4    deference to state-only regulation.  But even if the policy were an appropriate basis for excluding

5    some waters from "waters of the United States," the Agencies do nothing more than invoke the

6    policy as a basis for narrowing the definition of "waters of the United States."  *See, e.g.,* 85 Fed.

7    Reg at 22,250, 22,269, 22,273, 22,296.  They offer no analysis or explanation of whether or how

8    excluding interstate waters as an independent category, as well as ephemeral streams and wetlands

9    without surface water connections, preserves or protects the "responsibilities and rights of States to

10   prevent, reduce, and eliminate pollution."  33 U.S.C. §1251(b).

11      Because the Agencies fail to analyze and explain how the redefinition of "waters of the

12   United States" impacts the CWA's policy regarding state rights and responsibilities, the Rule is

13   arbitrary and capricious under *State Farm*.

14      **C.    The 2020 Rule Is Arbitrary and Capricious Because the Agencies Fail to
            Consider the States' and Cities' Reliance Interests.**
15

16      "When an agency changes course . . . it must 'be cognizant that longstanding policies may

17   have engendered serious reliance interests that must be taken into account.'"  *DACA*, 140 S. Ct. at

18   1913 (quoting *Encino Motorcars*; internal quotation marks omitted); *see also California v. Azar*,

19   950 F.3d 1067, 1113 (9th Cir. 2020).  In particular, an agency revising its prior policy is "required

20   to assess whether there were reliance interests, determine whether they were significant, and weigh

21   any such interests against competing policy concerns."  *DACA*, 140 S. Ct. at 1915.

22      The Agencies entirely fail to assess whether states have reliance interests in the prior

23   definitions of "waters of the United States" and then weigh those interests against the other factors

24   the Agencies considered in deciding to change their longstanding policy.  As explained above (pp.

25   11-15, *supra*), the 2020 Rule excludes (1) all ephemeral streams and any other streams that do not

26   contribute flow to a covered water in a "typical year"; (2) many wetlands that do not have a

27   surface water connection to another covered water; and (3) interstate waters as an independent

28   category.  In contrast, the 1980s regulations defined "waters of the United States" broadly and the

25

1    2008 *Rapanos* Guidance explained that the 1980s definition includes (1) ephemeral streams with a

2    "significant nexus" to traditionally navigable waters; (2) wetlands with a shallow subsurface

3    connection to traditionally navigable waters; and (3) all interstate waters.  *Rapanos* Guidance, AR

4    11695 at 4-11.  The 2015 Rule confirmed that "waters of the United States" include (1) ephemeral

5    streams with bed and banks and ordinary high-water marks; (2) wetlands with important functional

6    connections to covered waters other than surface water connections; and (3) all interstate waters.

7    80 Fed. Reg. at 37,055, 37,068, 37,079, 37,080-81.  The 2019 Rule returned to the 1980s

8    regulations and the *Rapanos* Guidance.  84 Fed. Reg. at 56,626.

9         The States and Cities have relied on those earlier definitions to structure their water quality

10   protection programs and safeguard their waters.[11]  AR 5126 at 2, 7-8; AR 5467 at 42, 44, 46-48,

11   50, 58-59, 68, 89, 93, 95, 97, 100, 102; AR 11442, Comment at 7-14; AR 4820 at 15-16; AR 4528

12   at 3.  Many states did not seek authorization to administer the Section 404 dredge and fill

13   permitting program and decided not to develop their own dredge and fill programs or point source

14   programs because they relied on long-standing federal protections.  AR 5126 at 7-8; AR 5467 at

15   58-59, 68, 89, 93, 95, 97, 100, 102; AR 11442, Comment at 7-14; AR 4820 at 15-16; AR 4528 at

16   3.  The 2020 Rule upends longstanding state regulatory programs, increases state administrative

17   costs and burdens, threatens to profoundly damage state property, and drastically reduces federal

18   water quality protections.  *Id.*; s*ee* Argument, Section III, *infra*.

19        In response to comments regarding states' reliance interests, the Agencies take the position

20   that the states did not have reliance interests in the 2015 Rule because it was the subject of

21   _____

22        [11] Dkt. No. 30-17 ¶¶ 14, 25, 34; Declaration of Roy A. Jacobson Jr. in Support of
     Plaintiffs' Motion for Summary Judgment (Jacobson Decl.) ¶ 8; Declaration of Daniel Zarrili in

23   Support of Plaintiffs' Motion for Summary Judgment (Zarrilli Decl.) ¶ 2; Dkt. No. 30-14 ¶ 7;
     Declaration of Steve Mrazik in Support of Plaintiffs' Motion for Summary Judgment (Mrazik

24   Decl.) ¶ 5; Dkt. No. 30-5 ¶ 16; Declaration of Jeffrey Seltzer in Support of Plaintiffs' Motion for
     Summary Judgment (Seltzer Decl.) ¶¶ 2, 24, 31; Declaration of Jonathan Bishop in Support of

25   Plaintiffs' Motion for Summary Judgment (Bishop Decl.) ¶ 31; Declaration of Teresa Seidel in
     Support of Plaintiffs' Motion for Summary Judgment (Seidel Decl.) ¶ 4; Dkt. No. 30-16 ¶ 11;

26   Dkt. No. 30-22 ¶ 31; Declaration of Kathleen M. Baskin (Baskin Decl.) ¶¶ 19-23.); Declaration of
     David Davis in Support of Plaintiffs' Motion for Summary Judgment (Davis Decl.) ¶¶ 5-6;

27   Declaration of Rebecca Roose in Support of Plaintiffs' Motion for Summary Judgment (Roose

28   Decl.) ¶¶ 10-11, 19-22.

1   substantial litigation or in the 2019 Rule because it was in place only for a short period of time.

2   AR 11574, Topic 1 at 29; Topic 11 at 12-25.  The Agencies, however, ignore the fact that for

3   many decades the Agencies' regulations consistently covered a far wider scope of waters than are

4   covered under the 2020 Rule.  The 1980s regulations defined "waters of the United States"

5   broadly, as did the 2008 *Rapanos* Guidance, which implemented Justice Kennedy's significant

6   nexus test and defined "waters of the United States" to include ephemeral streams and wetlands

7   that are now excluded.  *Rapanos* Guidance, AR 11695 at 4-11.  The 1980s definition and the

8   *Rapanos* Guidance have remained in place and were applied by the Agencies both during the

9   litigation and stay of the 2015 Rule and after the 2019 Rule was promulgated, demonstrating that

10  reliance on a broader, more protective definition of "waters of the United States" was long-

11  standing and reasonable.  *See* 84 Fed. Reg. at 56,626, 56,630.

12      The Agencies also assert that they have addressed the states' reliance interests because

13  there was ample notice that the 2015 Rule would be rescinded and the Agencies engaged in the

14  rulemaking for the 2019 Rule and the 2020 Rule.  *See* AR 11574, Topic 1 at 29.  But the Agencies

15  offer no authority for their claim that any reliance interests in longstanding agency policy

16  evaporate once an agency provides notice that it plans to change course.  And the mere fact that

17  the Agencies initiated notice-and-comment rulemaking related to the definition of "waters of the

18  United States," during which time they received hundreds of thousands of comments describing

19  the harm the new rule would cause, is insufficient under the APA.  Instead, the Agencies were

20  "required to assess whether there were reliance interests, determine whether they were significant,

21  and weigh any such interests against competing policy concerns."  *DACA*, 140 S. Ct. at 1915.  The

22  Agencies failed to do so in the 2020 Rule.

23      The Agencies' other contention that "even if serious reliance interests were at issue, which

24  they are not, the agencies have provided a thorough and reasoned explanation for the changed

25  definition," AR 11574, Topic 1 at 29-30, 107-10, is unavailing.  Rather than carefully balance the

26  states' reliance interests against other policy factors motivating the 2020 Rule, the Agencies

27  simply state that "Congress envisioned a major role for the states in implementing the CWA" and

28  "[t]he ultimate response of states and tribes to this rule would not change the agencies'

1    interpretation of the scope of their legal authority." <u>*Id.*</u> at 28.  As the Supreme Court has

2    explained, the Agencies must "weigh any such interests against competing policy concerns."

