| | |
|---|---|
| XAVIER BECERRA<br>Attorney General of California<br>SARAH E. MORRISON<br>ERIC KATZ<br>Supervising Deputy Attorneys General<br>CATHERINE M. WIEMAN, SBN 222384<br>TATIANA K. GAUR, SBN 246227<br>ROXANNE J. CARTER, SBN 259441<br>JESSICA BARCLAY-STROBEL, SBN 280361<br>BRYANT B. CANNON, SBN 284496<br>Deputy Attorneys General<br>  300 South Spring Street, Suite 1702<br>  Los Angeles, CA 90013<br>  Telephone: (213) 269-6329<br>  Fax: (916) 731-2128<br>  E-mail: Tatiana.Gaur@doj.ca.gov<br>*Attorneys for Plaintiff State of California, by and through Attorney General Xavier Becerra and California State Water Resources Control Board* | LETITIA JAMES<br>Attorney General of the State of New York<br>PHILIP BEIN (*admitted pro hac vice*)<br>Senior Counsel<br>TIMOTHY HOFFMAN (*admitted pro hac vice*)<br>Senior Counsel<br>  Office of the Attorney General<br>  Environmental Protection Bureau<br>  28 Liberty Street<br>  New York, NY 10005<br>  Telephone: (716) 853-8465<br>  Fax: (716) 853-8579<br>  Email: Timothy.Hoffman@ag.ny.gov<br>*Attorneys for Plaintiff State of New York* |

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, et al.,**<br>                          Plaintiffs,<br>**v.**<br>**ANDREW WHEELER, et al.,**<br>                          Defendants,<br>**STATE OF GEORGIA, et al.,**<br>                         Intervenor-Defendants. | Case No. 3:20-cv-03005-RS<br><br>**DECLARATION OF REBECCA ROOSE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: June 3, 2021<br>Time: 1:30 pm<br>Courtroom: Courtroom 3 – 17th Floor<br>               San Francisco Courthouse<br>Judge: The Honorable Richard Seeborg<br>Action Filed: May 1, 2020 |

**DECLARATION OF REBECCA ROOSE**

**I, Rebecca Roose , under penalty of perjury, declare as follows:**

1. My name is Rebecca Roose. I am over 21 years of age and am fully competent and duly authorized to make this Declaration. The facts contained in this Declaration are based on my personal knowledge and are true and correct.

2. I submit this declaration in support of the motion by the States and Cities for summary judgment. As discussed below, the Navigable Waters Protection Rule (NWPR) will have a devastating impact on New Mexico's waters and the State is in no position to fill the regulatory vacuum left by EPA and the Army Corps as a result of that rule.

**BACKGROUND**

3. I am employed as the Director of the Water Protection Division of the New Mexico Environment Department (Department). In my role, I oversee the Department's Ground Water Quality, Surface Water Quality, Drinking Water, and Construction Programs Bureaus, including implementation of Clean Water Act (CWA) Programs. I have been employed by the Department since May 2019. Prior to joining the Department, I worked for the U.S. Environmental Protection Agency (EPA). At EPA Headquarters, I devoted 13 years to supporting EPA, states, and tribes with implementation of CWA programs. Specifically, I drafted and defended National Pollutant Discharge Elimination System (NPDES) program regulations and effluent limitations guidelines promulgated pursuant to CWA Section 402, provided oversight of states' implementation of NPDES, pretreatment and CWA Section 319 nonpoint source control programs, and developed policy and training for compliance inspections of NPDES permittees, pretreatment programs and CWA Section 311 spill prevention, control and countermeasures facilities. During my tenure at EPA, I served as a national expert on NPDES requirements for Concentrated Animal Feeding Operations, NPDES program requirements for authorized states and tribes and NPDES compliance monitoring policy. I earned my law degree and natural resources law certificate from the University of New Mexico in 2004.

4. The purpose of the Department is "to ensure an environment that in the greatest possible measure will confer optimum health, safety, comfort and economic and social well-being on its inhabitants; will protect this generation as well as those yet unborn from health threats posed by the environment; and will maximize the economic and cultural benefits of a healthy people." N.M. STAT. ANN. § 74-1-2 (1997).

