1   HUBERT T. LEE (NY Bar No. 4992145)
    hubert.lee@usdoj.gov
2   PHILLIP R. DUPRÉ (DC Bar No. 1004746)
    phillip.r.dupre@usdoj.gov
3   Environmental Defense Section
    Environment & Natural Resources Division
4   U.S. Department of Justice
    4 Constitution Square
5   150 M Street, NE
    Washington, DC 20002
6   Telephone (202) 514-1806
    Facsimile (202) 514-8865
7

8

9   *Attorneys for Defendants*

10          **IN THE UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
11

12
    STATE OF CALIFORNIA, *et al.*,
13
                    Plaintiffs,                  Case No. 3:20-cv-03005-RS
14
                                                 **NOTICE OF MOTION AND**
15          v.                                   **DEFENDANTS' OPPOSITION TO**
                                                 **PLAINTIFFS' MOTION FOR**
16  ANDREW R. WHEELER, as the                    **SUMMARY JUDGMENT/CROSS-**
    Administrator of the United States           **MOTION FOR SUMMARY JUDGMENT**
17  Environmental Protection Agency, *et al.*,
                                                 Date:         June 3, 2021
18                  Defendants,                  Time:         1:30 pm
                                                 Courtroom:    Courtroom 3 – 17th Floor
19          and                                                San Francisco Courthouse
                                                 Judge:        Hon. Richard Seeborg
20  STATE OF GEORGIA, *et al.*,                  Action Filed: May 1, 2020

21                  Defendant-Intervenors.

22

23

24  / / /

25  / / /

26

27

28

**NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT**

TO ALL PARTIES AND COUNSEL OF RECORD:

Pursuant to L.R. 7-2, PLEASE TAKE NOTICE that, on June 3, 2021, at 1:30 pm, or as soon as it may be heard, defendants Andrew R. Wheeler, as the Administrator of the United States Environmental Protection Agency ("EPA"); EPA; R. D. James, as Assistant Secretary of the Army for Civil Works; and United States Army Corps of Engineers (the "Corps," and collectively "Agencies") by and through their undersigned counsel, will, and hereby do, cross move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This motion will be made before the Honorable Judge Richard Seeborg, San Francisco Courthouse, Courtroom 3 – 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102.

This motion is based on the Memorandum of Points and Authorities, the administrative record for The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("NWPR"), *see also* Dkt. No. 206-2, and the Court's entire file in this litigation.

Dated: January 19, 2021

Respectfully submitted,

JONATHAN D. BRIGHTBILL
*Acting Assistant Attorney General*

Of Counsel:

DAVID FOTOUHI
Acting General Counsel
Environmental Protection Agency

CRAIG R. SCHMAUDER
Deputy General Counsel
Department of Army

DAVID COOPER
Chief Counsel
U.S. Army Corps of Engineers
*Attorneys*

/s/ *Draft*
HUBERT T. LEE (NY Bar No. 4992145)
PHILLIP R. DUPRÉ (D.C. Bar No. 1004746)
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
4 Constitution Square
150 M Street, NE
Suite 4.1116
Washington, D. C. 20002
Hubert.lee@usdoj.gov
Phillip.r.dupre@usdoj.gov
Telephone (202) 514-1806 (Lee)
Telephone (202) 616-7501 (Dupré)
Facsimile (202) 514-8865

# TABLE OF CONTENTS

GLOSSARY ................................................................................................................ xii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

    A.     Statutory and Regulatory Background ...................................................... 3

         1.     CWA Permitting Programs ............................................................ 3

         2.     Prior Regulatory Definitions of "Waters of the United States" and Litigation .................................................. 4

             a.     The 2015 Rule .................................................................. 6

             b.     The Repeal Rule and the Navigable Waters Protection Rule ................................................................ 7

STANDARD OF REVIEW .......................................................................................... 9

ARGUMENT ................................................................................................................ 9

I.     The NWPR Is Permissible Under the CWA and Should Be Upheld ................................ 10

    A.     The NWPR Reasonably Construes "Waters of the United States," an Ambiguous Statutory Phrase .............................................. 10

    B.     Plaintiffs Have Failed to Demonstrate that the Agencies' Interpretation of "Waters of the United States" Is Unreasonable or Is Otherwise Unlawful ...................................................... 12

         1.     The Supreme Court's guidance in *Brand X* applies here. .......................... 12

         2.     Plaintiffs misapply *Marks* and related precedent. ...................................... 15

         3.     The NWPR is not a mere application of the *Rapanos* plurality opinion. ...................................................................... 17

         4.     The Court should defer to the Agencies' reasonable construction of CWA Section 101(b). ...................................... 18

C. The Agencies Were Correct to Consider Constitutional Concerns. ...........................................................................23

D. The NWPR's Exclusion of Interstate Waters as a Separate Category of "Waters of the United States" Is Lawful and Reasonable. ...................................................................................24

II. The NWPR Is Neither Arbitrary Nor Capricious Under the APA..................................26

A. The Agencies' Decision Is Well-Explained...........................................27

1. The Agencies Explained that the NWPR Is Driven by a Balance of Policy Considerations. .................................................27

2. The Agencies Explained Their Reasons for Excluding Ephemeral Features from CWA Jurisdiction. ...............................30

3. The Agencies Explained Their Reasons for Excluding Certain Wetlands from CWA Jurisdiction. ..................................33

4. The Agencies Properly Addressed Plaintiffs' Public Comments Regarding Adjacent Wetlands and Ephemeral Streams.............................................................................................36

5. The NWPR's "Typical Year" Criterion Is Reasonable............................37

B. The Agencies Fully Explained How the NWPR Advances the CWA's Policy of Protecting States' Rights and Responsibilities.........................39

C. The Agencies Addressed Any Reliance Interests. .................................40

III. The Court Should Defer Ruling on a Remedy Until After Deciding the Cross-Motions for Summary Judgment. ......................................................................43

CONCLUSION ...................................................................................................................44

# TABLE OF AUTHORITIES

## Cases

*Akins v. Fed. Election Comm'n*,
  101 F.3d 731 (D.C. Cir. 1996), *vacated*, 524 U.S. 11 (1998)..............................................13, 14

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ....................................................................................................43

*Alvarado Cmty. Hosp. v. Shalala*,
  155 F.3d 1115 (9th Cir. 1998), *amended*, 166 F.3d 950 (9th Cir. 1999)..................................36

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013)......................................................................................................................19

*Am. Hosp. Ass'n v. NLRB*,
  499 U.S. 606 (1991) .......................................................................................................................9

*Animal Def. Council v. Hodel*,
  840 F.2d 1432 (9th Cir.1988), *amended*, 867 F.2d 1244 (9th Cir. 1989)...........................38, 42

*Arkansas v. Oklahoma*,
  503 U.S. 91 (1992).......................................................................................................................26

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
  681 F.3d 427 (D.C. Cir. 2012).....................................................................................................36

*Bailey v. United States*,
  516 U.S. 137 (1995).....................................................................................................................20

*Cachil Dehe Band of Wintum Indians v. Zinke*,
  889 F.3d 584 (9th Cir. 2018) .........................................................................................................9

*California v. Wheeler*,
  467 F. Supp. 3d 864 (N.D. Cal. 2020) ...........................................................................................2

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*,
  846 F.3d 492 (2d Cir. 2017).........................................................................................................28

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
  467 U.S. 837 (1984)..................................................1, 3, 4, 9, 10, 11, 12, 14, 15, 17

*Clark v. Rameker*,
  573 U.S. 122 (2014)......................................................................................................................25

*Colony, Inc. v. Commissioner*,
  357 U.S. 28 (1958)....................................................................................................14

*Colorado v. EPA*,
  445 F. Supp. 3d 1295 (D. Colo. 2020), *on appeal*, No. 20-1238 (10th Cir.).......................7, 18

*Ctr. for Biological Diversity v. NHTSA*,
  538 F.3d 1172 (9th Cir. 2008) .................................................................................28

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020)............................................................................................42

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016)............................................................................................42

*Entergy Corp. v. Riverkeeper, Inc.*,
  556 U.S. 208 (2009)................................................................................................11

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)............................................................................26, 27, 32, 41, 42

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*,
  463 F. Supp. 3d 1011 (D. Alaska 2020) ...................................................................35

*Friends of Cowlitz v. FERC*,
  253 F.3d 1161 (9th Cir. 2001), *amended and superseded on other grounds*,
  282 F.3d 609 (9th Cir. 2002) ...................................................................................10

*Georgia v. Pruitt*,
  326 F. Supp. 3d 1356 (S.D. Ga. 2018).......................................................................6

*Georgia v. Wheeler*,
  418 F. Supp. 3d 1336 (S.D. Ga. 2019).................................................................6, 26

*Gill v. Dep't of Justice*,
  246 F. Supp. 3d 1264 (N.D. Cal. 2017) .....................................................................9

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018)............................................................................................44

*Golden State Transit Corp. v. City of Los Angeles*,
  493 U.S. 103 (1989)..........................................................................................14, 15

*Henson v. Santander Consumer USA Inc.*,
  137 S. Ct. 1718 (2017)......................................................................................23, 28

*Hernandez-Carrera v. Carlson,*
    547 F.3d 1237 (10th Cir. 2008) ........................................................................12

*Hodel v. Va. Surface Mining & Reclamation Ass'n., Inc.,*
    452 U.S. 264 (1981)..........................................................................................23

*Illinois v. City of Milwaukee,*
    406 U.S. 91 (1972)............................................................................................25

*Illinois v. City of Milwaukee,*
    731 F.2d 403 (7th Cir. 1984) ...........................................................................25

*In re EPA & DOD Final Rule,*
    803 F.3d 804 (6th Cir. 2015), *vacated by* 713 F. App'x 489 (6th Cir. 2018).......................6, 41

*Infuturia Glob. Ltd. v. Sequus Pharm., Inc.,*
    631 F.3d 1133 (9th Cir. 2011) .........................................................................19

*Int'l Paper v. Ouellette,*
    479 U.S. 481 (1987)..........................................................................................25

*Kern Cty. Farm Bureau v. Allen,*
    450 F.3d 1072 (9th Cir. 2006) ...........................................................................9

*Kimble v. Marvel Entm't, LLC,*
    576 U.S. 446 (2015)....................................................................................14, 15

*King v. Palmer,*
    950 F.2d 771 (D.C. Cir. 1991) .........................................................................15

*Lands Council v. Powell,*
    395 F.3d 1019 (9th Cir. 2005) ...........................................................................9

*Marks v. United States,*
    430 U.S. 188 (1977)....................................................................................15, 16

*Marquez-Coromina v. Hollingsworth,*
    692 F. Supp. 2d 565 (D. Md. 2010) .................................................................13

*Mayo Found. for Med. Educ. & Research v. United States,*
    562 U.S. 44 (2011)............................................................................................11

*Mercy Catholic Med. Ctr. v. Thompson,*
    380 F.3d 142 (3d Cir. 2004)..............................................................................28

*MikLin Enters., Inc. v. Nat'l Labor Relations Bd.*,
  861 F.3d 812 (8th Cir. 2017) ............................................................................13

*Mingo Logan Coal Co. v. Envtl. Prot. Agency*,
  829 F.3d 710 (D.C. Cir. 2016) ..........................................................................42

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)....................................................................................43, 44

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010)...........................................................................................22

*Mozilla Corp. v. FCC*,
  940 F.3d 1 (D.C. Cir. 2019) ..............................................................................41

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012) ..................................................................33, 35

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005)......................................................................1, 2, 10, 11, 17

*N. Cal. River Watch v. City of Healdsburg*,
  496 F.3d 993 (9th Cir. 2007) ......................................................................15, 16

*North Dakota v. EPA*,
  127 F. Supp. 3d 1047 (D.N.D. 2015)...................................................................6

*Office of Commc'n of the United Church of Christ v. FCC*,
  779 F.2d 702 (D.C. Cir. 1985) ..........................................................................28

*Pronsolino v. Nastri*,
  291 F.3d 1123 (9th Cir. 2002) .............................................................................4

*Rapanos v. United States*,
  547 U.S. 715 (2006)...............................1, 2, 5, 13, 14, 17, 18, 19, 21, 34, 35, 36, 41

*Reno v. Flores*,
  507 U.S. 292 (1993)..................................................................................9, 31, 34

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995).............................................................................................39

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001).......................................................5, 11, 20, 23,  25, 31, 35

*Spokeo v. Robins*,
     136 S. Ct. 1540 (2016) ...............................................................................................43

*State v. Bureau of Land Mgmt.*,
     No. 18-cv-00521, 2020 WL 1492708 (N.D. Cal. Mar. 27, 2020) ........................33, 35

*Texas v. EPA*,
     389 F. Supp. 3d 497 (S.D. Tex. 2019) ...........................................................................6

*Texas v. EPA*,
     No. 3:15-CV-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018) ...............................6

*Town of Chester v. Laroe Estates, Inc.*,
     137 S. Ct. 1645 (2017) ...............................................................................................44

*United States v. Bailey*,
     571 F.3d 791 (8th Cir. 2009) .......................................................................................16

*United States v. Davis*,
     825 F.3d 1014 (9th Cir. 2016) .....................................................................................15

*United States v. Donovan*,
     661 F.3d 174 (3d Cir. 2011) ........................................................................................16

*United States v. Eurodif S.A.*,
     555 U.S. 305 (2009) ....................................................................................................11

*United States v. Home Concrete & Supply, LLC*,
     566 U.S. 478 (2012) ....................................................................................................14

*United States v. Johnson*,
     467 F.3d 56 (1st Cir. 2006) .........................................................................................16

*United States v. Mendoza*,
     464 U.S. 154 (1984) ....................................................................................................44

*United States v. Riverside Bayview Homes, Inc.*,
     474 U.S. 121 (1985) .................................................................................4, 5, 11, 33, 34, 35

*United States v. Robison*,
     505 F.3d 1208 (11th Cir. 2007) ...................................................................................15

*Weinberger v. Romero-Barcelo*,
     456 U.S. 305 (1982) ...............................................................................................43, 44

*Wickard v. Filburn,*
  317 U.S. 111 (1942) ...........................................................................................23

*Zavala v. Biter,*
  No. C 15-2247 CRB, 2016 WL 1394337 (N.D. Cal. Apr. 8, 2016), *aff'd sub nom.*
  *Zavala v. Holland,* 809 F. App'x 370 (9th Cir. 2020) .............................................16

## Statutes

5 U.S.C. § 706 ...................................................................................................9, 44

5 U.S.C. § 706(2) .....................................................................................................43

