Jason R. Flanders
Aqua Terra Aeris Law Group
4030 Martin Luther King Jr. Way
Oakland CA, 94611
(916) 202-3018
JRF@ATAlawgroup.com

Luke Pierpont* (NM Bar No. 143524)
Kyle Harwood* (NM Bar No. 12062)
EGOLF + FERLIC + MARTINEZ +
HARWOOD, LLC
123 West San Francisco Street
Santa Fe, NM 87501
Tel: (505) 986-9641
Fax: (505) 214-2005
Email: Luke@EgolfLaw.com
         Kyle@EgolfLaw.com

Counsel for *Amicus Curiae*
Buckman Direct Diversion Board

*Pro Hac Vice*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA, *et al.*,

    *Plaintiffs*,

v.

MICHAEL REGAN *et al.*,

    *Defendants*,

and

STATE OF GEORGIA, *et al.*,

    *Intervenor-Defendants*.

Case No. 3:20-cv-03005-RS

**AMICUS CURIAE BRIEF OF BUCKMAN DIRECT DIVERSION BOARD IN SUPPORT OF THE PLAINTIFFS' PARTIAL OPPOSITION TO DEFENDANTS' MOTION FOR REMAND WITHOUT VACATUR**

Hearing: September 9, 2021 1:30 p.m.
Judge: Hon. Richard Seeborg

# TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS.............................................................................................. i

TABLE OF AUTHORITIES .................................................................................ii-iii

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* ......................................................1

ARGUMENT ................................................................................................................3

    I.      The Rule is Legally Deficient and Should be Vacated ...............................3

    II.     The Rule Undermines the Protection of the BDD's Source Water ........................7

          A.      The Rule Creates a Regulatory Gap by Excluding Ephemeral Streams that Directly Contribute Polluted Discharges to the Rio Grande .......................7

          B.      New Mexico is Unable to Fill the Regulatory Gap created by the Categorical Exclusion of Ephemeral Waters under the Rule Leaving the BDD Exposed to Unregulated Discharges .................................9

    III.    The BDD Project is Uniquely and Particularly Impacted by the Rule .................11

CONCLUSION..........................................................................................................13

CERTIFICATE OF SERVICE ................................................................................13

# TABLE OF AUTHORITIES

**Cases**                                                                                                   *Page*

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984) ..........................3,4

*Cnty. of Maui v. Haw. Wildlife Fund*, 140 S.Ct. 1462 (2020) .......................................................10

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) .....................4,5,6

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ......................4,5,

*Judulang v. Holder*, 565 U.S. 42 (2011) .......................................................................................4

*NRDC v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872 (9th Cir. 2005) ...........................................4

*Rapanos et al., v. United States*, 547 U.S. 715 (2006) ...............................................................5,6

**Statutes**

5 United States Code

    §706(2)(A) ..................................................................................................................4

33 United States Code (Clean Water Act)

    §1251(a) ...................................................................................................................4,6

    §1251(b) .......................................................................................................................6

    §1342(a)(1) ...................................................................................................................2

    §1344.............................................................................................................................9

42 United States Code §§300f-300j-26 (Safe Drinking Water Act)..........................................1,12

**Federal Register**

85 Federal Register

    22,250.............................................................................................................................1

    22,251..........................................................................................................................2,7

    22,270......................................................................................................................6,10

    22,287.............................................................................................................................3

    22,310.............................................................................................................................5

    22,319.............................................................................................................................6

**Miscellaneous**

BUCKMAN DIRECT DIVERSION, EARLY NOTIFICATION SYSTEM, https://bddproject.org/water-quality/early-notification-system/ ................................................................7

BUCKMAN DIRECT DIVERSION, WATER QUALITY HISTORY, https://bddproject.org/history/water-quality-history/ ................................................................9

ENV'T MGMT. LOS ALAMOS FIELD OFFICE, LEGACY CLEANUP, https://www.energy.gov/em-la/services/legacy-cleanup ................................................................7

