Demarcus Williams (SBN 329756)
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA 94306-2109
650-213-0327
650-213-8158 (fax)
demarcus.williams@whitecase.com

Christopher W. Greer*
WHITE & CASE LLP
1221 Avenue of Americas
New York, NY 10020-1095
212-819-2593
chris.greer@whitecase.com

Attorneys for *Amici Curiae*

*Admitted *pro hac vice*

Royal C. Gardner*
Erin Okuno*
STETSON UNIVERSITY
COLLEGE OF LAW
INSTITUTE FOR BIODIVERSITY LAW
AND POLICY
1401 61st Street South
Gulfport, FL 33707
727-562-7864
gardner@law.stetson.edu

Kathleen E. Gardner*
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
212-848-5373
kathleen.gardner@shearman.com

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | Case No.  3:20-cv-03005-RS |
| Plaintiffs, | **BRIEF OF AMERICAN FISHERIES SOCIETY, ASSOCIATION FOR THE SCIENCES OF LIMNOLOGY AND OCEANOGRAPHY, COASTAL AND ESTUARINE RESEARCH FEDERATION, INTERNATIONAL ASSOCIATION FOR GREAT LAKES RESEARCH, NORTH AMERICAN LAKE MANAGEMENT SOCIETY, PHYCOLOGICAL SOCIETY OF AMERICA, SOCIETY FOR ECOLOGICAL RESTORATION, SOCIETY FOR FRESHWATER SCIENCE, AND SOCIETY OF WETLAND SCIENTISTS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' PARTIAL OPPOSITION TO DEFENDANTS' MOTION FOR REMAND WITHOUT VACATUR** |
| v. | |
| MICHAEL REGAN, et al., | |
| Defendants, | |
| and | |
| STATE OF GEORGIA, et al., | |
| Defendant-Intervenors. | |

| | |
|---|---|
| Hearing Date: | September 9, 2021 |
| Time: | 1:30 p.m. |
| Dept: | San Francisco Courthouse, Courtroom 03, 17th Floor |
| Judge: | Honorable Richard Seeborg |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................... ii

INTEREST OF THE *AMICI CURIAE*............................................................................ 1

ARGUMENT ................................................................................................................... 1

    I.    Concessions made in the course of these proceedings and the rulemaking record confirm that the Agencies ignored important aspects of the problem when they promulgated the NWPR—a serious error requiring vacatur. ................. 2

        A.    The Agencies concede—and the rulemaking record establishes— that they failed to appropriately consider the extent to which the NWPR reduced Clean Water Act jurisdiction. ............................................ 2

        B.    The Agencies concede—and the rulemaking record establishes— that they failed to appropriately consider the negative environmental impacts of the NWPR, as required by *State Farm* and EPA's own regulations. ......................................................................... 6

    II.    Vacatur will not result in disruptive consequences for regulated entities; rather, vacatur will minimize the harmful consequences of the NWPR. ................. 9

CONCLUSION ............................................................................................................... 11

APPENDIX A ................................................................................................................. 12

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bob Marshall All. v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) ............................................................. 7

*Cal. Cmties. Against Toxics v. U.S. EPA*, 688 F.3d 989 (9th Cir. 2012) ....................................2, 9

*California v. Wheeler*, 467 F. Supp. 3d 864 (N.D. Cal. 2020)..................................................... 1, 3

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995) ...........................................2, 9

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020)...... 2

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................................................... *passim*

*Municipality of Anchorage v. United States*, 980 F.2d 1320 (9th Cir. 1992) ................................. 8

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018) ......................................................... 9

*Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520 (9th Cir. 2015)............................9, 10

*Rapanos v. United States*, 547 U.S. 715 (2006)...............................................................................9

*SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 769 F.3d 1184 (D.C. Cir. 2014).................. 2

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ............9

*Stewart v. Azar*, 313 F. Supp. 3d 237 (D.D.C. 2018)............................................................. 6, 7, 8

**Statute**

33 U.S.C. § 1371(c) (2018)............................................................................................................ 7

**Administrative Authorities**

33 C.F.R. § 331.2 (2021) ...............................................................................................9

40 C.F.R. pt. 6 (2020) ............................................................................................ 7, 8

Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) ...................................................................................... 4

Navigable Waters Protection Rule, 85 Fed. Reg. 22,250 (Apr. 21, 2020)............................. *passim*

U.S. Army Corps of Engineers, *Regulatory Guidance Letter No. 16-01* (Oct. 2016) .....................9

U.S. EPA & Dep't of the Army, *Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States"* (Jan. 22, 2020) ....................................................... 5

U.S. EPA & Dep't of the Army, *Resource and Programmatic Assessment for the Navigable Waters Protection Rule: Definition of "Waters of the United States"* (Jan. 23, 2020) .............. 4

U.S. EPA, Office of Research & Dev., *Connectivity of Streams & Wetlands to Downstream Waters: A Review & Synthesis of the Scientific Evidence* (Jan. 2015).................................... 7, 8