3    *DACA*, 140 S. Ct. at 1915.  Regardless of whether the Agencies' explanation for their changed

4    position is "thorough and reasoned"—which it is not—the Agencies have failed to balance the

5    States' and Cities' significant reliance interests against any "competing policy concerns."

6        This arbitrary failure to consider the States' and Cities' reliance interests has serious real-

7    world consequences.  The States and Cities are faced with the decisions of whether and how to

8    establish and expand water pollution control programs to protect the countless waters no longer

9    protected by the CWA.  *See* Argument, Section III, *infra*.  These efforts by the States and Cities

10    will require long-term investment of significant resources, but in the meantime water quality, and

11    the States' and Cities' important interests in their wildlife and public property, will be exposed to

12    degradation and increased risk of harm.  *Id.*

13   **II.**     **THE 2020 RULE IS AN IMPERMISSIBLE INTERPRETATION OF THE CWA**

14        While the Agencies are authorized to promulgate regulations interpreting the scope of the

15    "waters of the United States" protected by the Act, here their interpretation constitutes an

16    unreasonable construction of the Act that is not entitled to any deference whatsoever.  *See The*

17    *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1061- 62 (9th Cir. 2003)

18    (*Wilderness Society*).  "An agency's interpretation of statutory authority is examined 'in light of

19    the statute's text, structure and purpose.'"  *Altera*, 926 F.3d at 1088; *see also United States v.*

20    *Dailey*, 941 F.3d 1183, 1192 (9th Cir. 2019) (courts do not reflexively defer to agencies'

21    interpretations of statutes).  The interpretation fails if it is "unmoored from the purposes and

22    concerns" of the statutory regime.  *Judulang v. Holder*, 565 U.S. 42, 64 (2011); *see also Altera*,

23    926 F.3d at 1088.  A statutory interpretation "is not a permissible (or reasonable) construction of

24    the statute [if] it is directly at odds with the text and purpose of the Act."  *NRDC v. Nat'l Marine*

25    *Fisheries Serv.*, 421 F.3d 872, 879 (9th Cir. 2005).

26        The 2020 Rule adopts an impermissible and unreasonable interpretation of "waters of the

27    United States" because the Rule categorically excludes all ephemeral streams, many wetlands, and

28    interstate waters as an independent category.  This interpretation is untethered from and conflicts

<div align="center">28</div>

1   with the Act's text, structure, and essential objective, and contradicts Supreme Court precedent.

2       **A.   The 2020 Rule Is Unreasonable Because It Excludes Ephemeral Streams.**

3       The Agencies' exclusion of ephemeral streams in the 2020 Rule relies on the *Rapanos*

4   plurality's conclusion that ephemeral waters are not within the scope of "waters of the United

5   States." *Rapanos,* 547 U.S. at 733-34.  That interpretation by the Agencies constitutes an

6   impermissible interpretation because most of the Supreme Court Justices in *Rapanos* agreed that

7   interpreting the term "waters of the United States" to categorically remove ephemeral streams

8   from its scope is contrary to the CWA's text, structure, and purpose.  *Id.* at 769-70, 800.  Justice

9   Kennedy's concurrence together with Justice Stevens' dissent in *Rapanos* established the

10  boundaries of the Agencies' discretion when interpreting the statutory language at issue.  *See*

11  *Vasquez v. Hillery*, 474 U.S. 254, 262 n.4 (1986) (agreement of five justices, even when not

12  joining each other's opinions, constitutes a majority whose opinion carries "precedential weight");

13  *see also Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 17 (1983) (four

14  dissenting Justices and a Justice concurring in the judgment who agree on a particular legal

15  conclusion "form[] a majority to require application" of that legal conclusion).  Therefore, Justice

16  Kennedy's concurrence in *Rapanos*, which the Ninth Circuit has held is "controlling", *N. Cal.*

17  *Riverwatch v. City of Healdsburg*, 496 F.3d 993, 995 (9th Cir. 2007) (*Healdsburg*), together with

18  the four-Justice dissent in *Rapanos* forecloses an interpretation that excludes ephemeral streams as

19  a whole because such an interpretation is inconsistent with the Act's text, structure and purpose

20  and thus unreasonable and impermissible under *Chevron*.  *Rapanos*, 547 U.S. at 769-770, 800.

21      **1.   The Rule Adopts the *Rapanos* Plurality's Exclusion of Ephemeral**
            **Streams.**
22

23      The 2020 Rule is based on the *Rapanos* plurality opinion's exclusion of ephemeral streams.

24  The Rule repeatedly cites "the plurality decision in *Rapanos*," 547 U.S. at 732, as the basis to

25  exclude ephemeral streams, explaining that, "[a]ccording to the *Rapanos* plurality . . . the

26  ordinary meaning of the term 'waters' does not include areas that are dry most of the year, and

27  which may occasionally contain 'transitory puddles or ephemeral flows of water.' 547 U.S. at

28  733."  85 Fed. Reg. at 22,273.

1
2
3
4
5

> Under the final rule, ephemeral features . . . are not jurisdictional and do not
> become jurisdictional even if they episodically convey surface water from
> upstream relatively permanent jurisdictional waters to downstream jurisdictional
> waters in a typical year, and thereby help maintain the jurisdictional status of the
> upstream waters.  This approach incorporates the plurality's requirement that
> jurisdictional waters be continuously present, fixed bodies of water and that dry
> channels, transitory puddles, and ephemeral flows be excluded from jurisdiction.
> 547 U.S. at 733–34; *see also id.* at 731.

6    *Id*. at 22,278, 22,289 (internal citations omitted) (the Agencies reasoned that ephemeral streams

7    should be excluded because "the requirement that a tributary be perennial or intermittent and be

8    connected to a traditional navigable water is reasonable and reflects the [*Rapanos*] plurality's

9    description of a 'wate[r] of the United States' as '*i.e.*, a relatively permanent body of water

10   connected to traditional interstate navigable waters.'").  As explained below, because the

11   "relatively permanent waters" test was rejected by the controlling *Rapanos* opinion, the 2020 Rule

12   is unlawful.

13
14

     **2.**    **The Agencies' Exclusion of Ephemeral Streams Is Not Entitled to Deference Because the Controlling Rule of Law from *Rapanos* Rejects Such Exclusion as Impermissible Under the Act.**

15        The Ninth Circuit has repeatedly held that Justice Kennedy's opinion in *Rapanos* is the

16   controlling rule of law.  *Healdsburg*, 496 F.3d at 999-1000; *United States v. Robertson*, 975 F.3d

17   1281, 1290-92 (9th Cir. 2017) *vacated on other grounds by* 139 S. Ct. 1543 (2019).  EPA cannot

18   dispute this point, having recently conceded that "Justice Kennedy's opinion in *Rapanos* provides

19   'the controlling rule of law' in the Ninth Circuit."  Br. for U.S. EPA at 32-35, *Sackett v. U.S. EPA*,

20   No. 19-35469 (9th Cir. June 22, 2020).  Moreover, five Justices in *Rapanos* concluded that an

21   interpretation of "waters of the United States" that excludes ephemeral streams is contrary to the

22   Act's text, purpose, and structure.  *Rapanos*, 547 U.S. at 769-770, 800.

23        Justice Kennedy's *Rapanos* opinion flatly rejected the plurality's relatively permanent

24   waters test, explaining that "[t]he plurality's first requirement—permanent standing water or

25   continuous flow, at least for a period of 'some months,'—makes little practical sense in a statute

26   concerned with downstream water quality."  *Id.* at 769 (internal citations omitted).  "Congress

27   could draw a line to exclude irregular waterways," e.g., ephemeral streams, "but nothing in the

28   statute suggests that it has done so."  *Id.* at 769-770.  "Quite the opposite, a full reading of the

<center>30</center>

---

1   dictionary definition *precludes* the plurality's emphasis on permanence . . ." *Id*. (emphasis added).