5. The Department serves as agent of the State in matters of environmental management and consumer protection. N.M. STAT. ANN. § 74-1-6(E) (2009). The Department certifies federal

1  CWA permits issued in New Mexico and has primary responsibility for implementing the
2  activities of the New Mexico Water Quality Control Commission, the state water pollution
3  control agency for purposes of the federal CWA.

## THE NWPR'S HARM TO NEW MEXICO WATERS

6. According to the U.S. Geological Survey's National Hydrography Dataset, approximately 89% of the State's rivers and streams are ephemeral, 7% are perennial, and 4% are intermittent. Under the NWPR, none of the ephemeral streams are protected by the CWA, and the jurisdictional status for other waters could change because New Mexico does not have any traditionally navigable waters (TNWs) with a permanent designation, except Navajo Reservoir. For example, within the past two years, the Albuquerque District of the U.S. Army Corps of Engineers designated both the Gila River and Rio Grande under an Approved Jurisdictional Determination (AJD); however, AJDs are only valid for five years.

7. The NWPR also results in the loss of many wetlands in New Mexico. Saint Mary's University of Minnesota's Geospatial Services, with input from the Department, created a model to evaluate the extent of federally protected wetlands and other surface waters in the Cimarron River Watershed located in northeastern New Mexico.[1] The results of this case study show that by narrowing the scope of federal jurisdiction, the number of wetlands protected by the CWA is substantially decreased, leading to a likely loss of benefits provided by wetlands such as flood control and attenuation, pollution control, wildlife habitat, and recreation. The Cimarron River Watershed is known for its special trout waters, cross country and downhill skiing, boating, ice fishing, and other recreational opportunities that contribute to an important outdoor recreation economy for the communities in the watershed. Depending on how the NWPR is applied, 20-70% of the wetlands in the Cimarron River Watershed lose federal protections, threatening the livelihoods of these small, rural towns.

8. To represent benefit-cost analyses of the NWPR, EPA and USACE (collectively the "Agencies") relied on three case studies in the supporting Economic Analysis, "to explore

---

[1] For details of the Saint Mary's University of Minnesota model, visit
https://www.arcgis.com/apps/Cascade/index.html?appid=f3de6b30c0454c15ac9d3d881f18ae33.

potential changes and resulting forgone benefits and avoided costs."[2] The case studies focused on three geographical regions – the Ohio River Basin, the Lower Missouri River Basin, and the Rio Grande River Basin – that intersect 10 states. The Rio Grande River Basin was divided into two major watersheds, the Upper Pecos (HUC 1306) and Lower Pecos (HUC 1307) River Basins, which contain a combined 44,300 square miles in New Mexico and Texas from east of Santa Fe, New Mexico to the confluence of the Pecos River and Rio Grande at the Texas-Mexico border. This case study found 85% of stream miles within the Upper Pecos River Basin in New Mexico are ephemeral, and 34% of all wetland acres to be "non-abutting" wetlands. These ephemeral waters and non-abutting wetlands in the Upper Pecos River Basin automatically are no longer federally protected under the NWPR, whereas many other waters in the Upper Pecos River Basin *may* no longer be protected under the NWPR because they likely do not contribute surface flow to a TNW in a "typical year." Further, the cost analysis for the Pecos River case study shows benefits of the NWPR to be minimal or negligible; however, the Agencies did not quantify or monetize the environmental effects and forgone benefits of the NWPR for this case study, blaming this deficiency on limitations in the data. The *Economic Analysis of the EPA-Army Clean Water Rule*[3] monetized the ecosystem services and benefits from wetlands, so it is possible to evaluate this important component of any new rule. In fact, the estimation of nonmarket environmental values is not new – one notable example is compensation for the 1989 Exxon Valdez oil spill in the Gulf of Alaska. It is well known that wetlands provide many ecological and economic benefits to watersheds such as filtering and improving water quality, flood attenuation, erosion control, carbon sequestration, aquifer recharge, and providing fish and wildlife habitat and nurseries.[4] It is also known that ephemeral waters are ecologically and hydrologically significant in arid and semi-arid watersheds of the southwestern United States. They transport nutrients and sediment to downstream ecosystems, provide habitat for wildlife, and recharge