5 U.S.C. § 706(2)(A) .................................................................................................9

33 U.S.C. §§ 1251 et. seq. ..........................................................................................1

33 U.S.C. § 1251(a) ........................................................................................3, 18, 27

33 U.S.C. § 1251(b) ......................................................................3, 11,19, 21, 39

33 U.S.C. § 1255(a)(1) ........................................................................................20, 22

33 U.S.C. § 1258(a) .................................................................................................22

33 U.S.C. § 1311(a) ...........................................................................................3, 20

33 U.S.C. § 1311(a)(1) ..............................................................................................25

33 U.S.C. § 1313(a) ...................................................................................................4

33 U.S.C. § 1313(b) ...................................................................................................4

33 U.S.C. § 1313(c)(1) ...............................................................................................4

33 U.S.C. § 1313(d) ...................................................................................................4

33 U.S.C. § 1313(d)(1)(A) ..........................................................................................4

33 U.S.C. § 1313(d)(1)(B) ..........................................................................................4

33 U.S.C. § 1329(i)(1) ..............................................................................................22

33 U.S.C. § 1344(a) ...................................................................................................4

33 U.S.C. § 1344(d) ...................................................................................................4

33 U.S.C. § 1344(g) ...................................................................................................4

33 U.S.C. § 1362(7) ...................................................................3, 7, 10, 11, 19, 20, 25

33 U.S.C. § 1362(12) .........................................................................................3, 20

33 U.S.C. § 1362(14) ................................................................................................20

33 U.S.C. § 1363 ................................................................................................25

33 U.S.C. § 1377(e) ..............................................................................................4

**Code of Federal Regulations**

33 C.F.R. § 328.3(a) (1987) ..................................................................................4

33 C.F.R. § 328.3(c)(1)(iii) ................................................................................33

40 C.F.R. § 122.44(d)(1)(vii)(A) ..........................................................................3

40 C.F.R. § 130.2(j) ..............................................................................................4

40 C.F.R. § 130.7(b)(1) .........................................................................................4

40 C.F.R. § 131.8 ..................................................................................................4

40 C.F.R. § 131.10(b) ..........................................................................................21

40 C.F.R. § 232.2(q) (1988) ..................................................................................4

**Federal Registers**

39 Fed. Reg. 12,115 (Apr. 3, 1974) ....................................................................11

42 Fed. Reg. 37,122 (July 19, 1977) .....................................................................4

80 Fed. Reg. 37,054 (June 29, 2015) ...............................................................6, 32

82 Fed. Reg. 34,899 (July 27, 2017) ...................................................................41

84 Fed. Reg. 56,626 (Oct. 22, 2019) ...................................................................41

84 Fed. Reg. 4154 (Feb. 14, 2019) ......................................................................41

85 Fed. Reg. 22,250 (Apr. 21, 2020) ....................................1, 3, 7, 11, 17, 18, 20-22, 24-35, 37-42

**Executive Order**

Executive Order 13778 (Feb. 28, 2017).........................................................7, 17, 41

**Legislative Materials**

Pub. L. No. 95-217, 91 Stat. 1566 (1977)...........................................................21

118 Cong. Rec. at 10,667 (daily ed. Mar. 28, 1972)...........................................21

S. Rep. No. 92-414 (1971)     26

# GLOSSARY

| | |
|---|---|
| 2015 Rule | Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) |
| APA | Administrative Procedure Act |
| CWA | Clean Water Act, 33 U.S.C. §§ 1251 et seq. |
| EA | Economic Analysis |
| EPA | Environmental Protection Agency |
| NPDES | National Pollutant Discharge Elimination System |
| NWPR | Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) |
| Repeal Rule | Definition of "Waters of the United States"- Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) |
| RPA | Resource and Programmatic Assessment |
| RTC | Response to Comments |
| TMDL | Total Maximum Daily Load |
| WQS | Water Quality Standards |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The Navigable Waters Protection Rule ("NWPR") (85 Fed. Reg. 22,250 (Apr. 21, 2020)) has brought decades of debate regarding the jurisdictional limits of the Clean Water Act, 33 U.S.C. §§ 1251 et seq., ("CWA") to a close. Under prior regulatory regimes, CWA jurisdiction often turned on an administratively burdensome and case-specific analysis. This analysis looked at whether certain wetlands and other waters had a "significant nexus" to traditionally navigable waters—a case-by-case analysis merely intended to be a stopgap "[a]bsent more specific regulations" by the Agencies. *Rapanos v. United States*, 547 U.S. 715, 782 (2006) (Kennedy, J., concurring in judgment). The application of this standard muddied the waters of CWA jurisdiction. It spawned years of litigation. But the NWPR now more clearly defines discrete categories of covered waters. The regulated public can better anticipate whether a CWA permit may be required to discharge pollutants to a particular water or wetland. And the Agencies' best analysis reflected they would only minimally impact the Agencies' CWA programs.

The NWPR promulgates a reasonable interpretation of the CWA's ambiguous phrase "waters of the United States." That construction is entitled to deference by this Court. *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). Plaintiffs argue otherwise using snippets of the disparate Supreme Court opinions in *Rapanos*. But *Rapanos* addresses a fundamentally different question from the question before this Court. For *Rapanos* addresses the outer limits of the CWA: how far *can* the Agencies reach; what waters may the Agencies regulate? The opinions do not dictate what waters the Agencies *must* regulate.

Further, while the Agencies carefully crafted the NWPR interpretation to synthesize major aspects of all the opinions in *Rapanos*, the Agencies' reasonable construction of the statute is entitled to deference—*regardless of these prior judicial interpretations. See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). A foundational principle of administrative law is that a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference *only if* the prior

court decision holds that its construction follows from the *unambiguous* terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982 (emphasis added). Yet none of the opinions in *Rapanos* found the terms "navigable waters" or "waters of the United States" unambiguous. Rather, as the Chief Justice stressed, the Agencies are "delegated rulemaking authority . . . [and] are afforded generous leeway by the courts" in interpreting the CWA. *Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring). And the NWPR articulates a clear and reasonable construction of the CWA.

This Court already recognized all the above. In denying Plaintiffs' motion for preliminary injunction, this Court correctly observed that "a holding that the Agencies *must* construe the statute more broadly [than the *Rapanos* plurality's articulation of the Act] is a bridge too far." Dkt. No. 171 ("Order Denying PI") at 11 (*California v. Wheeler*, 467 F. Supp. 3d 864, 874 (N.D. Cal. 2020)). This Court further found, correctly, that "nothing in either the *Rapanos* concurrence or the dissent—or in the two read together—can be characterized as a holding 'that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.'" *Id.* (quoting *Brand X*, 545 U.S. at 982). Rehashing the same contentions made in their failed motion for preliminary injunction, Plaintiffs' motion for summary judgment (Dkt. No. 214, "Pls.' Br.") raises arguments already rejected by this Court. They have offered no reason for this Court to reconsider its conclusions set forth in its Order Denying PI.

The NWPR is also neither arbitrary nor capricious under the Administrative Procedure Act ("APA"). While jurisdiction is fundamentally a legal inquiry, the Agencies did consider the science, as well as other factors relevant to their reasoned decisionmaking. The Agencies' analysis and discussion span more than 1,500 pages across the rule's preamble, the Response to Comments ("RTC"), the Resource and Programmatic Assessment ("RPA"), and the Economic Analysis ("EA"). As this Court appropriately noted, "Plaintiffs' arguments that the Agencies disregarded the scientific evidence they previously had gathered is ultimately a policy disagreement." Order Denying PI at 13.

1    Plaintiffs also incorrectly suggest that the mere fact that the NWPR shifts regulation of

2    certain waters and wetlands exclusively to state and tribal authorities automatically spells

3    environmental catastrophe. But the Agencies' balancing of the CWA's objective and policy

4    consistent with the CWA's cooperative federalism framework is reasoned. The NWPR is

5    consistent with the CWA, is well-supported by the administrative record, and is a lawfully

6    promulgated regulation entitled to *Chevron* deference.

7    **BACKGROUND**

8    **A.    Statutory and Regulatory Background**

9    Congress enacted the CWA with the objective "to restore and maintain the chemical,

10   physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), while declaring

11   its policy to "recognize, preserve, and protect the primary responsibilities and rights of States

12   to prevent, reduce, and eliminate pollution." *Id.* § 1251(b). The Act prohibits "the discharge of

13   any pollutant by any person," *id.* § 1311(a), to "navigable waters," which "means the waters of

14   the United States," *id.* § 1362(7), unless otherwise authorized under the Act. The Act also

15   prohibits certain discharges to non-jurisdictional waters that are conveyed downstream to

16   jurisdictional waters and that are not otherwise authorized under the Act. *See* 85 Fed. Reg. at

17   22,289.

18   **1.    CWA Permitting Programs**

19   Two permitting programs are key to implementing the CWA's prohibition on the

20   unauthorized discharge of pollutants into "navigable waters." 33 U.S.C. §§ 1311(a), 1362(12).

21   EPA or authorized states issue CWA National Pollutant Discharge Elimination System

22   ("NPDES") permits for the discharge of pollutants (other than dredged or fill material) from

23   point sources into "waters of the United States." *Id*. § 1342. NPDES permits control water

24   pollution using two strategies. First, permits must include effluent limitations that are based on

25   the capability of pollution-control technology. *Id.* §§ 1311, 1314, 1316–17, 1362(11). These

26   are called "technology-based" limitations. Second, permits must also include any additional

27   limits that are needed to implement applicable water quality standards. *Id.* § 1311(b)(1)(C); 40

28   C.F.R. § 122.44(d)(1)(vii)(A). These are called "water quality-based" limitations. For

discharges of dredged or fill material into "waters of the United States," the U.S. Army Corps of Engineers ("Corps") or a state or tribe with a federally approved program may issue CWA Section 404 permits. 33 U.S.C. § 1344(a), (d), (g).

Supporting these programs, states and authorized tribes adopt water quality standards ("WQS") for particular waterbodies or waterbody segments within their boundaries. 33 U.S.C. §§ 1313(a), (b) & (c)(1), 1377(e); 40 C.F.R. § 131.8. States and authorized tribes then identify, and prioritize, water-quality-limited segments, i.e., segments that do not meet water quality standards even after implementation of technology-based effluent limitations. 33 U.S.C. § 1313(d)(1)(A) & (B); 40 C.F.R. §§ 130.2(j) & 130.7(b)(1). States and authorized tribes develop a Total Maximum Daily Load ("TMDL") for each impaired waterbody and the particular pollutant causing the impairment. 33 U.S.C. § 1313(d). TMDLs function primarily as planning devices. *See Prosolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002). States and authorized tribes implement TMDLs by adjusting pollutant discharge limits in individual permits and/or by nonpoint source controls.

### 2. Prior Regulatory Definitions of "Waters of the United States" and Litigation

The Corps first promulgated regulations defining "waters of the United States" in the 1970s. Those included only waters subject to the ebb and flow of the tide or used "for purposes of interstate or foreign commerce." 39 Fed. Reg. 12,115, 12,119 (Apr. 3, 1974). Thereafter, the Corps substantially broadened its interpretation of the phrase. *See, e.g.*, 42 Fed. Reg. 37,122, 37,144 (July 19, 1977). In the 1980s, the Agencies adopted regulatory definitions substantially similar to the 1977 definition; those regulations remained in effect until 2015. *See* 33 C.F.R. § 328.3(a) (1987) (Corps); 40 C.F.R. § 232.2(q) (1988) (EPA) (collectively, the "1986 Regulations").

Over time, the Agencies refined their application of the 1986 Regulations, as informed by three Supreme Court decisions. In *Riverside Bayview*, the Court applied *Chevron* deference to hold that the Corps' assertion of jurisdiction over wetlands "actually abut[ting]" a traditional navigable water was reasonable. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121,

135 (1985). But in *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ("*SWANCC*"), the Court held "the text of the statute will not allow" CWA jurisdiction to extend to "nonnavigable, isolated, intrastate" ponds based solely on their use by migratory birds. *Id.* at 168, 171-72.

In *Rapanos*, the Supreme Court examined the Corps' assertion of jurisdiction over four specific wetlands adjacent to ditches that were at issue in an enforcement action and a permit proceeding. *Rapanos*, 547 U.S. at 719–20, 729–30. Pursuant to Justice Scalia's plurality opinion and a concurrence by Justice Kennedy, the Court found the Corps' jurisdictional analysis too expansive and remanded it for further consideration. *Id.* at 757 (Scalia, J., plurality); *id.* at 786–87 (Kennedy, J., concurring). The plurality concluded that Congress intended to protect only "relatively permanent" waters that connect to traditional navigable waters, and wetlands that have a "continuous surface connection" to such relatively permanent waters. *Id.* at 742. The plurality further stated that "the traditional term 'navigable waters' . . . carries *some* of its original substance" and "includes, at bare minimum, the ordinary presence of water." *Id.* at 734 (Scalia, J., plurality). But the plurality stated the term "waters of the United States" does "not necessarily exclude *seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months." *Id.* at 732 n.5. Further, the plurality would have excluded from jurisdiction "[w]etlands with only an intermittent, physically remote hydrologic connection to 'waters of the United States.'" *Id.* at 742.

In concurring in the judgment, Justice Kennedy opined that jurisdiction may extend to wetlands with a "significant nexus" to "waters that are or were navigable in fact or that could reasonably be so made." *Id*. at 759 (Kennedy, J., concurring). In the context of wetlands adjacent to traditional navigable waters, Justice Kennedy found the 1986 regulations to be valid without the need for any additional or case-specific significant nexus determination. *Id.* at 780 (citing *Riverside Bayview*). In all other contexts, however, Justice Kennedy would require a case-specific demonstration of significant nexus absent "more specific regulations." *See id*. at 782. Justice Kennedy rejected the dissent's view that the CWA "would permit federal

regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." *Id.* at 778.

The four dissenters in *Rapanos* would have upheld the assertion of jurisdiction over the wetlands in question, explaining their view that waters of the United States encompass (at least) waters that satisfy "either the plurality's or Justice Kennedy's test." *Id.* at 810 & n.14 (Stevens, J., dissenting).

### a. The 2015 Rule

In 2015, the Agencies revised the regulatory definition of "waters of the United States." 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule"). Using Justice Kennedy's "significant nexus" discussion as its legal touchstone, *id.* at 37,061, the 2015 Rule had the "objective of enhancing regulatory clarity, predictability and consistency." *Id.* at 37,090. The 2015 Rule defined the jurisdictional scope of the CWA by placing waters into three categories: (A) waters that were categorically jurisdictional; (B) waters that were subject to case-specific analysis to determine jurisdiction; and (C) waters that were categorically excluded from jurisdiction. *Id.* at 37,057.

Multiple parties sought judicial review of the 2015 Rule in courts across the country. A court of appeals and multiple district courts stayed or enjoined the 2015 Rule, concluding plaintiffs were likely to succeed.[1] Two courts ruled on summary judgment that the 2015 Rule was unlawful and remanded the rule to the Agencies. *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1372 (S.D. Ga. 2019); *Texas v. EPA*, 389 F. Supp. 3d 497, 504–06 (S.D. Tex. 2019). In so ruling, the Southern District of Georgia held that "the definition of waters of the United States in the [2015] WOTUS Rule extends beyond [the Agencies'] authority under the CWA." *Georgia*, 418 F. Supp. 3d at 1360.