NM ENV'T DEPT. SURFACE WATER QUALITY NPDES PERMITS, https://www.env.nm.gov/surface-water-quality/npdes-permits/ ................................................................8

LANL STORM WATER INDIVIDUAL PERMIT NO. NM0030759, https://www.env.nm.gov/surface-water-quality/npdes-permits/ ................................................................9

LANL INDUSTRIAL WASTEWATER PERMIT NO. NM0028355, https://www.env.nm.gov/surface-water-quality/npdes-permits/ ................................................................8

UNITED STATES ENV'T PROTECTION AGENCY, NPDES STATE PROGRAM AUTHORITY, https://www.epa.gov/npdes/npdes-state-program-authority ................................................................3,5

1                                        **INTRODUCTION AND INTEREST OF AMICUS CURIAE**

2          The Buckman Direct Diversion (the "BDD") is a water supply project that is operated

3 jointly by the City of Santa Fe and Santa Fe County, New Mexico and is managed by the

4 intergovernmental Buckman Direct Diversion Board. The BDD diverts up to 8,730 acre feet per

5 year (2.84 billion gallons) of water supplied by the U.S. Bureau of Reclamation San Juan-Chama

6 Project, as well as native pre-1907 New Mexico water rights, from the Rio Grande to supply

7 drinking water to Santa Fe regional water customers. The BDD Board submits this *amicus curiae*

8 brief to provide its unique perspective as a water utility in the arid West that is directly and

9 adversely impacted by the categorical exclusion of ephemeral streams from Clean Water Act

10 protection under the Navigable Waters Protection Rule: Definition of "Waters of the United

11 States" 85 Fed. Reg. 22,250 (Jun. 22, 2020) (hereinafter the "Rule").

12          Geographically, the BDD is located west of the City of Santa Fe, New Mexico on the Rio

13 Grande and is downstream of the city of Española, the community of Los Alamos, and the Los

14 Alamos National Laboratory ("LANL"). LANL is located on the Pajarito Plateau, to the west of

15 the Rio Grande, which is the watershed for several ephemeral streams that are tributaries to the

16 Rio Grande upstream of the BDD intake. The BDD relies on the Rio Grande as its source water

17 and will be adversely affected by any reduction in the water quality of the Rio Grande due to

18 polluted runoff from these upstream tributary ephemeral streams. Because the Rule excludes

19 ephemeral streams from Clean Water Act ("CWA" or the "Act") regulation, the BDD is at

20 immediate risk from unregulated discharges to these ephemeral tributaries that feed into the Rio

21 Grande.

22          The BDD has a strong and direct interest in the water quality of its source water from the

23 Rio Grande and the tributaries that contribute flow to the Rio Grande. The BDD diverts surface

24 water from the Rio Grande and treats it to federal Safe Drinking Water Act (42 U.S.C. §§300f-

25 300j-26 (2018)) standards to supply clean water to the citizens of the City and County of Santa

26 Fe. Any increase in contamination or sedimentation of the Rio Grande has a direct impact on the

27 BDD's ability and its expense to divert and treat this source water to drinking water standards.

28

1   The BDD relies on CWA permitting and control of industrial and stormwater discharges to

2   upstream ephemeral streams to maintain and preserve the water quality of its source water.

3   Permits issued under the CWA have stringent requirements limiting discharges of pollutants to

4   ensure that state water quality standards are met and maintained. *See* 33 U.S.C. § 1342(a)(1)

5   (2019). CWA permits are particularly important in New Mexico because the State has not

6   obtained authorization from the U.S. Environmental Protection Agency (USEPA) to administer

7   its own CWA permitting program. As one of only three states that lack permitting authority

8   under the CWA, New Mexico relies on the USEPA to administer the permitting program under

9   Section 402 of the Act for point source pollution. *See generally*, 33 U.S.C. § 1342. Like most

10  states, New Mexico relies on the Army Corps of Engineers to administer the permitting program

11  under Section 404 of the Act for the discharge of dredged and fill material. *See generally*, 33