**Other Authorities**

Comment submitted by Barbara D. Underwood, Attorney General of New York, et al., to Andrew Wheeler, Administrator, U.S. EPA, *Revised Definition of "Waters of the United States,"* (Apr. 15, 2019), https://oag.ca.gov/system/files/attachments/press-docs/comment-letter-final-04-15-19-final.pdf................................................................................................................ 5

Kurt A. Fesenmyer et al., *Large portion of USA streams lose protection with new interpretation of Clean Water Act*, 40 Freshwater Sci. (published online Feb. 10, 2021)............................... 10

Letter from Dr. Michael Honeycutt, Chair, Science Advisory Board, to Andrew R. Wheeler, Administrator, U.S. EPA, *Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act* (Feb. 27, 2020) ............................................ 7

*Proposed Arizona mine passes federal regulatory hurdle*, AP News (Mar. 26, 2021) ................ 10

Roger Meyer & Andrew Robertson, *Clean Water Rule Spatial Analysis: A GIS-based Scenario Model for Comparative Analysis of the Potential Spatial Extent of Jurisdictional and Non-Jurisdictional Wetlands* (2019), https://static1.squarespace.com/static/578f93e4cd0................. 5

Steven Munson & Desmond Butler, *Trump rule eases effort to strip-mine near Okefenokee Swamp*, The Washington Post (Nov. 25, 2020), https://www.washingtonpost.com/climate-environment/trump-rule-eases-effort-to-strip-mine-near-okefenokee-swamp/2020/11/25/84ed10ba-229a-11eb-a688-5298ad5d580a_story.html............................ 10

1

## INTEREST OF THE *AMICI CURIAE*[1]

2

*Amici Curiae*[2] are nine national and international scientific societies, all actively involved

3

in research, education, and the conservation and restoration of aquatic ecosystems and resources

4

in the United States. *Amici* have an interest in this case because of the impact of the Navigable

5

Waters Protection Rule, 85 Fed. Reg. 22,250 (Apr. 21, 2020) (NWPR), on the integrity of those

6

ecosystems, their biodiversity, and their resources. As scientific societies, *Amici* support the use

7

of the best available scientific information in making decisions on the use and management of

8

aquatic ecosystems and resources.

9

*Amici*'s interest here is not to make a policy argument or to compel the U.S.

10

Environmental Protection Agency and the U.S. Army Corps of Engineers (together, the Agencies)

11

to provide "*all* of the benefits for water quality the science suggests might be achievable."

12

*California v. Wheeler*, 467 F. Supp. 3d 864, 875 (N.D. Cal. 2020) (emphasis in original). Their

13

interest rather stems from the mandate of *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm*

14

*Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983), which requires that the Agencies properly consider the

15

scientific evidence that existed in the administrative record. *Amici* seek to explain why the

16

Agencies' conceded failure to consider the NWPR's impact on the integrity of the Nation's

17

waters is a serious error that requires vacatur of the NWPR.

18

## ARGUMENT

19

Vacatur upon remand is entirely appropriate here. Two factors control whether a court

20

should vacate a rule when remanding it back to an agency: the seriousness of the agency's errors

21

and the disruptive consequences that an interim change may have. *Cal. Cmties. Against Toxics v.*

22

23

[1] Plaintiffs and Intervenor-Defendants do not oppose and Defendants take no position regarding the filing of this brief. *Amici Curiae* state that no counsel for a party authored this brief in whole

24

or in part, that no party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief, and that no person—other than *Amici Curiae*, their

25

members, or their counsel—made a monetary contribution intended to fund the preparation or submission of this brief.

26

[2] *Amici Curiae* are American Fisheries Society, Association for the Sciences of Limnology and Oceanography, Coastal and Estuarine Research Federation, International Association for Great

27

Lakes Research, North American Lake Management Society, Phycological Society of America, Society for Ecological Restoration, Society for Freshwater Science, and Society of Wetland

28

Scientists (collectively, the Scientific Societies). Descriptions of the Scientific Societies are provided in Appendix A to this brief.

1

1  *U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). A court should "leave an invalid rule in place only

2  'when equity demands[.]'" *Id.* (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405

3  (9th Cir. 1995)). Here, the Agencies' failure to comply with the requirements of *State Farm* and

4  the EPA's regulations are serious errors in the rulemaking process that require vacatur.

5  Furthermore, equity does not demand leaving the NWPR in place—quite the opposite. Vacatur

6  will not be disruptive to the regulated community as the U.S. Army Corps of Engineers

7  recognizes the validity of jurisdictional determinations for five years. Instead, vacatur will ensure

8  that further negative impacts from the NWPR will be minimized.