2   The four-Justice dissent, led by Justice Stevens, agreed that the plurality's "relatively permanent

3   waters" standard was "without support in the language and purposes of the Act or in our cases

4   interpreting it." *Id.* at 800 (quoting Justice Kennedy's concurrence).  For these and other reasons,

5   both Justice Kennedy and the four-Justice dissent rejected the plurality's "relatively permanent

6   waters" test as "inconsistent with the Act's text, structure, and purpose." *Rapanos*, 547 U.S. at

7   769-770, 800.  This conclusion is the controlling rule of law from *Rapanos.  See Vasquez*, 474

8   U.S. at 262 n.4; *see also Moses H. Cone Mem. Hosp.*, 460 U.S. at 17.

9          **B.    *Brand X* Does Not Save the 2020 Rule.**

10          The 2020 Rule cannot be saved by the Agencies' invocation of *National Cable &*

11   *Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005) (*Brand X*).  That

12   case held that a *lower* court's "construction of a statute trumps an agency construction otherwise

13   entitled to *Chevron* deference only if the prior [lower] court decision holds that its construction

14   follows from the *unambiguous* terms of the statute and thus leaves no room for agency discretion."

15   *Id.* at 982 (emphasis added).  But *Brand X* has no application here.

16          As an initial matter, *Rapanos* is a Supreme Court decision, and "it is far from settled that

17   *Brand X* applies to prior decisions of the Supreme Court."  *MikLin Enters, Inc. v. Nat'l Labor*

18   *Relations Bd.*, 861 F.3d 812, 823 (8th Cir. 2017) (en banc).  *Brand X* did not address whether an

19   agency may defy Supreme Court precedent.  545 U.S. at 1003 (Stevens, J., concurring) (observing

20   that the Court's holding "would not necessarily be applicable to a decision by this Court that

21   would presumably remove any pre-existing ambiguity").

22          Tellingly, the Supreme Court has rejected invocation of *Brand X* where the agency's

23   statutory interpretation was contrary to a prior Supreme Court decision, even where the statute was

24   ambiguous.  *See United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 486-87, 488

25   (2012) (rejecting agency's *Brand X* argument that earlier Supreme Court decision "cannot govern"

26   the case at issue, notwithstanding that the earlier decision acknowledged the statute's

27   "ambiguity"); *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 525, 528 n.2 (2009) (rejecting

28   *Brand X* argument where agency's interpretation of an "ambiguity" in the statute contradicted

31

1  prior Supreme Court decisions). Thus, the Agencies may not rely on *Brand X* here because *Brand*

2  *X* did not eliminate the ordinary application of stare decisis, which applies when a Supreme Court

3  decision interprets a statute, regardless of whether that decision "focused only on statutory text" or

4  "relied on the policies and purposes animating the law." *Kimble v. Marvel Entm't, LLC*, 576 U.S.

5  446, 456 (2015); *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 112 (1989) ("A

6  rule of law that is the product of judicial interpretation of vague, ambiguous, or incomplete

7  statutory provision is no less binding than a rule that is based on plain meaning of statute.").

8        Five Justices in *Rapanos* rejected the interpretation the Agencies espouse, and, in any

9  event, "*Brand X* does not require a court to defer to an agency's interpretations of judicial

10  precedent." *MikLin*, 861 F.3d at 823; *Akins v. FEC*, 101 F.3d 731, 740 (D.C. Cir. 1996) (en banc)

11  (no deference owed to agency interpretation of "limitation[ ] put on [statutory] language by

12  Supreme Court decisions" because courts, not agencies, are the "experts in analyzing judicial

13  decisions") *vacated on other grounds by FEC v. Akins*, 524 U.S. 11 (1998). Rather, this Court is

14  bound by Ninth Circuit precedent which (like every other Circuit to address the issue) holds that a

15  water is "subject to the CWA" if it satisfies the "significant nexus" standard in Justice Kennedy's

16  *Rapanos* concurrence, which protects ephemeral streams and many wetlands that lack surface

17  water connection with jurisdictional waters. *Healdsburg*, 496 F.3d at 995.

18        Accordingly, the Agencies cannot rely on *Brand X* to issue a rule that excludes ephemeral

19  streams and or other waters protected by Justice Kennedy's opinion. That controlling *Rapanos*

20  opinion*,* endorsed by a majority of Supreme Court justices, held that the plurality opinion's

21  exclusion of such waters is "inconsistent with the Act's text, structure, and purpose." *Rapanos*,

22  547 U.S. at 776. Because "*Rapanos* is unambiguously *against* the construction offered in the

23  plurality opinion, on which the [2020] Rule is modeled. . . [and] *does* foreclose" an interpretation

24  based on the plurality opinion, the 2020 Rule is unreasonable and impermissible. *Colorado v.*

25  *EPA*, 445 F. Supp. 3d 1295, 1312 (D. Colo. 2020) (original emphasis) (preliminarily enjoining the

26  2020 Rule), *appeal pending*, Nos. 20-1238, 20-1262, 20-1263 (10th Cir.) (argued Nov. 18, 2020).

27

28

### C. The Agencies' Interpretation of Section 101(b) and States' Rights and Responsibilities Under the Act Is Impermissible.

The 2020 Rule is contrary to law and fails under *Chevron* because it adopts an interpretation of the role of states under the Act that is unambiguously barred by Congress's intent. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-843. "Congressional intent may be determined by 'traditional tools of statutory construction,' and if a court using these tools ascertains that Congress had a clear intent on the question at issue, that intent must be given effect as law." *Wilderness Society*, 353 F.3d at 1059 (citing *Chevron*). That is because, even where "ambiguities in statutes" leave a gap for an agency to fill, courts "have not abdicated [their] judicial role" to "mark the bounds of delegated agency choice." *Negusie v. Holder*, 555 U.S. 511, 531 (2009) (Thomas, J., concurring in part). The federalism principles embodied by the Act favor broad federal water quality protections, not narrower ones, as the Agencies try to do here.

In drastically narrowing the scope of protected waters, the Agencies specifically rely on CWA Section 101(b), which states Congress's policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce and eliminate pollution," and "to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b). But the Act's text, history, and caselaw regarding Section 101(b) demonstrate that Congress did not intend Section 101(b) to serve as a vehicle for the Agencies to undermine the Act's "objective . . . to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Indeed, Congress referred three times in Section 101(b) to preserving State authority to "prevent, reduce, and eliminate pollution," State efforts that further the Act's objective, *id.* § 1251(b), and Congress then effectuated that policy in Section 510, making clear that States can enact regulations beyond the federal CWA floor but not less stringent regulations. *Id.* § 1370. A contrary reading makes no sense at all.

The primary purpose of Section 101(b) is to preserve states' authority to protect their waters and to provide for state operation of the CWA permit programs, not to defer to hypothetical

1  state regulation as a counterweight to the Act's objective to restore and maintain national water

2  integrity, and certainly not to reduce the scope of federally protected waters.  The Act's legislative

3  history thus makes clear that Congress meant in Section 101(b) only to reinforce the

4  "responsibility of states to prevent and abate pollution *by* assigning them a large role in the

5  national discharge permit system established by the Act."  Dkt. No. 31-1, Ex. P (emphasis added).