---

[2] Economic Analysis for the Navigable Waters Protection Rule: Definition of ''Waters of the United States.'' U.S. Environmental Protection Agency and U.S. Department of the Army. January 22, 2020.
[3] Economic Analysis of the EPA-Army Clean Water Rule. U.S. Environmental Protection Agency and U.S. Department of the Army. May 20, 2015. Available at: https://www.epa.gov/sites/production/files/2015-06/documents/508-final_clean_water_rule_economic_analysis_5-20-15.pdf
[4] https://www.epa.gov/sites/production/files/2016-02/documents/wetlandfunctionsvalues.pdf

1 aquifers used for drinking water.[5] Loss of environmental protections for ephemeral streams and
2 wetlands, especially related to reductions in water quality above and below ground, flood
3 attenuation, and fish and wildlife habitat and nurseries, should have been quantified to evaluate
4 the nonmarket environmental values and costs for not protecting these waters.

5     9.    Because of the ephemeral exemption and new definition of "adjacent wetland," the
6 NWPR creates a significant gap in regulation under CWA Section 402 general permits (i.e.,
7 construction and industrial stormwater discharges) and CWA Section 404 dredge and fill permits
8 in ephemeral streams and non-abutting wetlands. The Agencies considered the potential effect of
9 the NWPR on issuance of CWA Section 402 permits for stormwater from construction activities.
10 Overall, the Agencies concluded that the ephemeral exemption would likely change
11 circumstances in arid and semi-arid states where many streams are ephemeral, and CWA
12 protections would be removed from the vast majority of waters in these states.[6] Under the NWPR,
13 many construction sites in arid states are no longer required to obtain NPDES permit coverage for
14 stormwater discharges to ephemeral waters. Dredge and fill and industrial activities in ephemeral
15 streams will no longer need a CWA Section 404 permit. Besides excess sediment, which can
16 smother bottom-dwelling organisms, fill deep pools that are critical refugia during summer and
17 drought, and clog or injure gills of fish, stormwater carries other harmful pollutants. Construction,
18 industrial, and urban sites generate pollutants such as phosphorus and nitrogen from the
19 application of fertilizer, bacteria, various metals (arsenic, cadmium, chromium, copper, zinc),
20 acidic wastewaters, pesticides, phenols, paints, solvents, phthalates, petroleum products, and solid
21 wastes that attach to sediment and/or get washed into streams and wetlands during overland
22 stormflows. Sediment loading rates from constructions sites are typically 10 to 20 times that of
23 agricultural lands and 1000 to 2000 times that of forest lands. Even a small amount of
24 construction or industrial activity can have a significant negative impact on water quality in
25 localized areas if permits are not required and proper management practices are not implemented

---

[5] Levick, L., et al. 2008. The Ecological and Hydrological Significance of Ephemeral and Intermittent Streams in the Arid and Semi-arid American Southwest. U.S. Environmental Protection Agency and USDA/ARS Southwest Watershed Research Center, EPA/600/R-08/134, ARS/233046, 116 pp.

[6] Economic Analysis for the Navigable Waters Protection Rule: Definition of ''Waters of the United States.'' U.S. Environmental Protection Agency and Department of the Army. January 22, 2020.

1   to reduce or eliminate pollutants in stormwater. New Mexico has over a thousand facilities
2   covered by stormwater general permits and, as a result of the NWPR, approximately 25-45% of
3   these facilities are no longer subject to stormwater management requirements.
4       10.   The NWPR also creates a significant gap in regulation of CWA Section 402 individual
5   permits issued by EPA in New Mexico. The Agencies did not sufficiently consider the potential
6   effect of the NWPR on issuance of CWA Section 402 individual permits for discharges to
7   ephemeral or other non-jurisdictional waters under the NWPR. New Mexico currently has 109
8   individual, EPA-issued NPDES permits in the State, including permits issued in Indian Country.
9   Under the NWPR, approximately 50% of these current permittees will no longer be required to
10  obtain an NPDES permit because they discharge to receiving streams that lose CWA protections.
11  Examples of federally-regulated facilities in New Mexico that discharge to NWPR non-
12  jurisdictional waters include: municipal and private domestic wastewater treatment plants; tribal
13  and Bureau of Indian Affairs wastewater treatment plants; multiple types of mines, both active
14  and in reclamation (coal, uranium, cement, rock, minerals and metals); national laboratories;
15  federal facilities; fish hatcheries; and oilfield sanitary waste treatment plants. Eliminating CWA
16  protections and federal regulation of these dischargers degrades water quality of ephemeral
17  receiving streams as well as the downstream TNWs and other jurisdictional waters that they feed.
18      11. The Department has relied upon the Agencies' broad interpretation of waters of the U.S.
19  (WOTUS) under the 1980s regulations and the *Rapanos* Guidance in order to protect New
20  Mexico's waters.
21      12.   The NWPR's ephemeral exemption has a disproportionate effect on water quality in the
22  arid Southwest (e.g., Arizona, Nevada, and New Mexico) because many stormwater discharges
23  from sites into ephemeral streams are no longer subject to CWA permits. New Mexico is one of
24  the driest states, averaging less than twenty inches of annual precipitation. Ephemeral streams
25  provide the same ecological and hydrological benefits as perennial streams by moving water,
26  sediment and nutrients through the system to be utilized downstream. Ephemeral flows are in
27  need of CWA protection because when they are functioning properly they provide important
28  hydrologic connections across the landscape and across geopolitical boundaries; they dissipate