---

[1] *See, e.g.*, *In re EPA & DOD Final Rule*, 803 F.3d 804, 808 (6th Cir. 2015), *vacated by* 713 F. App'x 489 (6th Cir. 2018); *Texas v. EPA*, No. 3:15-CV-00162, 2018 WL 4518230, at *1 (S.D. Tex. Sept. 12, 2018); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1364 (S.D. Ga. 2018); *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1051 (D.N.D. 2015); *North Dakota v. EPA*, No. 3:15-cv-59, Dkt. No. 250 (D.N.D. Sept. 18, 2018).

1

2

### b.      The Repeal Rule and the Navigable Waters Protection Rule

3

4   In 2017, the President issued Executive Order 13778, which directed the Agencies to

5   "review" the 2015 Rule and "consider interpreting the term 'navigable waters,' as defined in 33

6   U.S.C. § 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos*

7   *v. United States.*" Through a rulemaking process, the Agencies repealed the 2015 Rule and

8   reinstated the 1986 Regulations' definition of "waters of the United States" and the regulatory

9   regime that had existed prior to the 2015 Rule. 84 Fed. Reg. 56,626 (Oct. 22, 2019) ("Repeal

10  Rule"). The Repeal Rule became effective on December 23, 2019, and a number of parties

    have filed suits challenging the rule.[2]

11  On January 23, 2020, the Agencies then signed a separate final rule—the NWPR—that

12  takes a new approach to defining "waters of the United States." The NWPR went into effect on

13  June 22, 2020. 85 Fed. Reg. 22,250 (Apr. 21, 2020).[3]

14  The NWPR establishes four categories of jurisdictional waters: (1) the territorial seas

15  and traditional navigable waters; (2) tributaries of such waters; (3) certain lakes, ponds, and

16  impoundments of jurisdictional waters; and (4) wetlands adjacent to other jurisdictional waters

17  (other than waters that are themselves wetlands). 85 Fed. Reg. at 22,273. By creating these

18

---

19  [2] With the exception of a few cases, challenges to the Repeal Rule have been filed but are not
    currently proceeding. *See, e.g.*, *Murray v. Wheeler*, No. 1:19-cv-1498, Dkt. No. 22 (N.D.N.Y.
20  July 28, 2020) (adopting two-phased approach to briefing with NWPR claims proceeding first);
    *Washington Cattlemen's Association v. EPA*, No. 2:19-cv-569 (W.D. Wash. July 31, 2020),
21  Dkt. No. 86 (staying plaintiff's claims regarding the 2015 Rule and the Repeal Rule); *South
    Carolina Coastal Conservation League v. Wheeler*, No. 2:19-cv-3006, Dkt. No. 64 (D.S.C.
22  Oct. 27, 2020) (holding case in abeyance); *Pierce v. EPA*, No. 0:19-cv-2193, Dkt. No. 36 (D.
    Minn. Sept. 24, 2020) (staying case). Briefing has been scheduled on both the Repeal Rule and
23  the NWPR in only three other cases. *See Pascua Yaqui Tribe v. EPA*, No. 4:20-cv-266, Dkt.
24  No. 20 (D. Ariz. Oct. 28, 2020); *Navajo Nation v. Wheeler*, No. 2:20-cv-602, Dkt. No. 19
    (D.N.M. Oct. 8, 2020). Plaintiffs in *Chesapeake Bay Foundation, Inc. v. Wheeler*, have filed a
25  motion for summary judgment challenging both the Repeal Rule and the NWPR, Nos. 20-cv-
26  1063, 64, Dkt. No. 35 (D. Md. Nov. 23, 2020).

27  [3] In Colorado, a state-specific preliminary injunction currently applies. *See Colorado v. EPA*,
28  445 F. Supp. 3d 1295 (D. Colo. 2020), *on appeal*, No. 20-1238 (10th Cir.) (oral argument held
    Nov. 18, 2020).

DEFS.' OPP. TO PLFS.' MSJ /CROSS-MOT. FOR SUMMARY JUDGMENT
CASE NO. 3:20-cv-03005-RS

discrete categories of jurisdictional waters, the NWPR departs from any case-specific application of a "significant nexus" test. *Id.* The Rule also specifies "exclusions for many water features that traditionally have not been regulated, and define[s] the operative terms used in the regulatory text." *Id.* at 22,270; *see also id.* at 22,340–41.

The NWPR relies on "a unifying legal theory for federal jurisdiction over those waters and wetlands that maintain a sufficient surface water connection to traditional navigable waters or the territorial seas." *Id.* at 22,252. It extends jurisdiction over tributaries that are "perennial" or "intermittent" in a typical year. *Id.* at 22,251. "Perennial" tributaries are those that have surface water flowing continuously year-round; "intermittent" tributaries "flow[] continuously during certain times of the year and more than in direct response to precipitation." *Id.* at 22,275. As for non-tidal wetlands, the NWPR extends jurisdiction over "adjacent wetlands," meaning those wetlands that abut jurisdictional waters and those wetlands that are non-abutting but are (1) "inundated by flooding" from a jurisdictional water during a typical year, (2) physically separated from a jurisdictional water only by certain natural features (e.g., a berm, bank, or dune), or (3) physically separated from a jurisdictional water only by an artificial barrier that "allows for a direct hydrologic surface connection" during a typical year to a jurisdictional water. *Id.* at 22,251.

There are multiple challenges to the NWPR pending in other district courts.[4] On May 18, 2020, Plaintiffs moved to preliminarily enjoin the NWPR. Dkt. No. 30. On June 19, 2020, this Court denied Plaintiffs' motion, finding among other things that "plaintiffs have not shown a likelihood of success on the merits of their claim that the [NWPR] is 'otherwise contrary to law.'" Order Denying PI at 12.

---

[4] *E.g.*, *Colorado v. EPA*, No. 1:20-cv-01461 (D. Colo.); *Pasqua Yaqui Tribe v. EPA*, No. 4:20-cv-00266 (D. Ariz.); *Chesapeake Bay Found., Inc. v. Wheeler*, No. 1:20-cv-01064 (D. Md.); *Conservation Law Found. v. EPA*, No. 1:20-cv-10820 (D. Mass.); *S.C. Coastal Conservation League v. Wheeler*, No. 2:20-cv-01687 (D.S.C.); *Navajo Nation v. Wheeler*, No. 2:20-cv-00602 (D.N.M.); *N.M. Cattle Growers' Ass'n v. EPA*, No. 1:19-cv-00988 (D.N.M.); *Murray v. Wheeler*, No. 1:19-cv-01498 (N.D.N.Y.); *Puget Soundkeeper All. v. EPA*, No. 2:20- cv-00950 (W.D. Wash.); *Evnt. Integrity Project v. Wheeler*, No. 1:20-cv-01734 (D.D.C.); *Wash. Cattlemen's Ass'n v. EPA*, No. 2:19-cv-00569 (W.D. Wash.); *Waterkeeper All., Inc. v. Wheeler*, No. 3:18-cv-03521 (N.D. Cal.).

1

**STANDARD OF REVIEW**

2          "Summary judgment [] serves as the mechanism for deciding, as a matter of law,

3    whether the agency action is supported by the administrative record and otherwise consistent

4    with the APA standard of review." *Gill v. Dep't of Justice*, 246 F. Supp. 3d 1264, 1268 (N.D.

5    Cal. 2017) (quotation and citation omitted). Under the APA, a court may set aside an agency's

6    final action if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in

7    accordance with law." 5 U.S.C. § 706(2)(A). But this is a "highly deferential" standard under

8    which there is a presumption that the agency's action is valid, so long as a "reasonable basis

9    exists for its decision." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006)

10   (quotation and citation omitted). The scope of review is limited to "the administrative record in

11   existence at the time of the [agency] decision and [not some new] record that is made initially

12   in the reviewing court." *Lands Council v. Powell*, 395 F.3d 1019, 1029-30 (9th Cir. 2005)

13   (citation omitted); 5 U.S.C. § 706.

14          Where a court reviews a facial challenge to a regulation, as the Court is doing here,

15   Plaintiffs bear the burden of establishing that "no set of circumstances exists under which the

16   [NWPR] would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (quotation and citation

17   omitted); *see also, e.g.*, *Cachil Dehe Band of Wintun Indians v. Zinke*, 889 F.3d 584, 599 (9th

18   Cir. 2018). That is, even if Plaintiffs "can point to a hypothetical case in which the rule might

19   lead to an arbitrary result [, that] does not render the rule 'arbitrary or capricious.' [This is

20   because their] case is a challenge to the validity of the entire rule in all its applications." *Am.

21   Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619 (1991).

22

**ARGUMENT**

23          The Court should grant the Agencies' cross-motion for summary judgment and deny

24   Plaintiffs' motion. The NWPR constitutes a reasonable interpretation of the CWA's ambiguous

25   phrase "waters of the United States," and should be upheld under *Chevron*, 467 U.S. at 837.

26   Additionally, the NWPR is neither arbitrary nor capricious under the APA; the Rule is well-

27   reasoned and fully explained. Lastly, although the Agencies contend that Plaintiffs will not

28

1    prevail, if the Court finds that the NWPR violates the law, the Agencies request separate

2    briefing on an appropriate remedy.

3    **I.**    **The NWPR Is Permissible Under the CWA and Should Be Upheld.**

4         The NWPR is a well-explained interpretation of a famously ambiguous statute. Where a

5    challenged rule contains an agency interpretation of statutory language, the Court reviews that

6    interpretation under *Chevron*'s familiar two-step framework. 467 U.S. at 837. At Step One, the

7    Court determines "whether Congress has directly spoken to the precise question at issue." *Id.* at

8    842–43. "[I]f the statute is silent or ambiguous with respect to the specific issue," the Court

9    proceeds to Step Two to determine "whether the agency's answer is based on a permissible

10    construction of the statute." *Id.* at 843; *see also Friends of Cowlitz v. FERC*, 253 F.3d 1161,

11    1166 (9th Cir. 2001) ("[A]bsent a clear expression of congressional intent to the contrary,

12    courts should defer to reasonable agency interpretations of ambiguous statutory language."),

13    *amended and superseded on other grounds*, 282 F.3d 609 (9th Cir. 2002).

14         Because "waters of the United States" is concededly ambiguous, the Court need only

15    consider whether the Agencies' interpretation is reasonable. As explained further below, the

16    NWPR construction of "waters of the United States" reflects a reasonable and permissible

17    interpretation of 33 U.S.C. § 1362(7) (defining "navigable waters" as "waters of the United

18    States").

19         **A.**    **The NWPR Reasonably Construes "Waters of the United States,"**

20               **an Ambiguous Statutory Phrase.**

21       *Chevron* "established a presumption that Congress, when it left ambiguity in a statute

22    meant for implementation by an agency, understood that the ambiguity would be resolved, first

23    and foremost, by the agency, and desired the agency (rather than the courts) to possess

24    whatever degree of discretion the ambiguity allows." *Brand X*, 545 U.S. at 982 (internal

25    quotation marks and citation omitted). Because "waters of the United States" is ambiguous, the

26    Agencies were empowered to reconsider their prior statutory interpretation—*even in the face of*

27    *contrary judicial precedent*. *See id.* (holding a "court's prior judicial construction of a statute

28    trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court

1   decision holds that its construction follows from the unambiguous terms of the statute and thus

2   leaves no room for agency discretion"); *see also United States v. Eurodif S.A.*, 555 U.S. 305,

3   315 (2009) (A "court's choice of one reasonable reading of an ambiguous statute does not

4   preclude an implementing agency from later adopting a different reasonable interpretation.").

5          As noted above, the question at *Chevron* Step Two is "whether the agency's answer [to

6   the interpretive question] is based on a permissible construction of the statute." *Mayo Found.*

7   *for Med. Educ. & Research v. United States*, 562 U.S. 44, 54 (2011) (quotation and citation

8   omitted). This need not be "the only possible interpretation, nor even the interpretation deemed

9   *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009).

10  Interpreting ambiguous language "involves difficult policy choices," so judicial deference is

11  critical, as "agencies are better equipped to make [such choices] than courts." *Brand X*, 545

12  U.S. at 980.

13         The NWPR's "unifying legal theory"—consistent with the statutory text—asserts

14  "federal jurisdiction over those waters and wetlands that maintain a sufficient surface water

15  connection to traditional navigable waters." 85 Fed. Reg. at 22,252. Congress defined

16  "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C.

17  § 1362(7). The Corps originally defined these terms to encompass only tidal waters and waters

18  used "for purposes of interstate or foreign commerce." 39 Fed. Reg. 12,115, 12,119 (Apr. 3,

19  1974). After the Agencies broadened their statutory reading, the Supreme Court held that

20  Congress permitted this language to extend to some "waters" that are not actually " 'navigable'

21  under the classical understanding of that term." 85 Fed. Reg. at 22,262 (citing *Riverside*

22  *Bayview*, 474 U.S. at 133). But "the term 'navigable' indicates 'what Congress had in mind as

23  its authority for enacting the CWA.' " *Id.* (citing *SWANCC*, 531 U.S. at 172). Congress also

24  expressed its policy under the CWA "to preserve[ ] and protect" the power of states to regulate

25  water resources and land within their borders. *See* 33 U.S.C. § 1251(b). The NWPR avoids

26  federal regulation of non-navigable, non-adjacent waters that lack such a sufficient such

27  connection. In accordance with CWA Section 101(b), states and tribes have the primary—

28

1    indeed, exclusive—responsibilities and rights to protect such waters. *Id*. The NWPR is thus a

2    reasonable interpretation of "waters of the United States."

3       **B.    Plaintiffs Have Failed to Demonstrate that the Agencies'**
        **Interpretation of "Waters of the United States" Is Unreasonable or**
4       **Is Otherwise Unlawful.**

5       Plaintiffs do not meaningfully dispute that *Chevron* deference is due. Rather, they argue

6    that the NWPR is unlawful because it is modeled after the *Rapanos* plurality opinion and

7    "conflicts with the Act's text, structure, and essential objective." Pls.' Br. at 28-29. These

8    arguments lack merit for multiple reasons.

9            **1.    The Supreme Court's guidance in *Brand X* applies here.**

10      *First*, Plaintiffs claim that because *Brand X* does not apply to Supreme Court decisions

11   such as *Rapanos*, an agency's interpretation of ambiguous statutory language cannot trump a

12   Supreme Court's prior construction of that statutory language and therefore, *Brand X* cannot

13   "save" the NWPR. Pls.' Br. at 31-32. This claim is without merit.

14      As an initial matter, Plaintiffs' argument wrongly presumes that the Agencies even

15   need *Brand X* to "save" the NWPR. As this Court aptly noted, "nothing in either the

16   *Rapanos* concurrence or the dissent—or in the two read together—can be characterized as a

17   holding 'that its construction follows from the unambiguous terms of the statute and thus

18   leaves no room for agency discretion.' " Order Denying PI at 11.