12  U.S.C. § 1344 (2018). The categorical exclusion of ephemeral streams under the Rule from

13  CWA protections removes the existing regulations on discharges to the ephemeral streams in

14  New Mexico. *See* 85 Fed. Reg. at 22,251.

15      The BDD further relies on the New Mexico Standards for Interstate and Intrastate

16  Surface Water that were developed in reliance on the USEPA and Army Corps of Engineers'

17  (hereinafter collectively the "Agencies") longstanding interpretation of the definition of "waters

18  of the United States" (WOTUS). NM Admin. Code 20.6.4. These regulations define water

19  quality standards for New Mexico streams, including ephemeral streams, such as those that drain

20  LANL property upstream of the BDD. While New Mexico does not issue permits under the

21  CWA, it does certify those permits issued by the USEPA as protective of New Mexico Water

22  Quality standards under Section 401 of the Act. *See generally* 33 U.S.C. § 1341 (2018). The

23  Rule undermines these water quality standards for the surface waters of the State by removing

24  the existing regulation of ephemeral waters in New Mexico regardless of their hydrologic

25  connection to permanent surface waters.

26      Nearly all streams in New Mexico (89%) are ephemeral streams that have now lost CWA

27  protection under the Rule. In promulgating the Rule, the Agencies characterized it as

28  *Amicus Curiae* Buckman Direct Diversion Board's *Amicus* Brief Case 3:20-cv-03005-RS          2

1  "balanc[ing] the regulation of the Federal government with the authority of States and Tribes to

2  more appropriately regulate certain waters[.]" 85 Fed. Reg. at 22,287. In New Mexico the Rule

3  has upended the existing balance between the federal and state water quality programs, leaving

4  the majority of waterways in the State unprotected in a wide regulatory gap. New Mexico is

5  unable to fill the regulatory gap left between the coverage of prior CWA definitions of

6  jurisdictional WOTUS and the exclusions under the Rule. Dkt. No. 214-7 ¶ 21; Declaration of

7  Rebecca Roose (Roose Decl.). This gap means that the risk of pollution and increased sediment

8  to the BDD's source water, and the corresponding increased cost of treatment, will fall on the

9  BDD and its customers, rather than upstream polluters.

10      Leaving the Rule in place, while the Agencies conduct a new rulemaking to replace the

11  Rule will leave the BDD exposed to the serious risks posed by the Rule, even after the Agencies

12  have recognized the flaws in the Rule. The BDD supports the Plaintiffs' Partial Opposition to

13  Defendants' Motion for Remand Without Vacatur because the Rule should be vacated due to its

14  harmful effects on the BDD and other surface water users in the New Mexico.

15                                        **ARGUMENT**

16  **I.   THE RULE IS LEGALLY DEFICIENT AND SHOULD BE VACATED**

17      The Rule is contrary to the express objectives of the CWA as it undermines the ability of

18  states to prevent, reduce, and eliminate water pollution. The CWA is the basis of federal surface

19  water protections, with its objective to "restore and maintain the chemical, physical and

20  biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2018). The Rule, however, is

21  an impermissible interpretation of the CWA by the Agencies because it is contrary to these

22  express and unambiguous objectives of the Act. *See Chevron, U.S.A., Inc. v. Natural Res. Def.*

23  *Council, Inc.,* 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of

24  the matter; for the court, as well as the agency must give effect to the unambiguously expressed

25  intent of Congress."). The Rule disregards the primary objective of the CWA set forth in Section

26  101, and is thus not "based on a permissible construction of the statute*." Id.* at 843. Nor is the

27  Rule tied to the purpose of the CWA, which is the restoration and maintenance of water quality.

28  *Amicus Curiae* Buckman Direct Diversion Board's *Amicus* Brief Case 3:20-cv-03005-RS                    3

1  *Judulang v. Holder*, 565 U.S. 42, 64 (2011).  The Rule is an impermissible interpretation of the
2  CWA because it is directly at odds with the purpose of the Act. *NRDC v. Nat'l Marine Fisheries*
3  *Serv.*, 421 F.3d 872, 879 (9th Cir. 2005).