9
   **I.  Concessions made in the course of these proceedings and the rulemaking record
        confirm that the Agencies ignored important aspects of the problem when they
10       promulgated the NWPR—a serious error requiring vacatur.**

11        A bedrock tenet of administrative law is that, when engaging in rulemaking, an agency

12  must examine relevant data and provide a reasoned explanation for its decision. *State Farm*, 463

13  U.S. at 43. The U.S. Supreme Court recently reaffirmed that "[t]his requirement allows courts to

14  assess whether the agency has promulgated an arbitrary and capricious rule by 'entirely fail[ing]

15  to consider an important aspect of the problem [or] offer[ing] an explanation for its decision that

16  runs counter to the evidence before [it].'" *Little Sisters of the Poor Saints Peter & Paul Home v.*

17  *Pennsylvania*, 140 S. Ct. 2367, 2383–84 (2020) (quoting *State Farm*, 463 U.S. at 43).

18        The potential harms or effects of an agency's action are obviously an important aspect of

19  the problem. *SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 769 F.3d 1184, 1188 (D.C. Cir.

20  2014) (vacating agency order where agency failed to consider potential harms of its changes). In

21  the present case, to assess the effects of the NWPR on the integrity of the Nation's waters, the

22  Agencies needed to (A) determine the extent to which Clean Water Act jurisdiction would be

23  reduced and (B) consider the environmental impacts that would likely occur as a result. The

24  Agencies did neither. As such, the NWPR should be vacated upon remand.

25
        A.  The Agencies concede—and the rulemaking record establishes—that they failed to
            appropriately consider the extent to which the NWPR reduced Clean Water Act
26          jurisdiction.

27        During the preliminary injunction hearing before this Court, the Agencies boldly and

28  wrongly asserted that they were not required to consider the magnitude of the reduction in Clean

Water Act jurisdiction as part of the rulemaking process:

> THE COURT: … Does part of that process require the agencies to do some assessment of what -- what waters would have been protected under the existing regime and what will be lost under 2020? Do they have -- is that part of their process, or are they not required to do that?

*   *   *

> THE COURT: Okay. So I take it your answer is they're not required to do it as part of their –

> MR. BRIGHTBILL: They're not required to do it, Your Honor.

Tr. Videoconference Proceedings 50–51, *California v. Wheeler*, 467 F. Supp. 3d 864 (N.D. Cal. 2020). That position with respect to what information the Agencies must consider is not a mere "policy disagreement"—it is in direct conflict with the mandate of *State Farm*.

The Agencies now make clear that one of their "substantial concerns" causing them to seek remand in this case and initiate a new rulemaking is their "concern over the loss of waters protected by the CWA" as a result of the NWPR. Declaration of Jaime Pinkham ¶ 10, June 9, 2021 (ECF 250-3) (Pinkham Decl.); Declaration of Radhika Fox ¶ 10, June 9, 2021 (ECF 250-2) (Fox Decl.). This underscores Mr. Brightbill's concession. When conducting the rulemaking, the Agencies did not think they were required to assess the magnitude of the loss of protected waters or the effect of that loss, and they did not undertake any meaningful effort to do so.

The rulemaking record itself establishes that the Agencies failed to adequately estimate the magnitude of waters that would lose Clean Water Act protection under the NWPR. The Agencies repeatedly claimed that they were "unable to quantify" the change in jurisdictional coverage for at least seven separate categories of waters: tributaries, ephemeral streams, wetlands, lakes, ponds, impoundments, and interstate waters. For example, the Agencies asserted the following:

- "[T]he agencies are not aware of any means to quantify changes in CWA jurisdiction with any precision that may or may not occur as a result of this final rule." Preamble to the Navigable Waters Protection Rule, 85 Fed. Reg. at 22,332.

- "[T]he agencies also did not use the NHD [National Hydrography Dataset] or NWI [National Wetlands Inventory] to assess potential changes in jurisdiction as a result of the final rule." Preamble to the Navigable Waters Protection Rule, 85 Fed. Reg. at 22,329.

3

- "[T]he agencies are not aware of any map or dataset that accurately or with any precision portrays the scope of CWA jurisdiction at any point in the history of this complex regulatory program." Preamble to the Navigable Waters Protection Rule, 85 Fed. Reg. at 22,332.

- "[T]he agencies lack sufficient data to quantify the difference" of jurisdictional interstate waters under the 2019 Rule (Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019)) and the Navigable Waters Protection Rule. U.S. EPA & Dep't of the Army, *Resource and Programmatic Assessment for the Navigable Waters Protection Rule: Definition of "Waters of the United States"* 20 (Jan. 23, 2020) (hereinafter Resource and Programmatic Assessment).

- The Agencies are "unable to quantify the change in jurisdiction for tributaries[.]" Resource and Programmatic Assessment at 22.

- The Agencies are "unable to approximate what percentage of currently jurisdictional non-relatively permanent waters are ephemeral that will no longer be jurisdictional under the revised definition of 'waters of the United States.'" Resource and Programmatic Assessment at 22–23.