6  The Agencies' interpretation is also belied by the very reason Congress enacted the CWA in 1972:

7  to *replace* an ineffective patchwork of state laws with a strong national floor of federal water

8  pollution controls.  *See* pp. 2-4, *supra*; *City of Milwaukee*, 451 U.S. at 318; *City of Arcadia v. EPA*,

9  411 F.3d. 1103, 1106 (9th Cir. 2005) (states' Section 101(b) role "in combating pollution" is

10  consistent with CWA's "goals and policies").  In defiance of these two indisputable facts,

11  however, the Agencies attempt to ascribe to Congress an intent *not* to replace that ineffective

12  patchwork of state laws with a strong national floor but instead to continue that failed policy.

13  Neither the CWA's text nor its purpose or history support such a counterintuitive reading.

14  Contrary to this unambiguous Congressional intent and context, the Agencies assert that

15  the 2020 Rule "strikes a . . . balance between Federal and State waters" that "carries out Congress'

16  overall objective" while "preserv[ing] the traditional sovereignty of States."  85 Fed. Reg. at

17  22,252.  Yet the Rule's underlying assumption, that the definition for "waters of the United States"

18  must "balance" between Federal and State waters, has no basis in the Act's text.  Likewise, the

19  Rule's proclamation that Congress demanded that the Agencies prioritize the "traditional

20  sovereignty of States" is similarly bereft of any statutory foundation, as a protective definition of

21  "waters of the United States" does not infringe on state authority.  The Act established a federal

22  prerogative "to restore and maintain the chemical, physical, and biological integrity of the

23  Nation's waters" and allocated to the states discrete aspects of the federal programs necessary to

24  achieve this purpose.  And then, in Section 510, Congress *preserved* traditional state authority to

25  establish both stricter and broader water pollution controls than federal law requires to promote

26  that animating objective but expressly *prohibited* states from "adopt[ing] or enforc[ing]" any water

27  pollution control standard that is "*less* stringent" than an existing federal standard to prevent states

28  from undermining that objective.  33 U.S.C. § 1370 (emphasis added).

34

1    The Supreme Court has confirmed what the Act's text, purpose, and context makes plain.

2    In *EPA v. California ex. rel. State Water Resources Control Board*, for example, the Court stated

3    that "[c]onsonant with its policy 'to recognize, preserve, and protect the primary responsibilities

4    and rights of States to prevent, reduce, and eliminate pollution,' Congress also provided that a

5    State may issue [Section 402] permits 'for discharges into navigable waters within its jurisdiction,'

6    but only upon EPA approval of the State's proposal to administer its own program."  426 U.S.

7    200, 207 (1976) (quoting Section 101(b) (33 U.S.C. § 1251(b)) & § 1342(b)) (footnote omitted).

8    Similarly, in *Ouellette*, the Court explained that Section 101(b) gives states "a significant role in

9    protecting their own natural resources" and gave as examples the authority given to states to issue

10   Section 402 permits to "require discharge limitations more stringent than those required by the

11   Federal Government," and to issue Section 401 water quality certifications for federally licensed

12   projects in their states.  479 U.S at 489-90 (citing 33 U.S.C. §§ 1251(b), 1341(a)(1), 1370,

13   1342(b)).  Accordingly, states' rights under the CWA reflect the states' responsibilities to perform

14   their own set of obligations under "a regulatory 'partnership,'" *Ouelette*, 479 U.S. at 490, which is

15   a "partnership between the States and the Federal Government animated by a *shared objective*: 'to

16   restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'"

17   *Arkansas*, 503 U.S. at 101 (emphasis added).[12]

18        The Act's structure demonstrates that the role of states under the CWA framework is

19   focused on the following: (i) implementing the Act's regulatory programs under Sections 402 and

20   404, when authorized, as well as developing water quality standards under Section 303; (ii)

21   reviewing federally-licensed projects and approving or denying certifications under Section 401;

22   and (iii) implementing and enforcing any additional state water quality protections that go beyond

23   the national floor established by the Act.  33 U.S.C. §§ 1251 (b), 1313, 1341, 1342(b), 1344(h),

24   1370.  And, indeed, those are the state roles Congress specified in Section 101(b) and elsewhere in

25   _____

26        [12] *See also County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1471, 1476 (2020),
     (observing that Section 101(b) evidenced Congress's intent that states have autonomy for

27   "groundwater pollution and nonpoint source pollution," as opposed to "regulation of identifiable
     sources of pollutants entering navigable waters").

28

1    the Act.  33 U.S.C. §§ 1251(b) ("manage the construction grant program"; "implement" the

2    Section 402 and 404 permit program); 1370 (state authority to establish stricter and broader water

3    pollution control regulations).  Thus, nothing in the text of Section 101(b) or the Act as a whole

4    authorizes the Agencies to "strike a balance between Federal and State waters"—i.e., carving out

5    some waters as subject to state jurisdiction alone where the record demonstrates that doing so

6    would undermine Congress' objective in Section 101(a)—when developing the regulatory

7    definition of "waters of the United States."

8          In fact, a balancing between state and federal waters, or between the Act's clean water

9    objective and state sovereignty, that narrows the scope of federally protected waters directly

10   conflicts with the CWA.  Congress intended the waters of the United States to be defined as

11   broadly as possible, regardless of state sovereignty and the roles of states under the CWA

12   framework.  *See Riverside Bayview*, 474 U.S. at 133 ("Congress chose to define [navigable waters]

13   broadly" as "the waters of the United States"); H.R. Rep. No. 92-911 at 818, S. Conf. Rep. No. 92-

14   1236, at *3822 (Congress intended the term "waters of the United States" be "given the broadest

15   possible constitutional interpretation").  Indeed, a broad regulatory definition of federally

16   protected waters that is not based on the scope of waters protected (or that may be protected) by

17   individual states is consistent with and furthers Congressional intent.  The Act was specifically

18   enacted to establish a national floor of water quality protections and replace the prior failed federal

19   regime which relied on state protections alone to improve the quality of the Nation's waters.  S.

20   Rep. No. 92-414, at 2 - 7 (1971) (1971 WL 11307, at *3669-*3674) (explaining that, for the more

21   than two decades prior to the 1972 CWA Amendments, "Federal legislation in the field of water

22   pollution control has been keyed primarily to [the] principle [that] … States shall lead the national

23   effort to prevent, control and abate water pollution" with the federal role "limited to support of,

24   and assistance to, the States" and concluding that "the Federal water pollution program … has

25   been inadequate in every vital aspect").

26          By creating a definition for "waters of the United States" based on a rationale that defies

27   the established meaning of Section 101(b) and is irreconcilable with other sections of the statute

28   and the Act's history and purpose, the Agencies contradict and undermine the cooperative

36

1   federalism Congress intended the CWA to achieve.  Rather than further federalism, the 2020 Rule

2   abdicates federal responsibility and weakens the important national floor of water quality

3   protections that Congress set out to establish in the CWA.  In fact, the Rule punishes states that

4   adopt strong clean water safeguards by allowing states with weaker laws to effectively undermine

5   and undo downstream states' efforts to protect water quality in their states.  *See Rapanos,* 547 U.S.

6   at 777 (citing Section 101(b) and noting that "the Act protects downstream States from out-of-state

7   pollution that they themselves cannot regulate").  Because this is clearly not what Congress

8   intended when it enacted the CWA in 1972, *see, e.g.*, 33 U.S.C. §§ 1251(a), 1370, the Agencies'

9   contrary interpretation in the Rule must fail.