stream energy during high flow events to reduce erosion, thus improving water quality; they recharge aquifers where water can be stored for current and future drinking water supplies; they transport, store and deposit sediment to help maintain floodplains; they transport, store and cycle nutrients for vegetation, wildlife and aquatic life; and they support and provide migration corridors. Given the distribution of ephemeral streams in New Mexico (89% of streams) and their important hydrological and ecological functions, cumulative impacts of ephemeral streams throughout a watershed must be considered in order to protect and maintain water quality and watershed health. Removing protections from ephemeral streams degrades water quality in the watershed and the jurisdictional waters that they feed.

13. Science clearly demonstrates that ephemeral waters are ecologically and hydrologically significant in the arid southwestern United States. In New Mexico, ephemeral tributaries contribute up to 76% of the stormflow in the Rio Grande after a storm event. Where pollutants can be mobilized, ephemeral stormflows will deliver the pollutants to downstream waters, such as the Rio Grande. The cumulative impacts of these non-jurisdictional ephemeral stormflows are detrimental to downstream water quality and threaten human health and the environment.

14. More frequent droughts and shifting precipitation patterns due to climate change result in lower water levels in rivers, lakes, and streams, leaving less water to dilute pollutants. In addition, more frequent and more powerful storms increase polluted runoff from urban and disturbed areas, which transports pollutants from the landscape to nearby waterways. These changes stress aquatic ecosystems and dramatically impact communities throughout the United States, especially in the Southwest. Community impacts include threats to public health, economic strain, and decreased quality of life. The effects of climate change in New Mexico amplify the complexities of western water management. A lack of connectivity or perenniality today or in a "typical year" is not a suitable feature that EPA, USACE and New Mexico can rely upon to define a jurisdictional water.

15. Tijeras Arroyo presents an example of the devastating effects of the NWPR on water quality. This waterway winds for 26 miles from its headwaters in the Sandia and Manzano Mountains east of Albuquerque, New Mexico through developed and undeveloped areas of

7

Albuquerque in the foothills, including Kirtland Air Force Base, before entering the Rio Grande. The waterway is perennial in the headwaters but is ephemeral for 11 miles as it flows out of the mountains and into the Rio Grande. Tijeras Arroyo is a major tributary of the Rio Grande in the Albuquerque area and carries stormwater, and any pollutants mobilized by stormwater, to the Rio Grande during significant rain events, but maybe not in a "typical year" as defined in the NWPR. It is the subject of (1) a Watershed Restoration Action Strategy under CWA Section 319 to address excess *E. coli* bacteria and sedimentation through stormwater management and erosion controls; (2) a Total Maximum Daily Load (TMDL) under CWA Section 303(d) to reduce watershed nutrient loading during both low-flow and high-flow events; and (3) federal permits including several CWA Section 404 permits, an individual CWA Section 402 NPDES permit for Kirtland Air Force Base, and the Municipal Separate Storm Sewer System (MS4) permit for the Albuquerque-Bernalillo County area under CWA Section 402. These various permits and requirements limit and/or monitor the discharge of the following pollutants into Tijeras Arroyo: nitrate-nitrogen, ammonia-nitrogen, total nitrogen, total phosphorus, *E. coli* bacteria, sediment, ethylene dibromide (EDB), heptachlor, per- and polyfluoroalkyl substances (PFAS), total residual chlorine, total suspended solids, biological oxygen demand, and oil and grease. In addition, the Rio Grande downstream of Tijeras Arroyo is impaired for *E. coli* bacteria, polychlorinated biphenyls (PCBs) in fish tissue, and dissolved oxygen. Tijeras Arroyo was jurisdictional under the 1980s regulations, the 2008 Rapanos Guidance, and the 2019 Rule but is not jurisdictional under the NWPR. Surface water quality is also a major concern for the two acequia associations in the Tijeras watershed and the Pueblo of Isleta, which is downstream of Tijeras Arroyo and the City of Albuquerque. Under the NWPR, these CWA protections (e.g., *E. coli* strategy, TMDL, NPDES permits) are not enforceable as is. Depending on how the NWPR is implemented, they will either be modified to move the point of discharge to a jurisdictional water and consequently change the limitations and requirements, or they will be terminated.