19      Moreover, the claim that *Brand X* applies only to lower court decisions (and not to

20   Supreme Court decisions) is meritless. The Supreme Court did not exclude itself from its

21   *Brand X* decision. It would be contrary to the Supreme Court's reasoning in *Chevron* and

22   *Brand X*. And none of the cases Plaintiffs cite actually holds this to be true. The only circuit to

23   squarely address this question is the Tenth Circuit in *Hernandez-Carrera v. Carlson*, 547 F.3d

24   1237, 1247 (10th Cir. 2008). In *Hernandez*, the appellants challenged an agency's regulation

25   interpreting ambiguous statutory language. They argued that *Brand X* "only applies to lower

26   court decisions" and therefore, a prior Supreme Court decision interpreting that ambiguous

27   statutory language foreclosed the agency's subsequent, contrary interpretation. *Id.* at 1246-47.

28   The Tenth Circuit rejected this argument. It explained that applying *Brand X* only to lower

1  court decisions would " 'lead to the ossification of large portions of our statutory law,' " by

2  precluding agencies from revising unwise Supreme Court constructions of ambiguous statutes.

3  *Id.* at 1247 (internal citation omitted). *Hernandez* also explained that not applying *Brand X* to

4  Supreme Court decisions would disregard the intent of Congress to delegate statutory "gap

5  filling" duties to the Agencies. *Id.* Not applying *Brand X* to Supreme Court decisions would

6  also encourage litigants to resolve statutory ambiguity with the courts instead, usurping the

7  administrative notice-and-comment rulemaking process. *Id.*; *see also Marquez-Coromina v.*

8  *Hollingsworth*, 692 F. Supp. 2d 565, 573 (D. Md. 2010) (agreeing with the rationale employed

9  by the Tenth Circuit in *Hernandez*). The Tenth Circuit's reasoning is particularly apt here. The

10  *Rapanos* court affirmatively encouraged the Agencies to "fill the statutory gap" and

11  promulgate a regulation defining "waters of the United States." *See Rapanos*, 547 U.S. at 758

12  (Roberts, C.J., concurring) (noting that the Agencies should be "afforded generous leeway" for

13  "developing *some* notion of an outer bound" to their CWA jurisdiction); *id.* (remarking "how

14  readily the situation could have been avoided" had the Agencies exercised their "delegated

15  rulemaking authority" under the CWA).

16        The cases Plaintiffs cite do not actually hold that *Brand X* does not apply to Supreme

17  Court decisions. In *MikLin Enterprises, Inc. v. Nat'l Labor Relations Bd.*, 861 F.3d 812, 823

18  (8th Cir. 2017), the NLRB argued that in making its administrative decision, it properly applied

19  prior Supreme Court precedent and that this application was entitled to deference. The Eighth

20  Circuit rejected this claim. It held only that the NLRB's attempt to interpret Supreme Court

21  precedent is not entitled to deference. Unlike the NLRB in *MikLin*, the Agencies here are

22  advancing an interpretation of ambiguous language—not the *Rapanos* decision. Moreover,

23  *MikLin* only suggested, in dicta, that the question of whether *Brand X* applies to prior Supreme

24  Court decisions has not been definitively answered. *Id*. It did not hold that *Brand X* does not

25  apply to Supreme Court precedent. Likewise, Plaintiffs' citation to *Akins v. Fed. Election*

26  *Comm'n*, 101 F.3d 731, 740 (D.C. Cir. 1996), *vacated*, 524 U.S. 11 (1998), is similarly

27  misplaced. The D.C. Circuit only took issue with the agency's argument that its interpretation

28  of Supreme Court precedent was entitled to deference. The D.C. Circuit did not hold that the

1    agency's interpretation of an ambiguous statute was not entitled to deference; in fact, the D.C.

2    Circuit readily acknowledged that "Congress delegates policymaking functions to agencies, so

3    deference by the courts to agencies' statutory interpretations of ambiguous language is

4    appropriate." *Id.*

5      *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478 (2012), is also inapposite

6    and does not support Plaintiffs' argument. In that case, the Supreme Court never actually held

7    that *Brand X* only applies to lower court decisions. Rather, the *Home Concrete* plurality

8    opinion refused to apply *Brand X* at all because it believed that the prior Supreme Court

9    decision (*Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958)), had concluded that the statute at

10    issue unambiguously left "no gap" for the agency to fill, and there was no room for agency

11    discretion to interpret the statute differently. Thus, the statute must be interpreted pursuant to

12    how the Supreme Court in *Colony* read the statute. *Id.* at 488-89. The *Home Concrete* plurality

13    reasoned that *Colony* pre-dated *Chevron* by 30 years, and accordingly, "[t]here is no reason to

14    believe that the linguistic ambiguity noted by *Colony* reflects a post-*Chevron* conclusion that

15    Congress had delegated gap-filling power to the agency." *Id.* By contrast, *Rapanos* is a 2006

16    Supreme Court decision where the Justices readily acknowledged, and even encouraged, the

17    "gap-filling power" accorded to the Agencies in defining "waters of the United States." *See*,

18    *e.g.*, *Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring) (observing that the Agencies have

19    been "afforded generous leeway" for "developing *some* notion of an outer bound" to their

20    CWA jurisdiction).

21      Plaintiffs' reliance on *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446 (2015), and *Golden*

22    *State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989), is also unavailing. Pls.' Br. at

23    32. Neither *Kimble* nor *Golden State* involved a federal agency's interpretation of statutory

24    language conflicting with a prior Supreme Court decision's interpretation of that same

25    language—in fact, neither case involved a federal agency at all. Rather, those cases involved

26    *non*-federal agency litigants claiming that the Supreme Court's interpretations of ambiguous

27    statutory language should be discarded in favor of their alternative, preferred interpretations.

28

*See Kimble* 576 U.S. at 456; *Golden State*, 493 U.S. at 112.[5] In other words, neither *Kimble* nor *Golden State* undermine the principle that an agency can reinterpret ambiguous statutory language even when the Supreme Court has opined on an earlier interpretation of that language. Accordingly, *Rapanos* does not foreclose the Agencies' interpretation of "waters of the United States," and the NWPR should be afforded deference under *Chevron* and *Brand X*.

### 2.   Plaintiffs misapply *Marks* and related precedent.

*Second*, Plaintiffs incorrectly suggest that the concurring and dissenting *Rapanos* opinions categorically preclude the Agencies from interpreting "waters of the United States" to not encompass ephemeral streams. Pls.' Br. at 29-31.

*Marks v. United States* instructs lower courts that "[w]hen a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding . . . may be viewed as that position taken by those Members *who concurred in the judgments* on the narrowest grounds,' " 430 U.S. 188, 193 (1977) (emphasis added). While the Ninth Circuit has not expressly decided this question, other circuits have voiced skepticism that dissenting opinions can form the basis of a holding arising out of a *Marks* analysis.[6] *See, e.g.*, *United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007) ("In our view, *Marks* does *not* direct lower courts interpreting [*Rapanos*] to consider the positions of those who dissented. *Marks* talks about those who 'concurred in the judgment[],' not those who did not join the judgment.") (citation omitted) (quoting *Marks*, 430 U.S. at 193); *King v. Palmer*, 950 F.2d 771, 783 (D.C. Cir. 1991) (en banc) (holding it was not "free to combine a dissent with a concurrence to form a *Marks* majority").

---

[5] Plaintiffs also point to *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007) as the controlling Ninth Circuit precedent defining "waters of the United States" based on the *Rapanos* decision. Pls.' Br. at 32. However, given *Brand X* and the deference owed to the Agencies' interpretation, *Healdsburg* cannot usurp the Agencies' interpretation here.

[6] The Ninth Circuit in *Davis* expressly declined to decide the issue of whether it could combine a dissent with a concurrence when conducting a *Marks* analysis. *United States v. Davis*, 825 F.3d 1014, 1025 n.12 (9th Cir. 2016).

1    Indeed, in denying Plaintiffs' motion for preliminary injunction, this Court observed

2    that "it is suspect to attempt to cobble together a holding from the [*Rapanos*] concurrence and

3    the dissent." Order Denying PI at 11 (citing *Marks*, 430 U.S. at 193). And other courts in this

4    district have arrived at the same conclusion with respect to the proper application of *Marks* in

5    this type of context. *See, e.g.*, *Zavala v. Biter*, No. C 15-2247 CRB, 2016 WL 1394337, at *37

6    (N.D. Cal. Apr. 8, 2016) ("We do not believe that the common view expressed in Justice

7    Thomas's concurring opinion (in which no other justice joined) and the dissenting opinion in

8    *Williams*. . . may be taken as a holding of the U.S. Supreme Court since it is not yet the basis of

9    any judgment"), *aff'd sub nom. Zavala v. Holland*, 809 F. App'x 370 (9th Cir. 2020).

10    Furthermore, *eight* justices actually *rejected* the significant nexus methodology both

11    because it was not grounded in the text of the CWA and because it should not supplant agency

12    rulemaking. RTC-Legal Arguments, AR 11574, Topic 1 at 60-68.[7] So if *Rapanos* were

13    interpreted by the superficial vote-counting approach suggested by Plaintiffs, the Agencies

14    could not have adopted Justice Kennedy's significant nexus standard either (as the 2015 Rule

15    intended). Yet, as Plaintiffs note, the Ninth Circuit applies Justice Kennedy's standard in

16    assessing CWA jurisdiction. Pls.' Br. at 32 (citing *City of Healdsburg*, 496 F.3d at 995). And,

17    Plaintiffs neglect to mention that some courts have held that the *plurality's* test could be

18    applied to determine jurisdiction under the CWA. *See, e.g.*, *United States v. Donovan*, 661 F.3d

19    174, 176, 182, 184 (3d Cir. 2011); *United States v. Bailey*, 571 F.3d 791, 798-99 (8th Cir.

20    2009); *United States v. Johnson*, 467 F.3d 56, 64-66 (1st Cir. 2006).

21    Ultimately, the Court need not reach this question here, because even if the *Rapanos*

22    concurrence and dissent could be read together to form binding precedent, the "holding" of

23    such a combined opinion would still be distinguishable an inapposite to the NWPR. Neither

24    opinion directs what waters the Agencies *must* regulate under the CWA. *See* Order Denying PI

25    at 11. *Rapanos* was not a facial review of the regulatory text of the CWA. Rather, it was an as-

26    applied challenge of the Corps' *implementation* of the 1986 Regulations. At issue was whether

27    _____

28    [7] The Agencies will follow the same administrative record citation methodology set forth in
     Plaintiffs' brief. *See* Pls.' Br. at 5 n.2.

DEFS.' OPP. TO PLFS.' MSJ /CROSS-MOT. FOR SUMMARY JUDGMENT
CASE NO. 3:20-cv-03005-RS

1   the Corps extended jurisdiction to waters the CWA *cannot* regulate. The Supreme Court did

2   not address in *Rapanos* whether the Agencies' *Chevron*-delegated interpretation failed to cover

3   waters the Agencies *must* regulate. Neither Justice Kennedy's concurrence nor the dissenting

4   Justices read the text of the CWA to *require* extending federal jurisdiction over all ephemeral

5   streams. Pls.' Br. at 29-31.

6         Rather, *Rapanos* only addresses the *outer* limits of the CWA, i.e., what waters the

7   Agencies *may* regulate. Its opinions do not dictate what waters the Agencies *must* regulate. The

8   *Rapanos* dissent reasoned, "the proper question is not how [to] define, 'adjacent,' but whether

9   the Corps' definition is reasonable." 547 U.S. at 805. And the dissent thought it was. *See also*

10  *id.* at 780 (Kennedy, J., concurring) (finding the 1986 regulations' inclusion of "adjacent

11  wetlands" to be reasonable without a case-specific demonstration of significant nexus in the

12  context of wetlands adjacent to traditional navigable waters). So even if that opinion were

13  binding, it would not bar the new interpretation of "waters of the United States" in the NWPR.

14  This Court rightly acknowledged as much, noting in its order denying preliminary injunction

15  that even if the concurring and dissenting *Rapanos* opinions together could stand for the

16  proposition that the "plurality's articulation of the maximum permissible reach of the statute is

17  an improper construction, a holding that the Agencies must construe the statute more broadly is

18  a bridge too far." Order denying PI at 11. "[N]othing in either the *Rapanos* concurrence or the

19  dissent—or in the two read together—can be characterized as a holding 'that its construction

20  follows from the unambiguous terms of the statute and thus leaves no room for agency

21  discretion.' " *Id.* (quoting *Brand X*, 545 U.S. at 982). Plaintiffs have offered nothing that

22  demonstrates otherwise.

23        **3.**    **The NWPR does not merely apply the *Rapanos* plurality.**

24        *Third*, the notion that the NWPR is nothing more than the codification of the *Rapanos*

25  plurality is wrong. Pls.' Br. at 29-31. While the NWPR is guided by the *Rapanos* plurality—as

26  well as the concurring opinion in that case—it is not a rote application of that opinion.

27  Executive Order 13778 did not require the Agencies to rely exclusively upon the plurality

28  opinion. 85 Fed. Reg. at 22,273. And they did not. The NWPR instead synthesized "common

principles of the *Rapanos* plurality and concurring opinions" to "balance between the clear

directive from Congress to ensure that States maintain primary authority over land and water

resources" and to preserve the appropriate level of federal authority. *Id.*

Plaintiffs cite *Colorado*, 445 F. Supp. 3d at 1312, in support of their claim that *Rapanos*

precludes the statutory construction offered by the plurality because it commanded only four

Justices. Pls.' Br. at 32. But the *Colorado* court was incorrect precisely because it wrongly

characterized the NWPR as a rote interpretation of the *Rapanos* plurality and because it

erroneously believed the *Rapanos* opinions to be setting out what waters the Agencies *must*

regulate. There are concrete differences between the *Rapanos* plurality and the NWPR. *See* 85

Fed. Reg. at 22,273. The NWPR asserts jurisdiction beyond "those wetlands with a continuous

surface connection to bodies that are 'waters of the United States' in their own right," as the

plurality sought. *Rapanos*, 547 U.S. at 742. In contrast, this Court correctly observed that the

*Rapanos* opinions only identify how broadly the Agencies *may* regulate. Order denying PI at

11.

### 4.    The Court should defer to the Agencies' reasonable construction of CWA Section 101(b).

*Fourth*, Plaintiffs claim that for the purposes of determining CWA jurisdiction,

Congressional intent "unambiguously" precludes the Agencies from balancing Congress'

policy under CWA Section 101(b), to preserve and protect "the primary responsibilities and

rights of States to prevent, reduce and eliminate pollution," with the statute's objective under

CWA Section 101(a) "to restore and maintain the chemical, physical, and biological integrity

of the Nation's waters." Pls.' Br. at 33-38 (citing 33 U.S.C. §§ 1251(a), (b)). Plaintiffs'

argument is not supported by the plain language of the Act, it relies on convoluted reasoning

based on incomplete and misleading snippets of case law and legislative history, has already

been considered and rejected by this Court, and is little more than an attempt to usurp agency

discretion by replacing it with Plaintiffs' preferred policy choices.