4  In addition to presenting an impermissible construction of the CWA, the Rule fails to
5  account for the Agencies' prior interpretations of the Act and the reliance of states like New
6  Mexico on those prior interpretations. Because the Rule is arbitrary and capricious it should be
7  vacated before being remanded to the Agencies for a new rulemaking. *See* 5 U.S.C. § 706(2)(A)
8  (2018). While an agency is not always required to provide a more detailed justification for a rule
9  change, "it must—when, for example, its new policy rests upon factual findings that contradict
10 those which underlay its prior policy; or when its prior policy has engendered serious reliance
11 interests that must be taken into account." *Fed. Commc'ns Comm'n v. Fox Television Stations,*
12 *Inc.*, 556 U.S. 502, 515 (2009). The Rule fails to address "whether there were reliance interests,
13 determine whether they were significant, and weigh any such interests against competing policy
14 concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020).
15 The Agencies' failure to perform this required balancing makes the Rule arbitrary and
16 capricious.

17 Rather than providing a detailed justification for excluding ephemeral streams from
18 CWA coverage, the Rule merely concludes that the exclusion "rests upon a reasonable inference
19 of ecological interconnection" without offering any factual support for that inference. 85 Fed.
20 Reg. at 22,310 (internal quotation marks and citation omitted). Based upon this conclusory
21 statement, the Agencies have changed the underpinnings of the CWA permitting program that
22 the BDD has relied on for controlling pollution to its source waters.

23 Under the Agencies' prior guidance, ephemeral streams with significant nexus to a
24 traditional navigable water were considered jurisdictional waters under the CWA. *See Clean*
25 *Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United*
26 *States & Carabell v. United States* (Dec. 2, 2008) Administrative Record (AR) EPA-HQ-OW-
27 2018-0149-11695 (AR-11695). As jurisdictional waters, such ephemeral streams, including those

28 *Amicus Curiae* Buckman Direct Diversion Board's *Amicus* Brief Case 3:20-cv-03005-RS          4

1    draining the Pajarito Plateau and LANL, were subject to the federal permitting requirements

2    under Sections 402 and 404. The Rule fails to address the serious and legitimate reliance of New

3    Mexico, and New Mexico water users, on the permitting programs developed under their prior

4    definition of WOTUS as required by *Fox*. The Agencies did not justify the exclusion of

5    ephemeral streams by any "compelling policy decisions," but rely instead on the conclusory

6    statement regarding "reasonable inference of ecological interconnection." 85 Fed. Reg. at

7    22,310. Nor did the Agencies attempt to balance this statement against the significant reliance of

8    water users like the BDD on the Agencies prior interpretations of the CWA as reflected in prior

9    agency guidance, as was required by *Regents of the Univ. of Cal*. This failure makes the Rule

10   arbitrary and capricious.

11          The Agencies also relied on an incorrect legal interpretation of "their authority under the

12   Constitution and the language, structure, and legislative history of the CWA," to justify the

13   categorical exclusion of ephemeral streams from the Rule. 85 Fed. Reg. at 22,270. The Rule

14   describes that the exclusion of ephemeral streams "most appropriately balances the Federal

15   governments interest in regulating the nation's navigable waters with respecting State and Tribal

16   land use authority over features that are only episodically wet during and or following

17   precipitation events." 85 Fed. Reg. at 22,319. In support of this conclusion the Agencies cite to

18   Justice Scalia's opinion in *Rapanos* for the proposition that ephemeral streams were "beyond the

19   scope of CWA jurisdiction." *Id.* Importantly, this constrained reading of CWA jurisdiction as

20   categorically excluding ephemeral streams was rejected by a plurality of the *Rapanos* Court. *See*

21   *Rapanos v. U.S.*, 547 U.S. 715, 769-70, 800. (Kennedy, J., concurring) (rejecting the pluralities