- The Agencies are "unable to quantify" how many lakes and ponds will no longer be protected. Resource and Programmatic Assessment at 24.

- The Agencies are "unable to quantify" the change in jurisdiction of impoundments compared to the baseline. Resource and Programmatic Assessment at 25.

- The Agencies are "unable to quantify" how many wetlands will no longer be protected. Resource and Programmatic Assessment at 26–27.

- The Agencies are "unable to . . . determine how many waters have been determined to meet an exclusion from the definition of 'waters of the United States' under the 2019 Rule/*Rapanos* Guidance practice and are unable to quantify the magnitude of the changes in jurisdiction due to these exclusions." Resource and Programmatic Assessment at 30.

- The Agencies are "unable to quantify potential changes in jurisdiction as a result of the final rule's ditch exclusion." Resource and Programmatic Assessment at 30.

- The Agencies are "unable to quantify this change" for artificial lakes and ponds. Resource and Programmatic Assessment at 33.

- The Agencies are "unable to quantify this change" for exclusions of "stormwater control features constructed in upland or in non-jurisdictional waters that convey, treat, infiltrate, or store stormwater run-off." Resource and Programmatic Assessment at 33.

- The Agencies are "unable to quantify this change" for exclusions of "groundwater recharge, water reuse, and wastewater recycling structures." Resource and Programmatic Assessment at 33–34.

- "As discussed further in this document, the final rule reduces the scope of federal CWA jurisdiction over certain waters (e.g., some ephemeral streams, isolated wetlands, and

4

1   ditches) compared to prior regulations, although the agencies are unable to quantify these

2   changes with any reliable accuracy." U.S. EPA & Dep't of the Army, *Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States"* xi

3   (Jan. 22, 2020) (hereinafter Economic Analysis).

4   The Agencies' professed inability to quantify the NWPR's effect on Clean Water Act jurisdiction

5   points to the serious deficiencies of their action.[3]

6   The seriousness of this error is highlighted by the fact that scientific tools were indeed

7   available for the Agencies to assess the NWPR's impact on Clean Water Act jurisdiction. For

8   example, in January 2019, well before the Agencies promulgated the NWPR, GeoSpatial Services

9   of Saint Mary's University of Minnesota developed a Geographic Information System-based

10  model, called the "CWA Jurisdictional Scenario Model," that compares the extent of Clean Water

11  Act protection for aquatic ecosystems under different regulatory scenarios.[4] This tool, which was

12  part of the rulemaking record,[5] is discussed in further detail in the Scientific Societies' previous

13  brief.[6] The Agencies, however, failed to use this or other scientific tools and data that were

14  available.

15  The Agencies' failure to quantify the extent to which certain waters would lose protection

16  under the NWPR is a serious error. Without even an estimate of the extent of Clean Water Act

17  ─────────────────────

18  [3] Whatever analysis the Agencies may have conducted in connection with the Resource and Programmatic Assessment and Economic Analysis is irrelevant because the Agencies now concede they did not rely on any such analyses when promulgating the NWPR. Pinkham Decl. ¶

19  12; Fox Decl. ¶ 12. Moreover, in the rulemaking record, the Agencies repeatedly emphasized that the information in the Resource and Programmatic Assessment (as well as the Economic

20  Analysis) "was not used by the [A]gencies to help determine the extent of their authority under the CWA." U.S. EPA & Dep't of the Army, *Economic Analysis for the Navigable Waters*

21  *Protection Rule: Definition of "Waters of the United States"* xi (Jan. 22, 2020).

[4] Roger Meyer & Andrew Robertson, *Clean Water Rule Spatial Analysis: A GIS-based Scenario*

22  *Model for Comparative Analysis of the Potential Spatial Extent of Jurisdictional and Non-Jurisdictional Wetlands* (2019), https://static1.squarespace.com/static/578f93e4cd0

23  f68cb49ba90e1/t/5c50c0e988251bc68fe33388/1548796144041/Hewlett_report_Final.pdf.

[5] At least 16 comment letters referenced and/or attached the CWA Jurisdictional Scenario Model

24  in response to the request for comments on the proposed 2020 Rule. *See, e.g.*, Comment submitted by Barbara D. Underwood, Attorney General of New York, et al., to Andrew Wheeler,

25  Administrator, U.S. EPA, *Revised Definition of "Waters of the United States,"* Attachment A at 21 (Apr. 15, 2019), https://oag.ca.gov/system/files/attachments/press-docs/comment-letter-final-

26  04-15-19-final.pdf.

[6] Brief of American Fisheries Society, Association for the Sciences of Limnology and

27  Oceanography, Coastal and Estuarine Research Federation, International Association for Great Lakes Research, North American Lake Management Society, Phycological Society of America,

28  Society for Ecological Restoration, Society for Freshwater Science, Society of Wetland Scientists as *Amici Curiae* in Support of Plaintiffs' Motion for a Preliminary Injunction or Stay, May 26,

5

1    contraction, the Agencies could not, and thus did not, conduct a meaningful assessment of the

2    NWPR's impacts on the integrity of the Nation's waters. This error alone mandates vacatur upon

3    remand.