10          Nor can the Agencies justify narrowing the "waters of the United States" definition by

11   invoking Section 101(b)'s acknowledgement of the "primary responsibilities and rights of States"

12   to "plan the development and use (including restoration, preservation and enhancement) of land

13   and water resources."  *See* 85 Fed. Reg. at 22,262.  While development impacting a waterbody

14   deemed to be a "water of the United States" may be subject to CWA permitting, that fact does not

15   take primary *planning* responsibility away from state or local authorities; it merely establishes that

16   a CWA permit among other local, state, or federal permits may be needed for the activity.

17          Equally without merit is the Agencies' contention that "waters of the United States" must

18   be defined narrowly because the Act's "non-regulatory programs," such as research and funding

19   programs to assist states in water quality protection, apply to "the Nation's waters" broadly.  *See*

20   85 Fed. Reg. at 22,253, 22,269.  Controlling pollution under the Act's regulatory programs and

21   assisting states through research and grant programs are complementary, not mutually exclusive,

22   ways to achieve Act's objective.  *See Shanty Town Assocs. Ltd. P'ship v. EPA*, 843 F.2d 782, 791-

23   92 (4th Cir. 1988) (describing Congress' intent that EPA use "the threat [of withholding grant

24   funds] and promise of federal financial assistance . . . to influence the states to adopt nonpoint

25   source pollution control programs that will accomplish the Act's water quality goals") (internal

26   citations omitted)).  And since the "United States" and the "Nation" are synonymous, the

27   Agencies' contention that "waters of the United States" are different from "the Nation's waters" is

28   baseless.  *Cf.* 85 Fed. Reg. at 22,253.

1    In sum, because the Agencies ground their new definition of "waters of the United States"

2  on an interpretation of Section 101(b) that is unsupported by the Act, its history, and caselaw, the

3  Rule must be set aside as "not in accordance with law."  5 U.S.C. § 706(2)(A).

4    **D.    The Agencies' Constitutional Concerns Do Not Justify the Rule.**

5    The Agencies incorrectly claim that the 2020 Rule is necessary to "avoid regulatory

6  interpretations of the [Act] that raise constitutional questions."  85 Fed. Reg. at 22,269.  That claim

7  is both remarkable and meritless.  First, precedent makes clear that the Agencies' previous

8  definition based on the significant nexus standard raises no constitutional concerns.  Second, the

9  Agencies do not even attempt to reconcile their new position with the contrary one they have taken

10  for over four decades, including as recently as last year when, in their 2019 Rule, the Agencies

11  expressly relied on the *Rapanos* Guidance and its embrace of the significant nexus standard—the

12  constitutionality of which they now purport to doubt.  84 Fed. Reg. at 4198.

13    In any event, reliance on the "significant nexus" standard "raise[s] no serious

14  constitutional or federalism difficulty."  *Rapanos*, 547 U.S. at 782-83 (Kennedy, J., concurring).

15  In fact, employing the significant nexus test does the precise opposite: it "prevents problematic

16  applications of the statute" that could raise such concerns.  *Id.*  The Agencies rely on *SWANCC* to

17  argue that elimination of the significant nexus standard is needed to avoid Commerce Clause

18  implications. 85 Fed. Reg. at 22,273.  But *SWANCC*, which endorsed the significant nexus

19  standard, concerned abandoned intrastate waters that were isolated and lacked a significant nexus

20  to other waters protected by the Act, and in any case did not decide any constitutional questions.

21  *See Rapanos*, 547 U.S. at 766-67 (Kennedy, J., concurring); *SWANCC*, 531 U.S. at 162, 167, 174.

22    Moreover, the polluting activities controlled by the Act are economic in nature and subject

23  to regulation under the Commerce Clause.  *See, e.g., Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S.

24  334, 340 n.3 (1992) (solid waste is an "article of commerce"); *Wickard v. Filburn,* 317 U.S. 111

25  (1942).  Protecting both navigable waters and the waters that significantly affect them provides

26  "'appropriate and needful control of activities and agencies which, though intrastate, affect that

27  [interstate] commerce.'"  *Rapanos*, 547 U.S. at 783 (Kennedy, J., concurring) (quoting *Oklahoma*

28  *ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 525-26 (1941)).  As the Court stated in

38

1    *Hodel v. Virginia Surface Min. & Reclamation Ass'n., Inc.*, "the power conferred by the

2    Commerce Clause [is] broad enough to permit congressional regulation of activities causing air or

3    water pollution, or other environmental hazards that may have effects in more than one State."

4    452 U.S. 264, 282 (1981).

5         **E.**     **The Rule's Exclusion of Interstate Waters as an Independent Category of**
           **"Waters of the United States" is Contrary to the Act's Text, History, and**

6               **Purpose.**

7         The Agencies' decision that interstate waters as a category are not "waters of the United

8    States" contradicts clear Congressional intent as reflected in the Act's text and structure and

9    therefore fails under *Chevron* step one. *See Wilderness Society*, 353 F.3d at 1059. Federal

10   jurisdiction over interstate waters under the Act, regardless of their navigability, has been

11   longstanding and essential. In the CWA, Congress intended to prevent harms to downstream

12   states from such detrimental upstream activities.

13        In a departure from all previous agency definitions, the 2020 Rule no longer includes

14   interstate waters as an independent category of "waters of the United States." Instead, interstate

15   waters are protected only if they otherwise meet the new narrower definition of "waters of the

16   United States." AR 11574, Topic 1 at 26. The Agencies' failure to protect all interstate waters is

17   contrary to the plain language, structure, and history of the Act and defies controlling precedent.

18   As waters spanning state boundaries, interstate waters are unquestionably subject to federal

19   jurisdiction under the Act and must be included as a category under any definition of the "waters

20   of the United States." Failure to do so is an abdication of a core premise of the Act's federalism.

21        The CWA's language clearly demonstrates that the Act protects all interstate waters.

22   Enacted in 1972, Section 303(a) of the Act provides, in pertinent part, that any pre-existing "water

23   quality standard applicable to *interstate waters* . . . shall remain in effect," unless determined by

24   EPA to be inconsistent with any applicable requirements in effect prior to 1972. 33 U.S.C.

25   §1313(a) (emphasis added). The Act's specification of protection for interstate waters in the

26   section setting forth the Act's foundational water quality standards requirements demonstrates that

27   interstate waters are categorically protected by the Act. Without reasoned explanation and in

28   conflict with bedrock rules of statutory interpretation, *Lowe v. S.E.C.*, 472 U.S. 181, 219 (1985)

39

1   ("fundamental axiom of statutory interpretation that a statute is to be construed so as to give effect

2   to all its language."), the Agencies ignore section 303(a)'s plain language and state that it "was

3   referring to interstate navigable waters," despite the fact that the word "navigable" is not in section

4   303(a). 85 Fed. Reg. at 22,284.

5           In addition to conflicting with the Act's plain language, the Agencies' exclusion of

6   interstate waters also ignores that the "Federal Water Pollution Control Act as it existed prior to

7   the 1972 Amendments .... 'ma[de] it clear that it is federal, not state, law that in the end controls

8   the pollution of interstate *or* navigable waters." *Illinois v. City of Milwaukee*, 731 F.2d 403, 408

9   (7th Cir. 1984) (emphasis added) (quoting *Illinois v. City of Milwaukee*, 406 U.S. 91, 102 (1972)).

10  The Agencies' new interpretation, reading out protections for interstate waters, also ignores the

11  purpose of the 1972 Amendments, which was to expand, not narrow, federal protection of waters.