16.   Another example of the NWPR's harm is the Gila River, which originates in the Nation's first designated wilderness area (the Gila National Wilderness) and is the last major wild and free-flowing river in New Mexico. The Gila River supports a remarkable abundance of aquatic life

and wildlife, provides significant economic value to the region through abundant outdoor recreation opportunities, and is culturally important to indigenous peoples who have lived in southwestern New Mexico for thousands of years. The Gila River flows from New Mexico into Arizona and typically goes dry before it reaches the Colorado River due to large irrigation diversions, groundwater mining, and sustained drought. Some segments of the Gila River in Arizona have been designated as TNWs, and the Gila River in New Mexico is designated through an Approved Jurisdictional Determination; however, that designation is only valid through 2023. New Mexico's Gila River was named by American Rivers as the country's most endangered river in 2019 because of threats from water diversions and climate change.[7] The temporary designation of the Gila River in New Mexico creates uncertainty surrounding federal protection under the CWA, and results in a precarious future for this precious resource.

17. The Rio Hondo Watershed in south-central New Mexico is yet another example of the irreparable harm the NWPR will have on New Mexico. As the perennial headwaters of the Rio Ruidoso and Rio Bonito flow downstream, they become interrupted and eventually go underground along several ephemeral segments. Because the ephemeral segments are substantially long (over 50 miles), it is highly unlikely that the Rio Ruidoso, Rio Bonito or upstream portions of the Rio Hondo have a surface connection to the Pecos River (a jurisdictional water) in a "typical year." Therefore, everything upstream of these ephemeral breaks/segments is considered non-jurisdictional under the NWPR. In this watershed there are several facilities discharging to the river, including the Ruidoso Downs Wastewater Treatment Plant and the Ruidoso Racetrack. The Rio Ruidoso already exceeds water quality standards for total nitrogen and total phosphorus, two pollutants that are currently controlled by NPDES permits. Historically, excess nitrogen and phosphorus have negatively impacted downstream irrigation uses. Further, construction and industrial sites are no longer required to obtain NPDES permit coverage for their stormwater discharges. This means industrial facilities and construction sites could discharge pollutants into the river without consequence under federal law. Loss of federal pollution control

---

[7] https://www.americanrivers.org/2019/04/americas-most-endangered-rivers-of-2019-spotlights-climate-change-threats/

for the Rio Ruidoso will result in polluted water conveyed to local farms via the 82 acequias, or community ditches, in this area. Acequias have important historical and cultural value in New Mexico, with many dating to the 17th and 18th Centuries, and provide essential water for agriculture. Public health and the environment are directly impacted by the NWPR and unregulated pollutant discharges in the Rio Hondo Watershed.

18. The NWPR will have a profound adverse effect on water quality in the State because the vast majority of New Mexico's waters are ephemeral and large numbers of wetlands are non-abutting. In much of the country, ephemerality of rivers is typically seen in the upper watershed where impacts of the NWPR may be minimal. That is not the case in the arid West. By removing protections for ephemeral waters, waters like the Santa Fe River, Rio Ruidoso, Jemez River, Rio Puerco, Tijeras Arroyo, and Rio Grande tributaries on the Pajarito Plateau (which contain legacy contamination from the Manhattan Project) will have severed and interrupted jurisdiction in the middle and lower reaches. This creates a patchwork of jurisdictional and non-jurisdictional segments along the path of a single river that make it nearly impossible to implement an effective water quality protection program, and likewise make it difficult for landowners and the regulated community to be certain of what is required of them. A patchwork of unregulated contamination will have serious public health and economic consequences related to drinking water supplies, cultural and agricultural uses, recreational uses, and aquatic species and wildlife.