At bottom, Plaintiffs' argument relies on an overly constrained reading of the CWA,

i.e., that CWA Sections 101(a) and (b) must be read together, with Section 101(b) being

subservient to the objective set forth under Section 101(a). Pls.' Br. at 33-38. Nothing in the plain language of the Act supports Plaintiffs' argument that the Agencies *must* interpret the Act in this manner. *See Infuturia Glob. Ltd. v. Sequus Pharm., Inc*., 631 F.3d 1133, 1137 (9th Cir. 2011) ("When interpreting the meaning of this statute, we look first to its plain language") (internal quotations and citation omitted). Rather, the plain language of Section 101(b) *supports* the Agencies' consideration of States as having "primary" rights and responsibilities to prevent pollution within their borders. *See* 33 U.S.C. § 1251(b); *see also Rapanos*, 547 U.S. at 755–56 (Scalia, J., plurality) ("[C]lean water is not the *only* purpose of the statute. So is the preservation of primary state responsibility for ordinary land-use decisions."). The Agencies appropriately balanced the statutory objective and policies.

Plaintiffs ultimately assert that the Agencies were wrong even to recognize Section 101(b) as an appropriate policy consideration in defining "waters of the United States." Relying on inaccurate characterizations of the Act's structure, case law, and legislative history, they argue "Congress intended the waters of the United States to be defined as broadly as possible, regardless of state sovereignty and the roles of states under the CWA framework." Pls.' Br. at 36. This claim fundamentally misunderstands the relationship between jurisdictional limits and an agency's obligation to fulfill the statutory objective. The CWA's objective to maintain water quality integrity must be achieved through a *valid exercise* of federal authority. The statutory objective does not give the Agencies the authority to extend their jurisdiction beyond the limits imposed by the CWA or the Constitution "in the name of providing *all* of the benefits for water quality the science suggests might be achievable." Order Denying PI at 13. Congress limited the CWA's jurisdiction to "navigable waters," 33 U.S.C. § 1362(7), and the Agencies cannot exceed this authority. The "textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations." *Rapanos*, 547 U.S. at 752 (plurality). And "no legislation pursues its purposes at all costs." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).

Legislative history does not save Plaintiffs' argument either. In *SWANCC*, the Court specifically rejected that the legislative history "signifies that Congress intended to exert

1   anything more than its commerce power *over navigation*." *SWANCC*, 531 U.S. at 168 n.3

2   (emphasis added). Where an agency's interpretation of a statute "invokes the outer limits of

3   Congress' power," the Court expects "a clear indication that Congress intended that result." *Id.*

4   at 172. The Court found no such clear statement of Congress' intent for the CWA to reach the

5   waters at issue in *SWANCC*. *Id.* at 174.

6          Thus, *SWANCC* fully rejects Plaintiffs' argument here. Pls.' Br. at 36. While the

7   CWA's objective is to restore and maintain water quality integrity, the Agencies may not

8   interpret CWA jurisdiction to extend to the broadest constitutionally permissible reach under

9   the Commerce Clause. *SWANCC*, 531 U.S. at 166 (reversing holding that "the CWA reaches as

10  many waters as the Commerce Clause allows").

11         If anything, the state-federal partnership structure under the CWA supports the

12  Agencies' understanding that "waters of the United States" is not defined as broadly as

13  Plaintiffs believe. The CWA features two general types of federal support for tribal and state

14  authorities: (1) non-regulatory support for states in controlling pollution in any of the Nation's

15  waters, and (2) federal regulatory permitting authority over a *subset* of the Nation's waters

16  defined as "navigable waters." *See* 85 Fed. Reg. 22,253. The CWA's non-regulatory programs

17  provide technical and financial assistance to states and authorized tribes to prevent, reduce, and

18  eliminate pollution in the Nation's waters generally. *Id.* For instance, Congress authorized the

19  EPA to make grants to states to develop techniques to control pollution in "any waters," 33

20  U.S.C. § 1255(a)(1), and to fund research "for prevention of pollution of any waters," *id.*

21  § 1255(c). In contrast, federal regulatory permitting authority does not extend to "any waters."

22  It is more limited, only extending to "navigable waters" defined as "waters of the United

23  States."[8] *See* 85 Fed. Reg. 22,253 (citing 33 U.S.C. §§ 1362(7), 1311(a), 1362(12), (14)).

24

25  _____

26  [8] Plaintiffs claim that "waters of the United States" and "waters" are synonyms and therefore,

27  this is a distinction without a difference. Pls.' Br. at 37. But this ignores the maxim that "[w]e
    assume that Congress used two terms because it intended each term to have a particular,

28  nonsuperfluous meaning." *Bailey v. United States*, 516 U.S. 137, 146 (1995). And, legislative
    history indicates that Congress understood that different types of "waters" would be subject to

1    States and tribes play a significant role under the CWA in protecting other water resources. 85

2    Fed. Reg. 22,253. Thus, a reading that limits federal jurisdiction to "navigable waters" and

3    provides state and tribal authorities a greater role in regulating waters not subject to federal

4    jurisdiction is not arbitrary or capricious. It is what the statute directs.

5          Alternatively, Plaintiffs believe that to the extent CWA Section 101(b) is relevant, the

6    import of this Section is limited to the states' and tribes' roles in implementing the CWA. Pls.'

7    Br. at 34-37. Plaintiffs' interpretation is inconsistent with the plain language of the statute.

8    Section 101(b) expressly calls for "preserv[ing], and protect[ing] the . . . rights of States,"

9    including "to plan the development and use . . . of land." 33 U.S.C. § 1251(b). And, the fact

10   that Section 101(b) was included in the Act in 1972, yet the additional Section 101(b) policy

11   statement "that the States . . . implement the permit programs under sections 402 and 404 of

12   this Act" was not added until the 1977 amendments and the specific authority for states to

13   administer Section 404 was also not added until 1977 indicates that Section 101(b) as a whole

14   refers to "something beyond the subsequently added state administration program of 33 U.S.C.

15   1344(g)–(l)." *Rapanos*, 547 U.S. at 737 (citations omitted); Pub. L. No. 95-217, 91 Stat. 1566,

16   1575 (1977). So the NWPR reasonably considers the CWA's statutorily-stated "policy" to

17   preserve traditional state authority. It is entirely within the Agencies' discretion to balance the

18   statutory objective and the policies set forth in Section 101(b). 85 Fed. Reg. at 22,253, 22,269–

19   72, 22,287–88.

20         Plaintiffs also claim that the NWPR's implementation of Section 101(b) "undermines

21   the cooperative federalism Congress intended the CWA to achieve." Pls.' Br. at 36-37. But this

22   contention ignores the existing safeguards in place under the CWA and its regulations in

23   protecting downstream states from any upstream states that purportedly would have weaker

24   water quality standards. *First*, as described *supra* at p. 4, states must establish WQS for "waters

25   of the United States" within their borders, and these standards *must consider* the downstream

26   effects on other jurisdictions. *See* 40 C.F.R. § 131.10(b). The NWPR does not alter the

27   _____

28   varying regulation. 85 Fed. Reg. 22,253 n.4 (citing 118 Cong. Rec. at 10,667 (daily ed. March
     28, 1972)).

substantive WQS requirements that states must have in place for "waters of the United States." These account for *all* pollution reaching waters of the United States, including from non-jurisdictional ephemerals, non-adjacent wetlands, and even nonpoint sources. So, even if under the NWPR certain discharges will no longer be within the Agencies' permitting jurisdiction (though potentially covered by state laws), to the extent this pollution reaches downstream waters, increased pollution that causes an exceedance of WQS will continue to be addressed. Should that occur, states may need to adjust their TMDLs to ensure that the underlying WQS are met. *See* RPA, AR 11573, at 63. *Second*, if pollution in a non-jurisdictional water reaches a jurisdictional water, CWA Section 402 permitting requirements may still apply. 85 Fed. Reg. at 22,333. *Third*, as the Agencies recognized, disputes over pollution in non-jurisdictional waters that cross state lines could be mediated by EPA or resolved in court through application of federal common law. RTC-Legal Arguments, AR 11574, Topic 1 at § 1.2.3.1, *id.*-Economic Analysis and RPA, Topic 11 at § 11.3.2.5. Accordingly, the NWPR does not necessarily remove federal protections with respect to pollution conveyed downstream to a jurisdictional waterbody. 85 Fed. Reg. 22,333 ("complete State 'gap-filling' could result in a zero-net impact in the long-run").

The NWPR also does not disturb the many non-regulatory technical and financial assistance programs available for states, local governments, interstate agencies, and tribes to address pollution in waters even if they are *not* federally regulated. *See, e.g.*, 33 U.S.C. § 1255(a)(1) (authorizing grants for reducing pollutant discharge "into *any waters*") (emphasis added); *id.* § 1258(a) (authorizing agreements with states to "eliminate[e] or control . . . pollution, within all or *any part of the watersheds* of the Great Lakes") (emphasis added); *id.* § 1329(i)(1) (authorizing grants for groundwater protection); *see also supra* at pp. 20-21.

Ultimately, Plaintiffs' preferred policy for achieving the CWA's objective does not override the Agencies' delegated discretion to balance statutory elements and policy considerations reflected in the statute itself. "It is [a court's] function to give the statute the effect its language suggests, however modest that may be; not to extend it to admirable purposes it might be used to achieve." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 270

1   (2010); *see also Henson v. Santander Consumer USA Inc*., 137 S. Ct. 1718, 1725 (2017)

2   (observing that it would be a mistake to assume "that 'whatever' might appear to 'further the

3   statute's primary objective must be the law.' ") (internal citation omitted). Plaintiffs have

4   already advanced these very same arguments in their unsuccessful motion for preliminary

5   injunction, which the Court considered and rightfully rejected. Plaintiffs' renewed claim that

6   the Agencies must construe jurisdiction as broadly as possible to carry out the CWA's

7   objective continues to be unpersuasive. *See* Dkt. No. 30 at 24-27; Dkt. No. 148 at 9-10; Order

8   Denying PI at 11-12 (concluding that plaintiffs' "arguments that the narrowness of the

9   [NWPR] serves poorly to carry out the objectives of the CWA . . . do not provide a sufficient

10   basis for a court to substitute its judgment for the policy choices of the Agency").

11       **C.    The Agencies Were Correct to Consider Constitutional Concerns.**

12       Despite Plaintiffs' claims to the contrary, it was reasonable for the Agencies to account

13   for constitutional considerations regarding the NWPR. Pls.' Br. at 38. Regarding Due Process

14   considerations, the Agencies observed that the NWPR provides fair and predictable notice of

15   the limits of federal jurisdiction. RTC-Legal Arguments, AR 11574, Topic 1 at 8, 39. The

16   Agencies also noted that the "significant nexus" standard could be applied in a manner that

17   could possibly result in an overly-broad assertion of jurisdiction over waters that would

18   otherwise be deemed non-jurisdictional pursuant to *SWANCC. Id.*, AR 11574, Topic 1 at 46.

19       More fundamentally, as explained above, Plaintiffs fail to appreciate the Supreme

20   Court's holding that the outer limits of the CWA's jurisdiction is more limited than Plaintiffs

21   claim. *See*, *e.g.*, *SWANCC*, 531 U.S. at 168 n.3 ("[Nothing] in the legislative history . . .

22   signifies that Congress intended to exert anything more than its commerce power over

23   navigation."). While Plaintiffs cite various cases suggesting that the scope of the Commerce

24   Clause defines the outer reaches of the CWA's jurisdiction, *see* Pls.' Br. at 38-39 (citing

25   *Wickard v. Filburn*, 317 U.S. 111 (1942), *Hodel v. Va. Surface Mining & Reclamation Ass'n,

26   Inc.*, 452 U.S. 264, 282 (1981)), the Supreme Court rejected this argument in *SWANCC. See

27   SWANCC*, 531 U.S at 166 (reversing holding that "the CWA reaches as many waters as the

28   Commerce Clause allows"); *id.* at 172 (concluding that "what Congress had in mind as its

1   authority for enacting the Clean Water Act" was "its traditional jurisdiction over waters that

2   were or had been navigable in fact or which could reasonably be so made"). Ultimately, when

3   an administrative interpretation of a statute invokes the outer limits of Congress' power, there

4   must be a clear indication that Congress intended that result. *See id.* Accordingly, the

5   Agencies' constitutional reservations regarding applications of the significant nexus test are

6   reasonable.

7       **D.    The NWPR's Exclusion of Interstate Waters as a Separate Category
                of "Waters of the United States" Is Lawful and Reasonable.**

8

9       Plaintiffs also assert that the removal of "interstate waters" as a separate category of

10  jurisdictional waters was unlawful. Pls.' Br. at 39-41. This is without merit. The elimination of

11  "interstate waters" as a standalone category of jurisdictional waters under the CWA is a

12  reasonable exercise of agency discretion that avoids the legal pitfalls associated with asserting

13  categorical jurisdiction over *all* interstate waters. 85 Fed. Reg. at 22,283-86. Allowing all

14  "interstate waters" to be considered jurisdictional under the CWA, even interstate waters

15  without any surface water connection to traditional navigable waters or the territorial seas,

16  would improperly subject those water bodies to CWA jurisdiction. *Id.* at 22,284. Therefore, the

17  Agencies acted reasonably in excluding "interstate waters" as a standalone category of

18  jurisdictional waters.

19      Until the NWPR, the Agencies relied on the doctrine of congressional acquiescence to

20  maintain "interstate waters" as a separate category of waters of the United States. 85 Fed. Reg.

21  at 22,283. The Agencies now explain there is a better reading. Prior to passage of the 1972

22  amendments to the Act, Congress used the terms "navigable waters" and "interstate waters"

23  distinctly, and in 1972 Congress only retained the term "navigable waters." *Id.* The agencies

24  now recognize that the most natural interpretation of the 1972 amendments is an express

25  rejection of that independent category. *Id.* The fact that, in amending the Act in 1977, Congress

26  was aware that the agencies defined "waters of the United States" to include interstate waters

27  and did not object does not undermine the plain meaning of the statute. And the Supreme Court

28  explicitly rejected the Agencies' reliance on congressional acquiescence and their

1   interpretation of Supreme Court case law in *SWANCC* when the Corps asserted jurisdiction

2   over isolated pits used by migratory birds, 531 U.S. at 169-71. Under Plaintiffs' theory, even

3   the smallest, isolated wetland or pond could be federally regulated simply if it crosses state

4   boundaries.