22   exclusion of irregular waterways as unsupported by the statutory text); (Stevens, J., dissenting)

23   (rejecting plurality exclusion of water beds that are periodically dry). This justification also fails

24   under both *Fox* and *Regents of the Univ. of Cal.*, because it is both incorrect and fails to balance

25   the change in the Agencies' interpretation of CWA jurisdiction against the significant reliance

26   interests of water users, like the BDD, who are affected by the drastic change represented by the

27   Rule.

28   *Amicus Curiae* Buckman Direct Diversion Board's *Amicus* Brief Case 3:20-cv-03005-RS          5

1   Congress unambiguously set forth its view regarding the appropriate balance of state and

2   federal interests in Section 101(b),

3   "[i]t is the policy of the Congress to recognize, preserve, and protect the primary
    responsibilities and rights of States *to prevent, reduce, and eliminate pollution, to*

4   *plan the development and use (including restoration, preservation, and*
    *enhancement) of land and water resources, and to consult with the Administrator*

5   *in the exercise of his authority under this [Act].*"

6   33 U.S.C. §1251(b) (emphasis added). Additionally, the Act declares that "[t]he objective of this

7   [Act] is to restore and maintain the chemical, physical, and biological integrity of the Nation's

8   waters." *Id*. §1251(a). As ably argued by Plaintiffs in their Motion for Summary Judgment,

9   Section 101(b) recognizes the authority of states to enact water quality regulations that are more

10  protective than the federal regulatory floor set by the CWA, and to allow the states to operate the

11  permitting programs required by the Act. [Dkt. No. 214, pg. 33, Plt's MSJ]. In contrast to the

12  plain text and purpose of Section 101 of the Act, the Rule undermines New Mexico's "right to

13  prevent, reduce, and eliminate pollution" by eliminating a critical tool that the State had to do

14  so—Section 402 permitting for ephemeral streams.

15  As noted in the Agencies Notice of Motion and Motion for Voluntary Remand Without

16  Vacatur, the Agencies now acknowledge substantial concerns about the Rule and its effects on

17  the nation's waters. [Dkt. No. 250, pg. 13,Defs.' Mot. for Remand w/o Vacatur]. Specifically, the

18  Agencies describe their concerns about the impacts of the exclusion of ephemeral waters. Id.

19  Further, the Agencies note that they have serious concerns about the Rule's consideration of the

20  effect of ephemeral streams on the chemical, physical, and biological integrity of the nation's

21  waters. Declaration of Radhika Fox (Fox. Decl.) ¶ 14. As now acknowledged by the Agencies,

22  the categorical exclusion of ephemeral waters was not sufficiently supported, however the harm

23  to those ephemeral waters and connected perennial waters will continue unless the rule is

24  vacated.

25

26

27

28

**II. THE RULE UNDERMINES THE PROTECTION OF THE BDD'S SOURCE WATER AND SHOULD BE VACATED**

**A.    The Rule Creates a Regulatory Gap by Excluding Ephemeral Streams that Directly Contribute Pollution to the Rio Grande**

New Mexico is one of three states in the Nation that do not have USEPA authorized National Pollutant Discharge Elimination System ("NPDES") permitting authority under Section 402 of the Act. UNITED STATES ENV'T PROTECTION AGENCY, NPDES State Program Authority, https://www.epa.gov/npdes/npdes-state-program-authority. In the absence of an authorized state-based Section 402 permitting program, New Mexico relies on the USEPA to administer its Section 402 permitting. New Mexico has no existing state pollution discharge permitting program that can fill the gap created by the Rule's exclusion of ephemeral streams. Roose Decl. ¶ 21. Developing a state program in New Mexico to fill the newly created regulatory gap will take significant time and resources. Roose Decl. ¶ 22.  Further, there is no authority for local governments, such as the City of Santa Fe and Santa Fe County, to fill this permitting gap.