4         B.  <u>The Agencies concede—and the rulemaking record establishes—that they failed to appropriately consider the negative environmental impacts of the NWPR, as required by *State Farm* and EPA's own regulations.</u>

5

6    When promulgating a rule, an agency must consider the likely positive and negative

7    impacts of a rule. *State Farm*, 463 U.S. at 48. Accordingly, ignoring a rule's negative impacts is

8    grounds for vacatur. For example, in *Stewart v. Azar*, the U.S. District Court for the District of

9    Columbia vacated the Health and Human Services Secretary's waiver of several requirements of

10   expanded Medicaid because "[f]or starters, the Secretary never once *mentions* the estimated

11   95,000 people who would lose coverage, which gives the Court little reason to think that he

12   seriously grappled with the bottom-line impact on healthcare." 313 F. Supp. 3d 237, 263 (D.D.C.

13   2018) (emphasis in original). Here, the impact on water quality by the NWPR's reduction in

14   Clean Water Act jurisdiction is an important aspect of the rulemaking. Yet the Agencies failed to

15   meaningfully assess the NWPR's impacts on water quality. Such an error in the rulemaking

16   process, now acknowledged by the Agencies, compels vacatur upon remand.

17   The Agencies concede in their motion for voluntary remand without vacatur that they

18   have significant concerns regarding their failure to adequately consider "the effects of the NWPR

19   on the chemical, physical, and biological integrity of the nation's waters when determining the

20   limits of the specific definitional language 'waters of the United States' in the NWPR." Pinkham

21   Decl. ¶ 14; Fox Decl. ¶ 14. The Agencies identify one such failure when they describe how they

22   failed to examine the effect on traditional navigable waters of excluding all ephemeral waters

23   from Clean Water Act protection. *Id.*

24   The seriousness of this failure is evidenced by how obvious the negative impacts of

25   excluding all ephemeral waters were to the scientific community, including EPA's own Scientific

26   Advisory Board.[7] The Agencies ignored unequivocal scientific research that had been part of the

27   _____

2020 (ECF 68) (Scientific Societies Brief).

28   [7] The EPA's Scientific Advisory Board concluded that the proposed NWPR "lacks a scientific justification, while potentially introducing new risks to human and environmental health[.]"

6

1 record for Clean Water Act rulemakings for years and that established that the loss of protected

2 waters would likely have significant cumulative impacts on downstream waters. The Agencies

3 now effectively concede these points. *See* Pinkham Decl. ¶ 20; Fox Decl. ¶ 20 (stating that

4 "[e]phemeral streams, wetlands, and other aquatic resources provide numerous ecosystem

5 services, and there could be cascading and cumulative downstream effects from impacts to these

6 resources, including . . . effects on water supplies, water quality, flooding, [and] drought" and

7 citing U.S. EPA, Office of Research & Dev., *Connectivity of Streams & Wetlands to Downstream*

8 *Waters: A Review & Synthesis of the Scientific Evidence* (Jan. 2015) (Connectivity Report)).

9       The Connectivity Report, which examined over 1,200 peer-reviewed publications, states

10 that "scientific literature unequivocally demonstrates that streams, individually or cumulatively,

11 exert a strong influence on the integrity of downstream waters." Connectivity Report, at ES-2.

12 "All tributary streams," including ephemeral ones, "are physically, chemically, and biologically

13 connected to downstream rivers." *Id.* "The incremental effects of individual streams and wetlands

14 are cumulative across entire watersheds and therefore must be evaluated in context with other

15 streams and wetlands." *Id.* at ES-5. So the amount of water "contributed by a specific ephemeral

16 stream in a given year might be small, but the aggregate contribution of that stream over multiple

17 years, or by all ephemeral streams draining that watershed in a given year or over multiple years,

18 can have substantial consequences on the integrity of the downstream waters." *Id.* As the

19 Agencies now largely concede, the NWPR ignored these fundamental principles. As a result, in

20 accordance with *State Farm* and *Stewart*, a remand with vacatur is appropriate.

21       The Agencies' failure to consider the impact of the NWPR on water quality also violates

22 EPA's National Environmental Policy Act (NEPA) regulations. These regulations, which were in

23 force at the time of the rulemaking, expressly state that the EPA's "development and issuance of

24 regulations" are proposed actions subject to NEPA. 40 C.F.R. § 6.101 (2020).[8]

---

25 Letter from Dr. Michael Honeycutt, Chair, Science Advisory Board, to Andrew R. Wheeler,

26 Administrator, U.S. EPA, *Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated Under the Clean Water Act* 4 (Feb. 27, 2020).