12  *See* S. Rep. No. 92-414, at 7 (1971) (1971 WL 11307, at *3674) (prior mechanisms for abating

13  water pollution "ha[d] been inadequate in every vital respect"); *City of Milwaukee*, 451 U.S. at 317

14  (in passing the CWA, Congress "occupied the field by establishment of a comprehensive

15  regulatory program . . . *not merely another law 'touching interstate waters'*" (emphasis added)).

16  As a means to protect interstate waters, the 1972 Amendments superseded the federal common law

17  of nuisance in favor of a statutory "all-encompassing program of water pollution regulation." *City*

18  *of Milwaukee*, 451 U.S. at 318.  Given that Congress's purpose in the 1972 Amendments was to

19  expand federal protections for waters, and that prior to the Amendments to the Act already

20  protected navigable and interstate waters as separate categories, the Act necessarily continued to

21  protect interstate waters after 1972.

22          The Agencies' attempt to distinguish seminal Supreme Court cases demonstrating the

23  Act's applicability to interstate waters regardless of navigability ignores the Court's analysis in

24  those cases.  *See* 85 Fed. Reg. at 22,286 n. 43.  In both *Ouellette* and *Arkansas*, the Court

25  explained that the Act had established a broad statutory scheme for addressing interstate water

26  pollution disputes.  The Court in *Ouellette* observed that, *regardless of navigability*, "the Act

27  applies to virtually all surface water in the country," and that "the control of interstate pollution is

28  primarily a matter of federal law."  479 U.S. at 486, 492 (citations omitted).  Similarly, the Court

40

1   in *Arkansas* explained that "interstate water pollution is controlled by *federal* law" and "the Act's

2   purpose [is to] authoriz[e] the EPA to create and manage a uniform system of interstate water

3   pollution regulation."  503 U.S. at 110 (emphasis in original).

4          The Agencies' contention that they were required to remove interstate waters because the

5   Southern District of Georgia found the interstate waters provisions of the 2015 Rule unlawful has

6   no merit.  *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1358-60 (S.D. Ga. 2019).  First, the

7   Agencies' decision to propose the removal of interstate waters *pre-dated* the Southern District of

8   Georgia's decision by more than 6 months, *see* 84 Fed. Reg. 4154, 4171 (Feb. 14, 2019)

9   (proposing to remove the interstate waters category), demonstrating unequivocally that the

10  Agencies were not motivated by that court's ruling.  Second, *Georgia* is neither correct nor

11  binding and, for the reasons provided above, should be disregarded.  *See United States v.*

12  *Ensminger*, 567 F.3d 587, 591 (9th Cir. 2009) ("'a district court opinion does not have binding

13  precedential effect,' especially one from another federal circuit" (citations omitted)).  Remarkably,

14  in *Georgia*, the court did not even address the language of Section 303(a), which provides yet

15  another reason to reject its conclusion, as the Agencies should have done here.

16          In summary, removing interstate waters as a category of protected waters under the CWA

17  is contrary to statutory text, history, Congressional intent, and established case law.

18  **III.   THE 2020 RULE HARMS THE INTERESTS OF THE STATES AND CITIES, GIVING THEM
          STANDING TO BRING THIS ACTION**
19

20          States are "entitled to special solicitude in [Article III] standing analysis" and, given their

21  interests "in all the earth and air within [their] domain," are routinely held to have standing to

22  challenge actions by federal environmental agencies.  *Massachusetts v. EPA*, 549 U.S. 497, 518-20

23  & n.17 (2007).  To establish standing, only one party must satisfy the requirement that plaintiff's

24  injury be fairly traceable to the defendant and redressable by a decision in their favor.  *Id*. at 518.

25  Here, the States and Cities easily establish standing.

26          The States and Cities have and will continue to suffer four types of injuries traceable to the

27  2020 Rule that can be redressed by vacatur of the Rule: (1) harm to their waters and water

28  protection programs; (2) harm to wildlife; (3) harm to property; and (4) increased monetary

41

expenditures and administrative burdens.  These four injuries are detailed in more than 30

declarations, including expert testimony, showing that "all states will be significantly impacted"

by the 2020 Rule and that the States' and Cities' "harms threatened by the Rule will be extensive,

long-lasting, and nationwide."[13]  Such harms easily establish state standing.  *See Massachusetts*,

549 U.S. at 519 (standing shown by federal agency decision's environmental harm); *California v.*

*Block*, 690 F.2d 753, 776 (9th Cir. 1982) (standing shown by federal policy's effect on State

lands); *California v. Azar*, 911 F.3d 558, 571-73 (9th Cir. 2018) (standing shown by federal rule's

creation of a regulatory gap that state would need to expend resources to fill).

   *Harm to the States' and Cities' waters and water protection programs.*  By leaving

ephemeral streams, interstate waters, and over half of the nation's wetlands unprotected by the

Act, the 2020 Rule threatens entire watersheds, including 4.8 million miles of streams[14] and 16.3

million acres of non-floodplain wetlands.[15]  The arid West—where several States are located—

will be particularly hard hit; for example, more than 85% of stream miles in New Mexico's key

watersheds are no longer protected[16] and 40% of wetland acres in New Mexico are at risk of

destruction.[17]  Because of the Rule, 25 to 45% of New Mexico's stormwater general permits and

50% of its individual permits are no longer required.[18]  As a result, pesticides, paint solvents,

acidic wastewater, and other pollutants will discharge into New Mexico waters—including the

Tijeras Arroyo, Gila River, and Rio Hondo watersheds—without regulatory limit.[19]

   The 2020 Rule severely harms downstream States and Cities by increasing the risks of

pollution from upstream states.  By excluding numerous waters from the Act's jurisdiction, the

2020 Rule significantly curtails the Section 402 and 404 permit programs that previously protected

the States' and Cities' natural resources and citizens from upstream pollution.[20]  For example, New

York does not regulate smaller wetlands because it relies on the Army Corps' operation of the

---

[13] Dkt. No. 30-18, ¶¶ 3, 21
[14] *Id.* ¶¶ 3-5, 14, 21-22, 24, 34.
[15] *Id.* ¶¶ 5, 16, 34-43.
[16] *Id.* ¶¶ 3, 24.
[17] *Id.* ¶¶ 3, 36-39.
[18] Roose Decl. ¶ 20.
[19] *Id.* ¶¶ 9, 15-17.
[20] Dkt. No. 30-8 ¶ 9.

1    Section 404 program; while New York works to expand its state programs to fill the regulatory

2    gap created by the 2020 Rule (work that itself constitutes an injury establishing standing), many of

3    New York's wetlands could be filled and therefore would not be able to reduce downstream

4    pollution before its waters flow into New Jersey.[21]  Further, upstream harms will affect Maryland

5    because the health of Maryland's Chesapeake Bay relies upon water protections in six upstream

6    jurisdictions—including plaintiffs suffering from a regulatory gap in protections as well as non-

7    plaintiff states such as West Virginia and Delaware.[22]

8           Moreover, because many states upstream of the States and Cities have laws preventing the

9    imposition of stricter water pollution controls than those under the CWA, the Rule allows

10   increased upstream pollution that threatens to significantly degrade water quality in the States and

11   Cities.[23]  For example, California will be harmed by increased pollution in upstream states that

12   would flow to California via interstate waters, such as the Colorado River, which is an important

13   source of drinking water,[24] and the Amargosa River, which is ephemeral for the majority of its

14   length and subject to land use activities—such as Nevada's largest working dairy farm and

15   hazardous waste disposal—that may discharge pollutants.[25]

16          *Harm to the States' wildlife.*  Plaintiffs also are injured by the Rule's exclusion of waters

17   that are habitat for fish and other animals owned, regulated, or held in trust by the States.[26]  For