**DIFFICULTIES OF FILLING THE FEDERAL REGULATORY GAP WITH STATE PROGRAMS**

19. New Mexico cannot, as a practical matter, immediately fill the regulatory gap created by the NWPR. The NWPR disproportionately impacts states that do not have authority to administer and operate the NPDES permitting program under CWA Section 402. This program is the primary mechanism under the Act for regulating and limiting discharges of pollutants into the "waters of the United States." Further, the NWPR disproportionately impacts arid states that have many ephemeral waters. The State of New Mexico fits both these characterizations and is therefore particularly adversely impacted by the NWPR.

20.     The Agencies state, "[a]bsent CWA jurisdiction, states and tribes can still choose to regulate waters irrespective of federal mandates." While in theory this may be true, in practice this is impossible for states without NPDES authority or an established state permitting program. New Mexico is one of only three states without NPDES authority, and the only such state in the arid southwest. While the Department is interested in having EPA authorize New Mexico to implement the NPDES program, adopting and implementing such a program requires significant time, funding, and staff. At the very least, statutory authority under the State's Water Quality Act, N.M. STAT. ANN. §§ 74-6-1 to -17 (1967), will need to be amended or developed to cover federal NPDES requirements. Also, unlike most states with established NPDES programs, New Mexico does not have the legal and procedural program infrastructure to issue and enforce NPDES-like permits to regulate discharges of pollutants to surface waters of the state that are not WOTUS under the new definition. New Mexico will have to significantly overhaul its ground and surface water quality protection regulations at 20.6.2 N.M. ADMIN. Code in order to facilitate a state surface water permitting program. The last time these regulations were significantly amended the entire process took over three years from the initial scoping efforts until the regulations went into effect (WQCC 17-03 (R)). Thirteen parties participated in that often-adversarial proceeding, which included a four-day hearing before the State's Water Quality Control Commission. An appeal of one of the amendments is still pending in the New Mexico Court of Appeals (A-1-CA-37531), nearly two years after the regulations went into effect. Furthermore, creating a fee structure to support an effective permitting program will add to the time consuming and resource intensive nature of the rulemaking process. As laid out above, the Department estimates that 50% of NPDES individual permits and 25-45% of stormwater general permits are no longer required amounting to hundreds of unregulated discharges and thousands of pounds of pollutants entering New Mexico's surface waters every year as a result of the NWPR federal rollback, creating a burdensome federal regulatory gap that the Agencies unreasonably expect the State to fill to protect its surface waters and its citizens.

21.     The NWPR imposes significant resource burdens on the Department while putting the health of New Mexico waters at great risk. The premise that all states are capable of addressing

water quality issues in their state is false. Not all states can implement a robust and successful water quality program without significant federal assistance. Recurring federal and state funds need to be identified to support a New Mexico surface water discharge permitting program because reasonable permit fees would not cover the costs of the program in New Mexico. To exacerbate this issue, federal financial support for water pollution control programs has been steadily declining over the past decade, making it more and more difficult to establish an effective and viable permitting program, to the detriment of New Mexico's precious surface waters.

22. To prevent water quality degradation in State surface waters from the rollback of CWA protections, the Department must expand its Surface Water Quality Bureau and develop a State surface water permitting program. The Department lacks sufficient funding at this time to expand the Bureau and implement a permitting program in response to the NWPR. In addition, expansion and funding requests are dependent on approval from the State legislature. A preliminary estimate from a Department contractor indicates the cost of such a program could be in excess of $7.5 million annually, a 115% increase in the Department's budget for all surface water programs. This estimate includes costs associated with permitting, compliance and assistance, enforcement, and data management, which would be phased in over a five to ten-year time period. This estimate also includes recurring annual costs such as training, contractor support, office space, etc. This estimate assumes permits are or would be required for existing dischargers to surface waters of the state. At present this represents 109 individual permits (of which 51 are Publicly Owned Treatment Works), 26 Municipal Separate Storm Sewer System (MS4) permits, 814 facilities covered under the Multi-Sector General Permit for industrial stormwater, 2774 facilities covered under the Construction General Permit, and 200 entities subject to other general permits. Furthermore, in contrast to stagnated and declining state and federal funding, this estimated cost is expected to increase annually due to inflation, developing, defending and enforcing regulatory requirements, and identification of new dischargers. Reasonable permit fees will cover some of the estimated cost but will not be able to cover the majority.