5          Moreover, Plaintiffs have not pointed to anything in the administrative record that

6   would have compelled the Agencies to find that removing interstate waters as a standalone

7   category of jurisdictional waters would have any meaningful practical effects. *See generally*

8   Pls.' Br. To be clear, removing "interstate waters" as a standalone category of jurisdictional

9   waters does not remove *all* interstate waters from the CWA's jurisdiction. Many waters that

10  cross state boundaries will undoubtedly still be jurisdictional under the NWPR. If a water or

11  wetland crossing state lines meets one of the NWPR's many other jurisdictional requirements,

12  it is still subject to CWA jurisdiction. For example, rivers that cross state borders and lakes that

13  straddle state lines may fall into one of the NWPR's other paragraph (a) categories for

14  jurisdiction under the NWPR. *See* 85 Fed. Reg. at 22,273 (defining "waters of the United

15  States" to include "tributaries" and certain "lakes and ponds").

16         Plaintiffs point to CWA Section 303(a), 33 U.S.C. § 1313(a), in support of their charge

17  that all interstate waters, regardless of their specific attributes such as navigability, must be

18  considered jurisdictional waters under the CWA. Pls.' Br. at 39-40. But Section 303(a) actually

19  undermines Plaintiffs' claim. That provision notes that certain water quality standards in place

20  before 1972 would remain in effect. But from 1972 forward, Congress specifically chose the

21  term "navigable waters" to frame federal regulatory jurisdiction, not "interstate waters." 33

22  U.S.C. §§ 1311(a)(1), 1362(7), 1363. Section 303(a) and its reference to "interstate waters"

23  must therefore be interpreted to mean something different from the "navigable waters" of

24  § 1362(7); *see Clark v. Rameker*, 573 U.S. 122, 131 (2014) ("A statute should be construed so

25  that effect is given to all its provisions, so that no part will be inoperative or superfluous.")

26  (internal quotations and citation omitted).

27         Plaintiffs' citations to *Illinois v. City of Milwaukee*, 731 F.2d 403 (7th Cir. 1984),

28  *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972), *Int'l Paper v. Ouellette*, 479 U.S. 481

(1987), and *Arkansas v. Oklahoma*, 503 U.S. 91 (1992) do not help them either. In none of these cases was the court asked to consider whether the CWA's jurisdiction applies to non-navigable interstate waters. Nor does Plaintiffs' citation to one single vague and conclusory remark in the legislative history support their claim that Congress, in the 1972 CWA Amendments, clearly intended to extend CWA jurisdiction to all interstate waters regardless of navigability. *See* Pls.' Br. at 40 (citing S. Rep. No. 92-414 (1971) (stating only that the prior mechanisms for abating water pollution have been "inadequate")).

Finally, contrary to Plaintiffs suggestion, the Agencies never claimed that they were "motivated" to remove interstate waters as a standalone category of jurisdictional waters as a direct result of the *Georgia v. Wheeler* decision. Pls.' Br. at 41. Indeed, as Plaintiffs say, this is impossible because the Agencies' proposal to remove interstate waters as a standalone category of jurisdictional waters predates the *Georgia* decision by six months. *Id.* Rather, the Agencies merely noted in the NWPR's preamble that the *Georgia* decision supports their rationale for excluding interstate waters from CWA jurisdiction. *See* 85 Fed. Reg. at 22,284. Indeed, *Georgia* held that "the inclusion of all interstate waters in the definition of 'waters of the United States,' regardless of navigability, extends the Agencies' jurisdiction beyond the scope of the CWA because it reads the term navigability out of the CWA." *Georgia*, 418 F. Supp. 3d at 1358. The Agencies' decision to remove "interstate waters" as a standalone category of "waters of the United States" was lawful and reasonably explained.

## II.     The NWPR Is Neither Arbitrary Nor Capricious Under the APA.

At bottom, Plaintiffs' belief that the NWPR is arbitrary and capricious and in violation of the APA stems from their policy dissatisfaction with the new rule and their preference for the 2015 Rule. There is no question that the NWPR represents a departure from both the 2015 Rule and the regulatory regime reinstated by the Repeal Rule. But to change a policy, an agency must merely provide "a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). It does *not* require reasons any "more substantial than those required to adopt a policy in the first instance." *Id.* at 514. And an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the

reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.* at 515. The Agencies have satisfied this test. As explained below, they have articulated reasonable explanations for their policy choices.

### A.   The Agencies' Decision Is Well-Explained.

#### 1.   The Agencies Explained that the NWPR Is Driven by a Balance of Policy Considerations.

The essence of Plaintiffs' complaint is that they disagree with the Agencies' interpretation of the statute and disagree with the Agencies' consideration of other policy factors beyond the CWA's general objective to "restore and maintain the chemical, physical and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a); *see* Pls.' Br. at 17-25. However, Plaintiffs' myopic focus on this objective ignores the broader structure and text of the statute that reflects the means by which Congress intended this objective to be achieved. In fact, the NWPR is consistent with the statute, and the administrative record articulates a logical and well-explained interpretation of "waters of the United States" that is supported by technical analyses. The NWPR's extensive preamble and response to comments explained why "the agenc[ies] *believes* [the NWPR] to be better" than prior regulations. *Fox Television*, 556 U.S. at 515. The summary of key elements spanned almost 60 pages in the Federal Register. 85 Fed. Reg. at 22,273–329. The Agencies further analyzed district court opinions as to the infirmities of the 2015 Rule, including a district court's decision granting summary judgment against the 2015 Rule and remanding it to the Agencies. *E.g.*, *id.* at 22,272. The Agencies considered relevant Supreme Court cases. *E.g.*, *id.* at 22,268. And these analyses are further supplemented by almost 600 pages of responses to comments. *See generally* RTC (Topics 1–13), AR 11574.

The Agencies further explained that "replacing the multi-factored case-specific significant nexus analysis with categorically jurisdictional and categorically excluded waters in the final rule provides clarifying value for members of the regulated community." *See, e.g.*, 85 Fed. Reg. at 22,270. This reasonable explanation is all that is required from the Agencies. *Fox Television Stations*, 556 U.S. at 513.

1        The Agencies' balancing of relevant considerations is neither arbitrary nor capricious.

2   Science alone does not and cannot offer a precise answer to the question of what constitutes

3   "waters of the United States." *See* 85 Fed. Reg. at 22,262–71 (discussing *SWANCC* and

4   *Rapanos*). Citing *Office of Commc'n of the United Church of Christ v. FCC*, 779 F.2d 702, 707

5   (D.C. Cir. 1985), *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1197 (9th Cir. 2008),

6   and *Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 158 (3d Cir. 2004), Plaintiffs say

7   that the CWA's general statutory objective must drive the Agencies' decision regarding how it

8   defines the CWA's jurisdiction. Pls.' Br. at 19-20. But none of these cases involve a claim that

9   an agency failed to account for the statutory objective, like Plaintiffs are asserting here.

10  Plaintiffs have offered nothing else to demonstrate that the CWA affirmatively requires the

11  Agencies to extend federal jurisdiction "to the broadest permissible extent under the

12  Commerce Clause, in the name of providing *all* of the benefits for water quality the science

13  suggests might be achievable." Order Denying PI at 13. "Because the Agencies may

14  reasonably conclude they have no such statutory duty, discounting evidence of possible

15  benefits is not plainly arbitrary or capricious." *Id.* Ultimately, in denying Plaintiffs' motion for

16  preliminary injunction, this Court correctly recognized "[t]hat the Agencies now choose a

17  different approach, and a different balance between federal and state responsibilities does not

18  mean they have disregarded the primary objective of the statute in an arbitrary or capricious

19  manner." *Id.*; *see also Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d

20  492, 501 (2d Cir. 2017) (sustaining CWA water transfers regulation when it was deemed to be

21  supported by valid considerations, even though it may not be "the interpretation best designed

22  to achieve the Act's overall goal of restoring and protecting the quality of the nation's

23  waters"); *Santander*, 137 S. Ct. at 1725 (observing that it would be a mistake to assume "that

24  'whatever' might appear to 'further the statute's primary objective must be the law.' ")

25  (internal citation omitted).

26        In any event, Plaintiffs' characterizations of the Agencies' consideration of the

27  NWPR's impact on water quality and their consideration of the CWA's objective is inaccurate

28  and misleading. Pls.' Br. at 18-19. The RTC contains numerous discussions directly or cross-

1    referencing such issues, including (but not limited) to § 11.3.3.2 ("Reduction in Jurisdictional

2    Waters"), § 11.3.2.3 ("Concerns with States' Abilities to 'Fill the Gap'"), § 11.3.2.5

3    ("Interstate Impacts from the Proposed Rule"), § 11.4 ("CWA Programmatic Analyses"),

4    § 11.6 ("Aquatic Resource Benefits and Ecosystem Services"). *See* RTC-Economic Analysis

5    and Resource and Programmatic Assessment, AR 11574, Topic 11. The Agencies also

6    accounted for the fact that post-NWPR, the CWA's non-regulatory measures will continue to

7    address pollution of the Nation's waters generally. 85 Fed. Reg. at 22,253 (discussing non-

8    regulatory program provisions of the Act). States, tribes, and local entities can also exercise

9    programs that further enhance the quality of waters within their borders. *See* RPA, AR 11573,

10   at Appendix A; EA, AR 11572, at 37. And many states do so. *Id.* State programs may well

11   require permits for certain discharges to state waters regardless of the NWPR. *See* 85 Fed. Reg.

12   at 22,318 ("[C]ertain waters and features . . . not subject to regulation under the CWA . . . are

13   or could be subject to State or tribal jurisdiction . . . ."); *see also* RPA, AR 11573, at 47. These

14   programs collectively pursue the objective of maintaining the integrity of the Nation's waters,

15   which the Agencies endorse as the sole objective of the CWA. The Agencies' analyses reflects

16   that the NWPR does not necessarily affect certain CWA programs. For example, in case

17   studies of three separate watersheds, the Agencies found that only four of the 1,474 Section

18   402 permits would be impacted by the NWPR; approximately six percent of Section 404

19   permits would potentially be affected. EA, AR 11572, at 113-15, 139, 141, 157, 159.

20        Plaintiffs' real objection is that the Agencies did not reach a specific conclusion about

21   the NWPR's effects on water quality due to data limitations, as the Agencies did consider the

22   effects on water quality within those limitations. But the data limitations that prevented such

23   precise conclusions have long been known and consistently explained by the Agencies. In

24   2015, former EPA Administrator McCarthy testified to Congress that national datasets,

25   including the National Wetlands Inventory and the National Hydrography Dataset, are "not

26   used to determine jurisdiction and not intended to be used for jurisdiction," "are not relevant to

27   the jurisdiction of the 'waters of the U.S.," and "are not consistent with how we look at the

28   jurisdiction of the [CWA]." 85 Fed. Reg. at 22,330 n.61. And in 2014, when developing the

DEFS.' OPP. TO PLFS.' MSJ /CROSS-MOT. FOR SUMMARY JUDGMENT
CASE NO. 3:20-cv-03005-RS

2015 Rule, an EPA blog post entitled "Mapping the Truth" stated, "[w]hile these [USGS and FWS] maps are useful tools for water resource managers, they cannot be used to determine CWA jurisdiction—now or ever." *Id*. at 22,329–30 n.61. As a result, because of these very same data limitations, the Agencies have avoided such national predictions about the potential effects of the NWPR on water quality that Plaintiffs argue are necessary.

Plaintiffs also misconstrue the relevance to this Court's review of the Agencies' statement that they did not rely upon the EA or the RPA as part of their rulemaking. Pls.' Br. at 18, 19 (citing 85 Fed. Reg. at 22,332; 22,335). The Agencies stated that "the final rule is not based on the *information* in the agencies' economic analysis or resource and programmatic assessment." 85 Fed. Reg. at 22,332 (emphasis added). Thus, to the extent the EA quantifies economic costs and benefits of the NWPR in dollars, that information is not a basis for the Agencies' decision. But both the EA and RPA provide helpful explanations about the effects of the NWPR on the federal regulation of aquatic resources and CWA and other programs, including the specifics of the permit programs under Sections 402 (NPDES) and 404 (Dredged and Fill) of the CWA. The Agencies are not precluded from citing to these documents to help explain how the CWA works, either in the rulemaking process or in their briefing here. These documents were part of the record before the Agencies during this rulemaking and nothing required the Agencies—or this Court now—to pretend these documents do not exist, as Plaintiffs ask.

### 2. The Agencies Explained Their Reasons for Excluding Ephemeral Features from CWA Jurisdiction.

In explaining that the NWPR's definition of "tributary" does not extend to ephemeral features that flow only in direct response to precipitation, the Agencies do not offer "mere conclusions" as Plaintiffs believe. Pls.' Br. at 20. The Agencies reasonably explained why they did not define ephemeral features—those which "flow only in direct response to precipitation"—as "navigable waters." 85 Fed. Reg. at 22,251; *see also id.* at 22,275-76. The Agencies stated that "a mere hydrologic connection cannot provide the basis for CWA jurisdiction" because jurisdictional waters must be "relatively permanent (i.e., perennial or

1   intermittent)" and "contribute surface water flow to a traditional navigable water . . . in a

2   typical year." *Id.* at 22,289. Because ephemeral features "only flow during or in immediate

3   response to rainfall," *id.* at 22,274, they are not "relatively permanent bodies of water." *Id.* at

4   22,271, 22,289. The Agencies "determined that requiring surface water flow in a typical year

5   from relatively permanent bodies of water to traditional navigable waters and wetlands

6   adjacent to such waters as a core requirement of [jurisdiction] is the most faithful way of

7   interpreting . . . CWA authority over a water." *Id.* at 22,271.

8          In excluding ephemeral features, the Agencies considered the "connectivity gradient,"

9   including the "decreased 'probability that changes . . . will be transmitted to downstream

10   waters' at flow regimes less than perennial and intermittent." *Id.* at 22,288 (quoting EPA's

11   Science Advisory Board ("SAB") Commentary). The Agencies reasonably concluded that

12   ephemeral streams *are* scientifically different from intermittent or perennial streams. *E.g.*, *id.* at

13   22,275–76 (describing differences in water source and flow duration). And because ephemeral

14   features are defined by their impermanence, they "are more appropriately regulated by the

15   States and Tribes under their sovereign authorities." *Id.* at 22,287. Such "[a] clear regulatory

16   line between jurisdictional and excluded waters has the additional benefit of being less

17   complicated than prior regulatory regimes that required a case-specific significant nexus

18   analysis." *Id.* at 22,288; *see also Reno*, 507 U.S. at 311 (affirming consideration of

19   "administrative efficiency as the reason for selecting one means of achieving a purpose over

20   another"). This clear boundary "is consistent with the role of the Federal government under the

21   Constitution and the CWA" because "States traditionally exercise 'primary power over land

22   and water use.' " 85 Fed. Reg. at 22,287 (quoting *SWANCC*, 531 U.S. at 174). Thus, the

23   Agencies' decision to exclude ephemeral features from the definition of "tributary" had "a

24   'reasonable foundation' " in the record. *Reno*, 507 U.S. at 309 (citation omitted).