Approximately 89% of New Mexico's rivers and streams are ephemeral. Roose Decl. ¶ 6. Under the Rule all these ephemeral streams are categorically excluded from CWA permitting requirements. 85 Fed. Reg. at 22,251. LANL covers approximately 40 square miles on the Pajarito Plateau. Several ephemeral streams drain the Pajarito Plateau and LANL currently has two Section 402 permits, Permit No. NM0028355 for industrial discharges, and Permit No. NM0030759 for stormwater runoff, for discharges to these ephemeral streams. NM ENV'T DEPT., Surface Water Quality NPDES Permits, https://www.env.nm.gov/surface-water-quality/npdes-permits/. These permits were required under the Agencies' prior guidance requiring permits for ephemeral streams that have a significant nexus with the Rio Grande. With the removal of CWA jurisdiction over these streams, the BDD must operate under the assumption that unpermitted and uncontrolled point-source discharges of industrial and stormwater pollutants will migrate to the Rio Grande. This creates a new risk to the BDD, its customers, and its allocation of scarce resources to treat the water that it provides to the community of Santa Fe.

The BDD diverts surface water from the Rio Grande, a designated traditionally navigable water under an Approved Jurisdictional Determination. Roose Decl. ¶ 6. The BDD intake structure is located approximately three miles downstream from the confluence of the Rio Grande and the ephemeral Los Alamos/Pueblo Canyon, which has a watershed encompassing a large portion of the LANL property. Since its inception in the 1940s, LANL has created a vast area of toxic legacy contamination, including heavy metals, organic and inorganic compounds, and radionuclides. Env't Mgmt. Los Alamos Field Office, Legacy Cleanup, https://www.energy.gov/em-la/services/legacy-cleanup. These legacy contaminants are present in many locations, including sediments in the canyon bottoms that are often subject to floods which move the sediments and associated contaminants downstream to the Rio Grande. LANL also has at least 11 industrial outfalls where liquid waste is discharged to the ephemeral streams in the canyons under its current industrial NPDES Section 402 permit. LANL Industrial Wastewater Permit No. NM0028355, https://www.env.nm.gov/surface-water-quality/npdes-permits/. Los Alamos/Pueblo Canyons regularly flow in direct response to summer rain events and winter snowmelt, and the transport of legacy contamination from LANL through these canyons is well documented. Buckman Direct Diversion, Water Quality History, https://bddproject.org/history/water-quality-history/.

LANL contains hundreds of contaminated sites that are affected by stormwater runoff, which carries contamination to the Rio Grande. Many of these areas of contamination and the means of migration to the Rio Grande were assessed, monitored, and controlled under LANL's Section 402 permits for industrial and stormwater discharges under the prior jurisdictional definition of waters of the United States. See LANL Storm Water Individual Permit No. NM0030759, https://www.env.nm.gov/surface-water-quality/npdes-permits/. Los Alamos Canyon, which was covered under the prior permitting program, is among the many ephemeral streams that drain from LANL and that have a significant hydrologic nexus to the Rio Grande. NM Admin. Code 20.6.4.128. Under the prior CWA permitting, the USEPA required LANL, among other things, to manage run-on and runoff from the contaminated sites, control erosion

and sedimentation from those sites, and to monitor stormwater discharges to confirm that control structures and measures are working to prevent downstream contamination. LANL Storm Water Individual Permit No. NM0030759, pp. 3-5 of Part I. Under the Rule, these ephemeral streams are no longer jurisdictional waters, and no longer require Section 402 permitting for these stormwater discharges. This lack of coverage under the Rule significantly raises the threat that LANL legacy contamination will reach the Rio Grande and negatively impact the BDD.