27 [8] Although the EPA was not required to perform an Environmental Impact Statement (EIS), 33 U.S.C. § 1371(c) (2018), the Ninth Circuit has explained that NEPA's obligations regarding "the

28 consideration of alternatives requirement is both independent of, and broader than, the EIS requirement." *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988).

7

1  The EPA regulations identify the types of impacts the Agency must analyze when

2  developing and issuing a regulation, such as the NWPR. *Id.* Generally, the EPA must consider

3  "[t]he environmental impacts of the proposed action and alternatives[.]" *Id.* § 6.205(e)(iv). More

4  specifically, the EPA must consider impacts to "environmentally important natural resource areas

5  such as wetlands, floodplains, significant agricultural lands, aquifer recharge zones, coastal zones,

6  barrier islands, wild and scenic rivers, and significant fish or wildlife habitat." *Id.* § 6.204(b)(5).

7  The Agencies failed to do so here and thus failed to comply with NEPA regulations. There is

8  nothing in the record to suggest that the Agencies "seriously grappled with the bottom-line

9  impact" of the NWPR on the integrity of the Nation's waters. *Stewart*, 313 F. Supp. 3d at 263.

10  Indeed, the Agencies now emphasize that they

> explicitly and definitively stated in numerous places in the NWPR administrative
> record that they did not rely on agency documents in the record that provided some
> limited assessment of the effects of the rule on water quality in determining the
> scope of the definition of "waters of the United States." *See, e.g.*, 85 Fed. Reg. at
> 22,332, 22,335 ("[T]he final rule is not based on the information in the agencies'
> economic analysis or resource and programmatic assessment.").

15  Pinkham Decl. ¶ 12; Fox Decl. ¶ 12. As was the case with the assessment of the NWPR's

16  quantitative impact (reduction in waters protected), the Agencies cannot rely on the Resource and

17  Programmatic Assessment or Economic Analysis for a qualitative assessment. *See supra* n. 3.

18  In *Municipality of Anchorage v. United States*, the U.S. Court of Appeals for the Ninth

19  Circuit observed, in prescient fashion, that "it cannot be assumed that EPA will always be the

20  good guy." 980 F.2d 1320, 1328 (9th Cir. 1992) (internal quotation marks omitted). The

21  Agencies' refusal to consider the available science, and what that science demonstrated

22  concerning the magnitude of loss of jurisdictional waters under the NWPR, were serious

23  deficiencies. As the rulemaking record demonstrates and the Agencies now concede, the losses

24  are astounding, and the concomitant effect on the chemical, physical, and biological integrity of

25  the Nation's waters cannot simply be ignored in the rulemaking process. Ignoring such data runs

26  directly counter to the mandates of *State Farm* and the EPA's own regulations, a serious error

27  requiring vacatur of the NWPR.

28

*AMICI CURIAE* BRIEF OF SCIENTIFIC SOCIETIES
CASE NO:  3:20-CV-03005-RS

1

**II.  Vacatur will not result in disruptive consequences for regulated entities; rather, vacatur will minimize the harmful consequences of the NWPR.**

2      As the Business Coalition observed in its *Amici* brief,[9] the definition of "waters of the

3  United States" has been subject to a "roller coaster of regulatory change"—in part because of

4  challenges brought by regulated entities. *E.g.*, *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617

5  (2018) (challenging Clean Water Rule); *Rapanos v. United States*, 547 U.S. 715 (2006)

6  (challenging Clean Water Act jurisdiction over non-navigable tributaries); *Solid Waste Agency of*

7  *N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) (challenging Clean Water Act

8  jurisdiction based on the presence of migratory birds). To assist regulated entities, the Corps of

9  Engineers "has long provided JDs [jurisdictional determinations] as a public service." U.S. Army

10  Corps of Engineers, *Regulatory Guidance Letter No. 16-01*, at 1 (Oct. 2016). Upon request, the

11  Corps of Engineers will issue an approved jurisdictional determination, which is "a Corps

12  document stating the presence or absence of waters of the United States on a parcel or a written

13  statement and map identifying the limits of waters of the United States on a parcel." 33 C.F.R. §

14  331.2 (2021). An approved jurisdictional determination, including a determination of no

15  jurisdiction, remains valid for five years. U.S. Army Corps of Engineers, *supra*, at 3. The

16  authority of the Corps of Engineers to recognize approved jurisdictional determinations for up to

17  five years is not a question before the Court. Accordingly, vacatur of the NWPR will have no

18  immediate impact on regulated entities that have received an approved jurisdictional

19  determination.

20      When weighing the equity of vacating an invalid rule, the Ninth Circuit "consider[s]

21  whether vacating a faulty rule could result in possible environmental harm." *Pollinator*

22  *Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). The Ninth Circuit has

23  approved remand *without* vacatur when vacating the rule would create a risk of serious

24  environmental harm. *See, e.g., Cal. Cmties. Against Toxics*, 688 F.3d at 992 (leaving EPA rule in

25  place because vacatur could lead to increased air pollution); *Idaho Farm Bureau Fed'n*, 58 F.3d

26  at 1405 (leaving U.S. Fish and Wildlife Service rule in place because vacatur could threaten

27

28
[9] *Amici Curiae* Brief of Business Coalition in Support of Agencies' Motion to Remand Without Vacatur, August 6, 2021 (ECF 254).