18   example, habitats for scores of threatened and endangered species in California and other states

19          [21] Jacobson Decl. ¶¶ 7-8, 9-14; Dkt. No. 30-7 ¶¶ 13-15; *see also* Baskin Decl. ¶¶ 13-14
20   (discussing a similar regulatory gap in Massachusetts, and identifying specific projects involving
     fill of wetlands that are no longer protected by either federal or state law).
21          [22] Dkt. No. 30-14 ¶¶ 5, 7 (The 2020 Rule will also harm Maryland by removing protection
     for an estimated 10,000 acres of wetlands in the Nanticoke River watershed (a tributary to
22   Chesapeake Bay) within Delaware, thus eliminating the flood protection functions these wetlands
     provide to communities downstream in Maryland.)
23          [23] Bishop Decl. ¶ 20; Dkt. No. 30-18 ¶ 23; Ariz. Rev. Stat. Ann. § 49-104(A)(16); Utah
     Code Ann. § 19-5-105.
24          [24] Bishop Decl. ¶¶ 21, 23; *see also* Mrazik Decl. ¶ 9; Dkt. No. 30-13 ¶ 12; Dkt. No. 30-22
     ¶ 20.
25          [25] Dkt. No. 30-20 ¶¶ 5-6, 12-13. The 2020 Rule will likewise harm Michigan given that its
     water quality depends on adequate protection in other Great Lakes states. Seidel Decl. ¶ 3.
26          [26] Dkt. 30-18 ¶¶ 4, 16, 27-33, 38; Dkt. No. 30-6 ¶ 10; Declaration of Annee Ferranti in
     Support of Plaintiffs' Motion for Summary Judgment (Ferranti Decl.) ¶¶ 9-15; Dkt. No. 30-12 ¶¶
27   10-12; Dkt. No. 30-20 ¶¶ 13-17.  For example, California wildlife are "publicly owned" and it is
     the "state's policy to conserve and maintain wildlife for citizens' use and enjoyment." *Betchart v.*
28   *Department of Fish & Game*, 158 Cal.App.3d 1104, 1106 (1984); Cal. Fish & Game Code, §
     1801.

                                                        43

1    face increased degradation under the Rule.[27]  North Carolina will suffer a large loss of wetlands

2    under the 2020 Rule and the resulting decline in water quality and loss of wildlife habitat will

3    impact the 70% of rare and endangered plants and animals statewide that rely on these wetlands,

4    as well as North Carolina's $430 million commercial and $3.9 billion recreational fisheries.[28]

5            *Harms to the States' and Cities' property.*  The Rule's elimination of protections for

6    several upstream waters that trap pollutants and store water threatens downstream States and Cities

7    with more frequent flooding and increased pollution.[29]  For example, New York owns 658

8    facilities with replacement value of over $254 million located in 100-year floodplains that are

9    directly at risk from the 2020 Rule.[30]  This does not include State-owned or managed roads,

10   bridges, culverts, rail lines, airports and marine facilities that are also located in flood zones and

11   will also be threatened by implementation of the 2020 Rule.[31]  Likewise, in the District of

12   Columbia, more than $1 billion in District-owned property and approximately 10,000 District

13   residents are located within floodplains.[32]  The total economic loss from a 100-year storm along

14   the Potomac and Anacostia Rivers is estimated at $316 million.[33]

15           *Increased monetary expenditures by and administrative burdens on the States and Cities.*

16   The States and Cities have already and will increasingly need to expend money and resources to

17   fill the regulatory gaps created by the 2020 Rule.  For example, to mitigate the Rule's harm, the

18   District of Columbia has developed local regulations for dredge and fill activities in wetlands and

19   streams no longer subject to the Act's protection, has diverted approximately 2,520 hours of staff

20   time from other activities, and is in the process of hiring an additional employee to implement a

21   new permitting program.[34]  Similarly, New York has devoted staff time and funding to identify

22   and map wetlands no longer protected by the Act that will need to be protected under new state

23

24           [27] Dkt. No. 30-18 ¶¶ 4, 27, 40-41, 49; Dkt. No. 30-20 ¶¶ 14-16; Dkt. No. 30-12 ¶¶ 8-10;
     Ferranti Decl. ¶¶ 11, 14-19.
25           [28] Dkt. No. 30-5 ¶¶ 12-13, 17-18.
             [29] Dkt. No. 30-3 ¶ 11; Dkt. No. 30-7 ¶¶ 4, 7-8; Dkt. No. 30-18 ¶¶ 5, 15, 17, 34, 38, 41-42.
26           [30] Dkt. No. 30-22 ¶ 38
             [31] *Id.*
27           [32] Seltzer Decl. ¶ 3.
             [33] *Id.* ¶ 18.
28           [34] *Id.* ¶¶ 11-14.

1    efforts.[35]  Oregon has likewise devoted tens of thousands of dollars in staff time to filling the

2    regulatory gap created by the Rule and expects to incur significant additional costs in the future.[36]

3    California, Massachusetts, Wisconsin, and Virginia will also incur costs from increased staffing

4    and staff training to address the regulatory gaps left by the Rule.[37]  In addition, New Mexico will

5    need to overhaul its groundwater and surface water quality protection regulations to create a new

6    permitting program—at a cost of over $7.5 million annually, which is a 115% increase in New

7    Mexico's budget for all surface water programs.[38]  Until this new program is in place, New

8    Mexico has sought to mitigate the removal of water protections by diverting funding from other

9    areas and diverting work time from several staff members to address the federal regulatory gap.[39]

10                                          **CONCLUSION**

11           For all of these reasons, the Court should grant the States' and Cities' motion for summary

12   judgment and vacate the 2020 Rule as arbitrary, capricious, and contrary to law.

13

14

15

16

17

18

19

20

21

22

23

24

25   _____

26   [35] Jacobson Decl. ¶¶ 13-14.
     [36] Mrazik Decl. ¶ 8.

27   [37] Bishop Decl. ¶¶ 26-29, 38, 40, 43-44; Baskin Decl. ¶¶ 20-23; Davis Decl. ¶¶ 6-7;
     Declaration of David Siebert in Support of Plaintiffs' Motion for Summary Judgment ¶ 2.

28   [38] Roose Decl. ¶¶ 20, 22.
     [39] *Id.* ¶ 23.

45

1  Dated:  November 23, 2020              Respectfully Submitted,

2
                                         XAVIER BECERRA
3                                        Attorney General of California
                                         SARAH E. MORRISON
4                                        ERIC KATZ
                                         Supervising Deputy Attorneys General
5                                        CATHERINE M. WIEMAN
                                         ROXANNE J. CARTER
6                                        JESSICA BARCLAY- STROBEL
                                         BRYANT B. CANNON
7                                        Deputy Attorneys General

8
                                         /s/ Tatiana K. Gaur
9                                        TATIANA K. GAUR
                                         Deputy Attorney General
10                                       *Attorneys for Plaintiff State of California,*
                                         *by and through Attorney General Xavier*
11                                       *Becerra and California State Water*
                                         *Resources Control Board*
12

13

14
   For the STATE OF NEW YORK              For the STATE OF CONNECTICUT
15 LETITIA JAMES                          WILLIAM TONG
   Attorney General of the State of New York   Attorney General
16 Philip Bein (*admitted pro hac vice*)
   Senior Counsel
17                                        /s/ David H. Wrinn
                                          David H. Wrinn (*admitted pro hac vice*)
18 /s/ Timothy Hoffman                    Matthew I. Levine
   Timothy Hoffman (*admitted pro hac vice*)   Assistant Attorneys General
19 Senior Counsel                         Office of the Attorney General
   Office of the Attorney General         165 Capitol Avenue
20 Environmental Protection Bureau        P.O. Box 120
   28 Liberty Street                      Hartford, CT  06141-0120
21 New York, NY 10005                     Telephone: (860) 808-5250
   Telephone: (716) 853-8465              Email: Matthew.Levine@ct.gov
22 Fax: (716) 853-8579                    Email: David.Wrinn@ct.gov
   Email: Timothy.Hoffman@ag.ny.gov
23