23. With no new federal or state funding associated with this substantial shift in CWA jurisdiction amidst an economic recession, any meaningful oversight of NWPR implementation

will force the Department to pull resources from other priorities and programs. For example, the Department has already shifted portions of four Ground Water Quality Bureau and three Surface Water Quality Bureau staff members' time to investigating and pursuing coverage of surface water protection for waters that may no longer be jurisdictional via existing groundwater discharge permits. The Department also diverted $50,000 for a small professional services contract to conduct an NPDES gap analysis and reallocated portions of two Surface Water Quality Bureau staff members' time to work with the contractor. Redirection of staff time and money weakens, delays or possibly prevents the Department from implementing other critical water quality programs, such as ambient water quality monitoring, assessment and reporting on the status of the State's surface waters, water quality standards revisions, water quality management and watershed-based planning, watershed and wetland restoration, groundwater discharge permit issuance and enforcement, and program and project effectiveness monitoring. In fulfilling its mission to preserve, protect and improve surface water quality across our State, the Department will be harmed by the NWPR due to wholly inadequate resources to implement an effective permitting program, uncertain legislative and federal support, and redirection of already strained resources.

24. The NWPR introduces great uncertainty into the Department's regulatory efforts and burdens the Department with the onerous task of interpreting and applying the Rule. When the NWPR became effective, previous guidance documents, memoranda, and materials were rendered inoperative. In addition, the Department is unaware of a firm commitment by the Agencies to provide guidance and training to assist with early implementation of the NWPR. As of the time of this Declaration, the Agencies have yet to clearly communicate how or whether they intend to enforce, modify, or terminate existing federal permits for waters that are no longer jurisdictional, or whether they intend to issue any modified or new permits to protect downstream jurisdictional water quality for discharges to non-jurisdictional waters (e.g., ephemeral waters) that have a surface connection to a jurisdictional water in a typical year. On-the-ground investigations are needed to delineate which waters are truly intermittent and which are ephemeral for compliance and enforcement purposes. Considering New Mexico has over 88,000

miles of non-perennial streams, and the vast majority of streams in the State do not have active gages to measure stream flows, these stream-specific investigations will be extremely resource-intensive. The Department already has received inquiries from various stakeholders, including the regulated community, about scope and implementation of the NWPR that cannot be answered due to uncertainties related to jurisdictional interpretation and enforcement. These are not insignificant burdens and may lead to additional costly litigation stemming from the Department's interpretation of the new WOTUS definition.

**THE NWPR WILL ADVERSELY AFFECT THE NEW MEXICO ECONOMY**

25.  The value of healthy surface waters in New Mexico is both cultural and economic. New Mexico's diverse waters recharge aquifers, provide important ecological and hydrological connections, support an amazing variety of wildlife and aquatic life, maintain drinking water resources, and sustain critical economic activity. The State's lakes, reservoirs, rivers, streams, and wetlands are essential to the future vitality of the agricultural, outdoor recreation and tourism industries.

26. The NWPR will also create economic burdens associated with new regulatory gaps. Approximately 40% of New Mexicans rely on surface water as a drinking water source. The regulatory gaps created by the ephemeral waters exemption and loss of wetlands protections resulting from the NWPR will result in decreased water quality, as explained above. As a result, the cost to treat drinking water and maintain drinking water infrastructure will increase. The cost to treat surface water to drinking water standards depends on the quality of water coming into the treatment plant, the technologies used, the size of the system, and the energy source. Municipalities will likely need to invest in water treatment infrastructure and other costly technologies, such as desalination and ultrafiltration, to provide clean, safe water for drinking. Degraded water quality coming into the treatment plant, the need for improved and more costly treatment technologies and the less populated, rural nature of New Mexico as a whole will cause water treatment costs to increase substantially for many in the State and may force municipalities to choose lower water quality over necessary investments for clean and safe drinking water. In

addition, enhanced treatment to remove pollutants causes increased water loss during treatment, which translates to less potable water in an increasingly arid State.