25          Plaintiffs' primary argument—that the Agencies' exclusion of ephemeral features lacks

26   scientific support—is thus meritless. *See generally* Pls.' Br. at 20-22. In a similar vein,

27   Plaintiffs' assertion that the Agencies failed to explain how the connectivity gradient supports

28   the categorical exclusion of ephemeral tributaries is also inaccurate. Pls.' Br. at 21. Even

1   though the Agencies were fully aware of the relevant science, including their prior scientific

2   findings, the Agencies recognized that the definition of "waters of the United States" must be

3   grounded in a legal analysis of the limits on CWA jurisdiction, as reflected in the statutory text

4   and Supreme Court precedent. 85 Fed. Reg. at 22,261 ("[S]cience cannot dictate where to draw

5   the line between Federal and State Waters."). Therefore, even if Plaintiffs were correct that the

6   Agencies did not consider prior factual findings regarding ephemeral streams, that alone does

7   not render the NWPR arbitrary and capricious. Pls.' Br. at 21. The Agencies were entitled to

8   weigh the relevant considerations differently in developing the NWPR, so long as they

9   provided a "reasoned explanation" for their change (which the Agencies did here). *Fox*

10   *Television*, 556 U.S. at 515–16.

11   And, on one critical point for refuting Plaintiffs' argument, the Agencies reached the

12   exact same conclusion that they reached when finalizing the 2015 Rule: science alone cannot

13   define jurisdictional boundaries of "waters of the United States." *See, e.g.*, 80 Fed. Reg. at

14   37,055. The 2015 Rule based its interpretation "not only on legal precedent and the best

15   available peer-reviewed science, but also on the agencies' technical expertise and extensive

16   experience in implementing the CWA over the past four decades." *Id.* EPA's SAB similarly

17   stressed in 2015 that " 'significant nexus' is a legal term, not a scientific one." *Id.* at 37,065.

18   So, as the 2015 Rule noted, "science does not provide a precise point along the continuum at

19   which waters provide only speculative or insubstantial functions to downstream waters." *Id.* at

20   37,090.

21   The Agencies reached different conclusions in the NWPR than they did in 2015. But in

22   both rules, they correctly explained that the contours of CWA jurisdiction require a balancing

23   of various factors and evidence, including both legal and scientific considerations. *E.g.*, 85 Fed.

24   Reg. at 22,288. These include the statutory limits on the Agencies' legal authority (including

25   the CWA text and structure), *e.g.*, *id.* at 22,283–89, what would sufficiently embody the

26   statutory link to what is "navigable," and what would give due deference and respect for state

27   authority. *See, e.g.*, *id.* at 22,270; RTC-Legal Arguments, AR 11574, Topic 1 at 64–68, 114–

28   15. The Agencies explained that the connectivity gradient helped inform how they drew

1    categorical lines in respecting the statutory limits of their jurisdiction. 85 Fed. Reg. at 22,288.

2    Accordingly, the Agencies, informed by the SAB, determined that of perennial, intermittent,

3    and ephemeral streams, ephemeral streams have the lowest probability of impacting

4    downstream water quality. *See id.*

5        After considering these factors, the Agencies determined that ephemeral streams "are

6    more appropriately regulated by the States and Tribes under their sovereign authorities." *Id.* at

7    22,287. The Agencies are not obligated under the CWA to exercise jurisdiction over ephemeral

8    features simply because, from a scientific viewpoint, these ephemeral features may support

9    certain ecological functions and possess some hydrological connection to downstream. *See*

10   *also State v. Bureau of Land Mgmt.*, No. 18-cv-00521, 2020 WL 1492708, at *11 (N.D. Cal.

11   Mar. 27, 2020) (holding that the Court is not tasked with deciding policy questions and so long

12   as an agency articulates a reasoned explanation for prioritizing or de-prioritizing facts that

13   underlay its prior policy, its change in policy is not arbitrary or capricious); Order Denying PI

14   at 12-13 (same); *Nat'l Ass'n of Home Builders v. EPA.*, 682 F.3d 1032, 1037-38 (D.C. Cir.

15   2012) (same).

16           **3.      The Agencies Explained Their Reasons for Excluding**
                 **Certain Wetlands from CWA Jurisdiction.**
17

18       The Agencies explained their reasoning for assigning CWA jurisdiction to adjacent

19   wetlands as they did in the NWPR. The Agencies defined "adjacent wetlands" as those that

20   either abut jurisdictional waters, are separated from jurisdictional waters only by natural berms

21   and the like, or have certain direct hydrologic surface connections to otherwise jurisdictional

22   waters in a typical year. RTC-Adjacent Wetlands, AR 11574, Topic 8 at § 8.3. These adjacent

23   wetlands are included in the definition of "waters of the United States" because they are

24   "inseparably bound up with the 'waters' of the United States." 85 Fed. Reg. at 22,308 (quoting

25   *Riverside Bayview*, 474 U.S. at 134). And this definition actually stretches to cover waters

26   beyond the "continuous surface connection" of the *Rapanos* plurality. *See* 33 C.F.R.

27

28

1    § 328.3(c)(1)(iii) (including wetlands that "are physically separated from a water identified in

2    paragraph (a)(1), (2), or (3) of this section  only by a natural berm, bank, dune, or similar

3    natural feature").

4           Plaintiffs' assertion that the Agencies did not explain how they defined "adjacent

5    wetlands" is plainly incorrect. Pls.' Br. at 22. The Agencies rooted their interpretation in the

6    "text, structure, and legislative history of the CWA and on the core principles and concepts" set

7    forth in *Riverside Bayview*, *SWANCC*, and *Rapanos*. 85 Fed. Reg. at 22,308. The Agencies also

8    explained their reasons for excluding nonadjacent wetlands. Classifying all wetlands as

9    jurisdictional would be inconsistent with the CWA and Supreme Court case law. *Id.* So would

10   inclusion of isolated wetlands that lack a hydrological surface connection to other jurisdictional

11   waters, or that connect hydrologically only infrequently. *Id.*; *but cf. Rapanos*, 547 U.S. at 786

12   (Kennedy, J., concurring) ("Given the role wetlands play in pollutant filtering, flood control,

13   and runoff storage, it may well be the absence of a hydrologic connection … that shows the

14   wetlands' significance for the aquatic system."). The redefined category of "adjacent

15   wetlands," by contrast, provides regulatory agencies and the regulated community with a "clear

16   and implementable approach" to determining CWA jurisdiction. RTC-Adjacent Wetlands, AR

17   11574, Topic 8 at § 8.1; *see also Reno*, 507 U.S. at 311–13. The NWPR therefore provides

18   objective, categorical tests for adjacency, with improved clarity. 85 Fed. Reg. at 22,307–08.

19          Plaintiffs wrongly argue that the NWPR's provisions as to wetlands are arbitrary and

20   capricious because they purportedly contradict prior findings. Pls.' Br. at 22–23. *First*, just as

21   with the definition of "tributary," the definition of "adjacent wetlands" rests upon a legal

22   determination. The Agencies explained that they used their prior findings such as the

23   Connectivity Report "to inform certain aspects of the definition of 'waters of the United

24   States,' but recognize[d] that science cannot dictate where to draw the line between Federal

25   and State Waters." 85 Fed. Reg. at 22,261; *see also id.* at 22,308 ("science cannot dictate

26   where to draw the line between Federal and State or tribal waters, as those are legal distinctions

27   that have been established within the overall framework and construct of the CWA"). And they

28   explained why the Connectivity Report and other science did not preclude the definitions of the

1    rule. *E.g.*, *id.* at 22,288-95. As this Court previously noted, Plaintiffs' mere policy

2    disagreement with the Agencies' use of the relevant scientific literature, such as the

3    Connectivity Report, and dissatisfaction with the outcome of the NWPR do not render the rule

4    arbitrary and capricious. *See* Order Denying PI at 12-13; *see also Bureau of Land Mgmt.*, 2020

5    WL 1492708, at *11; *Home Builders*, 682 F.3d at 1037-38.

6         Plaintiffs' reliance on *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 463 F.

7    Supp. 3d 1011, 1020 (D. Alaska 2020) in support of their assertion that the Agencies were

8    required to present new information or data to justify their revised treatment of adjacent

9    wetlands also misses the mark. Pls.' Br. at 23. *Bernhardt* is inapposite because the agency in

10   that case made a new factual finding in support of its change in position that directly

11   contradicted the agency's prior factual determination. *See Bernhardt*, 463 F. Supp. 3d 1011 at

12   1019. Here, the NWPR's treatment of adjacent wetlands is not based on new factual findings

13   that contradicts any of the Agencies' prior factual determinations. Rather, the Agencies have

14   reexamined the legal boundaries of their authority under the CWA and applicable Supreme

15   Court precedent and made a policy decision in promulgating the NWPR.

16         *Second*, deference is particularly important in situations like this, where no one clear

17   answer exists and where many reasonable definitions could be adopted. The "scope of CWA

18   jurisdiction over wetlands has confounded courts, members of the regulated community,

19   regulators, and the public for decades." 85 Fed. Reg. at 22,308. The Supreme Court has

20   acknowledged the difficult task facing the Agencies, which "must necessarily choose some

21   point at which water ends and land begins . . . this is often no easy task." *Riverside Bayview*,

22   474 U.S. at 132. "Where on this continuum to find the limit of 'waters' is far from obvious" for

23   any entity. *Id.* In *SWANCC*, the Supreme Court held that the Agencies do not have authority to

24   regulate isolated waters that lack a sufficient connection to a traditional navigable water, as

25   regulation of those waters raise questions regarding the scope of CWA authority. 531 U.S. at

26   172. In *Rapanos*, the Court could not agree on whether the wetlands at issue were jurisdictional

27   and therefore remanded for further consideration. *Rapanos*, 547 U.S. at 757. In light of these

28   historically different views on the scope of jurisdictional wetlands, the Agencies reasonably

1   decided to "strike a better balance" between federal, state, and tribal jurisdiction, consistent

2   with the Agencies' best interpretation of the text, structure, and purpose of the CWA and of

3   relevant Supreme Court guidance.

4         Just as with the NWPR's treatment of tributaries, setting jurisdictional boundaries as to

5   wetlands does not conclusively determine "which of the nation's waters warrant environmental

6   protection and which do not." RTC-Adjacent Wetlands, AR 11574, Topic 8 at § 8.3.3. The

7   Agencies cannot exceed their authority under the CWA even to achieve "specific scientific,

8   policy, or other outcomes." *Id.*; *see also Rapanos*, 547 U.S. at 741–42 (Scalia, J., plurality)

9   (ecological connections do not provide an independent basis for including physically isolated

10   wetlands in the definition of "waters of the United States"). Accordingly, the Agencies

11   reasonably defined "adjacent wetlands," and the Court should defer to Agencies' carefully-

12   considered NWPR.

13         **4.    The Agencies Properly Addressed Plaintiffs' Public**

14              **Comments Regarding Adjacent Wetlands and Ephemeral**
                  **Streams.**

15         Plaintiffs also charge that the Agencies merely "waved away" public comments

16   regarding wetlands and ephemeral streams and their downstream effects without addressing

17   them. Pls.' Br. at 23. This claim too lacks merit. As an initial matter, an agency's obligation to

18   consider or otherwise respond to comments on a proposed rulemaking is "not particularly

19   demanding." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441–42 (D.C.

20   Cir. 2012) (internal quotations omitted). "[T]here is no obligation to make references in the

21   agency explanation to all the specific issues raised in comments. The agency's explanation

22   must simply enable a reviewing court to see what major issues of policy were ventilated . . .

23   and why the agency reacted to them the way it did." *Alvarado Cmty. Hosp. v. Shalala*, 155

24   F.3d 1115, 1122 (9th Cir. 1998), amended, 166 F.3d 950 (9th Cir. 1999) (citation omitted).

25         Here, the Agencies responded to comments addressing why they excluded ephemeral

26   streams from CWA jurisdiction (*see, e.g.*, RTC-Tributaries, AR 11574, Topic 5 at § 5.1.2.3)

27   and why they defined "adjacent wetlands" as those that either abut, are separated by only

28   natural berms and the like from jurisdictional waters, or have certain direct hydrologic surface

1   connections in a typical year to an otherwise jurisdictional water (*see*, *e.g.*, RTC-Adjacent

2   Wetlands, AR 11574, Topic 8 at § 8.3.3). And the Agencies acknowledged the potential

3   ecological services provided by ephemeral streams and excluded wetlands. RTC-Tributaries,

4   AR 11574, Topic 5 at § 5.1.2.3; RTC-Adjacent Wetlands, AR 11574, Topic 8 at § 8.3.3. But

5   the Agencies clearly articulated their decisionmaking process, stating they "are precluded from

6   exceeding their authority under the CWA to achieve specific scientific, policy, or other

7   outcomes," that "science cannot dictate where to draw the line between federal and state or

8   tribal waters, as those are legal distinctions that have been established within the overall

9   framework and construct of the CWA," and that they drew jurisdictional lines "based primarily

10  on their interpretation of their authority under the Constitution and the language, structure, and

11  legislative history of the CWA, as articulated in decisions by the Supreme Court." *E.g.*, *id*. The

12  Agencies accounted for other policy and legal considerations in drawing the NWPR's

13  jurisdictional lines and explained their reasoning. *See also* Order Denying PI at 11 (noting that

14  the NWPR's "different balance between federal and state responsibilities does not mean [the

15  Agencies] have disregarded the primary objective of the statute in an arbitrary or capricious

16  manner."). This is all the law requires from the Agencies.

17       **5.**     **The NWPR's "Typical Year" Criterion Is Reasonable.**

18       Contrary to Plaintiffs' belief, the Agencies' use of a "typical year" criterion is

19  reasonable and adequately explained. The concept of "typical year" is used to identify whether

20  certain waters are jurisdictional under the NWPR. Specifically, the Agencies explained that the

21  intent of analyzing a "typical year" is to "evaluate the flow regime of a stream and the

22  connectedness of a wetland within the context of what is typical for that water or wetland to

23  avoid making erroneous jurisdictional determinations at times that may be too wet or too dry to

24  be considered 'normal.' " 85 Fed. Reg. at 22,271. "Typical year" provides a predictable

25  framework by which to establish federal jurisdiction over relatively permanent waters that

26  contribute surface water flow to waters identified in paragraph (a)(1) of the Rule. *See id.* at

27  22,273-74. And utilizing the "typical year" concept allows one national regulatory definition

28  that accounts for regional and temporal differences. This permits the NWPR to account for

1   climatic and hydrological variability, while limiting variation that might occur from

2   assessments done during different times of the year and in different years. *See* RTC-Typical

3   Year, AR 11574, Topic 9 at 4, 6.

4           Plaintiffs' assertion that the Agencies' selection of "typical year" is arbitrary and

5   capricious is unavailing. Pls.' Br. at 24.[9] *First*, the Agencies provided ample factual support for

6   why they included "typical year" and how it is calculated. The Agencies first explained that

7   "typical year" is based upon a well-understood concept in the scientific community. *See* 85

8   Fed. Reg. at 22,273-74. The Agencies then identified a general methodology for calculating

9   "typical year." *Id.* at 22,274. Generally speaking, to determine if a water feature is being

10  assessed during normal precipitation conditions, the Agencies will first determine whether the

11  three 30-day precipitation totals in its geographic area preceding the observation date fall

12  within the 30th and 70th percentiles for totals from the same date range over the preceding 30

13  years. *Id*. at 22,274. The Agencies will then use weighted condition values from the three 30-

14  day periods to determine precipitation normality. The Agencies adopted a 30-year rolling

15  average to ensure consistent application. *Id*. at 22,274-75. This is also the most common and

16  recognized timeframe used in other climatic data programs (e.g., NOAA's National Climatic

17  Data Center climate normals, which are based on World Meteorological Organization

18  requirements). *Id.* at 22,274. Accordingly, the Agencies properly explained that "typical year"

19  is an entirely reasonable, longstanding hydrologic concept based on established scientific

20  principles that helps address the difficult problem of establishing a uniform national definition.