The exclusion of ephemeral streams also eliminates required Section 404 permitting for dredge and fill operations in those streams. Under the prior interpretation of the CWA, dredge and fill operations in ephemeral streams with a significant nexus to a navigable waterway were required to obtain a permit from the Army Corps of Engineers under Section 404 of the Act. AR-11695; *see* 33 U.S.C. § 1344 (Secretary may deny permit whenever he determines that discharges of such materials will have an adverse affect on municipal water supplies). Section 404 permitting in New Mexico is administered by the U.S. Army Corps of Engineers and will no longer be required for ephemeral streams. Roose Del. ¶ 9. Dredge and fill activities pose a particularly consequential risk to Rio Grande water users because many of the ephemeral streams on the Pajarito Plateau contain legacy waste going back to the Manhattan Project. Legacy Cleanup. Any unpermitted dredge and fill discharges in the ephemeral streams draining the Pajarito Plateau and LANL present a salient threat to the BDD because of this history of legacy waste at LANL and the associated the sediments of the canyons.

**B.     New Mexico is Unable to Fill the Regulatory Gap created by the Categorical Exclusion of Ephemeral Waters, Leaving the BDD Exposed to Pollution to its Source Water**

The Agencies describe that the Rule does not determine "which of the nation's waters warrant environment protection and which do not; rather the agencies interpret the definition as drawing the boundary between those waters subject to federal requirements under the CWA and those waters that States and Tribes are free to manage under their independent authorities." 85 Fed. Reg. at 22,270. However, this does not acknowledge how the states, and in this instance the

BDD, have developed their regulatory programs in reliance upon the longstanding agency interpretation of the Act as covering ephemeral streams, and the resulting permitting requirements. For example, the BDD, which was completed in 2011, was designed and built in reliance on the permitting requirements for LANL and other upstream discharges as part of the regulatory background protecting its source water. The exclusion of ephemeral streams from CWA jurisdiction and permitting requirements has created a regulatory gap which upends the framework under which the BDD was designed and built.

As a practical matter, the State of New Mexico cannot currently fill the regulatory gap created by the Rule. New Mexico is the only state without permitting authority under the CWA in the arid west. NPDES State Program Authority. The permitting program is the primary mechanism under the Act for regulating and limiting discharges of pollutants into the waters of the United States. *Cnty. of Maui v. Haw. Wildlife Fund*, 140 S.Ct. 1462, 1469 (2020). For New Mexico to develop, adopt, and implement a state-based permitting program that will fill the permitting gap will require significant time, funding, and staff. Roose Decl. ¶ 22. Unlike states with established permitting programs, New Mexico does not have the legal and procedural program infrastructure to issue and enforce discharge permits to regulate discharges of pollutants to the ephemeral waterways of the state. *Id*. This gap leaves the burden created by water pollution on the water users of the state, including the BDD.

To start up a new permitting program that would fill the regulatory gap, New Mexico will require a massive increase in funding for its surface water quality activities, new rulemaking proceedings, and a reallocation of scarce resources to a new program and the significant time required to accomplish this reorganization. Roose Decl. ¶¶ 20, 22, 23. The New Mexico Environment Department has evaluated the costs to create a new permitting program, and found that it will cost over $7.5 million annually, which represents an increase of 115% to the budget of the Surface Water Quality Bureau, which would be responsible for such a program. Roose Decl. ¶ 22. In addition, New Mexico lacks the legal and procedural mechanisms to issue and enforce NPDES-like permits and will require statutory amendments and new rulemaking to

create the newly required authority. Roose Decl. ¶ 20. As noted by Ms. Roose, the most recent rulemaking related to surface water quality lasted three years before the regulations became effective. *Id*. Because of budget constraints, the State will be forced to reallocate resources to fill this regulatory gap. Roose Decl. ¶ 23. This reallocation will weaken the regulatory capabilities of the State in other related areas, increasing the burden on water users like BDD. *Id*.