9

extinction of snail species). In contrast, the Ninth Circuit has remanded *with* vacatur when allowing the invalid rule to remain in place would lead to environmental harm. Thus, in *Pollinator Stewardship Council*, the court vacated the EPA's invalid Federal Insecticide, Fungicide, and Rodenticide Act registration of sulfoxaflor because of the threat to bee populations. 806 F.3d at 532.

Here, vacating the NWPR would not result in environmental harm; rather, as the Agencies now recognize, continued application of the NWPR will result in unpermitted discharges of pollutants to waters previously protected by the Clean Water Act. *See* Pinkham Decl. ¶¶ 15-16; Fox Decl. ¶¶ 15-16. The Agencies report that "[o]f the 40,211 individual aquatic resources or water features for which the Corps made approved jurisdictional determinations under the NWPR between June 22, 2020 and April 15, 2021, approximately 76% were found to be non-jurisdictional." Pinkham Decl. ¶ 15; Fox Decl. ¶ 15. Accordingly, projects negatively affecting the integrity of the Nation's waters are moving forward with no or limited federal review.[10]

The NWPR's impact in western states has been severe: "nearly every one" of more than 1,500 streams assessed are non-jurisdictional under the NWPR. Pinkham Decl. ¶ 16; Fox Decl. ¶ 16. These findings are consistent with the results of the Saint Mary's CWA Jurisdictional Scenario Model, discussed in the Scientific Societies Brief, and peer-reviewed scientific literature. *See* Kurt A. Fesenmyer et al., *Large portion of USA streams lose protection with new interpretation of Clean Water Act*, 40 Freshwater Sci. (published online Feb. 10, 2021) (finding that approximately 50% of the nation's total stream miles are no longer protected under the Clean Water Act as a result of the NWPR) (attached as Exhibit A). In light of these impacts to aquatic resources and the public interest, equity favors vacatur of the NWPR.

---

[10] *E.g.*, *Proposed Arizona mine passes federal regulatory hurdle*, AP News (Mar. 26, 2021), https://apnews.com/article/technology-arizona-army-tucson-6a5e300936ae7073600d639f9929467b (reporting that "the U.S. Army Corps of Engineers decided that the [Rosemont mining] project no longer needs a Clean Water Act permit"); Steven Munson & Desmond Butler, *Trump rule eases effort to strip-mine near Okefenokee Swamp*, The Washington Post (Nov. 25, 2020), https://www.washingtonpost.com/climate-environment/trump-rule-eases-effort-to-strip-mine-near-okefenokee-swamp/2020/11/25/84ed10ba-229a-11eb-a688-5298ad5d580a_story.html (reporting that the Corps concluded that it "lacked jurisdiction over 376 acres of land within the mining site" on the edges of the Okefenokee National Wildlife Refuge).

1

**CONCLUSION**

2          The Navigable Waters Protection Rule eliminates Clean Water Act protection for many

3   aquatic ecosystems, thereby causing irreparable harm to all Americans who benefit from and rely

4   on the integrity of the Nation's waters. Science alone does not dictate Clean Water Act policy, but

5   it is a critical cornerstone. The Agencies ignored available scientific tools and data, failing to

6   consider the extent to which their actions reduced Clean Water Act jurisdiction and the extent to

7   which the reduction in Clean Water Act jurisdiction would negatively affect water quality. As

8   such, and for the foregoing reasons, *Amici Curiae* respectfully request that this Court grant a

9   remand with vacatur.

10   Dated:     August 27, 2021                     Respectfully submitted,

11   By:  */s/ Demarcus Williams*                   By:  */s/ Royal C. Gardner*
     Demarcus Williams (SBN 329756)                 Royal C. Gardner*
12   WHITE & CASE LLP                                Erin Okuno*
     3000 El Camino Real                             STETSON UNIVERSITY
13   2 Palo Alto Square, Suite 900                   COLLEGE OF LAW
     Palo Alto, CA 94306-2109                        INSTITUTE FOR BIODIVERSITY LAW
14   650-213-0327                                     AND POLICY**
     650-213-8158 (fax)                              1401 61st Street South
15   demarcus.williams@whitecase.com                 Gulfport, FL 33707
                                                     727-562-7864
16   By:  */s/ Christopher W. Greer*                 gardner@law.stetson.edu
     Christopher W. Greer*
17   WHITE & CASE LLP                                By:  */s/ Kathleen E. Gardner*
     1221 Avenue of Americas                         Kathleen E. Gardner*
18   New York, NY 10020-1095                         SHEARMAN & STERLING LLP
     212-819-2593                                    599 Lexington Avenue
19   chris.greer@whitecase.com                       New York, NY 10022-6069
                                                     212-848-5373
20                                                   kathleen.gardner@shearman.com

21   Attorneys for *Amici Curiae*

22   *Admitted *pro hac vice*

23   **Affiliation of counsel is provided for identification purposes only.