24

25

26

27

28

46

1   For the STATE OF ILLINOIS                For the STATE OF MAINE
    KWAME RAOUL                              AARON M. FREY
2   Attorney General                         Maine Attorney General

3
    /s/ Jason E. James                       /s/ Jillian R. O'Brien
4   Jason E. James (*admitted pro hac vice*)   Jillian R. O'Brien, Cal. SBN 251311
    Assistant Attorney General               Assistant Attorney General
5   Matthew J. Dunn                          6 State House Station
    Chief, Environmental Enforcement/Asbestos  Augusta, Maine 04333-0006
6   Litigation Division                      Telephone: (207) 626-8800
    Office of the Attorney General           Email: Jill.OBrien@maine.gov
    Environmental Bureau
7   69 West Washington, 18th Floor
    Chicago, IL 60602
8   Telephone: (312) 814-0660
    Email: jjames@atg.state.il.us
9

10
    For the STATE OF MARYLAND                For the STATE OF MICHIGAN
11  Brian E. Frosh                           DANA NESSEL
    Attorney General of Maryland             Attorney General of Michigan
12

13  /s/ Joshua M. Segal                      /s/ Daniel P. Bock
    Joshua M. Segal (*admitted pro hac vice*)  Daniel P. Bock (*admitted pro hac vice*)
14  Special Assistant Attorney General       Assistant Attorney General
    Office of the Attorney General           Michigan Department of Attorney General
15  200 St. Paul Place                       Environment, Natural Resources and
    Baltimore, MD 21202                      Agriculture Division
16  Telephone: (410) 576-6446                P.O. Box 30755
    Email: jsegal@oag.state.md.us            Lansing, MI 48909
17                                           Telephone: (517) 335-7664
                                             Email: bockd@michigan.gov
18
    For the STATE OF NEW JERSEY              For the STATE OF NEW MEXICO
19  GURBIR S. GREWAL                         HECTOR BALDERAS
    Attorney General                         Attorney General of New Mexico
20

21  /s/ Lisa Morelli                         /s/ William Grantham
    Lisa Morelli, Cal. SBN 137092            William Grantham (*admitted pro hac vice*)
22  Deputy Attorney General                  Assistant Attorney General
    Environmental Practice Group             201 Third Street NW, Suite 300
23  Division of Law                          Albuquerque, New Mexico 87102
    R.J. Hughes Justice Complex              Telephone: (505) 717-3520
24  25 Market Street, P.O. Box 093           Email: wgrantham@nmag.gov
    Trenton, New Jersey 08625
25  Telephone: (609)376-2745
    Email: Lisa.Morelli@law.njoag.gov
26

27

28

Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities (3:20-cv-03005-RS)

For the STATE OF NORTH CAROLINA ex rel.
Attorney General Joshua H. Stein and for the
NORTH CAROLINA DEPARTMENT OF
ENVIRONMENTAL QUALITY
JOSHUA H. STEIN
Attorney General
Daniel S. Hirschman
Senior Deputy Attorney General

/s/ Amy L. Bircher
Amy L. Bircher (*admitted pro hac vice*)
Special Deputy Attorney General
Marc Bernstein
Special Deputy Attorney General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Telephone: (919) 716-6400
Email: abircher@ncdoj.gov

For the STATE OF OREGON
Ellen F. Rosenblum
Attorney General of the State of Oregon

/s/ Paul Garrahan
Paul Garrahan (*admitted pro hac vice*)
Attorney-in-Charge, Natural Resources
Section
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301-4096
Telephone: (503) 947-4593
Fax:  (503) 378-3784
Email: paul.garrahan@doj.state.or.us

For the STATE OF RHODE ISLAND
PETER F. NERONHA
Attorney General

/s/ Alison B. Hoffman
Alison B. Hoffman (*admitted pro hac vice*)
Special Assistant Attorney General
Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
Email: AHoffman@riag.ri.gov

For the STATE OF VERMONT
THOMAS J. DONOVAN, JR.
Attorney General of Vermont

/s/ Laura B. Murphy
Laura B. Murphy (*admitted pro hac vice*)
Assistant Attorney General
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3186
Email: laura.murphy@vermont.gov

For the STATE OF WASHINGTON
ROBERT W. FERGUSON
Attorney General

/s/ Ronald L. Lavigne
Ronald L. Lavigne (*admitted pro hac vice*)
Senior Counsel
Office of the Attorney General
2425 Bristol Court SW, 2nd Fl.
Olympia, WA 98504
Telephone: (305) 586-6751
Email: ronald.lavigne@atg.wa.gov

For the STATE OF WISCONSIN
JOSHUA L. KAUL
Wisconsin Attorney General

/s/ Gabe Johnson-Karp
Gabe Johnson-Karp (*admitted pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707
Telephone: (608) 267-8904
Email: johnsonkarpg@doj.state.wi.us

For the COMMONWEALTH OF
MASSACHUSETTS
MAURA HEALEY
Attorney General

/s/ Seth Schofield

Seth Schofield (*admitted pro hac vice*)
Senior Appellate Counsel
David S. Frankel (admitted pro hac vice)
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Flr.
Boston, MA 02108
Telephone: (617) 963-2436 / 2294
Email: seth.schofield@mass.gov
Email: david.frankel@mass.gov

For the DISTRICT OF COLUMBIA
KARL A. RACINE
Attorney General

/s/ Brian Caldwell

Brian Caldwell (*admitted pro hac vice*)
Assistant Attorney General
 Social Justice Section
 Office of the Attorney General
 for the District of Columbia
 441 Fourth Street N.W., Ste # 600-S
 Washington, D.C. 20001
 Telephone: (202) 727-6211
 Telephone: (202) 445-1952 (m)
 Email: brian.caldwell@dc.gov

For the COMMONWEALTH OF
VIRGINIA
MARK R. HERRING
Attorney General
Donald D. Anderson
Deputy Attorney General
Paul Kugelman, Jr.
Senior Assistant Attorney General
Chief, Environmental Section

/s/ David C. Grandis

David C. Grandis (*admitted pro hac vice*)
Senior Assistant Attorney General
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 225-2741
Email: dgrandis@oag.state.va.us

For the CITY OF NEW YORK
JAMES E. JOHNSON
Corporation Counsel of the City of New York

/s/ Nathan Taylor

Nathan Taylor (*admitted pro hac vice*)
 New York City Law Department
 100 Church Street, Rm 6-144
 New York, NY 10007
 Telephone: (646) 940-0736 (m)
 Telephone: (212) 356-2315
 Email: NTaylor@law.nyc.gov

49

1

**SIGNATURE ATTESTATION**

2          Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this

3     document has been obtained from each of the other signatories.

4

5     DATED: November 23, 2020                    /s/ Tatiana K. Gaur

6                                                 Tatiana K. Gaur

7     LA2020300885

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities (3:20-cv-03005-RS)

# CERTIFICATE OF SERVICE

Case Name:     **State of California, et al. v. Andrew Wheeler, et al.**

Case No.:      **3:20-cv-03005-RS**

I hereby certify that on <u>November 23, 2020,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>November 23, 2020,</u> at Los Angeles, California.

| Blanca Cabrera | /s/ Blanca Cabrera |
|:---:|:---:|
| Declarant | Signature |

LA2020300885
63769657.docx