27. Outdoor recreation is among New Mexico's largest economic sectors, representing the lifeblood of communities across the state and providing livelihoods for tens of thousands of New Mexicans. More than twice as many jobs in New Mexico depend on outdoor recreation than on the energy and mining sectors combined. The NWPR does not take into account the recreational economy impacts associated with poorer water quality. In addition to tourism dollars spent by New Mexicans in New Mexico, the Tourism Department reports that the State also has a high percentage of out-of-state visitors who come to New Mexico for outdoor recreation activities, such as river rafting, fly fishing, camping, boating and wildlife viewing along the State's scenic waters. Visitors spent $846 million on recreation in the State in 2017, supporting 13,000 direct jobs. In addition, the New Mexico Department of Game and Fish reports there are 160,000 anglers who fish in New Mexico, spending $268 million on their activities annually. The New Mexico Outdoor Recreation Division, created by legislation in 2019, is tasked with increasing outdoor recreation-based economic development, tourism and ecotourism, recruiting new outdoor recreation business to New Mexico, and promoting education about outdoor recreation's benefits to enhance public health. Investing in outdoor recreation helps promote healthy lifestyles and a high quality of life and attracts and sustains employers and families. People do not want to recreate on polluted waters that cannot sustain healthy fish, bird and wildlife populations. The outdoor recreation industry in New Mexico will be adversely impacted by the regulatory gap created by the NWPR, to the detriment of jobs and revenue in New Mexico.

28. Agriculture is part of New Mexico's cultural and economic identity. We are the top state in the country in chile production, third in pecans and in the top 10 for number of dairy cows. According to the New Mexico Economic Development Department, there are 24,800 farms in the State and agriculture and food products are among the State's top five exports. As a rural state with a poverty rate nearly twice the national average, many family farms grow crops and raise livestock for their own families and neighbors, as well as to contribute to the local economy. The Environment Department's surface water quality programs are designed and implemented to

identify waters used for irrigation/irrigation storage and livestock watering and to then take actions to protect and restore those waters to support that use. Based on the scope of the NWPR and New Mexico's inability to close the regulatory gap, waters that farmers rely on to irrigate crops and water livestock to feed New Mexicans and export to other states and nations will be vulnerable to increased pollutant loads from dischargers and detrimental impacts from dredge and fill activities.

29. The Agencies failed to address cross-media implications of the NWPR. The federal Resource Conservation and Recovery Act (RCRA) exempts wastewater treatment units from regulation under RCRA if, in addition to a number of other conditions, those units discharge effluent pursuant to a NPDES permit. 42 U.S.C. § 6903(27). Under the NWPR, many facilities currently discharging pursuant to a NPDES permit or to a wastewater treatment plant with an approved pretreatment program are no longer required to comply with CWA requirements due to the jurisdictional change in the receiving waters. As a result, these facilities may be subject to regulation under RCRA for the first time, are likely to not have performed an analysis of whether they are subject to RCRA, and will likely not be in compliance with RCRA as a result. Given that a number of these facilities are industrial or municipal facilities that have not contemplated regulation as a RCRA treatment, storage or disposal facility (TSDF), this will present an additional economic hardship on these facilities in New Mexico. This is an example of the regulatory uncertainty created by the NWPR that will hurt New Mexico businesses and municipalities.

**CONCLUSION**

30. The Department respectfully requests that the Court enjoin implementation of the NWPR. Implementation of the rule will have a devastating impact on New Mexico's waters and harm the New Mexico economy. The rule creates a regulatory vacuum that the State is incapable of filling to mitigate its harm.

31. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 19th day of November 2020, in Santa Fe, New Mexico.

*[signature]*

Rebecca Roose

# CERTIFICATE OF SERVICE

Case Name:   **State of California, et al. v. Andrew Wheeler, et al.**

Case No.:    **3:20-cv-03005-RS**

I hereby certify that on <u>November 23, 2020</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DECLARATION OF REBECCA ROOSE
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>November 23, 2020</u>, at Los Angeles, California.

| Blanca Cabrera | /s/ Blanca Cabrera |
|---|---|
| Declarant | Signature |

LA2020300885
63769725.docx