21  *See id.*

22          *Second*, Plaintiffs incorrectly claim that the Agencies failed to account for "increasingly

23  atypical years." Using a 30-year rolling average is advantageous precisely because it is a

24

25  [9] In support of this claim, Plaintiffs cite two declarations that were filed in support of their
    motion for preliminary injunction. Pls.' Br. at 24 (citing Dkt. No. 30-22 at 10-13; Dkt. No. 30-

26  15 at 12-13). Neither declaration should be considered because "judicial review of [an] agency
    action is limited to review of the administrative record." *Animal Def. Council v. Hodel*, 840

27  F.2d 1432, 1436 (9th Cir.1988), *amended*, 867 F.2d 1244 (9th Cir.1989). While there are

28  limited exceptions where outside evidence may be considered in a challenge to an
    administrative decision, none of these exceptions are met here. *Id*. at 1436–37.

1  dynamic calculation aimed to capture changes in climate trends. *See* 85 Fed. Reg. at 22,274-75.

2  So this methodology does account for the putative concerns Plaintiffs raise here.

3      *Third*, Plaintiffs assert that because some terms within the definition of "typical year"

4  are not defined, "typical year" is arbitrary and capricious. This argument is meritless. The

5  Agencies are not required to define every term in every regulatory definition—at some point

6  the definitional process would become absurd. Indeed, the Supreme Court recognized that

7  agencies are not required "to promulgate regulations that, either by default rule or by

8  specification, address every conceivable question." *Shalala v. Guernsey Mem'l Hosp.*, 514

9  U.S. 87, 96 (1995). Given that the specialized expertise of the Agencies often requires

10  deference to its discretionary functions, courts "presume that the power authoritatively to

11  interpret its own regulations is a component of the agency's delegated lawmaking powers." *Id.*

12  at 95. Thus, the fact that there are terms within the definition of "typical year" that are not

13  defined is not a flaw of the Rule. The Agencies are permitted to interpret undefined regulatory

14  terms, and Plaintiffs' assertion to the contrary is unavailing.

15      **B.**    **The Agencies Fully Explained How the NWPR Advances the**
        **CWA's Policy of Protecting States' Rights and Responsibilities.**

16

17      Contrary to Plaintiffs' claim, Pls.' Br. at 25-26, the Agencies explain how the NWPR

18  advances the "policy of the Congress to recognize, preserve, and protect the primary

19  responsibilities and rights of States" to oversee land use and pollution reduction policies within

20  their states. 33 U.S.C. § 1251(b). States have always had authority to regulate waters not

21  subject to CWA jurisdiction as they see fit. Whether states choose more protective regulations

22  than others, or choose not to regulate non-federal waters at all, is a decision left solely to the

23  states' discretion. 85 Fed. Reg. at 22,336. As this Court already recognized, the CWA lacks a

24  clear statement that Congress intended to extend federal jurisdiction to *all* waters that may

25  serve the Act's objective. *See* Order Denying PI at 11 (noting the lack of clarity with respect to

26  how broadly Congress intended CWA jurisdiction to extend). Although the NWPR better

27  distinguishes which waters are subject to federal regulation—as opposed to those that are

28

1  within the sole discretion of states and tribes to regulate—the NWPR does not alter the

2  authority of the states and tribes to manage their land and water resources as they see fit.

3  The Agencies explained that the NWPR gives due consideration to the Congressional

4  policy set forth in Section 101(b), which directs the Agencies to "preserve and protect" States'

5  sovereign authority over land and water use, which includes their authority over some waters

6  without mandates from the Federal Government. *See* 85 Fed. Reg. at 22,260-62, 22,272-73,

7  22,277, 22,287, 22,302, 22,308, 22,313. Not subjecting ephemeral features or certain wetlands

8  to federal jurisdiction will provide states and tribes greater control and discretion over how

9  they choose to regulate these water bodies. RTC-Legal Arguments, AR 11574, Topic 1 at §

10  1.2.2.1. The Agencies further noted that states or tribal authorities may choose to regulate these

11  water bodies more stringently than the federal standard. *Id.* This honors the policy set forth in

12  Section 101(b), which recognizes that states have "primary" responsibility to manage their land

13  and water resources. *Id.*; 85 Fed. Reg. at 22,334.

14  **C.   The Agencies Addressed Any Reliance Interests.**

15  Plaintiffs say that they had reliance interests in the prior existing definitions of "waters

16  of the United States" and that the Agencies, in promulgating the NWPR, failed to provide a

17  reasoned explanation for their change in the definition. Pls.' Br. at 25-28. These arguments are

18  unavailing. Plaintiffs have failed to establish the existence of any justifiable, detrimental

19  reliance on the "significant nexus" regime. Given the contentious litigation and uncertainty

20  regarding the definition of "waters of the United States," any reliance on prior definitions of

21  that term would be unreasonable. Regardless, the Agencies thoroughly and appropriately

22  responded to Plaintiffs' public comments regarding reliance interests. RTC-Legal Arguments,

23  AR 11574, Topic 1 at § 1.2.3.9.

24  As an initial matter, Plaintiffs cannot credibly claim justifiable, detrimental reliance on

25  any prior regulatory regime defining "waters of the United States." As this Court correctly

26  recognized when denying Plaintiffs' motion for preliminary injunction, "given the long

27  uncertainty about the permissible scope of federal regulation under the CWA, it is difficult to

28  see how significant cognizable reliance interests would have arisen." Order Denying PI at 14.

1   Indeed, Justice Kennedy in *Rapanos* suggested that "more specific regulations" would follow.

2   *Rapanos*, 547 U.S. at 782; *see also id.* at 811 (Breyer, J., dissenting) (the Agencies "may write

3   regulations defining the term—something that [they have] not yet done."); *id.* at 758 (Roberts,

4   C.J., concurring) (admonishing the failure to exercise the Agencies' "delegated rulemaking

5   authority" under the Clean Water Act). The Agencies have since attempted to provide clarity

6   through various guidance and regulatory changes for decades. *See, e.g.*, *In re EPA & DOD*

7   *Final Rule*, 803 F.3d at 808 (staying the 2015 Rule as likely unlawful). Based on this backdrop

8   of regulatory uncertainty, Plaintiffs cannot claim to have engendered serious reliance interest in

9   the pre-existing regulatory regimes.

10          To the extent Plaintiffs claim specific reliance on the 2015 Rule, such claims are even

11  more tenuous. That rule was subject to litigation and was enjoined in many states both before

12  and almost immediately after it became effective. *See supra* at pp. 6-7. And the public has been

13  specifically on notice that the Administration intended to replace the 2015 Rule for over three

14  years. *See* Executive Order 13778 (Feb. 28, 2017); 82 Fed. Reg. 34,899 (July 27, 2017); 84

15  Fed. Reg. 4154 (Feb. 14, 2019). Plaintiffs cannot credibly claim to have a reliance interest on

16  that Rule. *E.g.*, *Mozilla Corp. v. FCC*, 940 F.3d 1, 64 (D.C. Cir. 2019) (holding that a

17  purported reliance interest was not reasonable when the prior regulation was in effect for only a

18  few years and had been subject to persistent legal challenges).

19          In any event, even if Plaintiffs' reliance interests were valid (which they are not), third-

20  party "reliance" does not preclude Agencies from changing their policies or interpretations of

21  the law. Even if a "prior policy has engendered serious reliance interests," an agency may not

22  ignore them, but must only provide a reasoned explanation for its change in policy. *Fox*

23  *Television*, 556 U.S. at 515. Here, the Agencies did respond to alleged reliance interests. In

24  arriving at the NWPR, the Agencies engaged with various stakeholders across the public and

25  private spheres, including state, local, and tribal governments. 85 Fed. Reg. 22,260. The

26  Agencies recognized the NWPR would affect how states regulate their waters and they

27  discussed how states may adapt to the change in federal jurisdiction. *Id.* at 22,270, 22,333-34.

28  The Agencies addressed public comments regarding purported state reliance interests. *See, e.g.*,

1   RTC-Legal Arguments, AR 11574, Topic 1 at § 1.2.3.9. And they provided a thorough and

2   reasoned explanation for the changed definition, as discussed above. *Fox Television*, 556 U.S.

3   at 515.

4         Plaintiffs, in their motion for summary judgment, counter by proffering a number of

5   declarations and citing declarations previously filed in this proceeding in support of their claim

6   that they had relied on earlier definitions of "waters of the United States" to "structure their

7   water quality protection programs and safeguard their waters." Pls. Br. at 26 n.11. The

8   Agencies, however, could not have considered these declarations because they were not

9   submitted during the public comment period. *See Mingo Logan Coal Co. v. EPA*, 829 F.3d

10   710, 722 (D.C. Cir. 2016) ("[T]he extent to which the [Agencies are] obliged to address

11   reliance [is] affected by the thoroughness of public comments it receives on the issue.")

12   (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2128 n.2 (2016) (Ginsburg, J.,

13   concurring)). Moreover, the Court may not consider these citations in assessing whether the

14   Agencies adequately considered Plaintiffs' reliance interests in any prior regulatory regime.

15   Judicial review of the NWPR "is limited to review of the administrative record." *Hodel*, 840

16   F.2d at 1436. Therefore, Plaintiffs' citations to these sources outside the administrative record

17   cannot support their claim that the Agencies failed to consider their reliance interests in

18   promulgating the NWPR.

19         Lastly, Plaintiffs' citation to *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S.

20   Ct. 1891, 1913 (2020), is misplaced. Pls.' Br. at 27-28. There, the agency argued that it "did

21   not need to" consider reliance interests with respect to its policy decision, and the Supreme

22   Court faulted the agency for wholly failing to address that factor. *Id*. Here, in contrast, the

23   Agencies provided exactly the reasoned explanation that the Court held was lacking in

24   *Regents*. *See*, *e.g.*, 85 Fed. Reg. at 22,331-34; RPA, AR 11573, at 6-8; RTC-Legal Arguments,

25   AR 11574, Topic 1 at § 1.2.3.2. Thus, Plaintiffs' contentions that they had valid "reliance

26   interests" engendered by longstanding policies and that the Agencies failed to provide an

27   explanation as to how they addressed those interests are without merit.

28

III.   **The Court Should Defer Ruling on a Remedy Until After Deciding the Cross-Motions for Summary Judgment.**

If the Court perceives an APA violation, rather than set aside the entire NWPR, the court must impose a "less drastic remedy," for example "partial" vacatur of individual provisions, if "sufficient to redress respondents' injury." *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). Because remedy issues are complex—and the implications for setting aside a nationwide rule with public benefits like the NWPR are significant—the Agencies request further detailed briefing to the Court on any issues of remedy that may arise. A blanket, nationwide vacatur or injunction against the NWPR would be improper.

Without detailed briefing of the implications of the request, Plaintiffs generically ask the court to "vacate the [NWPR]." Pls.' Br. at 45. But courts should not simply vacate agency regulations as a matter of course. *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (deciding whether to vacate based on seriousness of agency action's deficiencies and vacatur's disruptiveness). A remedy must impact no more than the specific deficiencies identified and consider whether the agency may fix them. *See id.*; *Monsanto*, 561 U.S. at 165–66 (requiring "partial" vacatur if "sufficient"). Thus, the APA does not require blanket disruption of the NWPR for the entire country. Here, Plaintiffs raise a variety of challenges to the NWPR. Pls.' Br. at 17-41. An appropriate remedy may need to be tailored based on the claimed violation, the identified injury to Plaintiffs, and the broader equities of enjoining the NWPR on a nationwide basis.

Congress may not expand the Article III powers of the courts through statutory provisions. *See, e.g.*, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). So Article III's jurisdictional limits apply to the APA's general instruction that unlawful agency action "shall be set aside." 5 U.S.C. § 706(2). As a result, § 706(2) does not mandate a "depart[ure] from established principles" of equitable discretion. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). A "Court's constitutionally prescribed role is to vindicate the individual rights of

1   the people appearing before it"; so "[a] plaintiff's remedy must be tailored to redress the

2   plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931, 1933–34 (2018). APA

3   § 706 does not supplant the Article III requirement that, "[f]or all relief sought, there must be a

4   litigant with standing." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017).

5   Thus, "[i]f a less drastic remedy (such as partial or complete vacatur of [an agency's

6   challenged] decision) was sufficient to redress respondents' injury, no recourse to the

7   additional and extraordinary relief of an injunction was warranted." *Monsanto*, 561 U.S. at

8   165–66.

9        As a court acting in equity decides only the case or controversy before it, *see Romero-*

10  *Barcelo*, 456 U.S. at 313, an appropriate remedy must take into account the jurisdiction of and

11  parties before other district courts, debating similar issues about the NWPR, throughout the

12  country. *See supra* at p. 8 n.4. "Government litigation frequently involves legal questions of

13  substantial public importance," so "[a]llowing only one final adjudication would deprive [the

14  Supreme] Court of the benefit it receives from permitting several courts of appeals to explore a

15  difficult question." *United States v. Mendoza*, 464 U.S. 154, 160 (1984). Any judicial remedy

16  here cannot be nationwide, but rather must be narrowly tailored to the Article III injuries

17  proven. That tailoring of remedy should occur after separate briefing, specific to any issues

18  identified, and based on the facts and circumstances at that time.

19                                    **CONCLUSION**

20        For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied

21  and Defendants' cross-motion for summary judgment should be granted.

22        Dated: January 19, 2021.

23

24

25

26

27

28

Of Counsel:                                  Respectfully submitted,

DAVID FOTOUHI                                JONATHAN D. BRIGHTBILL
Acting General Counsel                       *Acting Assistant Attorney General*
Environmental Protection Agency

CRAIG R. SCHMAUDER                           /s/ *Hubert T. Lee*
Deputy General Counsel
Department of Army                           HUBERT T. LEE
                                             PHILIP DUPRE
DAVID COOPER                                 *Attorneys*
Chief Counsel                                Environment and Natural Resources Division
U.S. Army Corps of Engineers                 U.S. Department of Justice
*Attorneys*