### III. THE BDD PROJECT IS UNIQUELY AND PARTICULARLY IMPACTED BY THE RULE

Because of its location—downstream from the ephemeral streams that drain current and former LANL property and the legacy waste contained in the sediments of those ephemeral streams—the BDD is uniquely and particularly impacted by the Rule. The individual stormwater and industrial NPDES permits at LANL will be among the many CWA individual permits that will no longer be required under the Rule, which will result in unregulated discharges and pollutants entering ephemeral streams flowing to the Rio Grande upstream of the BDD. The Section 402 permitting for LANL currently controls industrial discharges of a range of heavy metals including chromium, arsenic, and mercury, in addition to adjusted gross alpha. LANL Industrial Wastewater Permit No. NM0028355. As a water user, the BDD does not have jurisdiction or authority to regulate or prevent upstream pollution, and relies instead on the permitting programs administered by the EPA and State of New Mexico for that protection.

Through its state of the art water treatment system, the BDD produces safe drinking water that meets and exceeds the standards of the Safe Drinking Water Act, 42 U.S.C. 300f to 300j-26. However, the quality of the source water has a significant impact on the treatment process and costs required to produce high quality drinking water for the BDD's customers. Under certain conditions, including increased turbidity, or storm flows from the ephemeral streams that drain the Pajarito Plateau, the BDD must shut down its surface water intake until the sediment pulse passes the intake. By shutting down its diversion intake, the BDD avoids damage to its water filtration and treatment equipment, and avoids diverting water carrying sediment and the entrained legacy waste from LANL which may include radionuclides and heavy metals. Water Quality History. In addition, any contamination that is removed in the water treatment

process poses increased disposal costs and regulatory burdens to the BDD. The existing risks to the BDD source water are managed with careful monitoring of the flows of the Rio Grande and the upstream ephemeral streams that contribute storm flows and the transport of legacy waste to the Rio Grande. BUCKMAN DIRECT DIVERSION, Early Notification System, https://bddproject.org/water-quality/early-notification-system/.

BDD has taken a proactive approach to protecting its source water quality. In addition to ceasing diversion from the Rio Grande when the potential for polluted water is the highest, the BDD has also worked within the prior regulatory framework to restore and maintain the water quality of the Rio Grande. As described above, *infra* p. 2, New Mexico may impose conditions on USEPA issued Section 402 permits for discharges into jurisdictional waters so that those permits comply with New Mexico water quality standards. The BDD has engaged with New Mexico regulators and petitioned the State Water Quality Control Commission under the State's Triennial Review process for setting Standards for Interstate and Intrastate Surface Waters to set protective water quality standards for radionuclides for the Rio Grande. NM Admin. Code. 20.6.4.900.

The BDD has also worked with State regulators to develop a source water protection plan for the Rio Grande and surrounding watershed. This source water protection plan relies on and incorporates the existing LANL, and other CWA permitting, to describe the baseline conditions of the watershed. These auxiliary regulatory tools, which have been supported by the BDD and other water users, are undermined by the loss of required permitting for discharges into the ephemeral streams of the Pajarito Plateau. As part of its ongoing efforts to protect its source water the BDD filed comments on the Rule, reflected at AR-5151, setting forth the risks posed to the BDD and other water users by the categorical exclusion of ephemeral streams, among other items. The Agencies' failed to address the BDD comments in the final Rule.

**CONCLUSION**

For the foregoing reasons, this Court should grant the Plaintiffs' Partial Opposition to Defendant's Motion for Remand Without Vacatur, and vacate the Rule prior to remanding to the Agencies.

Dated: August 17, 2021

Respectfully Submitted,

/s/ Luke M. Pierpont
Luke M. Pierpont*
Kyle S. Harwood*
EGOLF, FERLIC,
MARTINEZ & HARWOOD, LLC
123 W. San Francisco St. 2nd Floor
Santa Fe, NM 87501
Kyle@Egolflaw.com
Luke@Egolflaw.com
*Pro Hac Vice Application Pending

/s/ Jason R. Flanders
Jason R. Flanders (CA Bar No.238007)
Aqua Terra Aeris Law Group
4030 Martin Luther King Jr. Way
Oakland, CA, 94611
(916)202-3018
JRF@ATAlawgroup.com
*Counsel for* Amicus Curiae *Buckman Direct Diversion Board*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, on August 17, 2021.

/s/ Jason R. Flanders