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**APPENDIX A**

**Descriptions of *Amici Curiae***

The **American Fisheries Society (AFS)** is the world's oldest and largest organization dedicated to strengthening the fisheries profession, advancing fisheries science, and conserving fisheries resources. AFS has over 8,000 members from around the world, including fisheries managers, biologists, professors, ecologists, aquaculturists, economists, engineers, geneticists, and social scientists. AFS promotes scientific research and sustainable management of fisheries resources. The organization publishes five of the world's leading fish journals and many renowned books, organizes scientific meetings, and encourages comprehensive education and professional development for fisheries professionals.

The **Association for the Sciences of Limnology and Oceanography (ASLO)** has been the leading professional organization for researchers and educators in the field of aquatic science for more than 60 years. ASLO's purpose is to foster a diverse, international scientific community that creates, integrates, and communicates knowledge across the full spectrum of aquatic sciences, advances public awareness and education about aquatic resources and research, and promotes scientific stewardship of aquatic resources for the public interest.

The **Coastal and Estuarine Research Federation (CERF)** is a multidisciplinary organization of individuals who study and manage the structure and functions of estuaries and the effects of human activities on these environments. CERF's members are dedicated to advancing human understanding and appreciation of estuaries and coasts worldwide, to the wise stewardship of these ecosystems, and to making the results of their research and management actions available to their colleagues and to the public.

The **International Association for Great Lakes Research (IAGLR)** is a scientific organization made up of researchers with a mission to advance understanding of the world's great lake ecosystems. IAGLR promotes all aspects of large lakes research and communicates research findings through publications and meetings. Its members encompass all scientific disciplines with a common interest in the management of large lake ecosystems on many levels. IAGLR's *Journal of Great Lakes Research* is a peer-reviewed publication with broad distribution.

The **North American Lake Management Society (NALMS)** is a non-profit organization of professionals and citizens. Founded in 1980, its mission is to forge partnerships among citizens, scientists, and professionals to foster the management and protection of lakes and reservoirs for today and tomorrow. NALMS seeks to identify needs and encourage research on lake ecology and watershed management, facilitate the exchange of information on aspects of managing lakes and their watersheds, promote public awareness of and encourage public support for management of lake ecosystems, offer guidance to agencies involved in management activities for lakes and their watersheds, and provide a forum for professional development and training.

The **Phycological Society of America (PSA)** was founded in 1946 to promote research and teaching in all fields of phycology. PSA publishes the *Journal of Phycology*, the premier journal of research on phycology, and the *Phycological Newsletter*. PSA holds annual meetings, often jointly with other national or international societies of mutual member interest. The society also provides grants and fellowships to graduate student members.

The **Society for Ecological Restoration (SER)** is a leading international organization working to advance the science, practice, and policy of ecological restoration. Founded in 1988, SER works at the international, regional, and national levels, partnering with government agencies, intergovernmental organizations, NGOs, and the private sector to advance the science, practice,

and policy of ecological restoration for the benefit of biodiversity, ecosystems, and humans. SER publishes the peer-reviewed bimonthly journal *Restoration Ecology*, as well as other resources and guidance regarding ecological restoration. SER has more than 4,000 members across the world including researchers, practitioners, decision-makers, indigenous people, and community leaders; its members are actively engaged in the ecologically sensitive repair and recovery of degraded ecosystems, including wetlands, rivers, and all types of freshwater and marine ecosystems.

The **Society for Freshwater Science (SFS)** is an international organization whose purpose is to promote further understanding of freshwater ecosystems (rivers, streams, lakes, reservoirs, and estuaries) and ecosystems at the interface between aquatic and terrestrial habitats (wetlands, bogs, fens, riparian forests, and grasslands). Its members study freshwater organisms, biotic communities, physical processes that affect ecosystem function, linkages between freshwater ecosystems and surrounding landscapes, habitat and water quality assessment, and conservation and restoration. SFS fosters the exchange of scientific information among its membership and with other professional societies, resource managers, policymakers, educators, and the public. The organization advocates for the use of best available science in policymaking and management of freshwater ecosystems.

The **Society of Wetland Scientists (SWS)** is a leading professional association of wetland and aquatic scientists around the world, including the United States. Established in 1980, SWS advances scientific and educational objectives related to wetland science and encourages professional standards in all activities related to wetland science. The society has over 3,000 members and publishes a peer-reviewed quarterly journal, *Wetlands*, concerned with all aspects of wetland biology, ecology, hydrology, water chemistry, soil, and sediment characteristics. SWS supports the use of the best available scientific information in making decisions on the use and management of wetland and aquatic resources.

13